IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LISA M. HICE and LEANN D. HOFF, as Co-Administrators of the Estate of Marvin G. May, deceased,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>TURN KEY HEALTH CLINICS LLC, et al.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. CIV-24-00119-JD |

## ORDER

Before the Court are Defendants Turn Key Health Clinics, LLC's ("Turn Key") Motion to Dismiss [Doc. No. 14], Tamara Carey's ("Carey") Motion to Dismiss [Doc. No. 22], Stacia Unruh's ("Unruh") Motion to Dismiss [Doc. No. 38], responses and replies on the motions to dismiss [Doc. Nos. 28, 29, 30, 32, 45, 46], two Reports and Recommendations issued by United States Magistrate Judge Suzanne Mitchell [Doc. Nos. 42, 49], and objections filed by Turn Key, Carey, and Unruh [Doc. Nos. 47, 48, 50]. For the following reasons, and upon its de novo review in accordance with Federal Rule of Civil Procedure 72(b)(3), the Court denies the Motions to Dismiss and accepts the Reports and Recommendations.

**I.　BACKGROUND**

Marvin May ("May") was a pretrial detainee at Custer County Jail ("CCJ"). Turn Key, a third-party contractor, was responsible for providing all the medical care at CCJ. When May was booked on January 25, 2022, he was 74 years old and weighed 275

pounds. He suffered from multiple medical conditions, including chronic obstructive pulmonary disease ("COPD"), diabetes mellitus, cardiovascular disease, and Alzheimer's disease.

Although she did not work at CCJ in person, Carey was one of the individuals responsible for overseeing May's medical care. On February 3, 2022, Carey met with May via a telemedicine appointment. Carey's "chronic care note" documented that May suffered from hypertension, hypersensitivity lung disease, COPD, diabetes mellitus, rheumatoid arthritis, and "worsening Alzheimer's disease." [Doc. No. 1 at 6]. She also noted that May had not showered or eaten in seven days. Carey took no further action beyond scheduling a follow-up visit for ninety days later.

Unruh, a licensed practical nurse, was responsible for overseeing May's health, assuring that his medical needs were met, and reporting even minor changes in May's condition to a registered nurse or other medical professional during the time he was in custody at CCJ. During this time, Unruh documented that May's blood pressure dropped to eighty, seventy-nine, seventy-eight, and seventy. She also recorded that he had a diastolic blood pressure as low as fifty. As the days went on, May began to audibly gasp for air and display signs of shortness of breath. Since May laid in the same position for hours, he developed bed sores on his body. He also became incontinent and continued to refuse to eat. Unruh was aware of May's physical and mental deterioration but did not attempt to provide or obtain medical care.

On March 18, 2022, May fell out of his bed and was later found lying in his own feces and unresponsive on the floor. A dispatch officer called 911. EMS transported May

2

to the hospital where he was diagnosed with cardiorespiratory arrest and acute renal failure. He died a few hours later. The medical examiner determined May's probable cause of death was COVID-19. At the time of his death, May weighed 224 pounds, approximately fifty pounds less than when he was booked at CCJ fifty-two days earlier.

The Estate sued Defendants for Eighth Amendment violations under 42 U.S.C. § 1983. It also brought a negligence claim against Turn Key.

## II.  LEGAL STANDARD

Rule 12(b)(6) dismissal 'is appropriate if the complaint alone is legally insufficient to state a claim.'" *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1169 (10th Cir. 2023) (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017)). The Court must "view the allegations and all reasonable inferences in favor of the plaintiffs." *Hubbard v. Okla. ex rel. Okla. Dep't of Hum. Servs.*, 759 F. App'x 693, 696 (10th Cir. 2018) (unpublished).

In considering a motion to dismiss under Rule 12(b)(6), the inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Woodard*, 912 F.3d 1278, 1299 (10th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "whether a complaint states a plausible claim for

relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678, 679.

### III. ANALYSIS

Turn Key, Carey, and Unruh argue the Reports and Recommendations incorrectly deny their motions. They contend neither Carey nor Unruh violated May's constitutional rights and that the Estate has failed to plausibly allege municipal liability against Turn Key.

