IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased, and
(2) LEANN D. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

Plaintiffs,

v.

(1) TURN KEY HEALTH CLINICS, LLC,
(2) TAMARA CAREY, APRN,
(3) STACIA UNRUH, LPN,
(4) CUSTER COUNTY SHERIFF, in his official capacity, and
(5) JULIE WARNKE,

Defendants.

Case No. CIV-24-119-JD

JURY TRIAL DEMANDED

**DEFENDANT JULIE WARNKE'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Jordan L. Miller, OBA No. 30892
COLLINS ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
Email: jlm@czwlaw.com

***ATTORNEY FOR DEFENDANTS SHERIFF OF CUSTER COUNTY, IN HIS OFFICIAL CAPACITY, AND JULIE WARNKE***

October 30, 2025

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii-iii

LIST OF EXHIBITS ........ iv-v

MOTION TO DISMISS AND BRIEF IN SUPPORT ........ 1

STATEMENT OF THE CASE ........ 1

STATEMENT OF MATERIAL FACTS ........ 2

ARGUMENT AND AUTHORITY, STANDARD OF REVIEW ........ 13

I. WARNKE IS ENTITLED TO QUALIFIED IMMUNITY ........ 14

II. WARNKE DID NOT VIOLATE MAY'S CONSTITUTIONAL RIGHTS ........ 17

CONCLUSION ........ 29

CERTIFICATE OF SERVICE ........ 31

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) .......... 14
*Anderson v. Creighton*, 483 U.S. 635 (1987) .......... 15-16
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 13
*Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) .......... 17
*Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997) .......... 18
*Brosseau v. Haugen*, 543 U.S. 194 (2004) .......... 16
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 13
*Conaway v. Smith*, 853 F.2d 789 (10th Cir. 1988) .......... 14
*Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994) .......... 14
*Estelle v. Gamble*, 429 U.S. 97 (1976) .......... 17
*Gross v. Pirtle*, 245 F.3d 1151 (10th Cir. 2001) .......... 14
*Hall v. Bellmon*, 935 F.2d 1106 (10th Cir. 1991) .......... 14
*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .......... 14
*Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) .......... 18-19
*Kisela v. Hughes*, 584 U.S. 100 (2018) .......... 16
*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) .......... 18-19
*Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001) .......... 15
*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996) .......... 15
*Mitchell v. Forsyth*, 472 U.S. 511 (1985) .......... 14
*Mullenix v. Luna*, 577 U.S. 7 (2015) .......... 16
*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999) .......... 15
*Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272 (10th Cir. 2001) .......... 18
*Paugh v. Uintah County*, 47 F.4th 1139 (10th Cir. 2022) .......... 17
*Pearson v. Callahan*, 555 U.S. 223 (2009) .......... 14
*Reichie v. Howards*, 566 U.S. 658 (2012) .......... 16
*Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464 (D. Colo. 1996) .......... 14
*Saucier v. Katz*, 533 U.S. 194 (2001) .......... 14-15

*Strain v. Regalado*, 977 F.3d 984 (10th Cir. 2020) ........................................................ 17
*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008) ........................................................... 19
*White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) ........................ 16
*Ziglar v. Abbasi*, 582 U.S. 120 (2017) ............................................................................ 16

**Statutes**

42 U.S.C. § 1983 ............................................................................................................ 17

**Rules**

Fed. R. Civ. P. 56 (a) .................................................................................................. 1, 13

# LIST OF EXHIBITS

| | |
|---|---|
| Exhibit 1: | Canadian County Booking Sheet |
| Exhibit 2: | Mahmood Records |
| Exhibit 3: | Canadian County Turn Key Records |
| Exhibit 4: | Deposition of Leann Hoff |
| Exhibit 5: | Deposition of David Hoff |
| Exhibit 6: | Deposition of Sheriff Daniel Day |
| Exhibit 7: | Deposition of Tamara Carey |
| Exhibit 8: | Deposition of Stacia Unruh |
| Exhibit 9: | Integris January 9, 2022 Records |
| Exhibit 10: | Failure to Appear Warrant Custer County |
| Exhibit 11: | Canadian County Release Sheet |
| Exhibit 12: | Custer County Booking/Release Sheet |
| Exhibit 13: | January 25, 2022 Medical Questionnaire/COVID Screening |
| Exhibit 14: | Custer County Turn Key Records |
| Exhibit 15: | Deposition of Julie Warnke |
| Exhibit 16: | Custer County Medication Administration Records |
| Exhibit 17: | All Warnke Incident and Jail Entry Reports |
| Exhibit 18: | Deposition of Brayan Alvarado |
| Exhibit 19: | Foster Grievance |
| Exhibit 20: | First Call from Diaz |
| Exhibit 21: | Second Call from Diaz |
| Exhibit 22: | Deposition of Teofilo Diaz |
| Exhibit 23: | Visitors Log |

Exhibit 24: Criminal Court Records

Exhibit 25: Oklahoma Forensic Center Admission Sheet

Exhibit 26: Combined video clip of March 18 incident

Exhibit 27: Alliance Health ER Records

Exhibit 28: ME Report

Exhibit 29: Feb. 8 E-mail from Crabtree to Edwards

Exhibit 30: Deposition of David Crabtree

Exhibit 31: Deposition of Martha Stanford

Exhibit 32: Deposition of Lisa Hice

**DEFENDANT JULIE WARNKE'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant Julie Warnke ("Warnke"), in her individual capacity, hereby moves this court for summary judgment in her favor, pursuant to Fed. R. Civ. P. 56 (a). Warnke is not liable for the deliberate indifference claim brought against her by Plaintiffs Lisa Hice and Leann Hoff, as Co-Administrators of the Estate of Marvin May ("May"), for the reasons discussed in the following brief.

**BRIEF IN SUPPORT**

**STATEMENT OF THE CASE**

This case arises from the detention of Marvin May ("May") in the Custer County Jail ("the jail") from January 25, 2022, until his transport to the hospital on March 18, 2022, where he passed away. May was diagnosed with Alzheimer's in 2021. Although his family was aware of his condition and knew he needed to be in an assisted living facility, they chose not to place him in one. Despite knowing her father needed to be in assisted living, when May was arrested in January 2022, and taken to the Canadian County Jail, his daughter and her husband additionally purposely decided not to bail him out because they did not want to be responsible for the full cost of his bond if he did not show up for court. When May was taken from the Canadian County Jail to the Custer County Jail on an outstanding warrant, they again purposely decided not to bail him out from Custer County for the same reason.

