IN THE UNITED DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

LISA HICE, as Co-Administrator of the
Estate of Marvin G. May, Deceased; and
LEANN D. HOFF, as Co-Administrator of the
Estate of Marvin G. May, Deceased,

PLAINTIFFS,

vs. No. CIV-24-119-JD

TURN KEY HEALTH CLINICS, LLC;
TAMARA CAREY, APRN;
STACIA UNRUH, LPN;
CUSTER COUNTY SHERIFF, In His
Official Capacity; and,
JULIE WARNKE,

DEFENDANTS.

VIDEOTAPED DEPOSITION OF STACIA UNRUH
TAKEN ON BEHALF OF THE PLAINTIFFS
ON APRIL 25TH, 2025, BEGINNING AT 10:24 A.M.
IN OKLAHOMA CITY, OKLAHOMA

APPEARANCES:

On behalf of PLAINTIFFS:

Daniel E. Smolen
Bryon D. Helm
Mazie Bell
SMOLEN & ROYTMAN
702 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
(918) 585-2667
kendrarash@ssrok.com

(Appearances continued on next page.)

REPORTED BY: Lindsey Troiani, CSR

**aren't there?**

A Just, like, pictures and things like that, that I've noticed it.

**Q Okay. Have you looked through your text messages to see if they're still available?**

A No, sir.

**Q When were you employed with Turn Key?**

A Approximately November '21, I think, to, like, March of '22.

**Q Have you gone through your phone and looked for any messages that could potentially pertain to this case?**

A No, sir.

**Q Has anyone asked you to do that?**

A No.

MR. WINTER: Okay. We can't talk about anything that you may have been discussed with counsel. That's privileged.

THE WITNESS: Okay.

**Q (By Mr. Smolen) Yeah. And I wasn't asking you -- I was just curious if anyone asked you to do that.**

A Okay.

**Q Did you, from time to time, communicate on your cell phone about different matters pertaining to**

**if you see this situation with an inmate, you need to transport them to the hospital emergently?**

MS. MARTINEZ: Form.

A No, sir.

MR. SMOLEN: Let's take about a five-minute break, ten minute break.

(Off the record at 11:15 a.m. and returning at 11:46 a.m.)

**Q (By Mr. Smolen) Ma'am, I want to, kind of, back up a minute and talk to you about your work history. Do you have a medical licensure?**

A Like a nursing license?

**Q Yes, ma'am.**

A Yes, sir.

**Q When did you obtain that?**

A I passed by NCLEX in January of 2018.

**Q Where did you first work after you obtained your nursing license?**

A I worked for The Geo Group, Inc., in the prison in Hinton, Oklahoma.

**Q For how long?**

A Just over three years.

**Q And why did your employment end?**

A The prison was shut down and I was laid off.

**Q Where was your next place of employment?**

MS. MARTINEZ: Form.

A I'm not exactly sure all the technical terms or science behind it, no.

**Q Okay. What do you believe when a person is malnourished, how does that cause a person's death?**

MS. MARTINEZ: Form.

A I mean, it affects the heart and the organs and causes them to shut down.

**Q Multi-system organ failure; right?**

A Correct.

**Q And do you know why that is?**

A Not specifically, no.

**Q You just know that's what happens?**

A Yes.

**Q And you understood that that could be a deadly condition --**

A Yes.

**Q -- when you go into multi-organ failure?**

A Yes.

**Q From an assessment standpoint, do you know what assessments would indicate to you that a patient is malnourished?**

MS. MARTINEZ: Form.

A Well, as an LPN, I'm not allowed to do assessments.

**they're booked into the jail, but become unable to walk while they're incarcerated there?**

MS. MARTINEZ: Form.

**Q Can you think of any scenario that you're not required to document that?**

MS. MARTINEZ: Form.

**Q As far as -- and I'm talking about nursing requirements. I'm talking about what the Nursing Board would require.**

MS. MARTINEZ: Form.

A Can I think of any other situation?

**Q Yeah.**

A No.

**Q When -- do you know of what continuity of care is?**

A Yes.

**Q What is continuity of care?**

A Like, the continuation of care.

