IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN N. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

Plaintiffs,

-vs-

TURNKEY HEALTH CLINICS, LLC, et. al.,

Defendant.

Case No. 24-CV-119-JD

VIDEO DEPOSITION OF JULIE ANN WARNKE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 13, 2025, AT 2:14 P.M.

REPORTED BY: LANA L. LEDFORD, CSR

**Exhibit 15**

**Q Yeah.**
A I'm not for sure.
**Q Yeah. Okay.**
**Did you review any video?**
A Yes, I did.
**Q What video?**
A When Mr. May fell.
**Q That would have been May 18, 2022?**
MR. MILLER: Object to the form. You said May.
MR. BLAKEMORE: Oh.
**Q (BY MR. BLAKEMORE) March 18, 2022?**
A Yes.
**Q Just briefly, if you could, summarize your education -- educational background beginning with high school.**
A I graduated high school in 1991 from Canute Public Schools. Afterwards, I worked a few odd jobs until a friend of mine recommended me going into nursing in 2001. And I went to work in a nursing home.
**Q Were you a licensed nurse?**
A No, sir. I was a CNA. At that time, we were not required to carry license.
**Q What's a CNA?**



Exhibit 15

A Certified nursing assistant.

**Q And when did you obtain a CNA certificate?**

A The nursing home would give them to you after so many hours, weeks of training.

**Q Do you remember how much training you had?**

A I think it was four to six weeks, hands on. Of course, the rules have changed quite a bit since back then.

**Q So that was just, like, on-the-job training?**

A Yes, sir.

**Q And the -- what nursing home gave you this certificate?**

A Elk City Nursing Home.

**Q And when -- about when did you obtain that certificate?**

A In 2001.

**Q And so the actual facility where you were working gave you the certificate?**

A You took a test, and if you passed the test, you would get your nursing certification.

**Q Well, not your nursing certification. CNA; right?**

A Yes.
**Q Have you ever been licensed as a nurse?**
A Say again. Like, LPN or...
**Q Right. An actual nurse, like, an LPN or registered nurse. Have you ever been --**
A No.
**Q Okay. You would agree with me that a CNA is not a nurse; right?**
A We have nursing duties.
**Q Is a CNA a nurse? Yes or no?**
A No.
**Q Since you obtained this certificate, the CNA certificate, in 2001, has that certificate been renewed or kept up to date?**
A I got out of nursing for a time and went to work in corrections.
**Q Okay. But my question was, is that -- have you ever done anything to renew or recertify?**
A Yes. The sheriff's department sent me back to school.
**Q And when was that?**
A 2023, '24. Somewhere around in there.
**Q So sometime in 2023 or '24, you say you went back to school. What kind of school?**

A CNA school.
**Q And where was that?**
A Elk City Vo-tech.
**Q And did you recertify after going to this Elk City Vo-tech?**
A Yes, I have.
**Q And how much -- how many hours of schooling did you -- were you required to have to recertify?**
A It was a four -- four-week course. I also recertified as a CMA after six months in that time.
**Q And again, this was -- you said 2023 or 2024?**
A Yes, sir.
**Q When you received this certificate in -- CNA certificate in 2001, was that -- was that given to you by the State of Oklahoma or any kind of licensure board?**
A The State of Oklahoma.
**Q Okay. Do you still have that certificate?**
A No, sir. It's on file online.
**Q With who?**
A NAR. Nurse Aide Registry.



Exhibit 15

**Q Did you take any -- you say that when you went back in 2023, '24, that you -- you took a four-week course at vo-tech.**

**Was that required?**

A Yes. To become CNA.

**Q Okay. And when you obtained this certificate in 2001, were you required to take a four-week course?**

A It was on-the-job training.

**Q Okay. So the answer is no?**

A Yes.

**Q That's correct?**

A That is correct.

**Q How long did you work as a CNA with this Elk City Nursing Home?**

A I think I left there in around 2009. I was also working at an assisted living facility in Elk City.

**Q Did -- so when you left in 2009, how long between 2009 and you leaving the Elk City nursing home facility -- how long was it before you got a job with the sheriff's office?**

A At Custer County, I started there in 2021.

**Q Between 2009 and 2021, did you work as a**

**Q Were you provided with any -- did the sheriff's office provide you with any training with respect to the Custer County Sheriff's Office policies?**

A Not at that -- yes, they did. Yes, they did.

**Q When?**

A We had a handout that we took home, and I took it home the date of my hire.

**Q What do you mean a handout?**

A It was a small condensed policy of the Custer County Sheriff's Office. We also have ACCO training. County commissioner's training. Association of County Commissioner's training.

**Q Okay. When you say it was a condensed version of the policies, like, how many pages are we talking about?**

A I'd say probably 75.

**Q Do you recall receiving any training with respect to the medical policies?**

A No.

**Q All right. So you were hired as a detention officer in September of 2021. What was your -- what was your shift?**

A 6:00 a.m. to 6:00 p.m.

**Q And did that change after Mr. Wood left?**
A Yes. I was already the medical officer at that time.
**Q Okay. What's the medical officer?**
A It's, like, medical records. I would help set up for the nurse during her visits. Vital signs. Check blood sugar. Pull charts, if needed.
**Q When were you appointed as the medical officer?**
A Around sometime in October. I'm not specifically sure of the dates. Lieutenant Stanford offered it to me because they did not have anybody that had any background in medical, but she knew I had some training and experience working in nursing homes.
**Q And that's Martha Stanford?**
A Yes, sir.
**Q And she was a lieutenant?**
A That's what I knew her as. Jail administrator lieutenant.
**Q Okay. So vital signs, check blood sugar. You said set up the medical records? What does that mean?**
A If the nurse was going to see people,

pull their charts, get everything ready for her so she can come in and do her job.

