IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN N. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

Plaintiffs,

-vs-

TURNKEY HEALTH CLINICS, LLC, et. al.,

Defendant.

Case No. 24-CV-119-JD

VIDEO DEPOSITION OF DAVID ELDON CRABTREE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 13, 2025, AT 10:08 A.M.

REPORTED BY: LANA L. LEDFORD, CSR

**Exhibit 30**

**jail," what are you talking about?**

A The standards -- the jail standards of Oklahoma.

**Q Oklahoma jail standards?**

A Yes.

**Q What about the Custer County Sheriff's Office policies?**

A Our policies are written by Lexipol, which is a CALEA standard, I believe. Once they -- they will send us a policy. If there's a change, we'll review it. If we want to make any changes, we no- -- notate it, we send it back, and then -- then it's in our policy. And then it's also -- all the employees will get a email stating that they have a -- a new policy standard to read and review. The deputies, and I believe the jailers, have what they call a daily training bulletin. They come out once a month. There's, like, 28 different policy-type questions that they are supposed to review.

**Q Were you familiar with the policies prior to you taking on the job as undersheriff?**

A Yes. It was required by all new employees to read policy and procedure.

**Q And what -- you mentioned this -- what**

**is it Lexipol?**

A Yes, sir.

**Q So what, if any, role do you have as undersheriff in reviewing the -- the policies? And I'm really more concerned -- I'm specifically talking about the policies as they pertain to the jail.**

A Okay. At the time we had Jerry Wood was the jail administrator. He retired.

**Q And when you say "at the time," when was that?**

A Was that -- he retired shortly after I got there as the undersheriff. So I don't know if it was November, December of '21 that he retired. I don't know a date for sure. And then Martha Stanford became the jail lieutenant. And she was overseeing the day-to-day operations of the jail. If she had problems, she saw me and then we would solve the problems.

**Q When you say "jail lieutenant," is that synonymous with jail administrator?**

A Yes. It wasn't the official title that she had. It was just -- she was the jail lieutenant. She was the highest ranking detention officer in the jail.

**Q As of January through March of 2022, was there anyone who held the actual job title of jail administrator?**

A Don't believe we actually had a jail administrator. It would be -- I guess it would be me, because I had to oversee everything there.

**Q So when you say you had to oversee everything there, how much time would you spend actually at the jail --**

A The jail.

**Q -- on a given -- a given day? Realizing it probably --**

A Right.

**Q -- is different from day-to-day. But.**

A Some days, maybe 30 minutes. Some days, four to five hours, depending on what was going on.

**Q So while you were -- I mean is it fair to say you were acting kind of as the -- the defacto jail administrator at that time?**

A I would -- I guess so. Like I said, I had -- I oversaw the entire department.

**Q Were you responsible for ultimately updating the -- the policies?**

A Between myself, I had a major that was

A Correct.
**Q You also said something about across the street.**
A That's the courthouse.
**Q Okay.**
A The DA's office. The judge. The courtrooms.
**Q Did you ever have -- aside from this one interaction with Mr. May, did you ever have any additional -- additional contact with him?**
A No.
**Q Did you ever follow up with Ms. Warnke or Lt. Stanford or anyone else at the jail as to how Mr. May was doing?**
A Yes.
**Q Who?**
A Both of them. And I do not recall which one told me that the situation was not improving. Once I was given that information, I went across the street and spoke with the district attorney.
**Q And was it the actual district attorney or an assistant?**
A The first assistant.
**Q And who's that?**
A Ricky McPherson.

**Q And what was the conversation you had with Mr. McPherson?**

A Well, I told him based off of what I was informed, that he had not been eating. His bathing -- he's not bathing. I'd also -- through a phone call with the -- the jail division advised me that he potentially had Alzheimer's or dementia. And I said now, that has not been confirmed. Given that, his age, I said we need to get him out of our jail, either medically OR him, let's -- let's -- he doesn't belong here.

**Q Okay. And what did Mr. McPherson say?**

A Well, we didn't get him out of jail. As far as what he said, that they have their protocols. They were going to try and get him mentally looked at. I can't think of the word right now.

MR. DAY: (Inaudible.)

THE WITNESS: Who?

MR. MILLER: You can't speak.

THE WITNESS: I can't think of -- they had their protocols.

**Q (BY MR. BLAKEMORE) Okay.**

A They're going to see if he's mentally stable or what his mental capacity is. And so --

MR. EDWARDS: Hey, the reason why I called is you actually have a Marvin May detained there; is that right?

MR. CRABTREE: Yes, sir.

MR. EDWARDS: And adult protective services got a complaint and they forwarded it to us.

MR. CRABTREE: Uh-huh.

