UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

(1) LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, deceased, and
(2) LEANN D. HOFF, as Co-Administrator of the Estate of Marvin G. May, deceased,

Plaintiffs,

vs. Case No. CIV-24-119-JD

(1) TURN KEY HEALTH CLINICS, LLC;
(2) TAMARA CAREY, APRN;
(3) STACIA UNRUH, LPN;
(4) CUSTER COUNTY SHERIFF, in his official capacity; and,
(5) JULIE WARNKE,

Defendants.

DEPOSITION OF MARTHA STANFORD

TAKEN ON BEHALF OF THE PLAINTIFFS

ON OCTOBER 8, 2025, BEGINNING AT 9:54 A.M.

IN OKLAHOMA CITY, OKLAHOMA

REPORTED BY: D. Luke Epps, CSR, RPR

**Q Give me just a second. Was there a jail administrator at the jail in that time frame of, like, early 2022?**

A I'm trying to remember when Jerry left because after Jerry left there was no jail administrator, and the sheriff at that time decided not to hire one, and he kind of just appointed David Crabtree as a acting jail administrator.

**Q During that time frame -- there's been some testimony, it's a little confusing, that some of the staff at the jail thought you were the jail administrator. Were you ever actually appointed as the jail administrator?**

A No.

**Q So it was your understanding that during that time frame, and, again, we're talking about early 2022 after Wood leaves, that Crabtree is acting as the -- like, the de facto jail administrator?**

A Yes, sir.

**Q And he was also the undersheriff; right?**

A Yes.

**Q Did you supervise Julie Warnke?**

A Yes.

**Q And what was her position?**

A She was the head of the medical department.

**Q And from your perspective as her supervisor, what were Warnke's duties and responsibilities as the -- the head of medical?**

A She was the go-to person for Turn Key. She did med pass. She ordered medications. She overlooked the MARs cards. I don't know if you're familiar with those. That records when meds are given out and what kind of meds they're supposed to be on for each individual inmate.

**Q Anything else?**

A No.

**Q When you say she was the go-to person for Turn Key, what do you mean by that?**

A She was in charge of medical. I put her in that position because of her CNA experience.

**Q And for the record, what is a CNA?**

A I don't know what it stands for, but I know she worked in nursing homes.

**Q Did you have any understanding during this time frame, and, again, I'm talking about early 2022, whether Ms. Warnke was actually licensed as a CNA?**

A I mean, I never seen her certification,

A The fall or --
**Q Well, anything.**
A Just when -- after I got there, when they were helping him up and tending to him, and then the ambulance got there.
**Q Okay. So you actually were -- were you in his cell, outside the cell?**
A No. I went to control and I was watching the camera.
**Q Okay. So you're in master control. You just arrived on your shift.**
A Yes.
**Q And so this is after he fell or did you actually see him fall?**
A I did not see him fall.
**Q Okay. So after he falls, you observe -- tell me again.**
A Them tending to him because I think he had hit his head, I think, and that's why they were tending to him and I went up to control. Well, on my way through, they told me that an ambulance was on its way for him.
**Q And that's Alvarado that told you that?**
A Yes.
**Q At any point, did you actually go to Mr.**

**-- Mr. May's cell to check on him or --**

A No. I had to get to control to relieve that jailor.

**Q So when about was the time that you had this one interaction that you recall with Mr. May involving Crabtree?**

A I have no idea.

**Q Do you recall Julie Warnke or anyone else from the jail, any of the -- Stacia Unruh, anyone, from that time that you have that interaction with Mr. May until March 18th of 2022 when the ambulance arrives for him, did anybody communicate to you any concerns about Mr. May's health, his mental state, anything?**

A Julie.

**Q Okay. Tell me about that.**

A There were several times that she would voice her concerns with him not eating still, not showering, and we would talk to Crabtree, or I would talk to Crabtree, and that's when he started going over and trying to get him an OR bond and get him out of jail.

