**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN N. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>TURN KEY HEALTH CLINICS, LLC,<br>TAMARA CAREY, APRN,<br>STACIA UNRUH, LPN,<br>CUSTER COUNTY SHERIFF, in his Official Capacity, and<br>JULIE WARNKE<br><br>Defendants. | Case No. 24-CV-119-J |

**DEFENDANT TURN KEY HEALTH CLINICS, LLC'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant Turn Key Health Clinics, LLC, ("Defendant" or "Turn Key"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and LCvR 56.1, moves for summary judgment on all claims asserted by the Plaintiffs. In support thereof, Defendant respectfully submits to the Court the following Brief.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ……………………………………………………………ii

TABLE OF AUTHORITIES ………………………..……………………….…iv

STATEMENT OF THE CASE……………………………………………………… 1

STATEMENT OF UNCONTROVERTED FACTS ……………………………………1

ARGUMENTS AND AUTHORITIES……………………………………….………... 5

PROPOSITION I: UNCONTROVERTED EVIDENCE ESTABLISHES DEFENDANT IS ENTITLED TO JUDGMENT IN ITS FAVOR AS TO PLAINTIFFS 42 U.S.C. § 1983 CLAIM. …………………………………………..………7

A. PLAINTIFFS LACK EVIDENCE SUFFICIENT TO SUPPORT THE EXISTENCE OF AN UNDERLYING CONSTITUTIONAL VIOLATION ……………………………………………………...……..8

1. The actions or inactions of Turn Key's providers and staff do not constitute deliberate indifference…………………………………10

i. Decisions regarding whether to transfer Mr. May to an acute hospital facility do not rise to the level of deliberate indifference…………..…………….…...11

ii. Decisions regarding timing of a follow up are based on clinical judgment and do not rise to the level of deliberate indifference……………………………17

iii. Decisions regarding patient observation, including review of vital signs, do not rise to the level of deliberate indifference……………………………………………20

B. PLAINTIFFS LACK EVIDENCE SUFFICIENT TO ESTABLISH THAT TURN KEY WAS RESPONSIBLE FOR AN UNDERLYING DEPRIVATION PURSUANT TO THE *MONELL* THEORY OF LIABILITY……………………………………………………22

C. PLAINTIFF HAS NOT PRODUCED SUFFICIENT EVIDENCE TO ESTABLISH AN ACTIONABLE CLAIM AGAINST TURN KEY FOR CONSTITUTIONAL DEPRIVATION UNDER THE

*GARCIA/CROWSON* EXCEPTION……………………………………………26

PROPOSITION II: PLAINTIFFS CANNOT ESTABLISH A CLAIM UNDER OKLAHOMA STATE LAW………………….29

CONCLUSION ……….…………………………………………..………..….. 31

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby*, Inc., 477 U.S. 272, 248, 106 S.Ct. 2505 (1986)…………..…5, 6

*Blackmon v. Sutton*, 734 F.3d 1237, 1240–41 (10th Cir. 2013)..…………………………5

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)………………………..24

*Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)........................................... 10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). …………...……5, 6

*City of Canton Ohio v. Harris*, 489 U.S. 378, 388-89 (1989)………………………………23

*Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018)................................................... 5

*Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020)……. 8, 23, 27, 29

*Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008)……………….……… 11, 16

*Estate of Beauford v. Mesa Cnty. Colorado*, 35 F.4th 1248,
1262 (10th Cir. 2022). ............................................................................................ 7, 19, 24

*Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291,
50 L. Ed. 2d 251 (1976)……………………………………………..… 6, 7, 8, 11, 16

*Farmer v. Brennan*, 511 U.S. 825, 838, 114 S. Ct. 1970, 1979,
128 L. Ed. 2d 811 (1994)……………………………………………..…...7, 8, 9, 10, 20

*Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985)……………………...3, 27

*Gaston v. Ploeger*, 297 Fed. Appx. 738, 742 (10th Cir. 2008)……………………………9

*Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997)……………………………..…..8

*Heidtke v. Corr. Corp. of Am.*, 489 F. App'x. 275, 279-280 (10th Cir. 2012) ……...…6, 9

*Martin v. Creek Cnty. Jail, 2010 WL 4683852, 3 (N.D. Okla. 2010)*………………..……. 7

*Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987)…………………………………25

*Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009) ................................................. 9, 10

*Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005) .........................................................7, 9

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002)………………………..5

*Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1155 (10th Cir. 2022)…………………………………9

*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)…………………………………………...6

*Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803 (10th Cir. 1999) ...................................... 8

*Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016)……………………………………..19

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) ....................................................... 11, 16

*Redding v. Marsh*, 750 F.Supp. 473, 479 (E.D.Okla.1990) ……………...…………11, 16

*Sanders v. Turn Key Health Clinics*, 2025 OK 19, ¶ 1, 566 P.3d 591, 595………………30

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013)…….23

*Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007)……………………………………6

*Self v. Crum*, 439 F.3d 1227 (10th Cir. 2006) ..................................... 6, 7, 8, 9, 17, 20, 22

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007)……...24

*Smart v. Villar,* 547 F.2d 112 (10th Cir. 1976) ....................................................... 11, 16

*Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020)…………………………………19

*Tennant v. Miller*, 589 F. App'x 884, 885-86 (10th Cir. 2014) …………….…………8

*United States v. Mills*, 372 F.2d 693, 697 (10th Cir. 1966)……………………………… 1

*Waller v. City & County of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019)……. 23, 24, 25

*Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 611 (10th Cir. 1994)……………………………6

*Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir.1981)…………………………………..7

**RULES**

Fed. R. Civ. P. 56. ……………………………………………………….……………1

**STATUTES**

42 U.S.C. § 1983…………………………………………………………5, 6, 7, 8

OKLA. STAT. tit. 51 ........................................................................ 30

## STATEMENT OF THE CASE

Marvin May ("Mr. May") was transferred to the Custer County Jail on January 25, 2022. At the time of booking, Mr. May was a 75-year-old man with a history of high blood pressure, dementia, type 2 diabetes, coronary artery disease, hypertension, and obesity. During booking it was noted he was screened for COVID and Mr. May reported he was on medication. Mr. May's medication was verified and started. During his medical intake it was noted he had high blood pressure, had a stable gait, was alert, behavior was appropriate, and unremarkable appearance and breathing. Mr. May's vitals were taken and weighed two hundred and forty (240) pounds. A mental health screening and PREA Risk assessment was also completed for Mr. May. Mr. May was added to the Chronic care list to be seen by a Provider.

## STATEMENT OF UNCONTROVERTED FACTS[1]

1. During the timeframe at issue, Turn Key contracted with the Custer County Sheriff's Office ("CCSO") and the Board of County Commissioners of Custer County ("BCCCC") to provide certain medical care and treatment to inmates and detainees at the Custer County Jail ("CCJ"). *See* Exhibit 1, CCJ Contract.
2. The CCJ Contract required Turn Key to provide twelve (12) hours per week of on-site nursing services by a Registered Nurse (RN) or Licensed Practical Nurse (LPN).

