IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, AS
CO-ADMINISTRATOR OF THE
ESTATE OF MARVIN G. MAY,
DECEASED; AND LEANN N. HOFF,
AS CO-ADMINISTRATOR OF THE
ESTATE OF MARVIN G. MAY,
DECEASED,

PLAINTIFF,

VERSUS CASE NO. 23-CV-119-JD

TURN KEY HEALTH CLINICS,
LLC, ET AL.,

DEFENDANTS.

* * * * * * * * * * * * * * * * * * * * * * * * * *

The continued video deposition of TAMARA CAREY, taken in connection with the captioned cause, pursuant to the following stipulations before MARCIA B. MITCHELL, Certified Court Reporter, at Regus Shreveport Boardwalk, 333 Texas Street, Suite 1300, Shreveport, Louisiana, on the 3rd day of October 2025, beginning at 9:05 a.m.

DEFENDANT'S EXHIBIT
3
5:24-cv-00119-JD

A Correct.
Q All right. So you have this telemedicine vide -- visit with Mr. May. Do you recall anyone else being present, with Mr. May, during this visit?
A No. Usually it would just be the patient, an officer and the nurse in the room.
Q Okay. But as you sit here today you don t recall whether all those folks were there or not. Is that -- is that true?
A No, I m sure they were all there because they would have --
Q Okay. All right. Going to the substance of the -- the note here, I m looking down under Clinic, so what s the pur -- is this like a form that Turn Key --
A Yes. It s a form.
Q The --
A It s a SOAP note. So providers do SOAP notes, subject, objective, assessment, plan like on everybody. That s like the format of your charting as a provider.
Q Okay. And so the first thing that I want to look at -- well, let me ask you this first. One of the things here, it says allergies and

one. It's that first part of the SOAP note and S, I think you said that s subjective. Is that right?
A Correct. That s the information that I am given from --
Q Okay. And the first kind of subpart that you have here is History and where did you get -- where are you getting this information from, the History?
A Well, a history, this is information from the patient or from the officer or, you know, a chart review.
Q Okay. I mean you do say here --
A I was familiar with him from Canadian.
Q Right. Being transferred from Canadian County.
A Uh-huh.
Q "Patient denies concerns in treatment plan." What -- what -- do you -- do you recall Mr. May denying any concerns about his treatment plan?
A So if I charted it, he didn't deny anything. Like usually I will go through the same motion, you know, checking the orientation, making sure he s awake, alert, oriented. He understands where he is, things like that. When it comes to his medications, you know, are you okay with

your meds? Is there anything that we need to change? So obviously he denied that there was any need for change.
Q Okay. One of the things that you -- you state down here provider -- and that s -- you re referring to yourself when you say provider, right?
A Yes.
Q "Provider is aware of patient s worsening Alzheimer disease." Did I read that correctly?
A Correct.
Q So would it be fair to say that if you re aware of his Alzheimer s disease worsening --
A Uh-huh.
Q -- that Mr. May, at that point, might not have had the -- the mental capacity to accurately comment one way or another on his treatment plan; would that be fair?
MS. MARTINEZ:
Object to form.
A Well, no.
MR. MILLER:
Same objection.
A No. Just because it s worsening it doesn t mean -- he s still like oriented. He was still

aware of the situation, things like that, so he was able to, you know, make judgment on that. It wasn t to the point where he was confused and didn t know where he was or the day or his birthday or anything like that. He was still oriented.

BY MR. BLAKEMORE:

Q Okay. So what were the -- when you say; "Provider is aware of patient s worsening Alzheimer disease," what were the things that you were aware of that led you to write that portion of the note?

A So it was more of him not eating and things like that. Like the -- like I said I don t remember if it was a day before or the day of but Julie -- I do recall like having conversations with her about he s not showering, he s not eating and I know there was a time where Ensures were like ordered because he wasn t eating, just to make sure he was getting some type of nutrients. So I assume that was worsening of the Alzheimer s.

Q Okay. So that's what -- you re really mostly talking about his -- his not eating?