### A. The Estate plausibly alleged Eighth Amendment claims against Carey and Unruh.

"[D]eliberate indifference to serious medical needs of prisoners constitutes" an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To establish an Eighth Amendment claim based on inadequate medical care, the prisoner must prove both an objective component and a subjective component." *Redmond v. Crowther*, 882 F.3d 927, 939 (10th Cir. 2018). "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. In addition, under the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006) (citations omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Here, Defendants do not argue that May's death was not objectively serious.

For the subjective component, officials must know of and disregard "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

4

harm exists, and he must also draw the inference." *Id.* "In addition, [defendants] who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A [defendant's] duty under the Eighth Amendment is to ensure 'reasonable safety'. . . ." *Id.* at 844 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). More specifically, "the subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ('failure to properly treat theory') or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ('gatekeeper theory')." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023).

For the failure to properly treat theory, courts consider whether "[t]he patient's medical issue obviously required 'additional medical care and referral.'" *Id.* at 1138 (quoting *Self*, 439 F.3d at 1232). For example, if "a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, *e.g.*, a gangrenous hand or a serious laceration," the subjective component of the failure to properly treat theory would be met. *Self*, 439 F.3d at 1232. However, "'a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation . . . .'" *Id.* at 1231 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001)).

For the gatekeeper theory, courts consider whether the medical professional has "fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Lucas*,

5

58 F.4th at 1139. "'[A] good faith effort to diagnose and treat [the inmate's] medical condition'" will satisfy this obligation; "'completely refus[ing] to assess or diagnose' the potential . . . emergency" will not. *Self*, 439 F.3d at 1232 (second brackets in *Self* and first and third brackets and ellipses added) (quoting *Mata v. Saiz*, 427 F.3d 745, 761, 758 (10th Cir. 2005)).

Carey evaluated May and was aware that he suffered from hypertension, hypersensitivity lung disease, COPD, diabetes mellitus, rheumatoid arthritis, and Alzheimer's disease. She also knew that May had not showered or eaten in seven days. And, taking all reasonable inferences in favor of the Estate, Carey knew she had a duty to order treatment from an additional medical provider as necessary. Yet, in response to May's symptoms, she only scheduled a follow-up appointment in ninety days. This is not a mere misdiagnosis. *Id.* at 1231 ("[A] prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation . . . ."). Instead, Carey essentially declined to provide May with care for the next three months or refer him to a physician. This response to May's infirmity was "patently unreasonable" because, given May's age, condition, and symptoms, he presented her "with recognizable symptoms" which could "potentially create a medical emergency." *Id.* at 1232. Thus, Carey failed to properly treat May and delayed (or refused) to fulfill her gatekeeper role.

Unruh was tasked with monitoring and caring for May and knew of his deteriorating condition. Specifically, Unruh was aware of May's worsening blood pressure, breathing issues, bed sores, and incontinence. However, there are no allegations that Unruh did anything in response to these conditions from February 3, 2022, to March

6

18, 2022. She did not provide care or refer May to another provider. By failing to exercise any kind of medical judgment in response to May's symptoms, Unruh failed to properly treat May or fulfill her gatekeeper role. *See Lucas*, 58 F.4th at 1138 ("The patient's medical issue obviously required 'additional medical care and referral' and because the [provider] delayed addressing that need, he did not commit mere malpractice but rather consciously disregarded substantial risk to the inmate.").

### B.     The Estate plausibly alleged an Eighth Amendment claim against Turn Key.

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis omitted) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978)). "[A] plaintiff seeking to impose liability on a municipality under § 1983" must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."[1] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

---

[1] "[T]o establish municipal liability, a plaintiff must first demonstrate a 'municipal policy or custom,' which may take one of the following forms: '(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

An entity is not liable under § 1983 "unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (emphasis omitted). "For individual defendants, the applicable state of mind will depend on the type of constitutional violation at issue. In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 n.5 (10th Cir. 2013) (citations omitted). Thus, "to hold a municipality liable, a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs.*, 32 F.4th 1246, 1253 (10th Cir. 2022).

For the first element, the Estate alleges Turn Key has an established custom of not testing inmates for COVID-19, even when a test is clearly required, in order to avoid the significant costs of outside medical treatment and possible outbreaks. It also states that Turn Key fails to train its medical staff on how to assess and care for inmates with complex or serious medical needs, such as COVID-19.