During his detention in the Custer County Jail, May never exhibited any symptoms of COVID-19 and he was housed in a single cell for the vast majority of his detention,

which lessened his risk of exposure to COVID-19. While he was detained there, he had access to Turn Key Health Clinics medical providers. He was seen by LPN Stacia Unruh at least three times and was evaluated by Turn Key APRN Carey once. Neither provider believed he was experiencing a medical emergency or that he needed to be taken to the hospital. Jail staff, including medical officer Warnke, were aware that jail was not a suitable long-term environment for May and took the only steps they reasonably could to obtain a release for May. However, they too did not observe any signs of May having a medical emergency until March 18. Although May sometimes refused meals, he was offered Ensure shakes in accordance with nursing home standard practices, and the rapid weight loss he experienced both before his incarceration and at Canadian County drastically slowed.

On March 18, May fell from his bunk and was taken to the hospital, where he passed away from COVID-19. Although his family accepted a $9,000.00 payment from FEMA for May having died from COVID and there is no indication May passed from Alzheimer's dementia, malnutrition, or dehydration, they have sued Warnke and other Defendants for deliberate indifference to May's serious medical needs, alleging that May's Alzheimer's and dementia constituted a medical emergency prior to March 18. Warnke now seeks summary judgment on Plaintiffs' deliberate indifference claim against her.

## STATEMENT OF MATERIAL FACTS

1. Marvin May ("May") was arrested and booked into the Canadian County Jail on January 5, 2022. (Ex. 1, Canadian County Booking Sheet).

2. Medical Records show that before he was booked into Canadian County, May, who was obese, had been losing weight over the previous year. He weighed 286 lbs. in March

2021, and 260 lbs. on January 6, 2022. (Ex. 2, Dr. Mahmood 3/4/2021 Records, p. 2; Ex. 3, Canadian County Turn Key Records, p. 1).

3. May called his daughter Leann Hoff ("Hoff") from the Canadian County Jail and asked her to bail him out. She agreed, but never bailed him out, never visited him there, and never spoke to her father again. Hoff and her husband thought jail was the safest spot for him to be and did not want to be responsible for paying the full bail amount if May did not show up for court. (Ex. 4, Depo of Leann Hoff, 50:8-51:11, 52:4-55:12; Ex. 5, Depo of David Hoff, 36:23-38:18, 51:3-19).

4. Prior to his arrest, the Hoffs were aware that May needed to be in an assisted living facility. However, the facilities are expensive and they were not sure who would pay for that, so they did not move him into one. (Ex. 5, 44:24-48:17).

5. In early 2022, Turn Key was the medical provider for both the Canadian County and Custer County Jails. (Ex. 6, Depo of Sheriff Day, 27:16-10; Ex. 7, Depo of Tamara Carey, 20:11-19, 22:6-15; Ex. 8, Depo of Stacia Unruh, 56:19-57:16).

6. While May was at Canadian County, he was seen by Turn Key medical staff, including APRN Tamara Carey ("APRN Carey"). At that time, he was already using a wheelchair and had Alzheimer's. (Ex. 3, Canadian Co. Turn Key Records, pp. 1-41; Ex. 7, 11:14-23, 20:11-19, 24:20-25:1, 32:13-34:11, 37:2-5, 49:17-50:6, 149:5-8; Ex. 15, Depo of Julie Warnke, 34:1-7).

7. May was taken to the emergency room from the Canadian County Jail on January 9, 2022, for chest pain, diagnosed with costochondritis (muscle pain in the chest) and released back to Canadian County. There is no indication the ER doctors believed his

dementia or weight loss was a medical emergency. (Ex. 3, pp. 29-41; Ex. 9, Jan. 9 ER Records, pp. 2, 5, 9-30).

8. May lost a total of twenty (20) pounds during the 19 days he was in the Canadian County jail. (Ex. 3, p. 1; Ex. 14, Custer County Turn Key Records, p. 19).

9. Due to an outstanding warrant in Custer County, May was transported to the Custer County Jail ("the jail") on January 25, 2022, after he was released from Canadian County. (Ex. 10, Custer Co. Warrant; Ex. 11, Canadian Co. Release Sheet; Ex. 12, Custer Co. Booking/Release Sheet).

10. The Hoffs were aware May was transported to Custer County but chose not to bail him out (or even call or visit) for the same reasons they did not bail him out from Canadian County: they felt jail was the safest place for him to be and did not want to be responsible for paying the full bail amount if May did not show up for court. His family never called or visited him at the jail. (Ex. 5, 36:23-38:18, 51:3-19; Ex. 15, 110:8-12; Ex. 23).

11. The Custer County Jail contracted with Turn Key to provide medical staffing and services to the jail. A nurse staffed the jail two days per week, but Turn Key providers were on call 24/7 so jail staff could contact them at any time whether the nurse was at the jail or not. (Ex. 15, 78:8-80:5; Ex. 31, Depo. of Martha Stanford, 62:12-22, 64:11-17).

12. When May came into the jail, his paperwork did not list a next of kin. (Ex. 30, Depo of David Crabtree, 130:10-14).

13. The nurse staffing the Custer County Jail at that time was Stacia Unruh ("Unruh"), who was employed by Turn Key as a licensed practical nurse (LPN). Turn Key APRN Tamara Carey saw inmates on Thursdays but was on call for Unruh or jail personnel to

contact 24/7. APRN Martin was also one of the on call providers. (Ex. 7, 16:25-17:19, 19:17-20:10; Ex. 8, 12:7-9, 38:9-16, 48:1-8, 133:12-134:6; Ex. 15, 23:9-13, 78:8-80:5).

14. The jail employed Julie Warnke ("Warnke") as its medical officer. Warnke had been certified as a Certified Nursing Assistant in 2001, and as a Certified Medication Aide in 2009. She worked in a nursing home and assisted living facility before beginning her career in corrections. (Ex. 15, 7:25-9:11, 10:16-25, 11:14-18, 21:22-22:16, 70:8-22, 74:15-75:24).

15. Warnke had eight years of experience taking care of patients with Alzheimer's and dementia, including patients in a memory care unit before coming to work at the jail. (Ex. 15, 70:8-71:13).

16. As the medical officer, Warnke was responsible for helping set up for the Turn Key nurse during her patient visits, checking vital signs and blood sugar, and pulling medical charts if needed. She was the liaison between the jail and Turn Key. (Ex. 15, 22:4-23:2; Ex. 31, 15:23-16:11).

17. However, Warnke herself was not a medical provider. (Ex. 31, 40:5-11).

18. When May was booked into the jail on January 25, he underwent a COVID-19 screening which was unremarkable, and was asked medical questions from the medical questionnaire. His weight was recorded as 240 lbs. at that time. (Ex. 13; Ex. 14, p. 19).

19. Because Turn Key had previously provided care to him at Canadian County, May arrived at the facility with a box of medications and began receiving his medications immediately at Custer County. (Ex. 15, 82:10-84:5; Ex. 16, Custer Co. Medication Administration Records, pp. 1-2).

20. Nurse Unruh conducted an intake screening of May on January 27. (Ex. 8, 143:11-16; Ex. 14, pp. 19-27).

21. On February 2, Bryce Foster, a cellmate of May's, informed jail staff via a grievance that May had not eaten for several days and was refusing to shower. (Ex. 15, 31:15-32:7, 93:11-94:1; Ex. 17, Warnke Incident Reports, p. 2-3; Ex. 18, Depo of Brayan Alvarado, 20:2-23; Ex. 19, Foster Grievance).

22. The same day, February 2, Warnke had May moved to a single cell in the booking area near the medical office with a shower so officers could keep a closer eye on him and make sure he was eating. (Ex. 15, 26:1-16, 32:8-13, 33:9-18, 94:10-95:10; Ex. 17, p. 2-3).

23. Placing May in the single cell in the booking area had the added benefit of May being exposed to fewer people who could possibly give him COVID. (Ex. 15, 90:20-91:6).

24. May was seen in person by Nurse Unruh and by APRN Carey via a telemedicine visit on February 3, the following day. Carey noted that he had not eaten or showered for seven (7) days and that he was suffering from worsening Alzheimer's disease. (Ex. 7, 27:20-29:25, 32:13-33:11, 37:18-39:23; Ex. 8, 68:4-25, 130:11-133:11; Ex. 14, p. 35-36).

25. Although APRN Carey contacted Adult Protective Services about what would happen when May was released from jail, she did not believe he was having a medical or mental health emergency or that he needed to go to the hospital due to not eating or for any other reason. She scheduled May to be seen again for a follow up in *90 days*. (Ex. 7, 34:11-35:13, 38:1-20, 41:4-14, 48:6-51:2, 52:10-53:3, 56:13-57:20, 140:7-142:6; Ex. 8, 134:7-15; Ex. 14, pp. 35-36).

26. After May's telemedicine visit with APRN Carey, Warnke and jailer Angie Schmidt ("Schmidt") decided to call May's criminal defense attorney Teo Diaz ("Diaz") at OIDS the same day. They wanted Diaz to come check on May and do something to get him out of the jail. (Ex. 15, 98:4-99:9).

27. Schmidt left a message for Diaz at OIDS. Diaz called back and spoke with Warnke and then Schmidt. They told him APRN Carey had spoken to Adult Protective Services about May and advised him May needed to get to court faster because he was not accepting the meals or supplement shakes the jail was offering him. (Ex. 15, 99:10-100:16; Ex. 20, Audio Recording of First Call from Diaz).

28. Diaz told them he could move May's court date up if the judge and district attorney agreed. Warnke and Schmidt told Diaz that May had dementia and that he needed to be in a nursing home when he gets out. Diaz asked whether May needed to be taken to the emergency room and they told him the Turn Key nurse (Unruh) had seen May that morning but neither Unruh nor Carey said anything about sending May to the hospital. (Ex. 20).

29. Diaz said unless there was a medical emergency they needed a medical provider's order to take May to the ER. He told them it was up to the doctor and the nurse what to do about May's medical condition. (Ex. 15, 100:17-101:6; Ex. 20).

30. Shortly thereafter, Diaz called back and told Schmidt that he would come see May when the weather clears up, but there is no record of Diaz ever visiting May while he was detained at the jail. (Ex. 15, 102:9-16; Ex. 21, Audio Recording of Second Call From Diaz; Ex. 22, 33:23-39:25, 76:1-3; Ex. 23, Visitors Log).

31. Shortly after Warnke moved May to the booking area, she arranged for him to meet with her and Undersheriff David Crabtree ("Crabtree"). Crabtree encouraged him to shower and drink a protein shake. May did shower and drink some of the shake. (Ex. 15, 25:10-26:23; Ex. 30, 63:21-64:15).

32. At the time, Crabtree was the acting Jail Administrator and Lt. Martha Stanford ("Stanford"), as the highest-ranking detention officer at the jail, was overseeing the day-to-day operations of the jail. (Ex. 30, 16:10-17:22; Ex. 31, 15:1-22).

33. Crabtree followed up with Warnke and Stanford on February 7, or 8, to find out how May was doing. When he was told May was not improving, he went across the street to the courthouse and spoke with the first assistant district attorney about May. (Ex. 30, 35:12-36:25, 70:9-71:6).

34. He told the ADA that May had not been eating or bathing and potentially had Alzheimer's or dementia. He told the ADA May did not belong in the jail and needed a medical OR bond, but the district attorney's office never approved an OR bond. The ADA told Crabtree they were going to get him a mental competency evaluation. (Ex. 15, 103:9-104:11; Ex. 30, 36:1-25, 127:11-128:18).

35. In response to Barry Edwards at the Oklahoma Department of Health contacting the jail about APRN Carey's report to Adult Protective Services about May, on February 8, Crabtree e-mailed Edwards that he had met with the ADA about May and that the district attorney was going to look into the matter. (Ex. 29, Feb. 8 E-mail Chain).

36. After his first conversation with the ADA, Crabtree believes he followed up on the district attorney's office's efforts to get May evaluated. (Ex. 30, 71:7-73:24).

37. On February 9, May's criminal attorney Diaz filed an Immediate Application for Determination of Competency in May's criminal case. The application requested May be committed to the custody of the Department of Mental Health or secure private facility for observation and examination so May's competency could be evaluated. (Ex. 22, 45:22-46:6, 47:12-48:21; Ex. 24, Criminal Court Documents, p. 1-2).

38. Diaz thought May could have had Dementia but never contacted any hospital on May's behalf, never reached out to May's family about him, and there is no evidence Diaz attempted to obtain an OR bond for him. (Ex. 22, 71:12-73:8, 74:10-20, 76:4-16).

39. The court stayed the criminal proceedings until a competency hearing on March 3. The court also ordered May be evaluated at Oklahoma Forensic Center or another facility, and that the facility report its findings to the court by March 2. However, on March 3 the court revoked the order, stating it was incorrect, and instructed Diaz to present the correct order for the competency evaluation. (Ex. 22, 52:11-55:6, 63:22-65:6; Ex. 24, pp. 4-9).

40. A second March 3 order from a different judge set a status hearing for March 25. A March 4 order reinstated the previous order for observation and evaluation at the Oklahoma Forensic Center. Diaz does not know why the March 3 and March 4 orders were issued or why this played out as it did. (Ex. 22, 65:7-66:25, 67:17-68:20; Ex. 24, pp. 8-10).

41. The Oklahoma Forensic Center set May's evaluation for March 21, via zoom. If May was found incompetent at that evaluation, he could be sent to a mental hospital. (Ex. 22, 62:22-63:1, 68:21-70:16).

42. The jail could not simply release May from jail unless (1) his family bailed him out, (2) he received an OR bond, (3) the charges against him were dropped, or (4) he was found

mentally incompetent and placed in a mental health facility; none of these are totally under the control of jail staff. (Ex. 30, 127:5-129:16, 130:6-9; Ex. 31, 72:22-74:19).

43. May developed a pressure ulcer (or "bed sore") on his hip, which was examined by Nurse Unruh on February 10. Unruh reported this to APRN Carey, who ordered that antibiotic ointment be applied daily. (Ex. 7, 147:14-148:16; Ex. 8, 81:25-83:10, 84:4-85:12; Ex. 14, pp. 37; Ex. 15, 43:4-8, 48:15-49:5, 51:7-13).

44. Jailers applied antibiotic ointment to May's sore daily, checked his blood pressure daily, and gave him his medications daily. (Ex. 8, 74:2-7; Ex. 16, pp. 1-7).

45. Unruh saw May to look at his sore again on February 14. (Ex. 15, 107:20-108:5).

46. Over the next month that May was in the jail, Warnke continued to update Unruh about May's condition, telling her there was not any real change in him and asking her if there was anything they could do. Unruh would always tell her no. (Ex. 15, 108:9-109:2; Ex. 31, 31:15-23).

47. Although May's cell was in booking, close to the medical office, and Unruh could go and look at him at any time, Unruh did not think it necessary to see May again. (Ex. 15, 109:6-25).

48. Nurse Unruh did not believe May was having a medical emergency or that he needed to go to the hospital during the times she encountered him. (Ex. 8, 136:23-137:8).

49. Warnke checked on May at least once every day that she worked. She would have conversations with him, encouraging him to take a shower and eat something. Most days he would sit up and talk with her. (Ex. 15, 41:15-43:3, 71:16-74:7).

50. May continued to sometimes refuse meals over the next month. Warnke and other jail staff would offer him protein shakes to drink to supplement any meals he did not finish, which based on her experience, was the standard practice in nursing homes for patients who refused meals. (Ex. 15, 91:7-93:6).

51. Warnke also continued to update Stanford and Crabtree on May's condition. She told Crabtree May was not eating and still not able to walk. (Ex. 15, 37:18-39:2; Ex. 31, 30:8-31:8).

52. Jail staff were constantly updating Crabtree about May, and understood from Crabtree that he was constantly going to the district attorney's office trying to get May out of the jail with an OR bond. (Ex. 31, 45:12-46:20, 67:17-68:20).

53. Despite the concern about his chronic condition that clearly would require a different housing arrangement long-term, Warnke did not believe May was experiencing a medical *emergency* at any time prior to March 18. On March 17, he was communicating with her. (Ex. 15, 80:2-81:13).

54. If Warnke believed May was having a medical emergency she could contact the on-call medical provider or call EMS. (Ex. 15, 80:2-19).

55. Stanford also did not think that May's condition was an emergency at any point prior to March 18. (Ex. 31, 65:18-66:3).

56. On the morning of March 18, May fell from his bunk at approximately 5:52 a.m. Within one minute, detention officers entered his cell. Over the next three minutes, officers attempted to get May off the floor. (Ex. 26, March 18 Video, Timestamp 5:52:13-5:55:53).

57. They were unable to lift him. For the next eight minutes, they tended to May on the floor. (Ex. 26, Video Timestamp 5:55:54-6:03; Ex. 31, 29:16-24).

58. Warnke's shift started at 6:00 a.m. She instructed jail staff to call EMS and she called Martin, Turn Key's on-call provider. At 6:04 a.m. dispatch called EMS. EMS arrived and entered May's cell at 6:11 a.m. (Ex. 15, 44:25-45:16, 111:3-16; Ex. 26, Video Timestamp 6:11:04-6:24:44).

59. May was transported to the hospital, where he passed away. (Ex. 27, Alliance Health ER Records, pp. 1-44).

60. His cause of death was determined to be COVID-19. Neither malnutrition nor dehydration was determined to be a cause of his death. His weight on the day of his death was 224 lbs. (Ex. 28, Medical Examiner's Report, p. 1).

61. During his detention at the jail, May never exhibited any symptoms of having COVID-19. He did not complain of having any COVID symptoms. (Ex. 7, 148:17-23; Ex. 8, 143:4-7; Ex. 15, 90:4-15).

62. Warnke was not aware May had any family until the day he was sent to the hospital. If she had known who his family was, she would have called them about May while he was in the jail. (Ex. 15, 110:1-111:2).

63. Warnke was doing her best for May under the circumstances. (Ex. 15, 117:24-118:2).

64. Jail staff could call EMS, the Turn Key nurse, or on-call Turn Key medical provider if they believed an inmate is experiencing a medical emergency. (Ex. 30, 160:19-161:10).

65. Warnke was made the medical officer because Stanford knew Warnke already had training and experience working in nursing homes. (Ex. 15, 22:9-18; Ex. 31, 16:3-20, 60:19-61:11).

66. As a CNA, she was trained to report her findings and observations to the LPN. (Ex. 15, 108:10-18).

67. The Federal Emergency Management Agency ("FEMA") paid May's family $9,000.00 for burial expenses due to May having died from COVID-19. (Ex. 32, Depo of Lisa Hice, 84:25-86:4).

## ARGUMENT AND AUTHORITY

### STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court held that "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." The Court further held that "if the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, the *Anderson* Court stated that "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* A movant's summary judgment burden may properly be met by reference to

the lack of evidence in support of plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing, 477 U.S. at 325).

Furthermore, as described by the court in *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526 (10th Cir. 1994), "[e]ven though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone* at 530 (citing, 477 U.S. at 324). *See also Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991); *Roemer v. Pub. Serv. Co. of Colo.*, 911 F. Supp. 464, 469 (D. Colo. 1996). "In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## I. WARNKE IS ENTITLED TO QUALIFIED IMMUNITY

Plaintiffs have alleged Warnke was deliberately indifferent to May's medical needs in violation of his constitutional rights. [Dkt. 1]. Warnke is entitled to qualified immunity on this claim. The qualified immunity doctrine immunizes government officials from civil damages when their conduct does not violate an individual's clearly established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense which protects all government officials except "the plainly incompetent or those who knowingly violate the law." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001). It represents a complete immunity to suit, not merely a defense to liability, and is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985); *Medina v. Cram*, 252 F.3d

1124, 1127 (10th Cir. 2001). Government officials "are entitled to qualified immunity unless it is demonstrated that their conduct violated clearly established constitutional rights of which a reasonable person in their positions would have known." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999). Unless the official violates a constitutional right in a way she knows or should know is unconstitutional, qualified immunity attaches and she cannot be held individually liable. *Medina* at 1127. Whether qualified immunity applies is an issue for the courts, not for the jury. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). If no constitutional right was violated, no further inquiry is required. *Saucier, supra,* at 200-201. Here, Warnke did not violate May's constitutional rights, as is fully discussed in Proposition II below. Thus she is entitled to qualified immunity on that basis alone.

Even if Warnke violated May's constitutional rights, she is still entitled to qualified immunity if the right was not clearly established at the time of the violation. In *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), the U.S. Supreme Court explained that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." (Internal citations omitted). "If a constitutional right could be made out, then [t]he relative, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official in the defendant's position] that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. In other words, a right is only clearly established when a reasonable government official would have a

"sufficiently clear" understanding that her actions were unlawful at the time she acted. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citing *Reichie v. Howards*, 566 U.S. 658, 664 (2012)).

For law to be clearly established, the constitutional question at issue must have been settled "beyond debate" by existing precedent. *White v. Pauly*, 580 U.S. 73, 79, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (citing *Mullenix,* 577 U.S. at 12). A government official cannot knowingly violate the law unless she can "'reasonably…anticipate when [her] conduct may give rise to liability for damages.'" *Reichie*, 566 U.S. at 664 (quoting *Anderson,* 483 U.S. at 639). What constitutes clearly established law therefore cannot be defined at a high level of generality; it must be examined in the specific context of the case. *Kisela v. Hughes*, 584 U.S. 100, 104, 106 (2018) (citing *City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Although it is not necessary for the *exact* act in question to have previously been declared unlawful for law to be clearly established, a certain degree of specificity is required for legal precedent to place an official on notice that that the relevant legal doctrine will apply in the situation with which she is confronted. *Ziglar v. Abbasi*, 582 U.S. 120, 150-152 (2017) (internal citations omitted). If, under existing precedent, "a reasonable officer might not have known for certain that [her] conduct was unlawful – then the officer is immune from liability" because the law has not been clearly established. *Id.* at 152.

Here, May's right to receive medical care was clearly established. However, what was not clearly established is whether May had a right to be taken to the hospital or to another medical provider when neither Warnke, her supervisors, nor Turn Key medical

providers believed he was experiencing an acute medical emergency. Warnke is entitled to qualified immunity for that reason as well.

## II. WARNKE DID NOT VIOLATE MAY'S CONSTITUTIONAL RIGHTS

In general, inmates in a custodial setting are entitled to receive medical care. *Paugh v. Uintah County*, 47 F.4th 1139, 1153 (10th Cir. 2022). The Eighth Amendment is violated when a jail official is deliberately indifferent to the serious needs of a prison inmate. *Id.* (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)). The same constitutional protections afforded to prison inmates by the Eighth Amendment are afforded to pretrial detainees through the due process clause of the Fourteenth Amendment. *Id.* at 1153-1154 (citing *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019)). The United States Supreme Court has made clear that proof of deliberate indifference to an inmate's serious medical needs is required to succeed on a 42 U.S.C. § 1983 claim for denial of medical care under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The same deliberate indifference standard is used to evaluate denial of medical care claims brought by pre-trial detainees for alleged violations of the Fourteenth Amendment. *Strain v. Regalado*, 977 F.3d 984, 989-990 (10th Cir. 2020). Importantly, mere negligence – even gross negligence – is insufficient to support a claim of deliberate indifference under § 1983. *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489, 1495 (10th Cir. 1990) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 and n. 7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that [an] actor disregarded a known or obvious consequence of his action." *Board of County*

*Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410 (1997). A § 1983 claim alleging inadequate or delayed medical care involves "both an objective and subjective component, such that [the Court] must determine both whether the deprivation is sufficiently serious and whether the government official acted with a sufficiently culpable state of mind." *Oxendine v. R.G. Kaplan, M.D.*, 241 F.3d 1272, 1276 (10th Cir. 2001). As for the objective component, a medical need is considered sufficiently serious if a physician has diagnosed the condition and mandated treatment, or the condition is so obvious that even a layperson would easily recognize the medical necessity for a doctor's attention. *Oxendine,* 241 F.3d at 1276. Here, Defendant does not dispute that May's medical need was sufficiently serious at the time of her death.

As for the subjective component, a plaintiff alleging deliberate indifference to medical needs occurred must establish that the defendant knew of a substantial risk of harm and failed to take reasonable measures to abate that risk. *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (quoting *Farmer*, 511 U.S. at 847). In that regard, a plaintiff must prove that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the defendant actually drew that inference. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837). The Tenth Circuit has held that a prison official acts "solely…as a gatekeeper to other medical personnel capable of treating the condition" and "may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata*, 427 F.3d at 751 (internal quotations and citation omitted).

In this case, it is the subjective prong of the deliberate indifference case, which ultimately is at issue. To satisfy the subjective portion of the deliberate indifference test, Plaintiffs are required to establish that Warnke both knew of a substantial risk of harm to May *and* failed to take reasonable measures to abate that risk of harm. *Hunt, supra,* 199 F.3d at 1224 (quoting *Farmer, supra,* 511 U.S. at 847). Plaintiffs must therefore establish that Warnke was both aware of facts from which the inference could be drawn that May was at a substantial risk of serious harm *and* that Warnke actually drew that inference. *Mata, supra,* 427 F.3d at 752 (10th Cir. 2005) (quoting *Farmer*, 511 U.S. at 837). "An official's failure to alleviate a significant risk of which [she] was unaware, no matter how obvious the risk or how gross [her] negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). The evidence in this case shows that Warnke was not deliberately indifferent to May's serious medical needs.

Warnke was employed at the Custer County jail as the medical officer. (Fact 14). She had been certified as a Certified Nursing Assistant ("CNA") and as a Certified Medication Aide in 2009. (Fact 14). She worked in a nursing home and assisted living facility before beginning her career in corrections, so she had eight years of experience taking care of patients with Alzheimer's and dementia, including patients in a memory care unit, before coming to work at the jail. (Facts 14-15, 65). As the medical officer, Warnke was responsible for helping set up for the Turn Key nurse during her patient visits, checking vital signs and blood sugar, and pulling medical charts if needed. (Fact 16). She was the

liaison between the jail and Turn Key, but Warnke herself was not a medical provider. (Facts 16-17).

May was arrested and booked into the Canadian County Jail on January 5, 2022. (Fact 1). Medical Records show that before he was booked into Canadian County, May, who was obese, had been losing weight over the previous year. He weighed 286 lbs. in March 2021, and 260 lbs. on January 6, 2022. (Fact 2). May called his daughter Leann Hoff ("Hoff") from the Canadian County Jail and asked her to bail him out. She agreed, but never bailed him out, never visited him there, and never spoke to her father again. Hoff and her husband thought jail was the safest spot for him to be and did not want to be responsible for paying the full bail amount if May did not show up for court. (Fact 3). Prior to his arrest, the Hoffs were aware that May needed to be in an assisted living facility. However, the facilities are expensive and they were not sure who would pay for that, so they did not move him into one. (Fact 4). In early 2022, Turn Key was the medical provider for both the Canadian County and Custer County Jails. (Fact 5). While May was at Canadian County, he was seen by Turn Key medical staff, including APRN Tamara Carey ("APRN Carey"). At that time, he was already using a wheelchair and had Alzheimer's. (Fact 6). May was taken to the emergency room from the Canadian County Jail on January 9, 2022, for chest pain, diagnosed with costochondritis (muscle pain in the chest) and released back to Canadian County. There is no indication the ER doctors believed his dementia or weight loss was a medical emergency. (Fact 7). Ultimately, May lost a total of twenty (20) pounds during the 19 days he was in the Canadian County Jail. (Fact 8).

Due to an outstanding warrant in Custer County, May was transported to the Custer County Jail ("the jail") on January 25, 2022, after he was released from Canadian County. (Fact 9). The Hoffs were aware May was transported to Custer County, but chose not to bail him out (or even call or visit) for the same reasons they did not bail him out from Canadian County: they felt jail was the safest place for him to be and did not want to be responsible for paying the full bail amount if May did not show up for court. (Fact 10). His family never called or visited him at the jail. (Fact 10). When May came into the jail, his paperwork did not list a next of kin. (Fact 12). Warnke was not aware May had any family until he was sent to the hospital on March 18. (Fact 62). If she had known who his family was, she would have called them about May while he was in the jail. (Fact 62).

When May was booked into the jail on January 25, he underwent a COVID-19 screening which was unremarkable, and was asked medical questions from the medical questionnaire. (Fact 18). His weight was recorded as 240 lbs. at that time. (Fact 18). The jail contracted with Turn Key to provide medical staffing and services to the jail. (Facts 11, 13). A nurse staffed the jail two days per week, but Turn Key providers were on call 24/7 so jail staff could contact them at any time whether the nurse was at the jail or not. (Fact 11). Because Turn Key had previously provided care to him at Canadian County, May arrived at the facility with a box of medications and began receiving his medications immediately at Custer County. (Fact 19). Turn Key LPN Stacia Unruh conducted an intake screening of May on January 27. (Facts 13, 20).

On February 2, Bryce Foster, a cellmate of May's, informed jail staff via a grievance that May had not eaten for several days and was refusing to shower. (Fact 21). The very

same day, Warnke had May moved to a single cell in the booking area near the medical office with a shower so officers could keep a closer eye on him and make sure he was eating. (Fact 22). Placing May in the single cell in the booking area had the added benefit of May being exposed to fewer people who could possibly give him COVID. (Fact 23). The following day, February 3, May was seen in person by Nurse Unruh and by Turn Key APRN Tamara Carey via a telemedicine visit. (Facts 13, 24). Carey noted that he had not eaten or showered for seven (7) days and that he was suffering from worsening Alzheimer's disease. (Fact 24). Although APRN Carey contacted Adult Protective Services about what would happen when May was released from jail, she did not believe he was having a medical or mental health emergency or that he needed to go to the hospital due to not eating or for any other reason. She scheduled May to be seen again for a follow up in 90 days. (Fact 25).

After May's telemedicine visit with APRN Carey, Warnke and jailer Angie Schmidt ("Schmidt") decided to call May's criminal defense attorney Teo Diaz ("Diaz") at OIDS the same day. (Fact 26). They wanted Diaz to come check on May and do something to get him out of the jail. (Fact 26). Warnke and Schmidt spoke with Diaz over the phone. (Fact 27). They told him APRN Carey had spoken to Adult Protective Services about May and advised him May needed to get to court faster because he was not accepting the meals or supplement shakes the jail was offering him. (Fact 27). Diaz told them he could move May's court date up if the judge and district attorney agreed. (Fact 28). Warnke and Schmidt told Diaz that May had dementia and that he needed to be in a nursing home when he gets out. (Fact 28). Diaz asked whether May needed to be taken to the emergency room

and they told him the Turn Key nurse (Unruh) had seen May that morning but neither Unruh nor Carey said anything about sending May to the hospital. (Fact 28). Diaz said unless there was a medical emergency they needed a medical provider's order to take May to the ER. (Fact 29). He told them it was up to the doctor and the nurse what to do about May's medical condition. (Fact 29). Shortly thereafter, Diaz called back and told Schmidt that he would come see May when the weather clears up, but there is no record of Diaz ever visiting May while he was detained at the jail. (Fact 30).

Soon after Warnke moved May to the booking area, she arranged for him to meet with her and Undersheriff David Crabtree ("Crabtree"). (Fact 31). Crabtree encouraged him to shower and drink a protein shake. May did shower and drink some of the shake. (Fact 31). At the time, Crabtree was the acting Jail Administrator and Lt. Martha Stanford ("Stanford"), as the highest-ranking detention officer at the jail, was overseeing the day-to-day operations of the jail. (Fact 32). Crabtree followed up with Warnke and Stanford on February 7, or 8, to find out how May was doing. When he was told May was not improving, he went across the street to the courthouse and spoke with the first assistant district attorney about May. (Fact 33). He told the ADA that May had not been eating or bathing and potentially had Alzheimer's or dementia. He told the ADA May did not belong in the jail and needed a medical OR bond, but the district attorney's office never approved an OR bond. The ADA told Crabtree they were going to get him a mental competency evaluation. (Fact 34). In response to Barry Edwards at the Oklahoma Department of Health contacting the jail about APRN Carey's report to Adult Protective Services about May, on February 8, Crabtree e-mailed Edwards that he had met with the ADA about May and that

the district attorney was going to look into the matter. (Fact 35). After his first conversation with the ADA, Crabtree believes he followed up on the district attorney's office's efforts to get May evaluated. (Fact 36).

On February 9, May's criminal attorney Diaz filed an Immediate Application for Determination of Competency in May's criminal case. (Fact 37). The application requested May be committed to the custody of the Department of Mental Health or secure private facility for observation and examination so May's competency could be evaluated. (Fact 37). Diaz thought May could have had Dementia but never contacted any hospital on May's behalf, never reached out to May's family about him, and there is no evidence Diaz attempted to obtain an OR bond for him. (Fact 38). The court stayed the criminal proceedings until a competency hearing on March 3. (Fact 39). The court also ordered May be evaluated at Oklahoma Forensic Center or another facility, and that the facility report its findings to the court by March 2. (Fact 39). However, on March 3, the court revoked the order, stating it was incorrect, and instructed Diaz to present the correct order for the competency evaluation. (Fact 39). A second March 3 order from a different judge set a status hearing for March 25. A March 4 order reinstated the previous order for observation and evaluation at the Oklahoma Forensic Center. Diaz does not know why the March 3 and March 4 orders were issued or why this played out as it did. (Fact 40). The Oklahoma Forensic Center set May's evaluation for March 21, via zoom. If May was found incompetent at that evaluation, he could be sent to a mental hospital. (Fact 41).

May developed a pressure ulcer (or "bed sore") on his hip, which was examined by Nurse Unruh on February 10. (Fact 43). Unruh reported this to APRN Carey, who ordered

that antibiotic ointment be applied daily. (Fact 43). Jailers applied antibiotic ointment to May's sore daily, checked his blood pressure daily, and gave him his medications daily. (Fact 44). Unruh saw May to look at his sore again on February 14. (Fact 45). Over the next month that May was in the jail, Warnke continued to update Unruh about May's condition, telling her there was not any real change in him and asking her if there was anything they could do. (Fact 46). Unruh would always tell her no. (Fact 46). Although May's cell was in booking, close to the medical office, and Unruh could go and look at him at any time, Unruh did not think it necessary to see May again. (Fact 47). Warnke checked on May at least once every day that she worked. (Fact 49). She would have conversations with him, encouraging him to take a shower and eat something. (Fact 49). Most days he would sit up and talk with her. (Fact 49).

May continued to sometimes refuse meals over the next month. (Fact 50). Warnke and other jail staff would offer him protein shakes to eat to supplement any meals he did not finish, which based on her experience, was the standard practice in nursing homes for patients who refused meals. (Fact 50). Warnke also continued to update Stanford and Crabtree on May's condition. (Fact 51). She told Crabtree May was not eating and still not able to walk. (Fact 51). Jail staff were constantly updating Crabtree about May, and understood from Crabtree that he was constantly going to the district attorney's office trying to get May out of the jail with an OR bond. (Fact 52). However, the jail could not simply release May from jail unless: (1) his family bailed him out, (2) he received an OR bond, (3) the charges against him were dropped, or (4) he was found mentally incompetent and placed in a mental health facility; none of these are totally under the control of Warnke

or any jail staff. (Fact 42). Despite the concern about his chronic condition that clearly would require a different housing arrangement long-term, Warnke did not believe May was experiencing a medical emergency at any time prior to March 18. (Fact 53). On March 17, he was communicating with her. (Fact 53). If Warnke believed May was having a medical emergency she could contact the on-call medical provider or call EMS. (Fact 54). Stanford also did not think that May's condition was an emergency at any point prior to March 18. (Fact 55).

On the morning of March 18, May fell from his bunk at approximately 5:52 a.m. (Fact 56). Within one minute, detention officers entered his cell. (Fact 56). Over the next three minutes, officers attempted to get May off the floor. (Fact 56). Warnke's shift started at 6:00 a.m. (Fact 58). She instructed jail staff to call EMS and she called Martin, Turn Key's on-call provider. (Fact 58). At 6:04 a.m. dispatch called EMS. EMS arrived and entered May's cell at 6:11 a.m. (Fact 58). May was transported to the hospital, where he passed away. (Fact 59). His cause of death was determined to be COVID-19. (Fact 60). Neither malnutrition nor dehydration was determined to be a cause of his death. (Fact 60). In fact, FEMA paid May's family $9,000.00 because he died from COVID. (Fact 67). His weight on the day of his death was 224 lbs. (Fact 60). During his detention at the jail, May never exhibited any symptoms of having COVID-19 and he did not complain of having any COVID symptoms. (Fact 61).

Warnke was doing her best for May under the circumstances. (Fact 63). Warnke was clearly concerned for May's condition, but nothing indicated to her that May's condition was a medical *emergency* until March 18. (Facts 22, 26-31, 46, 49, 50, 51 53, 54,

61). It is quite clear from the evidence in this case that in addition to Warnke, Stanford, Schmidt, Crabtree, Diaz, and medical providers Unruh, and Carey were each aware that May had Alzheimer's or dementia and that he needed to be in an environment other than the jail long term, but that *none* of those individuals believed his condition was an acute emergency prior to March 18. (Facts 20-55). Warnke was simply not aware of facts from which the inference could be drawn that May was experiencing a medical emergency or needed to go to the hospital before March 18, or that she actually drew that inference. *See Mata, supra,* 427 F.3d at 751.

The inference that Warnke drew was that May was at risk of *long-term,* not immediate, harm and she actively took multiple measures to abate that risk of long-term harm. She moved May to the booking area so that officers could monitor his eating and showering. (Facts 21-22). After May was seen by nurse Unruh and APRN Carey and Carey scheduled him for a 90-day follow-up, Warnke took the step of contacting May's criminal attorney to see if he could get May released from jail sooner, even though neither Unruh nor Carey believed May was experiencing an emergency or that needed to go to the hospital. (Facts 24-30). Because of Warnke and Schmidt's efforts, May's criminal attorney attempted to get him a mental competency evaluation. (Fact 37). However, those attempts were unsuccessful, as there was a series of irregularities in May's case and the competency evaluation was not scheduled until March 21. (Facts 38-41).

Warnke also took the step of arranging a meeting with Undersheriff Crabtree and as a direct result of that effort, Crabtree attempted to get a medical OR bond from the district attorney's office. (Facts 31-36, 52). Crabtree's attempts were also unsuccessful and the

district attorney's office never authorized an OR bond. (Facts 31-36, 52). While this was occurring, Warnke continued to check on May at least once a day when she was working and continued to offer him protein shakes to supplement his meals, which she knew to be the standard practice in nursing homes for patients who refused regular meals. (Facts 49-50). Although May had lost twenty (20) pounds in the nineteen days he was detained in Canadian County, his rate of weight loss significantly slowed once he was in the Custer County Jail. (Facts 8, 18, 60). She also continued to update Stanford, Crabtree, and nurse Unruh on May's condition. (Facts 46, 51-52). When she asked Unruh if there was anything else she could do for May, Unruh would always tell her no. (Fact 46). It is indisputable that Warnke did everything she could possibly do under the circumstances, as she could not simply release him on her own from jail because he needed long-term care for a chronic condition. (Fact 42). It is also indisputable that as soon as Warnke became aware of facts on March 18, which indicated May was experiencing an emergency, she immediately arranged for EMS to come and transport May to the hospital. (Facts 56-59).

Again, Warnke can only be held liable for the alleged constitutional violation if she knew of a substantial risk of harm to May *and* failed to take reasonable measures to abate that risk of harm. *Hunt, supra,* 199 F.3d at 1224. Warnke absolutely took reasonable measures to abate the long-term risk of harm to May, and as soon as she became aware he was experiencing a medical emergency, she took immediate reasonable measures to abate that risk of harm as well. Although May died from COVID, Warnke was not aware of him ever exhibiting COVID symptoms or ever complaining about COVID symptoms. (Facts

18, 60-61). Consequently, Warnke is entitled to qualified immunity and summary judgment in her favor.

Additionally, should this Court determine there is a question of fact as to whether Warnke was deliberately indifferent to May's serious medical needs, the right of a detainee with Alzheimer's or dementia to be taken to the emergency room for that condition when (1) neither jail staff nor his medical providers believed his condition was an emergency, and (2) when an entirely different condition was the actual cause of his death, has not been clearly established. Defendant is not aware of any prior decision from the U.S. Supreme Court or the Tenth Circuit which has held Alzheimer's or dementia is an emergency condition or that jail staff violates a detainee's rights by not taking him to the hospital when there are no signs of a medical emergency or of the condition which was determined to have caused his death. Warnke is therefore entitled to qualified immunity for that reason as well.

## CONCLUSION

No reasonable jury could conclude that Warnke exhibited deliberate indifference to May's medical needs. It is abundantly clear that Warnke was aware that *someone*, whether the district attorney's office, May's criminal attorney and the court system, May's medical providers, or May's own family needed to find a long-term living solution for May. However, being aware that the jail was not a tenable place for May due to his Alzheimer's and dementia is not the same as being aware that May's condition was an emergency and that he needed to go to the hospital at any point prior to March 18. Warnke was certainly never aware of facts which indicated May had COVID-19 during his detention and never

drew the inference that he was infected with COVID-19. Defendant is not aware of any prior decision which has established a right to emergency care when a detainee is not exhibiting any signs of a medical emergency or of the condition which caused his death. Accordingly, Warnke is entitled to qualified immunity and summary judgment in her favor.[1]

WHEREFORE, premises considered, Defendant Julie Warnke, in her individual capacity, respectfully requests this Court GRANT her Motion for Summary Judgment on Plaintiffs' deliberate indifference claim against her.

Respectfully submitted,

s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
COLLINS, ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: jlm@czwlaw.com

***ATTORNEYS FOR DEFENDANTS SHERIFF OF CUSTER COUNTY, IN HIS OFFICIAL CAPACITY, AND JULIE WARNKE***

[1] To the extent Plaintiffs may argue their claim is premised on COVID countermeasures taken by the jail, Defendant is immune from liability for such claims under the express terms of the Public Readiness and Emergency Preparedness Act. 42 U.S.C. §§ 247d-6d, 319F-3.

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen
Robert M. Blakemore
Bryon D. Helm
SMOLEN & ROYTMAN
701 S. Cincinnati Avenue
Tulsa, OK 74119
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryonhelm@ssrok.com
***Attorneys for Plaintiff***

Vanessa O. Martinez
Sean P. Snider
Anthony C. Winter
JOHNSON HANAN VOSLER
HAWTHORNE & SNIDER
9801 N. Broadway Ext.
Oklahoma City, OK 73114
(405) 232-6100
vmartinez@johnsonhanan.com
ssnider@johnsonhanan.com
awinter@johnsonhanan.com
***Attorneys for Turn Key Clinics, LLC, and Tamara Carey, APRN, and Stacia Unruh***

s/ Jordan L. Miller
Jordan L. Miller