**Q And you understood that Marvin May was transferred from the Canadian County jail to Custer County; correct?**

A Yes.

**Q And were you provided with Mr. May's Turn Key medical intake form from Canadian County when he presented at Custer County?**

A No.
**Q Did Turn Key ever provide their medical intake forms where they had been providing care to a patient at another facility and that patient was transferred to the Custer County jail, would you ever receive the previous medical intake form that had been completed at the previous facility in which Turn Key was providing care?**
A Not that I'm aware of.
**Q Was there any way that you could access it?**
A No.
**Q If you're unable to access his medical intake form from the other facility in which Turn Key was providing medical care, how could you ensure continuity of care?**
A I'm not sure.
**Q It would be very difficult to. Don't you agree?**
MS. MARTINEZ: Form.
A Yes.
**Q Let's look at --**
MR. SMOLEN: I'm going to have to show her these in the book because I bet she doesn't have them.
(Plaintiff's Exhibit 1 is marked for identification.)

--
**Q Correct.**
A -- would have seen him. Yes.
**Q And from the 27th to February 3rd, why did it take that long to see Mr. May?**
MS. MARTINEZ: Form.
A So on the 3rd was that whenever he saw the provider?
**Q Well, he never saw a provider.**
MS. MARTINEZ: Form.
A He did a telehealth with a provider.
**Q Right.**
A Yes. That's what I'm asking. Is that whenever when he saw, on the 3rd?
**Q Well, telehealth's over the phone?**
A Over the laptop, yeah, the Zoom.
**Q Are those recorded?**
A I'm unsure. Where is that paperwork where he saw the provider? What day of the week was February 3rd?
**Q Thursday.**
A Was it the Thursday following after the 27th?
**Q It was a week later.**
A Okay. So it would have been because the provider visits are only done on Thursdays.

A Not that I'm aware of, no.

**Q At any point in time between February 3rd and March the 18th, was Mr. May ever monitored with respect to vital signs?**

A Just based off of looking through the paperwork, I know that he was having his blood pressure checked by the officers.

**Q But that was the extent of it; correct?**

A As far as I know, yes.

**Q So as far as vital signs go, based on your training as a nurse, what do you understand you have to do if you're going to take vital signs? What are you to test?**

A Like, what are basic vital signs?

**Q Yeah. What are you standard vital signs?**

A Blood pressure, pulse, temperature, weight, respirations.

**Q And you would agree with me that, of those required vital signs, the only one that was being done from time to time was blood pressure taken by officers?**

MS. MARTINEZ: Form.

A Yes, sir.

**Q And is that consistent with how the medical was delivered at the Custer County jail across the board or just special for Mr. May?**

**Q (By Mr. Smolen) Do you have Custer TK_36 in front of you?**
A Yes.
**Q And how about Custer TK_38?**
A Yes.
**Q Okay. Why don't you pull those two out. And you can put TK_38 in front of TK_36 and this gives us a chronology of all the documented jail entries into the jail entry report system. Do you see that?**
A Yes.
**Q So looking at the bottom of TK_38, we see that Mr. May was booked on January 25th of 2022; correct?**
A Correct.
**Q And there's not a single entry made between January 25th, 2022, and February 3rd in this jail entry; correct?**
A Correct.
**Q If Mr. May was not eating for a period of seven days between January 25th, 2022, and February 3rd, 2022, should jail staff have documented that?**
MR. MILLER: Object to the form.
MS. MARTINEZ: Form.
A I'm not sure what their orders to do are.
**Q Looking at the entry from February 10th,**

**2022, it says, "DO Lopez and DO Medical Warnke assisted Inmate May with a shower. Nurse Stacia looked at the wound on his right leg and got an order to apply antibiotic ointment to the wound. Also, he is to lay on his left side or set up and stay off of his right side." Correct?**

A Correct. That's what it reads.

**Q You never made any kind of medical documented note regarding that encounter with the patient; correct?**

A I have a wound care in there that was done.

**Q When did Mr. May develop the wound?**

MS. MARTINEZ: Form.

A I'm not sure when it developed.

**Q Do you know what a pressure ulcer is?**

A Yes, sir.

**Q What's a pressure ulcer?**

A When somebody lays on it too long and it develops a wound.

**Q You understood this to be a pressure ulcer that had appeared on Mr. May; correct?**

A I'm not sure.

**Q Did you do any kind of assessment?**

A I can't do an assessment.

**Q Did you notify the provider that he had what**

**could possibly be a pressure sore?**

A I notified her of the wound, yes.

**Q Okay. Did you tell her that you think it could be a pressure sore?**

A I don't recall what I told her about it.

**Q Well, you've seen pressure sores before; correct?**

A Yes, sir.

**Q Did this look like a pressure sore?**

A I don't recall.

**Q Is it possible that it did?**

A I mean, there's a possibility. It could have been anything.

**Q Well, what other kind of wound could it be?**

A I mean, he could have scraped it on something or, I mean, it could have been anything.

**Q Okay. You think a scrape looks like a pressure ulcer?**

MS. MARTINEZ: Form.

A I mean, I'm not exactly sure based off of this what it looked like.

**Q If you didn't think it was a pressure ulcer, why was he told to lay on his other side?**

MS. MARTINEZ: Form.

A I mean, regardless if it was a pressure ulcer

or not, it's not comfortable to lay on a wound. And it's not good for a wound to be laid on regardless of what it is.

**Q Is this the wound care note you completed?**

A Yes.

**Q And how did you mark your wound description?**

A The pink epithelialization.

**Q Okay. And in layperson's terms, what's that mean?**

A That it was pinkish, like, kind of deteriorated a little bit.

**Q And you put the pain score of eight out of ten; correct?**

A That's a five.

**Q Okay. What's exudate?**

A Is this somewhere on here or are you just asking me that question?

**Q I'm just asking you that.**

A It's just, like, drainage.

**Q Under the types column, you don't mark anything; correct?**

A Correct.

**Q And can you walk me through under those types, what the definition is of each of those terms?**

A So serous would be, like, clear; purulent

A Do you mean, like, she had some kind of licensure or just that she was, like, in charge of something that --

**Q You call her the medical officer. Why do you think that, that she was the medical officer?**

A Well, I mean, I was told that and she was always in medical with me.

**Q Did you ever ask her what her medical training was?**

A Not that I recall.

**Q You were shown some documents regarding a chronic care visit on February 3rd, 2022. Do you recall that?**

A Yes, sir.

**Q And I think you testified that you were present when the APRN spoke with Mr. May on that date; is that right?**

A I was in the room, yes.

**Q Do you know if Julie Warnke was present during that encounter?**

A I don't know specifically, but, I mean, that would be something that she typically would be there, yes.

**Q Do you recall what role, if any, she played during that encounter?**

A Like, that specific encounter?

**Q Yes.**

A No. Not that specific encounter.

**Q So I'm going to turn to Custer TK_18 if you can, which is the chronic care note from that encounter on February 3rd, 2022. Let me know when you're there.**

A I'm there.

**Q You talked a little bit about the plan. I don't think you read what the full plan was. What was the full plan after that encounter on February 3rd, 2022.**

A Do you want me to read it?

**Q Yes, please.**

A It says to "Place parameters on patient's blood pressure meds. If blood pressure is less than 100 over 70, do not give BP medications."

**Q Okay.**

A And it goes on to say under the monitoring to monitor BP BID times seven days.

**Q What does that mean, BID?**

A Twice a day.

**Q Okay. So was the plan to monitor his blood pressure twice a day every day of the week starting, at least, according to this? Monitor BP BID times seven days.**

A Correct.
**Q Do you take that to mean it's supposed to happen every day?**
A The only thing is, is that under the medications, it says that he has parameters on his blood pressure medication. So, I mean, it would indicate that they would need to take his blood pressure before doing his meds.
**Q Okay. So if his blood pressure was less than 100 over 70, he wasn't to receive his blood pressure medication?**
A Correct.
**Q And that's one of the reasons they're giving him the blood pressure check?**
A Yes.
**Q And next visit, what is checked off is what the next visit would be?**
A 90 days.
**Q Okay. And that's any particular date listed there?**
A Yeah. It says week of 5/3/22.
**Q And that's about 90 days later; right?**
A Right.
**Q And then there's another section called education. Tell me, kind of, what's checked off there.**

A Nutrition, exercise, medications, and disease.

**Q Do you have any sense of what that means, checking off all those boxes for education?**

A From how I interpret it, it would be that Tamara gave him education on those things.

**Q Okay. And that's signed by Tamara; right?**

A Correct.

**Q So that's the entire plan according to that chronic care visit; correct?**

A Yes.

**Q Whose plan was that? Was that your plan or was that Tamara's plan?**

A Tamara's.

**Q Okay. And do you know what her medical training is?**

A Just based off of it, it says that she's an APRN.

**Q Mid-level provider?**

A Yes.

**Q Was Tamara or another mid-level provider available for you to contact on the phone at all times during your shift?**

A Yes, sir.

**Q Was Tamara or another mid-level provider**

**available on call for jail staff to contact when you weren't on shift?**

A Yes, sir.

**Q And you were only on shift 12 hours a week; is that correct?**

A Yeah. Six hours two days a week.

**Q Would you agree with me that on February 3rd, 2022, Tamara Carey apparently did not think he needed to go to the emergency room?**

MR. SMOLEN: Object to the form.

**Q According to this plan?**

A Based off of the documents, yes.

**Q Does it say send to emergency room or anything like that?**

A No, sir.

**Q The phone calls that we listened to -- again, I'm going to be jumping around.**

**Were you present for either of the phone calls that were provided to you today in person or on those phone calls?**

A No, sir.

**Q Now, did you work full-time or part-time for Turn Key?**

A Part-time.

**Q Other than the two shifts, you may have**

A I mean, yeah. It was fine.

**Q Just very basically, who was your employer? Was it the Custer County Sheriff or Turn Key Health Clinics?**

MS. SMOLEN: Object to the form. Calls for a legal conclusion.

**Q To the best of your understanding.**

A Turn Key.

**Q Who provided you your wages, your checks?**

A Turn Key.

**Q Who was your supervisor, a Turn Key employee or the Custer County Jail?**

MS. MARTINEZ: Objection. Leading. Compound.

A Turn Key.

**Q And who did you understand your supervisor to be?**

A I believe it was Gwen.

**Q Now, you've testified today about various encounters to the extent of your recollection with Marvin May; correct?**

A Correct.

**Q At any point, do you remember thinking that Mr. May was in an emergency situation that needed to go to the hospital?**

A During the times that I encountered him, no.

**Q Do you recall thinking any other detention center inmate in Custer County was in an emergency situation that needed to go to the hospital at any time that you worked at Custer County?**

A With any other inmate?

**Q Yes.**

A Yes, sir.

**Q Okay. Were there times that you contacted the provider to send someone to the hospital?**

A I can't recall specifically if I ever did or not.

**Q Okay. Do you recall if you sent someone to the hospital without contacting a provider at any point?**

A I don't recall.

**Q Nothing that comes to mind?**

A No, sir.

**Q All right. If you did believe that Mr. May was in an emergency situation -- and I realize this is hypothetical -- what do you think you should have done?**

A It just depends. I mean, if it was emergent, like, needed to be taken care of right at that moment, go to the hospital.

**Q And you could do that either buy contacting**

**Q Would you agree with me that sepsis is not listed on there?**
A Yes.
**Q Did Mr. May ever complain to you, to the best of your memory, that he thought he might have COVID-19 or any symptoms of COVID-19?**
A No, sir.
**Q Now, at any point, did you yourself take any vitals of Mr. May?**
A Yes.
**Q When would you yourself have taken the vitals of Mr. May?**
A On his intake screening and then also I did the vitals during his chronic care visit.
**Q So on January 27th and also on February 3rd?**
A Yes.
**Q Can you please turn to TK_10 through -- 10 through 16, which is the MAR or Medication Administration Record.**
A Okay.
**Q I just want to be real clear on this. Are any of these -- is anything on any of these pages your handwriting? Did you write anything on pages 10 through 16?**
A I wrote -- just going through. I haven't