**Q How often was a nurse there?**

A Two days a week for six hours each time.

**Q And who was the nurse in early 2022 when this incident happened?**

A I don't recall his name. But we had a nurse before Ms. Unruh.

**Q Okay. Who was the nurse at the time that Mr. May was at the -- at the jail?**

A That would be Ms. Unruh.

**Q Okay. Is she a TurnKey employee?**

A Yes, she was.

**Q Was.**

A My understanding, she's no longer with the company.

**Q Had she -- was she also there two days a week?**

A Yes, she was. For 12 -- or for six hours each day.

**Q Was there any -- other than Nurse Unruh being there the two days a week, was there any other medical professional that was on site the rest of the week?**

A Not to my knowledge. No.

**Q What's the first -- what's the first thing you remember about Mr. May?**

A He was sitting in a wheelchair.

**Q The first time you saw him?**

A Yes, sir.

**Q Before I forget, I was -- I wrote these down from Mr. Crabtree's --**

A Sure.

**Q -- testimony.**

**Do you recall being present when Mr. Crabtree -- with Mr. Crabtree having a face-to-face meeting with Marvin May?**

A Yes, sir. I arranged that meeting.

**Q And when was that?**

A I'm not exactly sure on what day it was. It was shortly after I had Mr. May moved up to the booking area.

**Q Was there anyone else present for that meeting?**

A Besides Undersheriff and I, not that I can remember.

**Q And what do you recall specifically about that meeting?**

A It would be easier if I told you what led up to it. Is that okay?

**Q I mean, we can get -- we're going to get into that, I think. I'm just curious if you remember any of the content of what happened, what was discussed.**

A We just talked to Mr. May about taking a shower. I had put him in a room -- in a cell with a shower in it just specifically for him so that he could get in the shower. David went and talked to him and said, you know, you might feel better if you take a shower, if you'd drink this. Mr. May did drink some of it. We were able to get him into the shower. We had a -- just a plastic chair that we let him sit in while he showered. And once he got in the shower, it was very hard for us to get him out because he said the water felt so good.

**Q Was he -- at that point, was he having difficulty ambulating?**

A Yes, he was.

**Q And when you said he drank -- you said that Mr. May drank something. What did he drink?**

A It was either Ensure or Boost. A protein shake.

**Q Okay.**

A I'm not sure which brand we had at the

**Do you see that?**
A Yes, I do.
**Q Is that -- is that consistent with what your observations were with how long a follow-up appointment would be set with inmates who had some kind of issue?**
MS. MARTINEZ: Object to the form
MR. MILLER: Same.
Go ahead.
THE WITNESS: It varied from inmate to inmate depending on what their needs were.
**Q (BY MR. BLAKEMORE) Okay. Turn to Custer TK28.**
A (Witness complies.)
**Q Can you identify this?**
A Yes, I do.
**Q And what is it?**
A It's my incident report on Mr. May.
**Q And what's the date?**
A 2/2 of '22. At 12:44.
**Q All right. So the narrative -- the narrative states that an inmate Foster stated that May hasn't eaten for several days and is refusing to shower; correct?**
A Yes.



Exhibit 15

**Q And you -- you recall -- did you actually have a conversation with inmate Foster about this?**

A Yes, I did.

**Q And who was Inmate Foster?**

A Brian Foster. He was a cellmate of Mr. May's.

**Q So the next line, "I had -- I had Inmate May moved to cell 118 of booking area to be monitored for his behavior and eating habits."**

A Yes.

**Q Correct?**

A Yes.

**Q So does this refresh your recollection about when Mr. May was moved to the cell in booking?**

A Yes, it does.

**Q Okay. Now, turn to Custer TK30.**

A (Witness complies.)

**Q And what is this document?**

A It's my incident report on Mr. May again.

**Q And what's the date on this?**

A 2/3/2022.

**Q And this was the same date, if you**

**recall, as that chronic care note from Carey; correct?**

A Yes, sir. It is.

**Q So looking at this now, at the time that this telemedicine visit happened from APRN Carey, Mr. May would have been in that cell 118; correct?**

A Yes, he would have.

**Q All right. So you indicate "Brought to medical in wheelchair for medical visit."**

**When you say "brought to medical," what do you mean?**

A We have a medical office.

**Q And where is that?**

A It's in the booking area.

**Q Okay. So it's pretty close to where his cell was?**

A Yes, sir. It is.

**Q Who uses that -- or at the time of this incident, who used that medical office?**

A Jail staff and TurnKey.

**Q Indicates here that you and Nurse -- Nurse Stacia encouraged him to drink a protein shake and he refused; correct?**

A Yes.

**Q Then he was seen by APRN Carey, and she stated after the visit that his mental condition appeared to be deteriorating rapidly and that when she had seen him at the previous county, he was transported around via wheelchair at the facility also; correct?**

A Yes.

**Q Did -- recognizing that you're not a doctor or a nurse, just from a layperson's standpoint, did it also appear to you that Mr. May's mental condition was deteriorating?**

MR. MILLER: Object to the form.

MS. MARTINEZ: Same objection.

THE WITNESS: Yes.

**Q (BY MR. BLAKEMORE) Then it says, this last sentence, "Provider Carey said that she wanted to notify adult protective services about his well-being due to his deteriorating mental state."**

**Did I read that correctly?**

A Yes, you did.

**Q And do you know whether APRN Carey did contact adult protective services?**

A She said she was going to. So I'm assuming she did. Yes.

**Q So he -- you were able to get Mr. May to eat a small portion of eggs and then he refused the rest; correct?**

A Yes.

**Q Then you offered him a cookie and he took a small bite; right?**

A Yes.

**Q Were you concerned, by this point, on February 9th of 2022, were you concerned about Mr. May's health and safety?**

A Yes, I was, as all the detention staff was.

**Q Do you know whether -- when you would give updates to Stacia Unruh, do you know whether she would contact any of the physicians or RNs or APRNs at TurnKey?**

A I don't know.

**Q Did you -- did you keep anyone aside -- I know you testified that you kept Lieutenant Stanford up to date on what was going on with Mr. May.**

**What about the undersheriff?**

A Yes, I did go to him.

**Q About how many times?**

A Once that I know of.

**Q Okay. Is that the one where he -- he came in --**
A Yes.
**Q -- and gave him the shake?**
A Yes.
**Q Did you have any other communications with Crabtree after that about Mr. May's condition?**
A Yes, I did.
**Q When?**
A I couldn't give you specific dates because I don't know.
**Q Okay. But would it have been prior to his being found unresponsive?**
A Yes, sir.
**Q Okay. And what would -- what would Mr. Crabtree say to you when you would update him on the -- Mr. May?**
A He would tell me, okay. But I don't know what he did after that.
**Q Okay.**
A It was out of my hands at that point.
**Q So would it be -- what specifically would you tell him? Just he's not eating?**
A Yes.

**Q He's still not able to walk?**
A Yes.
**Q Okay.**
A But it wasn't -- I wasn't the only one reporting.
**Q Okay.**
A All of the jailers were.
**Q Okay. Who were some of the other ones that were reporting to --**
A Angie. Angie Rose Schmidt.
**Q Okay.**
A The one on the phone call with me.
**Q Yeah.**
A Brandon Lopez. I'm not sure about Mr. Alvarado or anybody like that.
**Q Okay.**
A Mr. McCowen, I think did.
**Q So was the --**
A Oh, and Michael Davidson Hall did as well. Sorry.
**Q So was there just generally kind of a this -- as this situation with Mr. May was continuing to -- to go on, were there discussions with the detention staff about his condition and what should be done and those kinds of things?**

to check his blood pressure or get enthused about a shower.

**Q And it says here that you noticed a pair of soiled orange clothes.**

**Had you observed that Mr. May was incontinent?**

A Yes.

**Q And how -- how frequent was that?**

A It was every day that I worked. I don't know -- I can't speak for others. So we had diapers ordered for him. Adult briefs ordered for him. If I was there -- on the days that I was there, I would encourage him to get up and take a shower. Let's get you some clean clothes. Let's get you cleaned up. And normally, he would. Like I said, a lot of times, once we had him in the shower, it was very hard to get him out.

**Q Yeah.**

A He would stay in there for 30 minutes at a time at least.

**Q So would you observe that -- let me ask you this first. What -- you mentioned there were days that you weren't there. What was your -- during this time frame -- and I'm talking about**

**from January to mid March of 2022 -- what was your shift?**

A I worked four 10-hour days. I worked Monday, Tuesday, Wednesday, and Thursday. And normally, off on Fridays unless something had come up.

**Q Okay.**

A And I needed another day off.

**Q So would you go -- every day that you were there, would you go and check on Mr. May?**

A Yes, I would.

**Q And more than once -- more than once a shift?**

A Yes.

**Q And did you notice -- I mean, was there any change in his condition that you noticed from the time that he was first put into the cell in booking on February 2nd and the time that he was found unresponsive on March 18th?**

A Yes. Most days he would talk with me.

**Q Most days he would talk with you?**

A Yes, he would.

**Q As far as his physical, though, like, would he mostly, like, kind of lay there or --**

A He'd usually sit up.

**Q Okay.**
A He'd usually sit up, and I would talk with him.
**Q Did you ever notice there's -- and we'll get into it, but there's some documentation of it, but did you ever notice, like, pressure ulcers?**
A Yes, I did.
**Q So were there times that you would notice he'd kind of lie in the same spot for an extended period of time?**
A Yes. We would go in and turn him over. But most of the time, he would roll back into the same position.
**Q Okay.**
A He would say he's comfortable.
**Q And I think you did say he was incontinent the whole time that you were --**
A There might have been a couple of times that he got up and used the bathroom on his own. But from what I saw, most of the time, he was incontinent.
**Q Turn to Custer TK 35.**
A (Witness complies.)
**Q So this is the next -- the next day. We**

**just had your incident report from March 17.**

**Is there -- just before we get into the -- this one on 35, I mean, you've got several of these incident reports. What -- what would -- and I'm saying prior to this -- the day that he's found unresponsive on March 18, what would have kind of sparked you to do an incident report?**

A Something out of the ordinary.

**Q Okay.**

A Something that's not quite usual.

**Q Okay. And are -- are these all your incident reports that you did on Mr. May, as -- as far as you know?**

A As far -- as long as they have Julie Warnke on them, yes, they are mine.

**Q Okay. Do you think there are any others that you did that are not here?**

A There are some Otis logs.

**Q Yeah.**

A But other than that, no. That one's Brandon Lopez. That's not mine.

**Q Right. Yeah, so 35 is you. This is the day, obviously, that he's -- he's found unresponsive.**

**What do you -- what do you remember**



Exhibit 15

**about that day?**

A I walked in and there was a lot of officers standing around Mr. May's cell, and I asked them what's going on. What's wrong with Mr. May. And they said that he fell out of bed, and they're trying to help him get up. But they said he's not standing very good. And I said, well, he normally don't. I said it takes two people to lift him up. They asked for an ammonia packet, smelling salts to see if that would revive him any. It didn't. I hit the button and called a control officer to notify dispatch to call EMS. I then stepped out and went into the medical office and called Malachi Martin, a doctor who was on call, and told him of the situation. And he said to send him out.

**Q This -- you said Malachi Martin?**

A Yes, sir. He no longer works for TurnKey either.

**Q Had you ever spoken to Dr. Martin, but prior to this?**

A Not on Mr. May, but I think on another instance I had.

**Q Had you ever seen him at the jail?**

A No, sir.

**him.**

**Right?**

A Let's see. Yes.

MR. MILLER: I'm sorry. Where -- where are you?

. THE WITNESS: The 2/22.

MR. BLAKEMORE: I'm looking at her entries on this jail entry report.

MR. MILLER: Okay. Got it.

**Q (BY MR. BLAKEMORE) That same day, you -- you note that he had received a shower and A triple antibiotic ointment applied to his wound?**

A Yes.

**Q Describe the wound that he had.**

A Have you ever seen a pressure sore?

**Q Yeah.**

A It -- I would say it was probably a stage 2 pressure sore.

**Q And where was it located?**

A On his hip.

**Q Okay. From where he was lying on his hip?**

A Yes, sir.

**Q Okay. Did -- did the nurse ever express**

**any concerns about that pressure sore on him getting infected?**

A Yes. I believe she got the order for the triple antibiotic ointment to be applied because that's not something I could just apply.

**Q Do you have any training in wound care?**

A Just from what I observed at the nursing homes.

**Q Do you know whether any of the other detention officers had any training in wound care?**

A Not to my knowledge.

**Q So there's a number of other entries here from earlier in February, kind of the same thing, refusing the shake. You encouraging him to drink it. Applying the ointment to his -- his wound. There's one down here February 14, 2022. And this is Herrara.**

A Montse.

**Q Alvarado went into his cell 118 with Inmate May to help change his diaper and give him a new clean blanket.**

**Did you ever -- did you ever have to change his diaper? Did you get a male -- one of the male officers to help you with that?**

A Yes.
**Q Did you report that to the nurse?**
A I don't know if I did or not.
**Q Was it just kind of a general, like, daily concern that this could get infected?**
A Yes.
**Q If you go to 38. I'm looking at -- this is back at February 10. And this is -- looks like it's when the -- the Nurse Stacia ordered the antibiotic ointment.**
**Is this the first time you'd noticed that wound?**
A Yes. I believe so.
On the staff notes, Daniel Abbott would have been one, too, that showed a lot of concern.
**Q Okay. I appreciate that.**
A Uh-huh.
(Plaintiffs' Exhibit 6 marked for identification)
**Q (BY MR. BLAKEMORE) All right. Ms. Warnke, I'm going to hand you what I've marked Exhibit 6.**
MR. BLAKEMORE: And I have copies of these, but they're kind of weird the way they copied.
MR. MILLER: Thank you.

**things I've noted, clarify various things.**
A Sure.
**Q We will get you out of here by five after.**
A We're good. We're good.
**Q All right. And if I jump around, it's because I'm kind of following the order --**
A Sure.
**Q -- of my notes based on the questioning.**
**You testified that you had worked at a nursing home. What years were you with the nursing home?**
A 2001 to 2009 with Elk City. And then 2008 to 2011 with assisted living.
**Q Okay.**
A It was Elk Wood at that time.
**Q So at a nursing home and an assisted living?**
A Yes.
**Q Did you do similar duties at both places?**
A Yes. Yes.
**Q I imagine you dealt with a lot of older people --**
A Yes.

**Q -- at both facilities.**
**Is that fair?**
A Yes.
**Q Did some of the individuals you dealt with have dementia or Alzheimer's disease?**
A Yes. I worked with several locked units with Alzheimer's patients.
**Q Okay. Is that like a memory care unit?**
A Yes, it is.
**Q So you had significant experience dealing with dementia patients.**
**Is that fair?**
A Yes.
**Q How do you -- as a CNA --**
A Uh-huh.
**Q -- when you're working with people with dementia, kind of what do you do for them?**
A You just let them go in their own little world, but you encourage them to eat, bathe, if they want to watch TV, play games, interact with them.
**Q Okay.**
A Because basically their mind is deteriorating.
**Q Okay. Are those the type of things you**

**did for dementia patients or Alzheimer's patients when you were in a nursing home similar to the type of things you did for Mr. May?**

A Yes.

**Q And you testified that you would -- well, maybe you didn't. Let me make sure I got this.**

A Sure.

**Q When you would go and talk to Mr. May, do you think you saw him every day that you worked?**

A At least every day.

**Q Okay. More than once a day?**

A Maybe twice a day. Just depends on how busy I was, but I would always go talk to Mr. May.

**Q Would you -- and you said you would talk to him. Would you actually have communications, conversations where he would talk?**

A Yes. He and I had a conversation.

**Q One or many?**

A One in particular stands out to me.

**Q Tell me about that.**

A I had went in there to encourage him to take a shower, eat something, and he was kind of



Exhibit 15

-- he sat on his bed and he said, well, I don't really feel like eating. And I said, well, if you could have one thing, what would you have? And he said Cattleman's steak dinner. And I said, I've never been to Cattleman's. He said, well, when I get out of here, I'm going to take you there. He said we'll go to Cattleman's.

**Q So were you doing your best to try to get him --**

A Sure.

**Q -- to eat?**

A Sure. I asked him that day or one of the days about the scrambled eggs if he would eat that instead of the regular breakfast, and he said he would. So the kitchen made him special scrambled eggs.

**Q Would you agree with me that not every conversation you had with Mr. May is documented?**

A Right.

**Q For example, the one you just said about the Cattleman's --**

A It's not -- it's not documented.

THE REPORTER: Wait. Wait. Just one at a time, please.

THE WITNESS: Oh, I'm so sorry.

THE REPORTER: So for example?

**Q (BY MR. MILLER) For example, the one you just described about how he liked to go to Cattleman's, that is not written down; correct?**

A No, it is not.

**Q But it did happen.**

A It did.

**Q All right. Talked a little bit about -- I'm backing up, I know.**

A You're fine.

**Q You described how there's paperwork you believe with the state that would note your CNA license.**

A Yes. It's a matter of public record.

**Q Okay. And I think your personnel file actually notes that you were a CNA from 2001 to 2011?**

A Somewhere around that, yes, that sounds right.

**Q And then also a CMA?**

A Yes.

**Q What is -- do you know if those are two different things?**

A They are.

**Q What is the difference?**

A One of them is a certified nurse's aide which is where you report to your LPN. The certified medication aide gives you the ability and the license to pass medications on a med cart.

**Q Okay. And I think your certified -- your CMA in your personnel file says 2009 to 2011?**

A Yes, I didn't --

**Q How did that come about that you also got a CMA?**

A I worked at Elk Wood and they didn't really need a lot of CNAs.

**Q Okay.**

A They were really needing med aides, so they sent several of us to class.

**Q Okay. So I can't recall if you testified about that earlier, but you actually went to a separate class around 2009 to get the CMA?**

A Yes. Yes, I did. Yes.

**Q In addition to the CNA that you already had?**

A Yes.

**Q Okay.**

**a medical officer, take blood pressures?**

A Yes, I would.

**Q Would you get -- would you take blood sugars?**

A Yes.

**Q Would you administer insulin?**

A Yes.

**Q Do you agree that a provider, an APRN, did telehealth visits during the period that Mr. May was there? We talked a little bit about one?**

A Yes. But I only recall her seeing him that one time.

**Q Okay. But also would she do it for others as well?**

A Oh, yes. Yes.

**Q Do you know who made the decision that they be telehealth visits rather than in-person visits?**

A That was already in place whenever I started.

**Q Okay. Did that at some point change, that the APRN visits became in person rather than --**

A No.

**Q -- Telehealth?**
A No.
**Q Was there also a APRN or midlevel provider on call even during the Mr. May era 24 hours a day?**
A Yes. TurnKey was -- they're always on call.
**Q Okay. And for example, Mr. Malachi --**
A Yes.
**Q -- at the time that you called him he was -- was he on call?**
A Yes, he was.
**Q Is that why you called him?**
A Yes.
**Q How did you know who would be on call in any given shift?**
A We had an on-call provider schedule for after hours emergencies.
**Q Okay.**
A Monday through Friday 8:00 a.m. to 5:00 p.m. it's the jail's provider, but after that, there are several that take after hours calls so you call one of them.
**Q Okay. Do you know if Mr. Malachi worked for TurnKey?**

A Yes, he did. He did.

**Q Okay. Did you understand the entire time that Mr. May was at the facility, that in an emergency, you could contact an on-call provider?**

A Yes.

**Q Did you also understand the whole time he was there in an emergency, you could contact EMS or have dispatch call EMS?**

A Yes.

**Q You did, in fact, do that on March 18th.**

A Yes, I did.

**Q Did you believe it was an emergency on March 18th?**

A Yes, I did.

**Q Is that why you -- you did what you did?**

A Yes, 100 percent.

**Q Did you believe it was an emergency with Mr. May at any point prior to March 18th?**

A No.

**Q Was he communicating with you -- I mean, there's a report even on the 17th, the day before.**

A He was --

**Q Did he communicate with you on that day?**

A Yes. That's the day he hit his head on

me, I think. He said -- he sat up and said, I don't care if you take my blood pressure. That's fine. And then he laid back down and covered up his head. Was, like, I don't want you to do it. I just want to go back to sleep.

**Q Okay.**

A And at that point I have to respect his wishes and not -- I can come back at another time and encourage him later, but I can't force him to do anything.

**Q And that was the day before the incident where he was found.**

A Yes, it was.

**Q I want to back up a little bit --**

A Sure.

**Q -- to where he first came in the facility.**

**If you look at Exhibit 2. There are some documents in the first couple pages; an intake form, a mental health screening, a -- various documents from when he first came in January 27th or so.**

A Uh-huh.

**Q Was that you? Did you -- did you do his original intake?**

A No, I did not.

**Q Okay.**

A That's out of my job capacity.

**Q Does TurnKey do that?**

A Yes, they do.

**Q Would that be Stacia?**

A Yes.

**Q I want you to turn to Page 10.**

A (Witness complies.)

**Q And this is -- the next couple pages are a medication administration record.**

A Okay.

**Q We -- we haven't really gone over this.**

A Okay.

**Q There are some medications on the left there. Is that your handwriting?**

A Yes, it is.

**Q How did you know what to put on the medication administration record?**

A One of the providers for TurnKey that worked at Canadian County called our facility and said, hey, Mr. May is coming to your jail and he'll have a box of medications with him.

**Q Okay.**

A And since he's already been seen at

Canadian by TurnKey, he's good to continue those meds.

**Q Okay. Was that a conversation between you and somebody?**

A Yes. It was a nurse -- and I -- I don't know -- I think his first name was Anthony, but I cannot remember his last name.

**Q Okay. So if you'll look there on that -- on Page 10, I see initials.**

A Uh-huh.

**Q Starting on the 26th, which is the day after he arrives at the facility. Actually I see one initial on the 25th at 1800.**

A Nighttime med.

**Q Yes.**

**So does it appear, based on this, he was getting medication beginning on the evening of the 25th of January?**

A Yes. He came in with his medications.

**Q Okay. Is it fair to say you must have written these medications down on the 25th, the day he came in?**

A Yes.

**Q Okay. And that was based on the fact that he had already been getting care from**

**TurnKey back at Canadian County.**
A Yes.
**Q Okay. So he didn't need to tell you what his medications were.**
A No.
**Q Then I see on the 26th, for example, to me it looks like J.W.**
A That's me.
**Q Are those your initials?**
A Yes.
**Q Okay. So any time on this log that we see J.W., does that mean you administered medication to Mr. -- Mr. May?**
A I think I was the only J.W. at that time.
**Q Okay.**
A Unless Jerry Wood would have happened to give him medication.
**Q I think --**
A It's possible.
**Q -- the testimony is Mr. Wood had already left by this point.**
A Okay. Okay.
**Q So if you -- look over the next couple pages 10, 11, 12, 13, 14, 15 -- and 15. Do you**

**Q I know you testified you heard he had passed away of COVID-19.**
A Yes.
**Q At any point prior to him going to the hospital on March 18th, do you remember thinking he had COVID-19?**
MR. BLAKEMORE: Object to form.
THE WITNESS: No.
**Q (BY MR. MILLER) Or that he had symptoms associated with COVID-19?**
MR. BLAKEMORE: Object to form.
THE WITNESS: No.
**Q (BY MR. MILLER) Were you surprised to hear he had died of COVID-19?**
A Yes, I was.
**Q You're not going to offer any kind of expert opinion on what his cause of death was. Is that --**
A No.
**Q Would you agree with me that after he's moved up to the front on February 2nd through the date of him being sent to the hospital, he was in a single cell?**
A Yes, he was.
**Q And thus had less opportunity to be**

**around other people that could give him COVID-19.**
MR. BLAKEMORE: Object to form.
THE WITNESS: Yes.
**Q (BY MR. MILLER) Compared to if he had been back in the back.**
A Correct.
**Q Whose idea was it to start giving him protein shakes?**
A Mine.
**Q That is different than a normal or the average meal; correct?**
A Yes.
**Q What made you think to try that?**
A If they're telling me he's not eating or if I'm seeing that he's not eating, he needs to be offered some kind of supplemental shake or whatever. We did it in the nursing home for people that ate -- I think it was 50 percent less of their meal, you offered them a protein shake, get them something.
**Q Based on your experience working at the nursing home, was it more effective to get someone who was not eating to eat a protein shake compared to a -- a sandwich?**
A Yes.

**Q Is it easier to eat?**
A Yes.
**Q You can drink it; right?**
A Yes.
**Q You were shown some logs on missing meals and there were --**
A Yes.
**Q -- you know, references to him not eating various meals.**
A Yes.
**Q Do you know if those logs -- the logs don't mention protein shakes.**
A No.
**Q Do you know whether if he didn't eat a meal but he ate a protein shake that got counted as eating a meal or not eating a meal on the log?**
MR. BLAKEMORE: Object to form.
THE WITNESS: I don't know.
**Q (BY MR. MILLER) Okay.**
A I don't know.
**Q Do you know how the kitchen supervisor would determine whether to write down somebody missed a meal or not?**
A No, I do not.
**Q Okay. What if somebody eats a piece of**

**a meal, you know, a -- you know, like, a little bit of the eggs and a protein shake, is there -- do you know if that counts as an eaten meal or a not eaten meal?**

MR. BLAKEMORE: Object to form.

THE WITNESS: I don't know.

**Q (BY MR. MILLER) All right. Now, you were at the -- okay. Let me -- sorry. I'm trying to keep everything in order here.**

A You're fine.

**Q Do you recall meeting with a jail inmate named Brian Foster?**

A Yes, I do.

**Q Okay. What do you remember him saying to you about Mr. May?**

A That Mr. May -- I don't know if he was having trouble showering or he wouldn't shower and he didn't eat.

**Q Okay. Is that how you first learned of the -- of -- of these issues --**

A Yes.

**Q -- or is that something you already kind of knew about?**

A I think it was about the first time I really learned it. And then Mr. Foster also put

in, I think, a grievance and a request to staff.

**Q Okay. And I'm not -- and we took Mr. Foster's deposition last week.**

A Okay.

**Q And we looked at that grievance and request of staff and it -- the -- Angie Schmidt responded to them and she said he's being moved -- he's about to be moved upfront basically.**

A Yes.

**Q Did you make the decision to move him upfront, or -- or did somebody else make that decision?**

A I think Angie and I both made it together. We had an open cell in booking and normally we like to keep those cells cleaned out just for an emergency like this or an inmate like this that had problems.

**Q Okay. Why did you and Angie decide to move him upfront?**

A So we could watch him. See if we could make sure he was eating. Just keep a closer eye on him. He's in booking where most of us are.

**Q Is that also closer to the TurnKey medical office?**

A Yes, it is.

**Q How far is where he was from the TurnKey medical office?**

A I would say probably about four cells L shaped. Not very far. I don't -- I'm not real good with measurements. So.

**Q Okay.**

A It was very close.

**Q And was that -- I believe the day before the chronic care visit with APRN Carey?**

A Yes.

**Q Do you know how it came about that the chronic care visit got set? Is that -- did you set that up?**

A No. That would have been Stacia and probably because he was new.

**Q Okay.**

A Or he might have had an appointment at Canadian County. I can't remember.

**Q And you were there for that visit.**

A Yes.

**Q After which Ms. Carey said she was going to go talk to Adult Protective Services, right?**

A Uh-huh.

**Q Yes?**

A Yes. I'm sorry.



Exhibit 15

**Debbie at OIDS and Angie Schmidt. And then Teo Diaz calls back and you answer the phone.**

A Yes.

**Q Do you know how it came about that somebody decided to call his criminal defense attorney about the situation on February 3rd?**

A It would have been Angie and I's idea because we were both on shift that day.

**Q Okay. So February 3rd is the same day of the chronic care visit; right?**

A Yes. Yes.

**Q Okay. So was it after the chronic care visit that you and Angie decide to call his criminal defense attorney?**

A Yes.

**Q Tell me about that decision to call his criminal defense attorney.**

A When we heard that Provider Carey wanted to call APS, Angie knows a lot about the courts and I think she suggested that we call his OIDS lawyer to see if we could get the lawyer to come visit him, come check on him, please do something with him.

**Q Okay. So the goal is --**

A Get him out.

**Q Get him out; right?**

A Get him out.

**Q Okay. So you -- you two, you and Angie are -- you came up with this yourselves; right?**

A Yes.

**Q This wasn't from the undersheriff.**

A No.

**Q Or even Martha Stanford.**

A No.

**Q Okay. So she calls, talks to somebody at OIDS and then Teo calls back. And do you recall recently listening --**

A Yes.

**Q -- to a conversation --**

A Yes, I do.

**Q -- between yourself and Mr. Diaz?**

A Yes, I do.

**Q Okay. Was anybody else on that call?**

A I know I passed it off to Angie at one point.

**Q Okay. And I actually -- I'm not sure I realized that myself. Is there a part of the conversation where you're talking and then the female voice actually switches and it is Angie?**

A Yes, there -- it is.

**Q Okay.**
A I couldn't tell you precisely where.
**Q Okay. If -- if -- if there's a part where somebody chimes in and says we're concerned about Mr. May, he's not eating, and it sounds like a different voice than the previous female, is that --**
A That would be Angie.
**Q Okay. The first female's you, then Angie; is that --**
A Yes.
**Q Okay. What were you trying to get Mr. Diaz to understand in that conversation on February 3, 2022?**
A Please come check on Mr. May. He needs to be out of here.
**Q Okay. Do you recall him saying that unless there's a medical emergency and there's a doctor's order or an order from a nurse practitioner, he has to stay there?**
A Yes.
**Q Do you recall him saying that the nurses and doctors are the ones to make the call of whether he goes to the hospital or not?**
A Yes.



Exhibit 15

**Q Do you recall him saying that as far as upping the court date, there's nothing they can do about it because the courthouse is closed?**
A Yes.
**Q Was this during a snowstorm?**
A It was.
**Q Do you recall him saying that he was going to come visit -- this is not verbatim -- but that he's going to come visit Mr. May?**
A Yes.
**Q Do you recall him saying that legally there's nothing he can do about the case until they get into court?**
A Yes.
**Q Is that true?**
MR. BLAKEMORE: Object to form.
THE WITNESS: Not to my knowledge.
**Q (BY MR. MILLER) Why to your knowledge is that not correct?**
A Because you can get OR bonds. I mean, they've had to call judges in the middle of the night to get an OR bond for medical emergencies.
**Q Okay.**
A I don't know if that's somebody from the jail or if an attorney can do it, but I would

assume being an attorney they could.

**Q He called back again after the call with you 20 or 30 minutes later.**

A Okay.

**Q And talks to Angie.**

**Were you on that second call to the best of your memory?**

A I don't think so.

**Q Essentially the upshot is he really wants to know -- let him know that he's going to come visit Mr. May.**

A Uh-huh.

**Q Do you know if he ever did?**

A Not to my knowledge.

**Q Did you ever see him visit Mr. May?**

A No, I did not.

**Q Do you keep the records of when attorneys visit their clients? Is that something you do?**

A No. You can log them on our jail logs.

**Q Okay.**

A But it wouldn't have been something that I would have done at that time.

**Q That's somebody else?**

A Yes.

**Q Okay. Did you ever speak with Mr. Diaz again after that call?**

A Not to my knowledge. No.

**Q What -- what was kind of your sense of how it ended and what he was going to do?**

MR. BLAKEMORE: Object to form.

THE WITNESS: I would hope that he would come see his client and do something for him.

**Q (BY MR. MILLER) Okay. Do you know what efforts were taken to get Mr. May an OR bond?**

A I believe Undersheriff Crabtree went across -- we call it going across the street to the courthouse and work -- presenting evidence on why Mr. May or any inmate at that time that we think needs to be out and would take it across the street and present it to the D.A.

**Q Okay. Did you talk to Mr. Crabtree about that plan, that he was going to do that?**

A Yes. I believe that's why I had Undersheriff Crabtree come back that one day and help me with Mr. May so everyone was aware of the problems we were going to have with him. With needing care.

**Q Okay. Were you over there across the street when he talked to the --**

A No, sir. No.
**Q Okay. Did you ever get an answer as to whether he got an OR bond or was going to get an OR bond?**
A I think the undersheriff came back and said, no, they were not going to.
**Q Who was not going to?**
A Mr. May was not going to get an OR bond.
**Q Okay. Did he -- was that his decision or did somebody else --**
A It was the D.A.'s decision.
**Q Okay. Did you ever talk to the D.A. about this?**
A No, I did not.
**Q Okay. Now, another series of events that's kind of going on is Mr. Diaz applies for him to get a competency evaluation.**
A Uh-huh.
**Q Were you in any way involved in the effort to get him a competency evaluation?**
A No, I was not.
**Q Did you understand that rather than the OR bond, there was a process in place to try to get him a competency evaluation?**
A No, I did not.

**weeks about the status of Mr. May being in the facility?**

A Like I answered before, I think undersheriff had came to me in passing and asked me how Mr. May was doing.

**Q Okay.**

A And I would tell him, you know, there's no -- there's no change.

**Q Okay. On your reports, and I'm going to -- I'm sorry. I know this is a lot.**

A It's okay. It's okay.

**Q Trying to get you out of here by 5:00.**

A You're fine. If it goes over, it goes over.

**Q On your report -- go back to Exhibit 2, pages 36. I see it referenced here --**

A You said 36? I'm sorry.

**Q Yes. Custer TK36.**

A 36.

**Q Do you see on February 14th you wrote Nurse Stacia and I, DO Medical Warnke, encouraged inmate May and he got up and took a shower. His wound was looked at by the nurse.**

A Yes.

**Q An antibiotic ointment medication was**



Exhibit 15

**applied to the sore.**

A Yes.

**Q Did Stacia Unruh look at his wound that day?**

A Yes.

**Q I don't see any reference by you to Ms. Unruh after that date.**

A Uh-huh.

**Q February 14th.**

**Did you, over the next -- over the next month or so that he was there in the facility, continue to update Ms. Unruh about Mr. May?**

A Yes.

**Q Okay. You're sure of that?**

A I'm -- I'm sure.

**Q Okay.**

A As a CNA, that's what we're trained to do is it report our findings to the LPN.

**Q Okay. So when you would do that, is that verbal?**

A Yes.

**Q What would you say to her?**

A You know, Mr. May there's still not any real change in him, you know, is there anything we can do.

**Q And what answer would you get?**

A No.

**Q Okay. I believe Ms. Warnke (sic) testified that she doesn't recall any --**

MS. MARTINEZ: You mean Ms. Unruh

**Q (BY MR. MILLER) I'm sorry. Ms. Unruh testified she doesn't recall any further conversations kind of later in time where she was involved.**

A Right.

**Q When you would bring something like that informally to Ms. Unruh, could she go and look at him?**

A Yeah.

**Q Was there anything stopping her from looking at him?**

A No. Well I -- let me retract that.

If she had a lot of sick calls that day, that would have been the preventative. But since he was up in booking, I mean, anybody could walk by his cell and open the window and look at him and see how he was.

**Q Okay. Do you know why she wasn't looking at him the last couple weeks?**

A No, I don't.

**Q Did you know who Mr. May's next of kin was?**

A No.

**Q Before -- until the day that he was sent to the hospital?**

A No. I had no idea. I had no idea he had any family.

**Q Okay. Did you ever -- did any of his family ever come visit him to your knowledge?**

A No.

**Q Did they ever call to your knowledge?**

A No.

**Q When you talked to Mr. Diaz, did he say anything about talking to the family?**

A No.

**Q Or suggesting, hey, maybe they pay bond to get him out of the facility?**

A No. No. And the families are welcome to call and talk. Medical staff we can't give them a whole lot of information.

**Q Uh-huh.**

A But they can call as to -- ask about bond or how their loved one is doing.

**Q Okay. If you had known who his family was, do you think you would have considered**

**calling his family?**
A 100 percent. Yes.
**Q I want to skip ahead to March 18th, the day of --**
A Okay.
**Q -- when he's sent to the hospital.**
**What time does your shift start?**
A 6:00 a.m.
**Q Okay. So I think he fell within a few minutes of that before you came in?**
A Yes, he did, according to the timestamp on the camera, he did.
**Q Okay. So you happened to walk in with this having just started.**
A Yes.
**Q Okay. The -- go to Exhibit 22.**
A 22.
**Q Page 12. It's a radio log.**
A Uh-huh.
**Q Can you tell when dispatch contacted -- when dispatch was contacted about Mr. May?**
A Looks like 6:04.
**Q All right. And it says here Frankie LaRou was a dispatcher and that D/O Martha called over and advised need ambulance to the jail.**

that.

**Q Okay. Because her husband was upset?**

A She said that her husband was upset that I was bothering the undersheriff with jail responsibilities and I should have went to her.

**Q Okay.**

A But that day she wasn't there.

**Q Okay. Was she mad at you?**

A I don't think so.

**Q Okay. But you continued talking to Undersheriff Crabtree regardless. Is that --**

A Yes. If he would ask me, I would talk to him, yes.

**Q Okay. And Jeff Stanford isn't your supervisor; right?**

A No. No. He was our investigator.

**Q You called Mr. -- Dr. Malachi on the 18th.**

A Yes.

**Q Is he involved in this in any other way? Did you ever speak to him about Mr. May prior to that call right at the end?**

A No.

**Q Were you doing your best for Mr. May under the circumstances?**

MR. BLAKEMORE: Object to form.
THE WITNESS: Yes, I was.
MR. MILLER: All right. I'll pass the witness.

EXAMINATION

BY MS. MARTINEZ:

**Q All right. My name is Vanessa Martinez. I work represent TurnKey, Tamara Carey, and Stacia Unruh.**
A Yes, ma'am.
**Q I may be jumping around.**
A That's fine.
**Q So if you get confused or you don't know what I'm saying, just ask me to repeat and I will do that.**
A Thank you.
THE VIDEOGRAPHER: Will you grab the mic?
MS. MARTINEZ: Can I have your mic, please?
THE WITNESS: He's awful quiet.
THE VIDEOGRAPHER: Thanks.
**Q (BY MS. MARTINEZ) Also, she's taking down everything that we're saying, so if you'll let me finish my question before you answer, that**