MR. EDWARDS: And basically that this individual has dementia.

MR. CRABTREE: Okay. Has he been diagnosed with it, or is it just their presumption?

MR. EDWARDS: Well, their -- their -- the complaint is that, I mean you have him in jail. You're going to know if he's got any -- any -- any cognitive issues or anything else and stuff that need to be brought to the DA's office --

A Uh-huh.

**Q -- attention to stuff. Said that he can't care for himself. So my question is, is he eating? Is he getting his medication? Does he need assessed.**

**Well, we obviously have medical here.**

**I'm trying to think of what day it was I went in there. They said he hadn't been eating. When I went in there, he got up, took his meds and drank a protein shake, and I haven't had a discussion with him since then.**

MR. BLAKEMORE: Okay.

MR. CRABTREE: So what my plan is I get a little busy, and I'm going to go back there and see what the status on him is. And if it's something I need to bring up to the DA to see if we can do something with him and get him out of here if that's the case. But they're going to want to know if it's been diagnosed when they have to go and send him somewhere and get that done, too. But.

MR. EDWARDS: Okay. Let me go ahead and forward this to you. Let me --

MR. CRABTREE: Okay.

MR. EDWARDS: Let me double check the email we have on file here. Just a sec.

MR. CRABTREE: I can give you my email address.

MR. EDWARDS: I want to double check to see what we have on file, in case I need to change it. Okay. I have -- are you -- you're

phone call, it was that day or the next day. It was -- I cannot tell you the exact time. But given that -- that information that I had received from the jail division warranted me to get back there quickly.

**Q Okay. So it would have been --**

A If it wasn't immediately, it had to have been that day or the next day.

**Q So representing that this was February 7th when you had this call, you would have met with them on either February 7th or February 8th.**

A Yes.

**Q What about the meeting with -- was it McPherson, the ADA?**

A Uh-huh.

**Q When was that?**

A Well, I want to think I met -- given that phone call, I either met with him that day or the next day.

**Q Okay.**

A And advised him of what I had found out and that probably tell him at that point we need to get him medically OR'd, get him OR'd, let's get him into a facility that can handle the potential problems that he has.

**Q Do you specifically recall saying that and making that request of ADA McPherson?**

A Yes.

**Q And that would have been also either February 7th or February 8th?**

A I believe so.

**Q And did -- after this -- I believe you testified earlier that after this interaction with -- first, with Warnke and Stanford and then with McPherson, and it would have been we know now around February 7th or February 8th, that you didn't -- you didn't have any other conversations with anyone about May until after he was found unresponsive.**

**Is that true?**

MR. MILLER: Object to the form.

THE WITNESS: I want to think I was still in contact with Martha or Julie. And again, I did not document. I make the presumption that I did go over there and ask McPherson, where are we at on this. And I would get their -- whatever their procedural thing that they're going to get him evaluated. And I was saying, again I'm sure -- I was -- the first time I went over I thought was enough to get him out

of jail, or at least to get him medically OR'd.

**Q (BY MR. BLAKEMORE) You said you make the presumption. Do you specifically recall any other meetings, phone calls, discussions that you had with anyone regarding Mr. May between this time of around February 7th or February 8th, and the time that he was found unresponsive on March 18th?**

A Again, it would have probably have been if I -- again, conversations with the DA.

**Q Okay. But do you specifically recall that?**

A The dates, no.

**Q You --**

A I do not know -- I cannot sit there 100 percent and say -- I would presume that I did.

**Q Okay. But you can't say 100 percent?**

A I don't have it documented so that's why I'm just hesitant to say, yes, on this date I did.

**Q Okay. But Do you -- and whether you have it documented or not, do you specifically recall having a conversation after this date of around February 7th or February 8th regarding Mr.**



Exhibit 30

**May prior to him being found unresponsive on March 18th?**

A I would say that I spoke with McPherson again, because I was getting updated by staff. Trying to find out where we're at.

**Q When you say "getting updated by staff," what do you mean?**

A Martha or Julie advised me of Mr. May's condition.

**Q Okay. So you had further conversations --**

A Yes.

**Q -- with Martha and Julie?**

A Yes.

**Q After --**

MR. MILLER: Let him finish his question.

THE WITNESS: Oh, I'm sorry.

MR. MILLER: It's okay. You're kind of talking over each other a little bit. Try and --

**Q (BY MR. BLAKEMORE) You did have further conversations with Ms. Stanford and Ms. Warnke after February 7th or February 8th?**

A Yes.

**Q How many times do you think?**

A Yes.
**Q What was his response?**
A He nodded.
**Q Okay. Another topic.**
**If you have an inmate such as Mr. May or any other inmate, can you just release them on to the street?**
A No.
**Q Why not?**
A It's against the law.
**Q Okay. What are the various ways for an inmate to be released from the Custer County Sheriff's Office custody?**
A Well, most of the time, it's going to be a medical reason. When the staff, whether it's TurnKey or medical staff, advises me of who the inmate is, through experience with the DA, what they're wanting. They want to know what the medical condition is, what the charges are. Once I've gathered this information, then I will go and -- most of my dealings are with the first district attorney.
**Q Okay.**
A Which is McPherson. If not, I would deal with the district attorney.

**Q Okay. And who is the district attorney?**
A That is Angela Marsee.
**Q Okay. And is that -- all you just described, is that in order to get an OR bond?**
A Once I present what I had for them, if they agree, then they will go to the one of the three judges -- if we have three there that day, and they will present to the judge and then the judge will authorize --
**Q Okay.**
A -- the release.
**Q And an OR bond, correct me if I'm wrong, allows the individual to be released from your custody without payment of bond. Is that right?**
A Correct. Yes.
**Q Okay. What does OR stand for, for the record?**
A Own recognizance.
**Q Okay. So that's one. Are there any other ways that somebody can get out of jail? For example, paying the bail?**
A Yes.
**Q Is that another way that people get out of jail?**
A Yes.

**Q Did anybody ever pay bail for Mr. May?**
A Not that I'm aware of.
**Q Generally who pays inmates bail? Other inmates.**
A It could be a family member. It could be a friend. We've had employers.
**Q Okay. Did anybody from Mr. May's family pay his bail?**
A Not that I'm aware of.
**Q Did anybody from Mr. May's family, until you spoke with Ms. Hoff on the 18th, ever call you ever?**
A No.
**Q Did anybody from Mr. May's family ever visit him?**
A Not that I'm aware of.
**Q Okay. When you spoke with Ms. May -- with Ms. Hoff, you listened to some recordings recently; correct, from the 18th?**
A Yes.
**Q Okay. Did she say anything on those recordings that you recently listened to about why she hadn't paid her father's bond?**
MR. BLAKEMORE: Object to the form.
THE WITNESS: I do not recall if she



Exhibit 30

said anything like that.

**Q (BY MR. MILLER) Okay. Do you remember her saying oh, anything about his bond at all during -- at any point?**

A Not that I can recall.

**Q Okay. Are you allowed, as a sheriff's office running a jail, to release someone without bond or an OR bond onto the street?**

A No.

**Q I think you already testified that his paperwork when he came into the facility did not have a next of kin on it; is that right?**

A The original -- or the one that I was looking at did not.

**Q Did his criminal attorney, Teofilo Diaz, ever call you about Mr. May?**

A Not that I can remember.

**Q Okay. I don't know if we talked about this too much, but I will represent there was a process by which there was an application for a competency evaluation that was filed with the court. Did you, David Crabtree, play any role after that initial conversation with Mr. McPherson, in trying to get him a competency evaluation? Did you play any role in that?**

**The jail staff would need to inform TurnKey regarding an inmate's eating or not eating; is that correct?**

A I believe they would.

**Q Okay. To your knowledge, did any -- either Julie Warnke or any other jail staff reach out to TurnKey regarding Mr. May not eating?**

A I'm not aware of that.

**Q Okay. And did you?**

A No.

**Q Okay. What about him not showering? Did you ever reach out to TurnKey regarding that?**

A No.

**Q What about drinking water? Did you ever reach out to TurnKey about him drinking water or not drinking water?**

A No.

**Q Okay. If there's a medical emergency you're able to call 911 or EMSA; is that correct?**

A When there's a medical emergency they call and get ambulance enroute immediately. They will make -- contact Clinton PD, because they'll dispatch them out. Or, I believe, they can call Sinor ambulance service. That's who provides



Exhibit 30

service to Clinton or Arapahoe.

**Q And when you say "they," you're talking about the jail staff and/or you?**

A The jail -- any one that is with the Custer County Sheriff's Office can call immediately for medical.

**Q Okay. And the jail staff is also able to contact TurnKey nurse or provider if they feel there's an emergency as well; is that correct?**

A Yes.

**Q Okay. Did you ever contact 911 or EMSA or Sinor regarding Mr. May?**

A No.

**Q Okay. Did you ever contact TurnKey nurse or TurnKey provider regarding any type of emergency regarding Mr. May?**

A No.

**Q Okay. I believe you were asked some questions about this email on DDR3813 where it says that he had may -- he may have been incarcerated for at least two to three months.**

**Do you know if Mr. May had came from another jail prior to being booked into the Custer County jail?**

A I believe he transported from Canadian



Exhibit 30