**Q About how many times? You said several. About how many times did you have these conversations with Ms. Warnke?**

A At least -- sorry. At least two or three. I don't know an exact number.

**Q And after any of these times that you had a -- that Ms. Warnke would bring these issues with her concerns about Mr. May to your attention, did you ever -- did you ever go check on him?**

A No. I would go to Crabtree so he could try to get him out.

**Q Did you ever -- did you ever try to contact anyone from Turn Key regarding Mr. May?**

A No.

**Q Why not?**

A Because Julie was in charge of medical and she was constantly on that.

**Q Do you know whether -- do you know whether Ms. Warnke had contacted anyone from Turn Key regarding Mr. May?**

A I believe that she had, yes.

**Q Okay. Why do you say that?**

A Because when she came to me with her concerns, I think she -- I believe, if I remember correctly, that she told me that she had discussed this with the nurse that comes.

**Q Okay. Did you ever try to contact a physician with respect to Mr. May?**

**Q He also indicates that he contacted what he calls jail medical staff, Julie Warnke. Was Ms. Warnke actually medical staff?**

A Yes.

**Q Okay. So it was your understanding as the lieutenant at the jail that Ms. Warnke was actually part of the medical staff?**

A Yes. Well, medical officer is what we called her.

**Q Was she a medical provider?**

A No.

**Q Okay. And he says, "I told" -- "I told her I needed copies of all May's medical records." Did you ever -- do you recall Warnke discussing with you having this contact with your husband?**

A No. I do not recall that.

**Q Do you ever recall having any contact either by phone or in person with any member of Mr. May's family?**

A No, I did not.

**Q Do you recall ever being a part of a conversation with Ms. Warnke and Mr. May's attorney?**

A No.

**Q All right. Turn to -- I'm still in Exhibit 22, looking at DDR 2, 14. And do you**

**Q Did you ever look at the logs?**
A No.
**Q Does the -- does the jail have any kind of policy as to what the protocol is when an inmate stops eating?**
A I really can't recall the policy and procedure from that county. It's been too long ago, and I worked at Canadian County and got familiar with their policy and procedure.
**Q Okay.**
A I don't remember.
**Q Well, did you do -- did you do anything as the lieutenant?**
A I mean, that's when we were talking to Crabtree, and he was trying to get him ORed out.
**Q Okay. So he was --**
A We were constantly going to Crabtree, and he was constantly going to the DA trying to get him out.
**Q When you say, "constantly," how many times?**
A I couldn't tell you a number, sir.
**Q What were you telling Crabtree?**
A That he's not eating or drinking or showering.

**Q Did Ms. Warnke or any of the -- Ms. Unruh or anybody else ever tell you that Mr. May had dementia or Alzheimer's?**
A No.
**Q Were you aware that Mr. May had dementia or Alzheimer's?**
A No, sir.
**Q At any of these times that you're saying you're constantly talking to Crabtree and you're voicing these concerns about Mr. May, did you ever talk to the nurse? Did you ever talk to Ms. Unruh?**
A I think there was a couple of times that she came into my office with Julie and that's when I would go talk to Crabtree.
**Q And about how many times do you think you talked to Crabtree about Mr. May?**
A Six or seven, eight, about that number.
**Q And what would Crabtree tell you?**
A "That I'm trying" -- "I'm working on trying to get him out."
**Q Did he ever say, "I'm going to call a doctor. I'm going to call somebody from Turn Key"?**
A He didn't to me. He may have with Julie because they were discussing the medical end of it.
**Q So did you think that, based on your**

**Q Okay. Do you know if the sheriff was looking for a jail administrator but just couldn't find one? Do you know?**
A When I was getting ready to leave, yes.
**Q Okay. He was looking for one at that point?**
A Yes.
**Q Do you know whether he looked for one earlier and couldn't find one during the time --**
A Not that I am aware of.
**Q Okay.**
A I may not have been privy to that.
**Q Thank you. I think you testified that you actually placed Julie Warnke in the medical position; is that right?**
A Correct.
**Q What was her position before that?**
A Just jailor.
**Q Okay. So did you kind of create this medical position that Julie was in?**
A No. There was one already in place before that.
**Q Okay. So she replaced --**
A But she left.
**Q She replaced someone else. Did you**

**understand that she had medical training beyond any of your other staff members?**

A Yes.

**Q Okay. And I think you testified that she had worked in a nursing home for many years?**

A Yes.

**Q Did you know that at the time?**

A Yes.

**Q Is that part of the reason you put her in that position?**

A Yes, and she's very caring, yes.

**Q That was actually my next question. What is her personality like?**

A She's a very caring person, very nice, patient.

**Q Sure.**

A Yes.

**Q Did you feel like she was someone who just blew off patients' concerns?**

MR. BLAKEMORE: Object to form.

**Q (BY MR. MILLER) Inmates' concerns?**

A No.

**Q I think you testified that she was current on her CNA licensure in January or March of '22, and then you were asked a question about, well, what if**

**the records dispute that. Do you know, as we sit here today, whether she was a current active CNA during the Marvin May period?**

A Yes.

**Q You know she was?**

A Yes, because we put her through school at Burns Flat.

**Q Right. Is it possible that was after Marvin May?**

A May have been. May have been. I'm sorry. I don't recall the dates on that.

**Q Fair. Fair enough. You talked a little bit about Stacia Unruh at Turn Key. Were providers on call 24/7?**

A Yes.

**Q Even beyond the 12 hours she was there?**

A Yes.

**Q Could jail staff call them at any time?**

A Yes.

**Q If there was an emergency room, could jail staff contact them at any time?**

A Yes.

**Q Did you have the authority to send someone to the hospital? If you walk in and see somebody's arm cut off, could you call -- could you call EMS to**

**number to a higher number?**

A No.

**Q Were you in charge of the budget?**

A No.

**Q Okay. That's somebody above you making those decisions?**

A Yes.

**Q All right. Would you agree the more hours of nursing coverage the better, ideally?**

A Absolutely.

**Q Okay. Regardless of whether a nurse is there or not physically, could your staff or you contact an APRN that was on call at all times?**

A Yes, sir.

**Q Okay. And send someone to the hospital at all times?**

A Yes, sir.

**Q And I know I'm jumping around. We talked a little bit about the protein shakes and I think you testified that you understood he was to get protein shakes at every meal?**

A Yes.

**Q And there was some record noting that it was to be logged. I'll represent to you it's not logged, you know, most of the time. If it is not**

**logged, does that mean it didn't happen, meaning are there -- is it possible he was receiving protein shakes at meals and it's just not logged anywhere?**

MR. BLAKEMORE: Object to form.

THE WITNESS: Yes.

**Q (BY MR. MILLER) Okay. We talked a little bit about the meal logs. Do you know whether the meal logs that were made by the kitchen staff noted whether he was getting protein shakes separately from the regular meals?**

A No.

**Q Did anyone ever tell you that Mr. May's condition, before March 18th, when he did go to the hospital, was emergent, meaning it was an emergency?**

A No.

**Q At any point?**

A No.

**Q Did you ever remember thinking that Marvin May's condition was an emergency at any point prior to March 18th?**

A No, sir.

**Q Did Julie ever tell you that his condition was emergent?**

A No.

**Q Did anybody from Turn Key, either Stacia**



Exhibit 31

**Unruh or anybody else ever tell you that Mr. May's condition was emergent?**

A No.

**Q I think you testified that Mr. May may have hit his head when he fell. Did you ever -- did you see him fall?**

A No, sir.

**Q Did you ever watch the video of him falling?**

A No, sir.

**Q So do you know whether he hit his head or didn't hit his head?**

A I do not know. I did not have access to watch cameras back at that time.

**Q I think you talked a little bit about a phone call to his attorney, Mr. May's attorney, a guy name Teofilo Diaz. Just to confirm, you were not on that call; is that right?**

A No, sir.

**Q I believe the two individuals that were on that call were Angie Schmidt and Julie. We've talked a little bit about Julie. Who is Angie Schmidt?**

A She is a sergeant.

**Q Okay. Did you direct them to make that**

call?
A No.
Q Okay. So that call was done by them without your involvement; is that fair?
A Yes.
Q Okay. Kind of a similar question on a competency evaluation. There was a competency evaluation process going on to get Mr. May evaluated for his competency. Were you involved in any way in that process?
MR. BLAKEMORE: Object to form.
THE WITNESS: No, sir.
Q (BY MR. MILLER) Okay. Did you ever speak with anybody at Oklahoma Forensic Center about his competency evaluation?
A No.
Q I think you testified that you spoke with the undersheriff six or seven times about Mr. May and getting him out of the facility. Was the first time that one where you watched him with the protein shake?
A Yes.
Q Okay. So the other five or six are subsequent to that?
A Yes, sir.

**Q Okay. Did you agree that ideally Mr. May would be in another facility?**

A Yes.

**Q Is that something you would discuss with Undersheriff Crabtree when you're having these conversations?**

A Yes.

**Q What would Mr. Crabtree tell you in response when you would bring up the idea of him going to a different facility?**

A He's working on it. He was trying to talk to the DAs and the judges, trying to get him an OR bond.

**Q Okay. Did that process ever work? Did that OR bond ever get inputted until March 18th?**

MR. BLAKEMORE: Object to form.

THE WITNESS: No.

**Q (BY MR. MILLER) But throughout, he's telling you he's working on it?**

A That he was trying, yes.

**Q Okay. Is that his role to handle rather than your role?**

A As an acting jail administrator, yes.

**Q Okay. Did you ever go across the street to the DA yourself?**

**administrator, was it being taken by him?**

A Yes.

**Q And other pieces, the day-to-day administration, were you kind of handling that?**

A Yes.

**Q Okay. Do you think the role was kind of split where some of what a jail administrator would do was handled by you and other pieces were handled by Mr. Crabtree?**

A Yes.

**Q Okay. All right. Next question. Mr. May's family, did you at any point ever see Mr. May's family in the facility?**

A No.

**Q Did anyone from his family ever call you or talk to you?**

A No.

**Q And did you ever call them?**

A No.

**Q Did you even know he had family?**

A No.

**Q Can a jail just release someone just because you don't want him in your facility anymore?**

A No.

**Q Okay. What are the various ways that an**

**inmate can be released out of your facility or out of your custody?**

A If they get bonded out.

**Q Okay. Let's start there. Who does that? If somebody -- to bond out an inmate, who has to do that?**

A A bail bondsman and they'll usually have a family member or friend cosign on it.

**Q Okay. A bail bondsman won't just do that on their own; right?**

A No.

**Q They need somebody to pay the bail; right?**

A Yes.

**Q Did that ever happen with Mr. May?**

A No.

**Q Is there another way? I think the OR bond, we talked about that.**

A OR bond.

**Q Can the jail just issue an OR bond on its own?**

A No.

**Q Okay. Who else has to participate in that process?**

A The judge.

**Q Okay. Anybody else?**

A The DA.

**Q All right. Are you in charge of either the DA or the judge?**

A No.

**Q Okay. Is that what -- at least what Undersheriff Crabtree was telling you he was doing --**

A Yes.

**Q -- was trying to get that done?**

A Yes.

**Q Are you aware of any other way that an individual can be released from the custody of a jail other than those two processes, an OR bond or paying a bond?**

A Or if a charge is dismissed.

**Q Okay. Do you have the power to do that?**

A Absolutely not.

**Q Who has the power to do that?**

A A judge.

**Q Let's talk a little bit about Stacia Unruh. I think you testified that she did speak with you a couple of times about Mr. May.**

A Yes.

**Q Do you know when that was?**

A No.