[1] These uncontroverted facts are included for the purpose of the instant Motion only. *See United States v. Mills*, 372 F.2d 693, 697 (10th Cir. 1966) (recognizing that a party moving for summary judgment may concede the nonmovant's version of facts solely "for the purpose of presenting a legal theory, which, if accepted by the court, would entitle the [movant] to a judgment.")

It also required the provision of a physician or mid-level provider for a weekly patient clinic, either in person or via telemedicine. *See Id*.

3. Additionally, Turn Key was responsible for ensuring 24/7 availability of an on-call physician or midlevel provider. *See Id*.
4. If a medical question arose while medical personnel were not physically on site, jail staff could, and did, contact medical providers for guidance. *See* Exhibit 2, Marvin May Turn Key Medical records (Custer County), p. 48.
5. During the period of time at issue, Tamara Carey, APRN ("APRN Carey") was an employee of Turn Key's and provided health care at the Custer County Jail ("CCJ"). *See* Exhibit 3, Depo of APRN Carey, 94:12-15.
6. During the period of time at issue, Stacia Unruh, LPN ("Nurse Unruh") was an employee of Turn Key's and provided nursing care at the CCJ. *See* Exhibit 4, Depo of Nurse Unruh, 12:7-9.
7. Marvin May ("Mr. May") was transferred to the CCJ on from the Canadian County Jail. Mr. May was booked into the CCJ January 25, 2022. *See* Exhibit 2, Marvin May Turn Key Medical records (Custer County), *See also* Exhibit 5, Depo of Plt. LeAnn Hoff, 50:8-13, 59:1-25, 60:1-12.
8. On January 25, 2022, a COVID-19 Screen was done by detention officers, Mr. May only reported nausea. *See* Exhibit 2, p. 45.
9. On January 27, 2022, Nurse Unruh conducted a Medical Intake on Mr. May. During this encounter she obtained and recorded his vital signs—including temperature, blood pressure, respiratory rate, pulse, and oxygen saturation—reviewed his medical history,

and evaluated his general appearance, behavior, level of consciousness, breathing, and mobility. *See* Exhibit 2, p. 19-20. *See also* Exhibit 4, 51:23-25, 52:1-4, 52:16-25, 53:2-24.

10. Nurse Unruh also completed a PREA Risk Assessment and scheduled Mr. May for a Chronic Care Visit with a medical provider. *See* Exhibit 4, 65:9-11, 20:19-23. See also Exhibit 2, p. 25.

11. On February 3, 2022, APRN Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. *See* Exhibit 2, p. 35-36.

12. Telemedicine is not an improper way to see patients. *See* Exhibit 6, Dr. Berk's Depo. 75:11-21.

13. Plaintiffs' expert Dr. Berk is not critical of the fact that APRN Carey saw Mr. May via telemedicine. *See* Exhibit 6, 98:3-6.

14. APRN Carey assessed Mr. May's orientation, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment for Mr. May. *See* Exhibit 3, 32:13-22, 37:1-25, 38:1-3, 41:1-25. *See also* Exhibit 2, p. 35-36.

15. Nurse Unruh gathered objective information from Mr. May on site during this telemedicine encounter. *See* Exhibit 3, 32:13-22, 37:1-25, 38:1-3, 41:1-25. *See also* Exhibit 2, p. 35-36.

16. In response to APRN Carey's visit with Mr. May she initiated an Adult Protective Services referral. *See* Exhibit 3, 32:13-22, 37:1-25, 38:1-3, 41:1-25. *See also* Exhibit 2, p. 35-36.

17. APRN Carey testified she called APS because she was concerned about Mr. May when

he would get released, and where he would go. *See* Exhibit 3, 41:1-25.

18. APRN Carey cannot unilaterally release patients. *See* Exhibit 3, 175:19-24.
19. On or around February 10 or 11th, 2022, Nurse Unruh evaluated Mr. May's wound. (*See* Exhibit 4, 20:19-23, 84:4-25, 87:13-16). *See also* Exhibit 2, p. 37, 40, and 121.
20. Nurse Unruh obtained an order from APRN Carey for a topical antibiotic ointment. (*See* Exhibit 4, 20:19-23, 84:4-25, 87:13-16). *See also* Exhibit 2, p. 37, 40, and 121.
21. Nurse Unruh provided the necessary wound care in accordance with the provider's order. (*See* Exhibit 4, 20:19-23, 84:4-25, 87:13-16). *See also* Exhibit 2, p. 37, 40, and 121.
22. On or around February 14th, 2022, Nurse Unruh provided the necessary wound care in accordance with the provider's order and encouraged Mr. May to shower. *See* Exhibit 2, p. 21.
23. After February 14th, 2022, nowhere in the medical records indicates Nurse Unruh or APRN Carey were informed or updated regarding Mr. May's medical condition. *See* Exhibit 2.
24. Other authorized parties—including the Undersheriff, district attorney's office, Mr. May's legal counsel, and Adult Protective Services—were engaged in efforts to get Mr. May released/transferred to an external facility. (*See* Exhibit 7, Depo of Undersheriff Crabtree, 69:18-25, 70:1-25, 71:1-3) (*See also* Exhibit 8, 98:4-25) (*See also* Exhibit 3, 57:18-25, 58:1-16).
25. On March 18th, 2022, Mr. May fell out of his bed and was discovered unresponsive. *See* Exhibit 2, p. 56-57, 70-118.

26. In response, Mr. May was transported to the hospital. *See* Exhibit 2, p. 56-57, 70-118.

27. Unfortunately, despite the hospital's resuscitative efforts, Mr. May was pronounced dead on March 18, 2022. *See* Exhibit 2, p. 56-57, 70-118.

28. The office of the Chief Medical Examiner for the State of Oklahoma investigated the cause of death and determined that the probable cause of Mr. May's death was COVID-19. *See* Exhibit 2, p. 56-57, 70-118. *See also* Exhibit 9, Death Certificate of Marvin May. *See also* Exhibit 10, Medical Examiner Report.

## ARGUMENTS AND AUTHORITIES

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment may be granted where there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only disputes over facts which are material will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 272, 248, 106 S.Ct. 2505 (1986). Summary judgment is properly entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, at 322.

When considering summary judgment in an § 1983[2] deliberate indifference case, a court

[2] As a pretrial detainee rather than a prisoner, Plaintiffs' claims would be founded upon the Due Process Clause, rather than the Eighth Amendment of the United States Constitution. *Blackmon v. Sutton*, 734 F.3d 1237, 1240–41 (10th Cir. 2013). With this in mind, the discrepancy is largely academic, as the Tenth Circuit has long applied the same test for deliberate indifference to serious medical needs to both Eighth Amendment claims brought by prisoners and Fourteenth Amendment claims brought by pretrial detainees. *See*, e.g.,

looks at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party. *Heidtke v. Corr. Corp. of Am.*, 489 Fed. Appx. 275, 279 (*see also Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)). In cases such as this, where the plaintiff bears the burden of proof on essential claims, a defendant need only produce affirmative evidence negating an essential element of the claim or show that plaintiff lacks evidence to carry his burden. *Celotex*, 477 U.S. at 322-24 (*see also Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)). Then, the non-movant must go beyond the pleadings and set forth specific facts demonstrating a triable issue. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; Fed. R. Civ. P. 56(e).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007). If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex* at 322.

Finally, at the summary judgment stage, the Court's function is not to weigh the evidence but to determine whether there is genuine issue for trial. *Willis v. Midland Risk Ins. Co.,* 42 F.3d 607, 611 (10th Cir. 1994). Thus, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. As outlined herein,

---

*Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).

Plaintiffs are unable to overcome the instant Motion and judgment should be entered in favor of Defendant.

**PROPOSITION I: UNCONTROVERTED EVIDENCE ESTABLISHES DEFENDANT IS ENTITLED TO JUDGMENT IN ITS FAVOR AS TO PLAINTIFFS 42 U.S.C. § 1983 CLAIM.**

In this matter, Plaintiffs assert a claim arising under 42 U.S.C. § 1983 ("§ 1983") alleging Decedent did not receive adequate health care in violation of the Eighth and/or the Fourteenth Amendment of the United States Constitution. *See* Doc. 1, ¶¶ 188-204. In order to prevail on a § 1983 claim, a plaintiff "must show deliberate indifference to a substantial risk of serious harm." *Estelle v. Gamble*, 429 U.S. 97, 105- 06 (1976); *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

"Prison officials violate the constitution when they act with 'deliberate indifference to an inmate's serious medical needs.'" *Estate of Beauford v. Mesa Cnty. Colorado*, 35 F.4th 1248, 1262 (10th Cir. 2022)(quoting *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005)). Such acts or omissions must offend "'evolving standards of decency' in violation of the Eighth Amendment" **– not mere negligence."** *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Farmer v. Brennan*, 511 U.S. 825, 826 (1994) (emphasis added); *See also Martin v. Creek Cnty. Jail*, 2010 WL 4683852, 3 (N.D. Okla. 2010) (quoting *Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981) (In order for a claim to be actionable under § 1983 the "misconduct [must be] 'so egregious as to subject the aggrieved individual to a deprivation of constitutional dimensions.'").

"[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-06. Therefore, it is well established that negligence alone does not state a claim under § 1983 for deliberate indifference to medical

needs and, according to the Tenth Circuit, "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006)(quoting *Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir. 1999)); *See also Estelle*, 429 U.S. at 105-06; *Farmer*, 511 U.S. at 826; *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997). Thus, in order to prevail on a § 1983 claim, a plaintiff "must show deliberate indifference to a substantial risk of serious harm." *Estelle*, 429 U.S. at 105-06 (1976); *Farmer*, 511 U.S. at 847.

## A. PLAINTIFFS LACK EVIDENCE SUFFICIENT TO SUPPORT THE EXISTENCE OF AN UNDERLYING CONSTITUTIONAL VIOLATION.

Without an underlying deprivation of Decedent's constitutional rights, Plaintiffs § 1983 claim fails. *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020). Plaintiffs are unable to controvert the uncontroverted evidence and establish that there actually was a violation of Decedent's constitutional rights, i.e. that there was deliberate indifference to Mr. May's serious medical needs. As a result, Plaintiffs cannot state an actionable § 1983 claim against Defendant. Since Nurses Carey and Unruh will separately file Motions for Summary Judgment regarding the claims asserted against them, Defendant adopts and incorporates those arguments and positions herein.

Deliberate indifference requires analysis of two components: (1) the objective component, which requires a showing that the deprivation was sufficiently serious, and, (2) the subjective component, which is akin to "recklessness" as used in criminal law and requires a showing of the conscious disregard of the substantial risk of serious harm. *Tennant v. Miller*, 589 F. App'x 884, 885-86 (10th Cir. 2014) (citing *Farmer*, 511 U.S. at 828); *Self*, 439 F.3d at

1231. Therefore, the plaintiff must establish defendant "acted with a culpable state of mind," as a defendant cannot be liable for a claim of deliberate indifference unless it is shown that defendant knew of and disregarded an excessive risk to inmate health and safety. *Farmer,* 511 U.S. at 837; *Gaston v. Ploeger*, 229 F. App'x. 702, 710 (10th Cir. 2007); *Heidtke v. Corr. Corp. of Am.*, 489 F. App'x. 275, 279-280 (10th Cir. 2012) (quoting *Self*, 439 F.3d at 1231). Defendant must specifically be shown to have been both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed as to the individual, and that defendant drew that inference, consciously disregarding the individual's health and safety to the level of a sufficiently serious deprivation. *Id.* The Tenth Circuit has explained that case law firmly establishes "the subjective component is not satisfied, absent an extraordinary degree of neglect, where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232; *Heidtke*, 489 F. App'x. at 282 ("Only when the symptoms obviously point to a substantial risk of harm can we draw an inference of the medical professional's conscious disregard of an inmate's medical emergency.").

In the matter at hand, the alleged deprivation sustained by Decedent was death due to COVID-19 (Uncontroverted Fact "U.F." 28). There is no dispute that death is sufficiently serious to satisfy the objective component. *See Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). While a plaintiff is free to select "what harm to claim," and there could be situations where a plaintiff tactically selects an intermediate harm rather than a later more significant harm (*see Paugh v. Uintah Cnty*., 47 F.4th 1139, 1155 (10th Cir. 2022) citing *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005)) the alleged harm

selected by Plaintiffs in this suit was death. Accordingly, the remaining analysis must be completed with this alleged harm in mind.

Plaintiff alleges that Ms. May's death was caused by a failure of Turn Key's employees to provide adequate medical care. Specifically, Plaintiffs allege, Defendants failed to provide Mr. May with timely or adequate medical or mental health treatment; proper monitoring and supervision; diagnostic testing; and reasonable access to outside medical providers who were qualified and capable of evaluating and treating him while he was placed under their care in deliberate indifference to Mr. May's serious medical needs, health, and safety. *See* Doc. No. 1, at ¶ 191.

**1. The actions or inactions of Turn Key's providers and staff do not constitute deliberate indifference.**

To prevail on a § 1983 claim, a plaintiff must establish a defendant specifically was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed as to the individual, the defendant drew that inference, and then proceeded to consciously disregard the individual's health and safety to the level of a sufficiently serious deprivation. *See Farmer*, 511 U.S. at 837. As such, Plaintiff "must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."' *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009)(quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir.)).

Plaintiffs allege Defendants failed to provide Mr. May with timely or adequate medical or mental health treatment. Plaintiffs' retained opinion witness, Dr. Justin Berk, articulated Plaintiffs' critiques as: 1) failing to transfer to an emergency department; 2) a ninety (90) day chronic care follow up with the provider was not sufficient; and 3) it was

inappropriate and improper for Nurse Unruh to not check on Mr. May and monitor his vital signs as he warranted close observation. (*See* Exhibit 6, 101:13-17; 104:7-25; 125:4-15; 196:2-8; 204: 3-8). As addressed below these criticisms – at best – support a claim of medical malpractice, not § 1983 deliberate indifference.

**i. Decisions regarding whether to transfer Mr. May to an acute hospital facility do not rise to the level of deliberate indifference.**

The exercise of medical judgment including whether to transfer a patient to an outside acute care hospital does not constitute deliberate indifference. It has been specifically held that a failure to transfer or delay transfer to an outside facility does not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105; *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976); *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008); *Ramos v. Lamm*, 639 F.2d 559, 574-75 (10th Cir. 1980); *Redding v. Marsh*, 750 F.Supp. 473, 479 (E.D.Okla.1990). In his deposition, Dr. Berk opined that Mr. May should have been sent to the Emergency room as early as February 3, 2022, the day of his Chronic Care Visit with APRN Carey. (*See* Exhibit 6, 201: 21-25; 202:1-25; 203:1-4). Dr. Berk opined that when there was an acute change, specifically, a change in his ambulatory status, such required Mr. May to be transferred to the emergency room. (*See* Exhibit 6, 106:6-16). Dr. Berk opined that during the visit prior to the Chronic Care Visit, APRN Carey evaluated Mr. May and he was not requiring a walking device. But, at the time of the Chronic Care Visit on February 3, 2022, the patient did require a walking device, indicating an acute change in condition. (*See* Exhibit 6, 105:13-15).

However, as noted in APRN Carey's Chronic Care Note, she was familiar with Mr. May due to seeing him at Canadian County Jail. (*See* Exhibit 2, p. 17). Additionally, APRN

Carey testified that Mr. May was using a wheel chair at Canadian County Jail as well. (*See* Exhibit 3, 50:9-23). In ARPN Carey's judgment, Mr. May's need for ambulatory assistance did not constitute an acute change in condition, as this limitation was consistent with his baseline. However, even if APRN Carey had considered this to have been a change in his condition, such change would not have been considered an acute change warranting emergency intervention. Indeed, there was no evidence of emergent symptoms—such as respiratory distress, altered mental status, uncontrolled pain, or other indicators of a medical emergency—that would justify such a transfer to an acute emergency room.

In reality, APRN Carey exercised her clinical judgment and based on Mr. May's presentation at the time, she determined that transfer to the emergency room or hospital was not warranted. (*See* Exhibit 3, 51:2-19). Of note, Defendant's expert Dr. Dameff opined that there was no indication at that time that Mr. May required emergent transfer to an outside hospital. (*See* Exhibit 11, Emil Dameff Expert Report, p. 4). Dr. Dameff opined that "at the time of evaluation, his vitals were stable, there were no signs of acute infection or hypoxia, and no clinical indications existed for hospitalization. This encounter met accepted clinical standards for correctional healthcare." (*See* Exhibit 11, p. 4). Accordingly, at best, there is a difference of opinion between Plaintiffs' and Defendant's expert witnesses as to whether the clinical decision making of APRN Carey was appropriate. As set forth in the authorities above, questions of medical judgment are not actionable under §1983.

Dr. Berk also opined that "when Mr. May began to have urinary incontinence, that's worrisome and warrants workup; when Mr. May had fecal incontinence, that's worrisome

and warrants medical workup. We had multiple episodes of hypotension, of low blood pressures in the setting of not eating, being elderly; that is an acute reason -- multiple days when I would have sent that individual to the ED." (*See* Exhibit 6, 202:16-23). However, after Chronic Care Visit on February 3, 2022, no one contacted APRN Carey regarding Mr. May's condition, including urinary incontinence, fecal incontinence, hypotension, or low blood pressures. ARPN Carey testified that she "does not recall anyone ever contacting her about Mr. May and telling her anything about his condition or what was going on with him during that time frame after this visit on February 3rd," besides an Order for topical antibacterial ointment for Mr. May's wound. (*See* Exhibit 3, 47:20-25) (*See* also Exhibit 6, 102:3-11) ( *See also* Exhibit 2, p. 40). APRN Carey also testified that the officers were the main ones with the inmates and "they were there every day all day." (*See* Exhibit 3, 179:15-20).

The uncontroverted evidence is that if the jail staff at the CCJ had any medical concerns or questions regarding an inmate, Turn Key had a system in place so that they could get in contact with a provider. (*See* Exhibit 3, 179:22-25). However, APRN Carey testified that besides Officer Warnke on February 3, 2022, no Officer contacted her in regards to Mr. May. (*See* Exhibit 3, 178:1-11). Similarly, Nurse Unruh testified that she was not made aware of urinary incontinence, fecal incontinence, hypotension, or low blood pressure readings. (*See* Exhibit 4, 77:14-21; 80:1-15; 88:17-22; 91:9-12: 92:6-12; 113:2-4). This is consistent with the testimony of Lieutenant Martha Stanford who did not contact Turn Key providers or nurses, including APRN Carey or Nurse Unruh in regards to Mr. May. However, she testified she had the ability to contact Turn Key providers or nurses

and knew how to contact Turn Key providers or nurses. (*See* Exhibit 12, Depo of Lt. Martha Stanford 83:7-25 and 84:1-6). Officer Michael McCowen and Officer Brayan Alvarado similarly testified that he never contacted Turn Key providers or nurses, including APRN Carey or Nurse Unruh in regards to Mr. May. However, he testified he had the ability to contact Turn Key providers or nurses and knew how to contact Turn Key providers or nurses. (*See* Exhibit 13, Depo of Officer Michael McCowen, 132:14-25; 133:8-25; 134:1-15) (*See* Exhibit 14, Depo of Officer Brayan Alvarado, 132:7-25; 133:1-23; 136:3-18; 138:8-14). Officer Julie Warnke similarly testified that she never contacted Turn Key providers or nurses after her initial notification regarding vital signs, including blood pressure readings, nor kept them providers updated on Mr. May's incontinence, and would not always inform Turn Key providers regarding officer's reports of Mr. May, including APRN Carey or Nurse Unruh in regards to Mr. May. However, she testified she had the ability to contact Turn Key providers or nurses and knew how to contact Turn Key providers or nurses. (*See* Exhibit 8, 126:9-16; 127:7-21; 128:13-17; 138:22-25; 139:1; 119:10-23).

The detention officers' testimony indicates that there was a system in place to contact medical provider if medical questions arose. The evidence also is that no jail staff contacted ARPN Carey or Nurse Unruh for guidance regarding Mr. May. Presumably, this is because based on the daily observations by detention staff, there was no reason to contact medical. In fact, as addressed in greater detail below the sentiment was Mr. May may have benefitted from a long-term care facility and efforts were being made to secure this for Mr. May.

However, assuming for the sake of argument, if Nurse Unruh or APRN Carey were aware of the alleged clinical changes of Mr. May, these changes still would not have risen to a level that warranted transfer to an emergency department. There was no evidence of emergent symptoms—such as respiratory distress, uncontrolled pain, or other indicators of a medical emergency—that would warrant an emergent transfer to an outside emergency room. The uncontroverted evidence demonstrates that APRN Carey acted within her scope and authority in her care of Mr. May. As outlined above, Turn Key could not unilaterally release Mr. May from custody or otherwise unilaterally effectuate his transfer to an outside long-term care facility. (U.F. 18). Mr. May could not be released or transferred to an outside facility Based on her professional evaluation, APRN Carey determined that Mr. May's condition was chronic and stable, and that he was not exhibiting any acute or emergent symptoms requiring immediate intervention. (*See* Exhibit 3, 51:2-10). Meanwhile, other authorized parties—including the Undersheriff, district attorney's office, Mr. May's legal counsel, and Adult Protective Services—were engaged in efforts to get him released/transferred to an external facility. (*See* Exhibit 7, 69:18-25, 70:1-25, 71:1-3) (*See also* Exhibit 8, 98:4-25) (*See also* Exhibit 3, 57:18-25, 58:1-16).

Regarding COVID-19, as Dr. Berk opined, Mr. May did not have any symptoms of COVID-19. (*See* Exhibit 4, 154:8-10). The uncontroverted testimony establishes that neither APRN Carey nor Nurse Unruh observed any signs or symptoms of COVID-19 during their respective interactions with Mr. May. Moreover, even assuming, arguendo, that Mr. May later manifested symptoms consistent with COVID-19, there is no evidence in the record that either APRN Carey or Nurse Unruh was informed of, or otherwise

became aware of, any such symptoms. (*See* Exhibit 3, 150:22-25, 151:1-3) (*See also* Exhibit 4, 116:22-25, 117:1-9, 140:21-25, 141:1-11, 143:4-7) Accordingly, neither APRN Carey nor Nurse Unruh had subjective knowledge of any risk of harm facing Mr. May from COVID-19, let alone any knowledge that he required emergent intervention for COVID-19.

If Mr. May was experiencing a medical emergency, detention officers at the CCJ were able to call 911 and have Mr. May sent to the Emergency Room/hospital. However, neither the detention officers nor APRN Carey or Nurse Unruh considered Mr. May to be suffering from a medical emergency. *see* Exhibit 4, 136:23-25 and 137:1, "at any point, do you remember thinking that Mr. May was in an emergency situation that needed to go to the hospital? During the times that I encountered him, no." (*See also* Exhibit 13, 135:5-15) (*See also* Exhibit 14, 139: 2-7) (*See also* Exhibit 8, 122:17-25) (*See also* Exhibit 12, 84:25 and 85:1-9) (*See also* Exhibit 3, 163:3-12). It has been specifically held that a negligent failure to diagnose a medical condition; failure to provide a test; failure to transfer or delay transfer to an outside facility; failure to perform a cursory examination do not rise to the level of a constitutional violation. *Estelle*, 429 U.S. at 105; *Smart v. Villar*, 547 F.2d 112 (10th Cir. 1976); *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008); *Ramos v. Lamm*, 639 F.2d 559, 574-75 (10th Cir. 1980); *Redding v. Marsh*, 750 F.Supp. 473, 479 (E.D.Okla.1990). Accordingly, criticisms for failing to send Mr. May to an emergency room/hospital more frequently, does not constitute deliberate indifference. "[A]bsent an extraordinary degree of neglect," the subjective component of the deliberate-indifference test is not satisfied "where a doctor merely exercises his considered medical judgment."

*Self*, 439 F.3d at 1232. "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id*. at 1233.

**ii. Decisions regarding timing of a follow up are based on clinical judgment and do not rise to the level of deliberate indifference.**

Plaintiff's expert, Dr. Berk, was of the opinion that a 90-day follow up by APRN Carey was improper. (*See* Exhibit 6, 101:13-17). However, APRN Carey explained that she did a 90-day follow-up because she did an initial assessment at Canadian County Jail on January 2, 2022, and after the initial assessment she did a 30-day follow-up at Custer County jail on February 3, 2022. (*See* Exhibit 3, 133:5-25; 134:1-25; 135:1-9). The purpose of the initial and 30-day visits is to do an initial assessment and establish a medical history. Since the patient had already completed the initial and 30-day follow-up evaluations, including the initial assessment at the previous facility, Mr. May's care schedule transitioned into the chronic phase. Therefore, the next medically appropriate follow-up was scheduled at 90 days. (*See* Exhibit 3, 133:5-25; 134:1-25; 135:1-9). Additionally, APRN Carey explained that Mr. May's Alzheimer's appeared to be progressively worsening based on the information provided to her; however, he was not experiencing any acute distress. And although there was a decline, his condition was considered stable and did not represent an immediate concern. (*See* Exhibit 3, 51:2-10). Put simply, identifying that an elderly patient has Alzheimer's does not constitute a medical emergency nor would the patient require emergent transfer to an emergency room.

Moreover, as it relates to Mr. May's alleged lack of eating, lack of showering, and ambulation, APRN Carey testified he was already non-ambulatory at the time of his initial assessment. And while the decreased intake and hygiene were concerning, they did not constitute an urgent issue requiring immediate hospitalization. (*See* Exhibit 3, 51:14-19). While Plaintiffs' expert may disagree, it is clear that APRN Carey's decision to do a 90-day follow up falls within the bounds of medical judgment, which is not actionable under §1983. APRN Carey provided a level of care consistent with the symptoms presented by Mr. May. She conducted a comprehensive assessment, including both subjective and objective evaluations, and formulated an appropriate plan of care. This process involved reviewing Mr. May's medical chart, obtaining his medical history, and performing a physical and cognitive assessment to confirm that he was awake, alert, and oriented to person, place, and situation. Medication verification and reconciliation were also completed. (*See* Exhibit 3, 32:13-22, 37:1-25, 38:1-3). Additionally, the fact that Mr. May was scheduled for a *chronic care* visit ninety (90) days later does not mean that APRN Carey could or would not have seen him sooner be it in response to a sick call from Mr. May or in response to a request by jail staff or Nurse Unruh.

APRN Carey documented a progression of Mr. May's Alzheimer's disease; however, she testified that he remained oriented and aware of his surroundings. She further explained during deposition that her reference to the worsening condition pertained primarily to Mr. May's decreased food intake. (*See* Exhibit 3, 39:8-22). In response, APRN Carey ordered nutritional supplements (Ensure), which were to be provided with each meal. (*See* Exhibit 3, 38:9-25, 39:1-6, 39:8-22). Additionally, APRN Carey ordered

medication for his Alzheimer's and his hypertension, including parameters when it should be given, along with twice daily blood pressure checks. (*See* Exhibit 3, 130:20-23). During his encounters with Turn Key providers, Mr. May's vital signs were assessed and found to be largely within normal limits, with no irregularities or concerning blood pressure readings. (*See* Exhibit 3, 42:7-25, 43:1-8, 52:19-21).

In addition, APRN Carey adjusted Mr. May's diabetes medication regimen (*See* Exhibit 3, 54:9-20) and made a referral to Adult Protective Services to ensure his continued safety and well-being. (*See* Exhibit 3, 57:18-25, 58:1-16). In summary, APRN Carey exercised sound clinical judgment in developing and implementing a plan of care based on Mr. May's presentation and overall clinical condition. Although Plaintiffs and their expert, Dr. Berk, disagree with the timing of Mr. May's follow up appointment, the Tenth Circuit Court of Appeals makes clear that "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." *Estate of Beauford v. Mesa Cty*., 35 F.4th 1248, 1271 (10th Cir. 2022) (citing *Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020)). It continued, "Nor will we freely substitute [our] judgment" for that of medical providers or "otherwise second-guess [their] course of treatment with the benefit of hindsight." *Id*. At most, the Plaintiffs' argument reflects a difference of opinion as to when Mr. May should have been scheduled for a routine chronic are follow up appointment—a scenario that cannot support deliberate indifference. *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) ("[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.") Thus in accordance with the

authorities and arguments herein, Plaintiffs are unable to establish any underlying indifference on the part of APRN Carey.

**iii. Decisions regarding patient observation, including review of vital signs, do not rise to the level of deliberate indifference.**

Plaintiff's expert, Dr. Berk, was of the opinion that it was inappropriate and improper for Nurse Unruh to not check on Mr. May as he warranted close observation and should have been reviewing Mr. May's vital signs. (*See* Exhibit 6, 196:2-8; 204: 3-8). For Plaintiffs to satisfy the subjective component of deliberate indifference, Plaintiffs must establish Defendant(s) acted with an intent or state of mind that is akin to "recklessness" in the criminal law where, to act recklessly, a "person must 'consciously disregard' a substantial risk of serious harm." *See Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837, 839, 842, & 843 n. 8).

The undisputed evidence establishes that Nurse Unruh consistently acted within the scope of her professional duties and complied with all applicable medical procedures while employed by Turn Key. She testified that she worked two six-hour shifts per week, during which her responsibilities included conducting medical intakes, performing nursing visits, and following all physician orders. (*See* Exhibit 4,40:22-24, 66:2-17) (*see* also Exhibit 1). Nurse Unruh did not perform medication passes at CCJ and was not responsible for taking daily vital signs, as those duties were that of correctional staff. (*See* Exhibit 4, 65:25, 66:1, 160:6-13). She further testified that she could not access an inmate's cell without an accompanying officer and that she was never advised of any reason to independently assess Mr. May. (*See* Exhibit 4, 185:18-25, 186:1-16).

On January 27, 2022, Nurse Unruh properly conducted a thorough medical intake and nursing assessment of Mr. May. (*See* Exhibit 4, 51:23-25, 52:1-4). She obtained and recorded his vital signs—including temperature, blood pressure, respiratory rate, pulse, and oxygen saturation—reviewed his medical history, and evaluated his general appearance, behavior, level of consciousness, breathing, and mobility. (*See* Exhibit 4, 52:16-25, 53:2-24). She completed a PREA Risk Assessment and appropriately scheduled Mr. May for a Chronic Care Visit with a medical provider. (*See* Exhibit 4, 65:9-11, 20:19-23). When later notified of a possible wound on Mr. May, on or around February 10th or 11th, 2022, Nurse Unruh promptly evaluated the wound, obtained an order for a topical antibiotic ointment, and provided the necessary wound care in accordance with the provider's order. (*See* Exhibit 4, 20:19-23, 84:4-25, 87:13-16). On or around February 14th, 2022, Nurse Unruh provided the necessary wound care in accordance with the provider's order and encouraged Mr. May to shower. *See* Exhibit 2, p. 21.

She testified that she was not thereafter notified of any changes in Mr. May's condition, food intake, blood pressure readings, or incontinence. (*See* Exhibit 4, 77:14-21; 80:1-15; 88:17-22; 91:9-12: 92:6-12; 113:2-4, 103:13-25, 112:25, 113:1-4). Detention Officers also testified that they did make Nurse Unruh aware of Mr. May's condition, food intake, blood pressure readings, and incontinence. (*See* Exhibit 13, 132:14-25; 133:8-25; 134:1-15). (*See* Exhibit 12, 83:7-25 and 84:1-6). (*See* Exhibit 14, 132:7-25; 133:1-23; 136:3-18; 138:8-14). (*See* Exhibit 8, 126:9-16; 127:7-21; 128:13-17; 138:22-25; 139:1; 119:10-23). This is largely confessed by Plaintiffs' expert, Dr. Berk also, who testified there was limited interaction between Mr. May and Nurse Unruh. (*See* Exhibit 6, 166:15-

23). Nurse Unruh further testified that had she been made aware of any deterioration in Mr. May's condition, she would have immediately contacted the provider and initiated an appropriate plan of care, as she did during her prior encounters on January 27th, 2022 and related to his wound. (*See* Exhibit 4, 104:2-13).

Plaintiffs have failed to produce any competent evidence establishing that Nurse Unruh disregarded a known medical risk or acted with deliberate indifference. To the contrary, the record demonstrates that she exercised sound professional judgment, acted promptly upon receiving information about Mr. May's condition, and followed all provider directives.

Plaintiffs are unable to overcome the undisputed evidence and establish that Nurse Unruh disregarded Mr. May's wellbeing. *See Self*, 439 F.3d at 1233 ("[O]ur subjective inquiry is limited to consideration of the doctor's knowledge at **the time [they] prescribed treatment for the symptoms presented**, not to the ultimate treatment necessary.") (emphasis added). Even viewing the evidence in the light most favorable to the Plaintiffs, no reasonable juror could find that Nurse Unruh's conduct was constitutionally deficient. Accordingly, there is no basis to find an underlying constitutional deprivation committed at the hands of Nurse Unruh, or APRN Carey.

### B. PLAINTIFFS LACK EVIDENCE SUFFICIENT TO ESTABLISH THAT TURN KEY WAS RESPONSIBLE FOR AN UNDERLYING DEPRIVATION PURSUANT TO THE *MONELL* THEORY OF LIABILITY.

Assuming *arguendo* that Plaintiffs possess sufficient evidence to support the finding of an underlying constitutional violation, judgment in favor of Turn Key is still appropriate as Plaintiffs lack sufficient evidence to subject Turn Key to liability for the same pursuant

to the *Monell* theory. The Tenth Circuit has made it clear that "a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." *City of Canton Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). That is because a core principle of *Monell* liability is that municipal entities are only liable for their own actions; they are not vicariously liable for the actions of their employees. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). With this in mind, Plaintiffs bear the burden of proving the existence of an official Turn Key policy or custom and that said policy or custom was the moving force or direct cause of Decedent's constitutional deprivation.

In the Tenth Circuit, an official policy or custom can be: (a) a formal policy, (b) an informal custom amounting to a persistent, widespread practice that is so permanent and well-settled as to constitute a custom with the force of law, (c) decisions of employees with final policymaking authority, (d) the ratification by such final policymakers of the decisions of subordinates to whom authority was delegated subject to those policymakers' review and approval, or (e) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1184 (citing *Waller v. City & County of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019)). Preliminarily, Plaintiffs' retained opinion expert's report stated "there was no policy in place at Custer County or by Turn Key to address hunger strikes, determine intent, or evaluate competency." (*See* Exhibit 15, Report of Dr. Berk, p. 13). Dr. Berk further testified that if there was a policy in place to address hunger strikes he would withdraw such position. (*See* Exhibit 6,120:18-25, 121:1-

2). Additionally, Dr. Berk went on to admit there was a hunger strike policy in place. (*See* Exhibit 6,121:9-11). In fact, there was a hunger strike policy in place at Custer County Jail, during the time Mr. May was incarcerated. (*See* Exhibit 7, 30:11-25).

However, Dr. Berk did not review any Turn Key policies or procedures. (*See* Exhibit 15, p. 1). Further, he testified he reviewed some written policies and procedures but was not sure if they were Turn Key's. (*See* Exhibit 6, 61:19-25). Dr. Berk further opined that "there were certainly specific policies that I called out that I don't feel were implemented in Mr. May's care," and that "if there was a policy in place, it was almost certainly not followed." (*See* Exhibit 6, 62:15-16, 31:13-14). "But a policy violation, without more, is not a constitutional violation." *Estate of Beauford v. Mesa Cty.*, 35 F.4th 1248, 1272 (10th Cir. 2022).

To the extent, Plaintiffs' position is that the official written policies or protocols of Turn Key were not followed with Mr. May, such a situation is also precluded by the applicable caselaw. In such a situation, "[m]unicipalities cannot be held liable for unauthorized actions by their employees…. [W]hen [employees] act inconsistently with official policy or custom, though perhaps even still within the scope of employment, that will not suffice [to establish municipal liability]." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284 (10th Cir. 2007). Moreover, Plaintiffs bear the burden of proving that there was an informal custom of failing to follow Turn Key's formal written policies that is "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Waller v. City & Cty.*

*of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019)(citing *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Notably, the applicable authorities provide, "[o]ne prior incident, even if it was a constitutional violation sufficiently similar to put officials on notice of a problem, does not describe a pattern of violations." *Waller v. City and Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019). *See also Id.* citing *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987) ("One instance, however egregious does not a pattern or practice make."). Here despite Plaintiffs' reference to other lawsuits involving Turn Key in Plaintiffs' Complaint, Plaintiffs lack admissible evidence of other instances involving Turn Key sufficiently similar to the facts at hand such that a reasonable jury could find that there was an official Turn Key policy or custom of failing to follow its written policies and procedures.

At this stage in the litigation, Plaintiffs may not merely rely on the allegations contained in their Complaint. Instead, they must come forward with admissible evidence demonstrating that there is at least a question of fact as to whether these alleged policies or customs existed and that such policies or customs were the moving force or direct cause of the alleged constitutional deprivation. In this case, Plaintiffs have failed to meet that burden. Their own retained expert, Dr. Berk, admitted during his testimony that a hunger strike policy was in place. This admission directly contradicts Plaintiffs' claim that the Defendants acted without policy guidance or in violation of established procedures. Further, Dr. Berk acknowledged that he did not review any of Turn Key's written policies or procedures.

Equally significant is the fact that Dr. Berk did not examine the medical records of any other inmates, which forecloses any ability for him to conduct a comparative review, or opine whether, the alleged conduct towards Mr. May reflected a broader systemic issue or was, instead, an isolated occurrence. (*See* Exhibit 15, p. 1) (*See* Exhibit 6, 59:3-9). This omission eliminates any evidentiary basis for establishing a pattern, practice, or custom of unconstitutional conduct. Dr. Berk also offered no opinions or criticisms concerning the contract between Turn Key and the CCJ. (*See* Exhibit 6, 58:20-23). Nor did he have opinios regarding the training provided to ARPN Carey or Nurse Unruh. (*See* Exhibit 6, 60:16-20).

As such, Plaintiffs cannot demonstrate that Mr. May's alleged constitutional deprivation was caused by an official Turn Key custom or policy. Taken together, this is fatal to Plaintiffs' claims. Without evidence showing that the alleged deprivations resulted from a policy or custom attributable to Turn Key, Plaintiffs' arguments rest solely on speculation. The record, as it stands, fails to raise any genuine dispute of material fact and therefore cannot support the continuation of these claims beyond summary judgment.

Assuming arguendo that Plaintiff could establish the existence of an official Turn Key policy, or custom, none of Turn Key's official policies or customs were the moving force or direct cause of a constitutional deprivation. Accordingly, even if Plaintiffs possessed sufficient evidence to support the finding of an underlying deprivation of Mr. May's constitutional rights, they are unable to subject Turn Key for liability for the same pursuant to *Monell*.

## C. PLAINTIFF HAS NOT PRODUCED SUFFICIENT EVIDENCE TO ESTABLISH AN ACTIONABLE CLAIM AGAINST TURN KEY FOR

**CONSTITUTIONAL DEPRIVATION UNDER THE *GARCIA/CROWSON* EXCEPTION.**

The Tenth Circuit has provided a limited exception to the previously well established law in *Monell*, which allows a plaintiff to establish liability on a municipality in a situation where there is no single individual who commits a constitutional violation. *See Crowson v. Wash. Cty. State of Utah*, 983 F. 3d 1166, 1191-92 (10th Cir. 2020). Said another way, the *Garcia/Crowson* exception can apply when no single individual violated the constitutional rights of an inmate, but rather, when the sum of multiple officers' actions taken pursuant to an official policy or custom results in a constitutional violation. *Id*. at 1191. ("That is, the municipality may not escape liability by acting through twenty hands rather than two." *Id*.) It is important to note that under both the traditional *Monell* pattern of proof and the limited *Garcia/Crowson* exception, there must be an underlying constitutional violation (regardless of whether at the hands of an individual or multiple individuals) to be a viable § 1983 claim. *Crowson v. Wash. Cty. State of Utah*, 983 F.3d 1166, 1186 (10th Cir. 2020). In *Crowson* the Tenth Circuit confirmed the viability of a claim against a municipality without an underlying deprivation by any individual when premised upon "gross deficiencies in staffing, facilities, equipment or procedures" such that "the inmate is effectively denied access to adequate medical care." *Id.* at 1187, citing *Garcia v. Salt Lake County*, 768 F.2d 303, 308 (10th Cir. 1985).

This case does not fall within the *Garcia/Crowson* exception as there is no admissible evidence that Mr. May was denied constitutionally adequate health care as a result of "gross deficiencies in staffing, facilities, equipment or procedures" (*id*.) which

was in Turn Key's control or otherwise attributable to Turn Key. In regards to nursing hours at the CCJ, Dr. Berk testified that

> It is difficult to give an exact number of what health care staffing is necessary for each facility. Obviously, as different facilities have different numbers of people, different level of comorbidities or acuity of care. I think if you are a rural jail that has very limited health care infrastructure and hours, that is going to mean that you're going to have to rely on external health care facilities, for example, an emergency department, while other facilities may have their own hospital within the jail or prison system. So while I'm not going to opine that the exact number of hours were X, I think if you're going to have only 12 hours of LPN care a week, then those facilities are necessarily going to have to rely on sending patients like this to the emergency department. Yeah. I'll stop there.

(*See* Exhibit 6, 135:12-25, 136:1-2). Dr. Berk did not express criticism regarding the adequacy of the 12-hour nursing schedule. Instead, he opined that, under such a schedule, the facility would necessarily rely on external healthcare providers to meet the medical needs of inmates. Dr. Berk further acknowledged that both Turn Key and the CCJ were able to use external medical resources to supplement on-site services. Testimony from Nurse Unruh and multiple detention officers corroborated this practice, indicating that medical inquiries could be directed to an off-site healthcare provider on a 24-hour, seven-day-a-week basis. Moreover, they affirmed that inmates could be transported to an outside hospital in the event of any medical emergency.

Accordingly, the record reflects that the CCJ had continuous access to medical care through a combination of scheduled on-site nursing services, a weekly provider clinic, and around-the-clock off-site medical consultation and emergency response. This arrangement demonstrates an established and reasonable system of medical coverage that extended beyond the 12-hour on-site nursing window. This was confirmed by Defendant's expert

who opined that "the Turn Key staff provided care within their training and education during the hours contracted at the Custer County Jail and had providers available by phone if a question arose. In addition, if a medical emergency occurred while a nurse was not physically present at the jail, the correctional staff were empowered to send a patient to an outside hospital. This arrangement allowed for medical questions to be addressed by an off-site provider if needed, transport to an outside hospital in the event of a medical emergency, and routine nursing tasks to be accomplished by a nurse in-person two days per week." (*See* Exhibit 16, Report of Linda Bernard, p. 5)

Plaintiff lacks evidence of any deficiencies in Turn Key's official policies or procedures. In accordance with the above analysis, Plaintiff therefore is unable to demonstrate a genuine question of fact as to any problematic policy or procedure, let alone a "gross deficiency." As such, Plaintiffs are unable to subject Turn Key to liability for a constitutional deprivation pursuant to a *Garcia/Crowson* exception. Therefore, as a result, Defendant's Motion for Summary Judgment should be granted.

**PROPOSITION II: PLAINTIFFS CANNOT ESTABLISH A CLAIM UNDER OKLAHOMA STATE LAW.**

In the event this Court properly grants Defendant's Motion as to Plaintiffs' § 1983 claim, Defendant would request this Court decline supplemental jurisdiction as to Plaintiffs' remaining state law claims. In the alternative if these claims are addressed, Plaintiffs cannot establish an Oklahoma state law claim for negligence or wrongful death as Turn Key is immune from liability in tort pursuant to the Oklahoma Governmental Tort Claims Act ("GTCA"). Under the GTCA, Turn Key is considered an "employee" of the

state and immune from liability for tort claims. Section 152.1 of Title 51 of the Oklahoma Statutes provides:

> The State of Oklahoma does hereby adopt the doctrine of sovereign immunity. The state, its political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts.

OKLA. STAT. tit. 51, § 152.1(A). The GTCA goes on to say, "licensed medical professionals under contract with the city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies" are considered "employees of the state" for purposes of the GTCA. OKLA. STAT. tit. 51, § 152(b)(7). The Oklahoma Supreme Court has explicitly extended such immunity to a jail's health care contractor such as Turn Key, "the Governmental Tort Claims Act makes licensed medical professionals to be "employees" of this state regardless of the place in this state where duties as employees are performed, when the licensed medical professionals are under contract, including when under contract as an independent contractor, with city, county, or state entities and providing medical care to inmates or detainees in the custody or control of law enforcement agencies." *Sanders v. Turn Key Health Clinics*, 2025 OK 19, ¶ 1, 566 P.3d 591, 595.

Here, Plaintiff has set forth claims against Turn Key for negligence surrounding the medical care and treatment of Decedent at the Custer County Jail. Doc. 1 at ¶¶ 213-219. There is no dispute that Nurse Carey and Nurse Unruh were employees of Turn Key. There is also no dispute that they were providing care pursuant to a contract between Turn Key

and Custer County. Accordingly, at all relevant times hereto, Turn Key provided services to Decedent by and through its employees pursuant to contract with Custer County.

In accordance with the Oklahoma Supreme Court's ruling in *Sanders*, immunity afforded by the GTCA applies to correctional health care contractors, such as Turn Key, as well as such contractors' employees. Thus, there is no question that Turn Key and its employees are insulated from liability in tort pursuant to the GTCA. Accordingly, under the facts of this case and based on the clarification pronounced by the *Sanders* Court, Turn Key falls within the definition of "employee" under the GTCA and is therefore entitled to immunity from Plaintiffs' state tort claims.

## CONCLUSION

For all the reasons set forth herein, Defendant, Turn Key Health Clinics, LLC, prays that its Motion for Summary Judgment be granted, and that judgment on all of the claims against it by Plaintiffs, be entered in its favor.

Respectfully submitted,

*/s/ Vanessa O. Martínez*

SEAN SNIDER, OBA # 22307
ANTHONY C. WINTER, OBA#32148
VANESSA O. MARTINEZ, OBA #34165
JOHNSON HANAN VOSLER
HAWTHORNE & SNIDER
9801 N. Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
E-Mail: ssnider@johnsonhanan.com
E-Mail: awinter@johnsonhanan.com

E-Mail: vmartinez@johnsonhanan.com
*Attorneys for Defendants Turn Key Health Clinics, LLC; Tamara Carey, APRN; and Stacia Unruh, LPN*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 3, 2025, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

*/s/ Vanessa O. Martínez*
Vanessa O. Martínez