A Right. And then -- yes, right.

or something and that was like a concern for me because I -- I -- like I said, I don t know his charges. I don t know why he was there or anything but when I found that out, I m like, oh, so he s really like demented or his Alzheimer s is, you know, getting worse because he was I guess forgetting appointments and they picked him up for a warrant or something. But there was a conversation like that we would -- we had outside of the -- it was outside of the visit. He wasn t there when we had that conversation. I just don t remember if it was before or over the -- I don t remember but I remember the conversation.
Q Which -- after you had that conversation, did you do anything else independently to investigate what Mr. May s charges were or --
A No.
Q Okay.
A Not his charges. I don t -- I mean I don t care about charges. I care about, you know, managing his care, but that s why I ultimately called APS because I was concerned about what was going on, on the outside, so whenever he was released from this situation what would

happen next.
Q Okay.
A But as far as charges, no.
Q And we ll -- we ll get to the APS here in a second.
A Okay.
Q All right. I m going to skip down here to vital signs. Anything in these -- these vital signs that you recorded that you viewed as problematic or irregular?
A Not problematic or irregular. Ninety-one over seventy-three (91/73) is not a concerning low blood pressure if the person is not in distress of alert, oriented. It -- no.
Q What about somebody though with hypertension and you -- you document up here that Mr. May has hypertension. So his base blood pressure --
A Uh-huh.
Q -- is higher, right?
A Everybody runs different. It s patient specific. So he -- they should have been getting vital signs on him like daily or twice a day. He could have just taken his medicine or I mean high blood pressure fluctuates every

second and I do remember putting protocols if his blood pressure was under something to not give him blood pressure medicine.
Q Okay. Did -- you said that he should have been having his vital signs taken twice a day; is that right?
A At -- at least daily being on blood pressure medicine.
Q Did you -- did you ever review his chart to see if he was being -- his vitals were being taken on a daily basis?
A I don t. Usually the nurse will send something over like a week -- like before the visit they will like send something with the vital signs on there, so I m sure I reviewed it to see a trend in how he was running.
Q Do you recall -- as you sit here today do you recall whether your review revealed that his vital signs were being taken every day or not?
A I don t recall that. No.
Q All right. So one of the things under here under vital signs in your note is weight, right?
A Right.
Q And there s nothing entered there. Is there

further contact with Mr. May?
A No. Not that I recall. No.
BY MR. BLAKEMORE:
Q So after this telemedicine visit and your contacting Adult Protective Services, did you ever follow up with Stacia Unruh or Julie Warnke or anyone at the -- the jail to see how Mr. May was doing?
A I wouldn t have reached out to Julie but I don t recall. Maybe I -- I don t recall honestly. I m sure I may have asked Stacia, hey, you know, anything going on with any -- with him or anything but I -- I don t recall.
Q Do you recall Stacia Unruh or anyone from the Custer County jail or Custer County Sheriff s Office, Turn Key, anybody between this time of February 3, 2022 -- and you actually left Turn Key on I think March 17th, right?
A It was shortly after, uh-huh. That --
Q Okay. Do you recall anyone ever contacting you about Mr. May and telling you anything about his condition or what was going on with him during that time frame after this -- this visit on February 3rd?
A I don t -- I don t recall but I mean you get a

soft. Like if it was -- I mean hard or something, you know, we would have to see if there was, I don t know, any severe constipation or hernias or, you know, inflamed appendix or spleen, things like that.
Q Okay. Then the next thing you have checked is NBS times four (NBSx4). What s that?
A Normal bowel sounds in all quadrants.
Q All right. Extremities. Patient is unable to ambulate safely alone. Assistance needed via wheelchair. Did I read that correctly?
A Correct.
Q And did you have any understanding, based on the information that you had, review of the records as to whether that was a -- that was a new development or something that had been a chronic issue with Mr. -- Mr. May?
A From what I recall he was in a wheelchair in Canadian as well, so it was --
Q You recall seeing him in a wheelchair at Canadian?
A I -- them bringing him in, in a wheelchair at Canadian, as well.
Q Okay. Neuro down here, Assessment Diagnosis you have degree of control, good. And what do

you -- what did you mean by that?
A So I mean good is just -- it s -- even though like I said the Alzheimer s was worsening from what they were telling me but he wasn t any -- he wasn t in any like acute distress or anything, so it was -- even though worsening, it was stable. It wasn t an acute concern. What -- it was worsening but it wasn t like he needs attention right now today because of his orientation. It was --
Q Okay. Well, what about the -- what about the fact that he s not eating, not showering, not ambulating?
A So he was already not ambulating but the not eating or showering part, it was a concern but like I -- it wasn t like a -- acute concern like he needed to be rushed to the hospital right now because he s not breathing or anything like that, if that makes sense.
Q All right. I think this is -- I m going -- I m just going down to Plan now and I guess part of what you were talking about earlier.
A Uh-huh.
Q Medications: Place parameters on patient s blood pressure medication and then you say

blood pressure below 100 over 70 (100/70) do not --
A Uh-huh.
Q -- give BP medication? Did I read that correctly?
A Correct. Yes.
Q Now, is that like -- is that based on like a clinical protocol or was that just your judgment?
A I mean if his blood pressure is running under that you don t want to give him more blood pressure medication and it drops even further.
Q Okay. And his blood pressure again that day was 91 over 73 (91/73), right?
A Right.
Q Okay. You have nothing on Diagnostics.
A Right. That means I didn t order any like labs or tests or anything like that.
Q And then Monitor; you have monitor blood pressure BID seven days. What does BID mean?
A Twice a day for seven days.
Q Do you know whether that was complied with?
A I don t recall.
Q Did you ever do anything to follow up to make sure that that was being complied with, with

Protective Services if you weren t concerned about him; is that fair?
A That s true.
Q All right. Let s look at -- I m now at page 20 of Exhibit 2 and this is the document headed Provider Orders, once again dated February 3, 2022. Is that your signature on that?
A It is, yes.
Q So what was the -- what was the order that you gave?
A Just to substitute his Janumet, Glipizide because that was on the formulary. We had a formulary of medications. He was taking Janumet like at home, I guess. I mean, I m sure he was and we didn't offer Janumet, so I switched him over to Glipizide what was offered on the formulary.
Q Okay. What are those -- what are those medications used for?
A Diabetes.
Q Did you follow up to make sure that that -- Mr. May was being provided with this Glipizide?
A No, I did not.
Q I m going to go ahead now and look at -- this is page 30 of Exhibit 2. Did you review -- in

while he was in the dorm house. Did I read that correctly?
A Yes.
Q And do you recall that, that they had moved him?
A I don t recall. They usually -- they wouldn t tell me if, you know, they moved somebody. I don t recall.
Q Okay. And then this is kind of what we ve been alluding to here. Carey said that she wanted to notify Adult Protective Services about his well-being due to his deteriorating mental state. Did I read that correctly?
A Yes.
Q And is that -- is that consistent with your memory of the -- events?
A Yes.
Q All right. So what was it, specifically, that led you to notify Adult Protective Services about Mr. May?
A Like I said, that conversation. Like the officers are there with him more. Like they see him all the time and Julie was like really concerned about, you know, the things that were going on and that s when we discussed like the

reason he was there and, you know, forgetting his appointment, so -- and, you know, seeing the worsening like of his Alzheimer s by not eating and things. It was just a -- it was a concern so I wasn t -- I spoke -- I remember speaking with like other providers trying to figure out like, you know, what to do. I can t release him, you know, so -- and I remember one of -- another provider she s like, well, call APS because what else can I do about it? I can -- I can only work with what I have in the setting. So she s like call APS because once he gets out, you know, what s going to happen then? That s all I --
Q Okay. You say --
A -- knew to do.
Q You say you talked to another provider. Who was the other provider?
A Oh, one of my like ex-coworkers. We talk about a lot of stuff. Josephine, like, she would kind of give me advice and things like that.
Q Josephine?
A Yes.
Q What s Josephine s last name?
A Oto. O-T-O.

was responsible for multiple facilities?
A Yes. All of the providers had multiple facilities.
Q So you -- you and Ms. Oto were essentially in the same -- the same predicament?
MS. MARTINEZ:
Object to form.
A Well, I --
BY MR. BLAKEMORE:
Q The same situation.
A As far as having multiple jails, yes.
Q Yeah. You re both APRNs, you re both employed by Turn Key and you re both being assigned to multiple facilities, right?
A Right.
Q So is it fair to say that she had some of the same issues and challenges that you had?
MS. MARTINEZ:
Object to form.
BY MR. BLAKEMORE:
Q Based on what she told you and your understanding?
A I would say some of the same challenges.
Q Did it make it more difficult, you think, to provide care for the extra population when

Q Okay. And then under degree of control, good, fair, poor, diabetes is listed as good; is that right?
A Right.
Q Hypertension is listed as good, correct?
A Correct.
Q Costochondritis is listed as fair, right?
A Right.
Q Okay. What is costochondritis, just for the record?
A He must have just had some pain in his chest area around his ribs or something -- was complaining.
Q Okay. And then fourth is Alzheimer s and that s listed as good. Do you see that?
A Right.
Q Okay. I am curious how do you as an APRN have the understanding, in the first place, back in January that he had Alzheimer s?
A It must have been somewhere in his medical intake form where they put it and then also that medication, Donezipil (sic) that is for dementia and Alzheimer s.
Q Okay. Did you diagnose him with Alzheimer s or --

A It is.
Q It also says; "Next visit 30 days." Do you see that?
A It is -- yes.
Q Do you know what he was going to be visited again in 30 days for?
A A follow up from the initial like from the initial visit. Usually a follow up from the initial visit you ll see them in 30 days and then at that point it ll turn into a chronic care visit and that switches to 90 days.
Q Okay. So this is when you first see him when he first comes into that Turn Key system, anywhere, and the follow up is 30 days?
A Right.
Q In the meantime he switches facilities and you see him again on February 3rd which I ll submit to you is thirty-two (32) days later.
A Uh-huh.
Q Is -- is that the reason you saw him on February 3rd that it was about 30 days after this visit?
A I don t --
Q Or did you see him on February 3rd because of concerns being brought by people at Custer

County?
A I don t recall.
Q Okay. I didn t quite understand what you just said about the 30 and the 90.
A So -- so --
Q What is the system of when it s 30 and when it s 90?
A So basically when you go for an initial assessment like that s your first time ever being seen by -- seeing that person you ll follow up with them a month later and, you know, at that point it ll roll over into a chronic situation. You re not going to see them every 30 days in a, you know, primary setting. At that point you ve established everything, your history and physical. You see them in a month and then once you see them after that month, you ll then see them 90 days after. Like you don t see them --
Q Okay.
A -- every 30 days. Does that make sense?
Q So once he switches to Custer County you do see him fairly early at his time in Custer County.
A Uh-huh.
Q Why is it not a 30-day further visit? Why is

it 90 at that point even though it s the first time you saw him at Custer County?
A Because I ve already seen him at Canadian.
Q Okay. So wherever you see him, the -- the -- you see him once, then you see him again 30 days later and then you see him again 90 days later. That s -- that s the reason for the 30 and then the 90; is that right?
A Yes.
Q Okay. Did you, as an APRN, have the ability to set a follow up visit for 30 days after the February 3rd visit? Was that something you could have done?
A Yes. I could have.
Q Okay. But -- but you didn t. Is that fair? You set it for 90?
A I did, correct.
Q Now we talked a little bit about the hospital in Canadian County. I think you testified you did not know he had gone to the hospital in Canadian County; is that right?
A I don t recall, no.
Q All right. So whoever sent him to the hospital in Canadian County must have been someone other than you; is that fair?

Q A bedsore. I m sorry. A bedsore. All right. Do you recall at any point being involved in ordering anything -- any antibiotic ointment for him having a pressure sore or --
A After --
Q -- a bedsore?
A -- reviewing that chart someone did call -- Stacia called me and I did a verbal order --
Q Okay.
A -- for --
Q So either you did -- you did order that after February 3rd. That is one other way in which you were involved; is that fair?
A Right. If it was -- I don t remember the date but I do recall.
Q Okay. So there is at least one other conversation beyond the ones we ve discussed in which you were involved in Mr. May s care and it s about giving him antibiotic ointment for a bedsore; is that fair?
A Yes.
Q Okay. One thing we haven t talked, at all, today about is -- is Covid 19. At any point in your care of Mr. May do you recall thinking he had Covid 19 or that he had any symptoms of

Covid 19, at all?
A Not -- no. Not according to our visits. He didn t exhibit any symptoms.
Q Okay. Are you aware that the medical examiner -- have you ever looked at the medical examiner report?
A I did see the cause was Covid 19.
Q Sure. And I realize you -- that s nothing you would have been aware of at the time; is that fair?
A Right.
Q None of your treatment for Mr. May had anything to do with Covid 19; is that fair?
A Correct.
Q I think you already testified that he was in a wheelchair, in Canadian County, as well as in Custer County; is that fair?
A Right.
Q So that is not actually a change in condition. That is something he already had before coming to Custer County; is that right?
MR. BLAKEMORE:
Object to form.
A From my understanding, yes.
BY MR. MILLER:

Q Correctly?
A Yes.
Q He could be sent to the hospital?
A Yes.
Q And would you agree with me you never suggested that, at any time?
A Right. You -- I would only suggest that in an -- in an emergency situation or if he was in acute distress.
Q Right. And you never saw that; acute distress or emergency?
A Correct.
Q So when you re talking about he needs to be in a nursing home, is that more of a long term solution?
A Yes, that s after the fact.
Q After his release?
A Release. Right.
Q As a medically trained person, a APRN, do you have any knowledge about how a lack of family interaction, whether that has any effect on the course of dementia? Meaning not being around people that you know. Do you have any knowledge of that?
MR. BLAKEMORE:

accepted method to see patients?
A Yes.
MR. BLAKEMORE:
Object to form.
A It is.
BY MS. MARTINEZ:
Q Okay. And in this case with Mr. May you saw him through tele -- telemedicine; is that correct?
A Yes.
Q Okay. And you were able to assess him and diagnose him and provide him the orders that you felt were necessary through telemedicine; is that correct?
A Yes.
MR. BLAKEMORE:
Object to form.
BY MS. MARTINEZ:
Q Okay. And you re --
COURT REPORTER:
Was that Mr. --
Q -- not able to release patients on your own; was that correct?
A Correct.
MR. BLAKEMORE:

Q Okay. So when you were on call --
A Uh-huh.
Q -- you were on call for your seven facilities plus six or seven facilities that Malachi Martin was responsible for?
A Correct. Yes.
Q So thirteen (13) to fourteen (14) facilities?
A Depending on how many he had, yes.
Q And you could get call -- you had a call from anyone of those 13 or 14 facilities at any time?
A Correct.
Q And so is that part of what the concern that you raised with Dr. Cooper as far as being overwhelmed that you had 13 to 14 facilities that could potentially call you at any time?
A Correct.
Q All right. Did you do anything to ensure -- after the -- the telemedicine visit on February 3rd, did you do anything to ensure that Stacia Unruh was medically monitoring Mr. May s condition?
A No. She would call if the opportunity -- you know, if anything significant was going on she would call. She would usually call.

Q So you re just relying on her to call rather than like actively supervising what she was doing?

MR. MILLER:

Object to form.

A We'll say I didn t call to make any follow ups on what she was doing.

BY MR. BLAKEMORE:

Q Okay. All right. Thank you. That s all I have, ma am.

MS. MARTINEZ:

I just -- sorry. I just have a few more questions.

RE-EXAMINATION BY MS. MARTINEZ:

Q In regards to the officers, I believe you testified that they were the main ones with the inmates; is that correct?

MR. BLAKEMORE:

Object to form.

A I mean, yes, they were there every day all day. Uh-huh.

Q Okay. And again if they had any concerns or questions regarding an inmate, medically, they could contact you; is that correct?

A Correct.