For the second element, the Estate alleges May died from COVID-19 and that Turn Key's custom of not testing for COVID-19 to save money is the reason May was not tested for the virus. It explains that Turn Key's failure to adequately train its employees resulted in their inability to care for May and ultimately resulted in his death.

For the third element, the Estate has provided numerous allegations of other incidents in which detainees at Turn Key facilities have experienced injuries similar to May's as a result of Turn Key's failure to adequately train or supervise its employees. And more specifically, the Complaint includes allegations regarding three other COVID-19 related deaths that have occurred at Turn Key facilities.

These facts plausibly allege that Turn Key's customs and training regarding treating and caring for patients with COVID-19 caused May's death and that Turn Key was deliberately indifferent to the risk of that injury occurring. Since the Estate has plausibly alleged (1) the necessary elements for municipal liability and (2) that Carey and Unruh violated May's constitutional rights, the Complaint is legally sufficient to state a claim for relief.[2] *See Crowson*, 983 F.3d at 1186 ("[I]t is important to begin with the Supreme Court's direction in *Collins v. City of Harker Heights* that 'proper analysis requires us to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and

---

[2] The Court acknowledges that the Report and Recommendation briefly addresses the parties' systemic failure arguments. For cases involving constitutional claims against municipalities, systemic failure can serve as the underlying constitutional violation "where no individual action by a single [individual] rises to a constitutional violation" but the sum of several [individuals'] "actions nonetheless violate the plaintiff's constitutional rights." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020); *see also Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1144 (10th Cir. 2023) ("[I]t was error for the district court to not consider a systemic failure as the underlying constitutional violation."). Since this Court agrees with the Reports and Recommendations that Carey and Unruh (allegedly) violated May's constitutional rights, it does not address whether, in the alternative, May's rights were violated via systemic failure.

(2) if so, whether the [municipality] is responsible for that violation.' The absence of an affirmative answer to either of these questions is fatal to a claim against the municipality." (citation omitted) (quoting 503 U.S. 115, 120 (1992))).

      **C.**    **The Court declines to dismiss the Estate's negligence claim against Turn Key.**

The parties dispute whether Turn Key is entitled to immunity under the Oklahoma Governmental Tort Claims Act ("OGTCA"). Okla. Stat. tit. 51, § 151, *et seq*. Turn Key argues that the Oklahoma Supreme Court's opinion in *Barrios* addressed this issue, and that it is entitled to immunity as a result. *Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 432 P.3d 233, 241 (Okla. 2018). The Estate argues that Turn Key is not entitled to immunity because it is not covered under the OGTCA's definition of "employee."

"An employee of the state or its political subdivision who operates or maintains a jail or correctional facility is exempt from state tort liability under the OGTCA." *Lucas*, 58 F.4th at 1147 (citing Okla. Stat. tit. 51, § 155(25)). The term "employee" includes "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." Okla. Stat. tit. 51, § 152(7)(b)(7).

"In a footnote in *Barrios v. Haskell County Public Facilities Authority*, 432 P.3d 233, 236 n.5 (Okla. 2018), the Oklahoma Supreme Court stated, 'Generally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the [O]GTCA.'" *Bond v. Regalado*, No. 22-5065, 2023 WL 7014047, at *3 (10th Cir. Oct. 25, 2023) (unpublished). However, district courts have been instructed that, on a

10

motion to dismiss, it is "premature" to determine whether healthcare contractors and prison doctors, nurses, etc. "[are] entitled to immunity based on *Barrios*'s non-binding legal assumption, which was decidedly not an express statement of law." *Lucas*, 58 F.4th at 1148. Instead, the "proper route" for district courts to take "is to determine the OGTCA's applicability to private corporations — and their employees — that contract with the state to provide medical services at the summary judgment stage if the factual record is sufficiently developed and the facts are uncontroverted." *Id.*

Thus, the Court determines that the Estate's allegations do not conclusively establish that Turn Key is entitled to immunity under the OGTCA. Based on the Tenth Circuit's instruction in *Lucas*, the Court declines to dismiss the negligence claims against Turn Key on this ground at the pleading stage.

## IV.   CONCLUSION

For these reasons, the Court ACCEPTS the recommendations of the Reports and Recommendations. [Doc. Nos. 42, 49]. Consequently, the Court DENIES Defendants' Motions to Dismiss. [Doc. Nos. 14, 22, 38].

IT IS SO ORDERED this 3rd day of September 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE