IN THE UNITED DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

LISA HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN D. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

PLAINTIFFS,

vs. No. CIV-24-119-JD

TURN KEY HEALTH CLINICS, LLC;
TAMARA CAREY, APRN;
STACIA UNRUH, LPN;
CUSTER COUNTY SHERIFF, In His Official Capacity; and,
JULIE WARNKE,

DEFENDANTS.

VIDEOTAPED DEPOSITION OF STACIA UNRUH
TAKEN ON BEHALF OF THE PLAINTIFFS
ON APRIL 25TH, 2025, BEGINNING AT 10:24 A.M.
IN OKLAHOMA CITY, OKLAHOMA

APPEARANCES:

On behalf of PLAINTIFFS:

Daniel E. Smolen
Bryon D. Helm
Mazie Bell
SMOLEN & ROYTMAN
702 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
(918) 585-2667
kendrarash@ssrok.com

DEFENDANT'S EXHIBIT 4 5:24-cv-00119-JD

(Appearances continued on next page.)

REPORTED BY: Lindsey Troiani, CSR

**aren't there?**

A Just, like, pictures and things like that, that I've noticed it.

**Q Okay. Have you looked through your text messages to see if they're still available?**

A No, sir.

**Q When were you employed with Turn Key?**

A Approximately November '21, I think, to, like, March of '22.

**Q Have you gone through your phone and looked for any messages that could potentially pertain to this case?**

A No, sir.

**Q Has anyone asked you to do that?**

A No.

MR. WINTER: Okay. We can't talk about anything that you may have been discussed with counsel. That's privileged.

THE WITNESS: Okay.

**Q (By Mr. Smolen) Yeah. And I wasn't asking you -- I was just curious if anyone asked you to do that.**

A Okay.

**Q Did you, from time to time, communicate on your cell phone about different matters pertaining to**

**Q Okay. Angie seems to be pretty knowledgeable about the fact that he hasn't eating in seven or eight days. Agreed?**

MS. MARTINEZ: Form.

MS. MILLER: Object to the form.

A Agreed.

**Q Okay. I mean, you can hear that on the call; correct?**

MS. MARTINEZ: Form.

MR. MILLER: Object to the form.

A Correct.

**Q Did Angie ever report to you that Mr. May hadn't eaten in seven or eight days?**

A Not that I remember.

**Q If she had reported that to you, what would you have done?**

MS. MARTINEZ: Form.

A Contacted the provider.

**Q Okay. Did you ever contact the provider about Mr. May?**

MS. MARTINEZ: Form.

A He was put on for the chronic care visit that he had and also for a wound care.

**Q How about the fact that he had been missing meals?**

me.

**Q Who was the other nurse?**

A They called him Tony. I don't remember a last name or anything like that.

**Q Do you know if Tony was an RN or an LPN?**

A I don't remember.

**Q And you said Tony was with you for your training?**

A Yes.

**Q Why don't you tell me what your training involved.**

A I remember I went a couple days and it was just, like, shadowing him and seeing how he did things. Then a couple of days it would be me doing it and him, kind of, just watching over, making sure I'm doing stuff right.

**Q Okay. So it was just general shadowing on the job?**

A Yes.

**Q Okay. Nothing specific more than that?**

A Not that I remember.

**Q What was your schedule at the Custer County jail?**

A I would work six hours, two days a week.

**Q During the time that you were employed with**

A Correct.

**Q And that you understand you were just supposed to do it the next time you were on shift?**

A Correct.

**Q Were you responsible for doing the medical intake form?**

A Yes, sir.

**Q I want you to look at -- take a look at Exhibit 2 -- you've got your own documents there.**

(Plaintiff's Exhibit 2 is marked for identification.)

MR. SMOLEN: I'm going to mark this as Exhibit 2. I'll give it to you before the end of the day. It's Custer TK_001.

MR. MILLER: And just for the record, Dan, what are you saying is Exhibit 2?

MR. SMOLEN: It's Custer TK_01 through Custer TK_95.

MR. MILLER: Okay. Thank you.

**Q (By Mr. Smolen) Do you have that document in front of you?**

A Yes, sir.

**Q Looking at the second page, it looks like you signed this evaluation; is that correct?**

A Yes, sir.

**Q And you date it 1/27 of '22; is that right?**
A Yes.
**Q Is that the day you actually did it?**
A Yes. It would have been.
**Q What days of the week did you work?**
A I don't recall exactly, but I believe it was Tuesday and Thursdays.
**Q Okay. I'm at the top of Page 1. Are you with me?**
A Page 1?
**Q Uh-huh.**
A Yes.
**Q It says "Sent for a fit." What does that mean?**
A I honestly don't remember what it means.
**Q Under vitals, temp, you put 98.2; correct?**
A Yes, sir.
**Q Blood pressure 117 over 68; correct?**
A Correct.
**Q Pulse is 72?**
A Yes.
**Q Respiratory rate of 18?**
A Yes.
**Q O2 sat of 99 percent and a weight of 240 pounds; correct?**

A Correct.
Q Under medical illness, it says, "Check any current or past conditions." You mark high blood pressure; correct?
A Correct.
Q You don't put any kind of explanation; right?
A Right.
Q How did you obtain that information?
A By asking him.
Q Okay. You mark that appearance was unremarkable; correct?
A Correct.
Q That his behavior was appropriate; correct?
A Correct.
Q State of consciousness, you say that he's alert?
A Yes.
Q That his breathing is unremarkable?
A Yes.
Q And that ease of movement, that he's got a stable gait; correct?
A Correct.
Q And was that all based on your observations?
A Yes.
Q It's fair to say, then, at the time that

**Q Have you ever back-dated any medical record?**
A Not that I can recall off the top of my head, no.
**Q Is it possible that you have?**
A Not that I'm aware of.
**Q Looking at Custer TK_006, is that your signature?**
A Yes, sir.
**Q PREA Risk Assessment at TK_007, did you complete this form?**
A Yes, sir.
**Q And did you actually complete it on the day that it's signed?**
A Yes.
**Q Looking at Custer TK_008, general consent for care and treatment, do you recall Mr. May signing that form?**
A I mean, I don't recall specifically him doing it, but it appears somebody has signed it.
**Q And Custer TK_009, it's also signed by the purported patient; correct?**
A Correct.
**Q And that's also your signature; correct?**
A Correct.
**Q Who did med pass at the Custer County jail?**

A The officers.

**Q What did you understand your job responsibilities to be at the Custer County jail?**

A You mean, like, what my daily duties were to do?

**Q Uh-huh.**

A The medical intakes, to do nurse visits, and, like, follow any of the doctor's orders that are provided, like, any of the, like, lab draws or things like that.

**Q What are nurse visits?**

A It's whenever the inmates submit, like, a sick call to be seen by the nurse.

**Q Would they have to submit a sick call before you would see them?**

A Not always. If the officers made me aware of something, I could see them.

**Q Do you believe it's the officers that brought your attention to Mr. May in February of 2022?**

MS. MARTINEZ: Form.

A For what exactly?

**Q Well, why did you have an encounter with him?**

A Because on his intake paperwork from the officers, it said that he had had a medical history.

**Q But you don't see him for how many days?**

A No, sir.
**Q Okay. Did that make your job difficult at times?**
MS. MARTINEZ: Form.
A I mean, based on knowing diagnoses exactly and stuff like that, I suppose, yeah.
**Q Or how about even just comparing vital signs?**
A Yeah.
**Q I mean, that would make everything really difficult if you were trying to provide some kind of basic level of medical care; right?**
MS. MARTINEZ: Form.
A It could, yes.
**Q At what point in time did feces begin building up in Mr. May's wounds?**
MR. MILLER: Object to the form.
MS. MARTINEZ: Form.
A I am not aware of that.
**Q When did Mr. May start having to wear diapers?**
A I am not aware.
**Q Do you know how diapers are provided to inmates at the Custer County jail?**
A I don't know.
**Q Do you know if that's a medical decision**

A Not that I'm aware of.

**Q Did you take any steps to determine why this man went from being able to use the restroom to having to wear a diaper?**

MS. MARTINEZ: Form.

A No, sir.

**Q Do you think that that would be important to find out why that's happening as a jail nurse?**

A Yeah.

**Q And can you tell the jury what steps you took to figure out why that was happening?**

A In honesty, I'm not completely sure whenever he even started defecated on himself or urinating on himself. I don't remember being made aware that that was even happening.

**Q Do you think if that was happening, that the jail staff should have notified you?**

A Yes.

THE WITNESS: Can we take a break?

MS. MARTINEZ: Can we take a break? Is it a good time to take a break?

MR. SMOLEN: Whatever you guys want to do.

MS. MARTINEZ: We'll go off the record.

(Off the record at 12:44 p.m. and returning at 1:11 p.m.)

or not, it's not comfortable to lay on a wound. And it's not good for a wound to be laid on regardless of what it is.

**Q Is this the wound care note you completed?**

A Yes.

**Q And how did you mark your wound description?**

A The pink epithelialization.

**Q Okay. And in layperson's terms, what's that mean?**

A That it was pinkish, like, kind of deteriorated a little bit.

**Q And you put the pain score of eight out of ten; correct?**

A That's a five.

**Q Okay. What's exudate?**

A Is this somewhere on here or are you just asking me that question?

**Q I'm just asking you that.**

A It's just, like, drainage.

**Q Under the types column, you don't mark anything; correct?**

A Correct.

**Q And can you walk me through under those types, what the definition is of each of those terms?**

A So serous would be, like, clear; purulent

A Okay.
**Q Are you with me?**
A Yes.
**Q You don't complete a wound care note on the 10th, do you?**
A According to the paperwork, it says it was done on the 11th.
**Q The order for antibiotic ointment to the wound, who made that order?**
A On what form?
**Q TK_38, are you there?**
A Okay.
**Q "Nurse Stacia looked at the wound on his right leg and got an order to apply antibiotic ointment to the wound."**
A It would have came from the provider.
**Q Did the provider ever have visual observation of the wound?**
MS. MARTINEZ: Form.
A Not that I'm aware of.
**Q Do you believe your interaction of Mr. May as it pertains to the wound care was on February the 10th or February the 11th?**
A I'm unsure.
**Q Do you recall if he was wearing a diaper on**

**either February 10th or February 11th?**

A I don't recall.

**Q Looking at TK_36, the bottom at 2/12 of '22, "At approximately 1130 hours Officer Carter and myself got May, No. 399021, to get up and shower himself and changed diaper and dressed his self. Was cleaned at this time. Then I applied triple antibiotic ointment to the sore on his right hip." Correct?**

A That's what it reads, yes.

**Q Whose decision was it to put Mr. May in a diaper?**

MS. MARTINEZ: Form.

A I'm unsure.

**Q Well, do you think maybe it was your idea?**

MS. MARTINEZ: Form.

A I don't believe so.

**Q Were you ever told that they were going to use a diaper because Mr. May was defecating on himself?**

A Not that I recall.

**Q Did you ever see Mr. May in a diaper?**

A Not that I remember.

**Q Look at the entry from 2/14/2022. "Nurse Stacia and I, DO Medical Warnke, encouraged Inmate May and he got up and took a shower. His wound was looked at by the nurse and antibiotic ointment and medication**

A I'm uncertain.
**Q Well, if there's no documentation that you did it, right, and you're supposed to do documentation if you do it, would that lead you to believe that you didn't do it?**
MR. MILLER: Object to the form.
MS. MARTINEZ: Form.
A I mean, I guess, yeah.
**Q And is it your testimony that none of the jail staff told you that he had feces in his open wound on the 13th?**
A Correct.
**Q And as we sit here today, you don't have a memory of whether you visualized that or not?**
A Visualized what?
**Q Feces inside his wound.**
A Not that I recall.
**Q Well, you don't recall anything about it though; right?**
A I recall that he had a wound that I took care of and got an order for.
**Q Because you looked at a note that told you that; right?**
A I mean, I remember there being a wound.
**Q Okay. And can you tell us what it looked**

**like without looking at your note on the 14th?**

A Not exactly, no.

**Q Can you tell me generally what it looked like on the 14th?**

A On the 14th, no.

**Q Did you notify the provider that Mr. May was no longer able to control his bowel movements?**

MS. MARTINEZ: Form.

**Q And needed to have a diaper?**

MS. MARTINEZ: Form.

A No. Because I don't recall being aware of that.

**Q So we know that he had a diaper on February 12th. Do you see that?**

A On 36?

**Q Yes, ma'am.**

MS. MARTINEZ: Form.

A What line?

**Q Third line down, 2/12/22, 1149, Mike McCowen. There was a diaper change; right?**

A That's what it says on the paper, yes.

**Q And if you showed up for one of your patients, and all of a sudden they're wearing the diaper the next day and they had feces on an open wound, what were you supposed to do?**

MR. MILLER: Object to the form.
**Q Do you believe that jail staff failed to provide you the information regarding Mr. May in a timely fashion?**
MS. MARTINEZ: Form.
A Yes.
**Q And had they provided you that information in a timely fashion, what steps would you have taken differently?**
MR. MILLER: Object to the form.
MS. MARTINEZ: Form.
A Spoken to the provider more, figured out a different plan of care.
**Q Who do you believe's responsible for Mr. May's death?**
MS. MARTINEZ: Form.
MR. MILLER: Object to the form.
A I'm not sure, sir.
**Q Well, I'm just asking you what your opinion is?**
A I don't --
MS. MARTINEZ: Form. She already answered the question.
**Q I'm asking you, in your opinion, who do you believe is responsible for Mr. May's death?**

A Notified the provider.
**Q And is it your testimony that no jail staff notified you of these alarming blood pressure readings?**
A Correct.
**Q But you just don't think anyone's fault that Mr. May died at -- you wouldn't blame anybody at the jail?**
MS. MARTINEZ: Form.
A I wouldn't blame a specific person, no.
**Q Okay. Would you blame the system?**
MS. MARTINEZ: Form.
MR. MILLER: Object to the form.
A I'm not really sure, sir.
**Q Well, if you're not going to blame an individual, right, and you've got all these alarming blood pressure readings that are being taken, right, which can be indicative of malnutrition and dehydration. Yes?**
MS. MARTINEZ: Form.
A It can be. It can mean a lot of things.
**Q One of them is malnutrition and dehydration; correct?**
A Correct.
**Q And no one notified you; right?**
A Correct.

A I'm not sure, sir.

**Q Did you have a policy or procedure that you were required to follow if an individual presented to the Custer County jail in January of 2022 that had any potential symptoms of COVID? Were you to do anything?**

A What was the question?

**Q If someone had presented on an intake at the Custer County jail and they had a symptom related potentially to COVID, you don't know who was supposed to do the COVID screening; correct?**

A No. I don't remember that, no.

**Q Okay. But if whoever that was did the screening and they identified a potential symptom of COVID, was there a policy or procedure under Turn Key at the Custer County jail that you were to follow?**

MS. MARTINEZ: Form.

A I don't remember.

**Q Take a look at Custer TK_24.**

A Okay.

**Q Are you with me?**

A Yes.

**Q Under the screening for COVID, there was a reported symptom of nausea and vomiting; correct?**

A Correct.

**Q But despite that, would you agree with me**

**that you did nothing to determine whether or not Mr. May had COVID?**

MS. MARTINEZ: Form.

A I don't recall even seeing this paperwork, sir.

**Q And you don't recall jail staff telling you that when he was booked, that he was reporting nausea and vomiting?**

A No, sir.

**Q Who fills out the inmate medical questionnaire?**

A Which -- is it TK_25?

**Q Yeah.**

A The officers.

**Q It's actually TK_26. Are you with me?**

A Yes.

**Q We see Marvin May's signature at the top of the form; correct?**

A Yes.

**Q And we see an officer's signature at the top of the form; correct?**

A Correct.

**Q And we see a date of 1/25 of 2022; correct?**

A Correct.

**Q I want you to compare the signature of Marvin**

A I mean, yeah. It was fine.
**Q Just very basically, who was your employer? Was it the Custer County Sheriff or Turn Key Health Clinics?**
MS. SMOLEN: Object to the form. Calls for a legal conclusion.
**Q To the best of your understanding.**
A Turn Key.
**Q Who provided you your wages, your checks?**
A Turn Key.
**Q Who was your supervisor, a Turn Key employee or the Custer County Jail?**
MS. MARTINEZ: Objection. Leading. Compound.
A Turn Key.
**Q And who did you understand your supervisor to be?**
A I believe it was Gwen.
**Q Now, you've testified today about various encounters to the extent of your recollection with Marvin May; correct?**
A Correct.
**Q At any point, do you remember thinking that Mr. May was in an emergency situation that needed to go to the hospital?**

A During the times that I encountered him, no.
**Q Do you recall thinking any other detention center inmate in Custer County was in an emergency situation that needed to go to the hospital at any time that you worked at Custer County?**
A With any other inmate?
**Q Yes.**
A Yes, sir.
**Q Okay. Were there times that you contacted the provider to send someone to the hospital?**
A I can't recall specifically if I ever did or not.
**Q Okay. Do you recall if you sent someone to the hospital without contacting a provider at any point?**
A I don't recall.
**Q Nothing that comes to mind?**
A No, sir.
**Q All right. If you did believe that Mr. May was in an emergency situation -- and I realize this is hypothetical -- what do you think you should have done?**
A It just depends. I mean, if it was emergent, like, needed to be taken care of right at that moment, go to the hospital.
**Q And you could do that either buy contacting**

**Q Okay. Do you recall at any point informing Ms. Warnke that you thought he was not receiving appropriate care?**
A No, sir.
**Q Did you, at any point while you were there, think he was receiving appropriate care?**
MR. SMOLEN: Object to the form. She's the only one providing care.
MR. MILLER: Keep your objections to form, Counsel.
**Q (By Mr. Miller) Did You at any point think that Mr. May was receiving improper care while you were working there at the facility?**
MR. SMOLEN: Object to the form.
A From what I knew about what was going on, no, I did not.
**Q You don't ever remember a light bulb going off at any point prior to March 18th that this man's care is insufficient; is that fair?**
A Yes.
**Q Now, COVID 19, as an LPN, what is your understanding of known symptoms of COVID 19?**
A Like, cough, loss of taste and smell, fever, fatigue.
**Q Okay. Are any of those symptoms that you**

**just described listed in anything we've talked about here today?**

A No, sir. Not that I know of.

**Q Do you ever recall hearing him cough in particular?**

A I mean, I can't recall that, no.

**Q Okay. Do you ever recall him mentioning anything about a loss of taste or smell?**

A No, sir.

**Q Or fever -- mentioning fever?**

A No, sir.

**Q Do you know what the medical examiner's report says Mr. May passed away from? And let me ask, have you looked at the medical examiner's report?**

A Just from what was given to me a little while ago.

MR. MILLER: Okay. And was that made an exhibit by you, Dan? I don't recall.

MR. SMOLEN: I don't remember.

MR. WINTER: I think it was. The ME's report, Exhibit 10.

**Q (By Mr. Miller) Can you look at Exhibit 10, please?**

A Yes, sir.

**Q Let me know when you have a chance to look at**

**Q Would you agree with me that sepsis is not listed on there?**

A Yes.

**Q Did Mr. May ever complain to you, to the best of your memory, that he thought he might have COVID-19 or any symptoms of COVID-19?**

A No, sir.

**Q Now, at any point, did you yourself take any vitals of Mr. May?**

A Yes.

**Q When would you yourself have taken the vitals of Mr. May?**

A On his intake screening and then also I did the vitals during his chronic care visit.

**Q So on January 27th and also on February 3rd?**

A Yes.

**Q Can you please turn to TK_10 through -- 10 through 16, which is the MAR or Medication Administration Record.**

A Okay.

**Q I just want to be real clear on this. Are any of these -- is anything on any of these pages your handwriting? Did you write anything on pages 10 through 16?**

A I wrote -- just going through. I haven't

question, wherever we were?

(The previous question was read back.)

**Q (By Mr. Miller) Do you know how it was decided that Mr. May was going to be taking these eight medications on sometime before January 26th?**

A Sorry. What page were you on again?

**Q We're on TK_10 and TK_12, which are the Medication Administration Records from January.**

A So can you ask me the question again? I'm sorry.

**Q Sure. Do you know how it was decided that Mr. May was going to be taking these medications?**

A Well, as far as I know, because he was transferred from another facility so...

**Q Okay. Because Turn Key also provided him care in Canadian County?**

A Correct.

MR. SMOLEN: Objection. Leading.

**Q So would there already have been a list of medications?**

MR. SMOLEN: Objection. Leading.

A I don't know if it was a list or if his medications just came with me. I'm not sure.

**Q Okay. Do you know what these medications are, Montelukast sodium or what that's for?**

**occasions?**

MS. MARTINEZ: Form.

A Repeat the question, please?

**Q On the times that you were there --**

A Yes, sir.

**Q -- twice a week, approximately, why did you never take his blood pressure?**

A Because I had no specific reason or need to take it. I mean, I wasn't --

**Q There was an order by the APRN to take his blood pressure; correct?**

A Correct. But that was put on the MAR and the officers were the ones that were in charge of --

**Q The one that you never checked again after February 10th; is that right?**

MS. MARTINEZ: Form.

A I mean, I can't say that I did or didn't ever check it again, but I didn't write in it any other time.

**Q Okay. You have no memory of checking it at any point after February 10th?**

A I'm not sure.

**Q All right. Now, Mr. Smolen alleged that Marvin May lost 70 pounds including 50 pounds at Custer County. Do you recall that suggestion?**

**aware that jail staff were doing med pass, doing blood pressure checks, and providing wound care on Mr. May. Agreed?**

A I mean, based off of the documents, yes.

**Q Did you, at any point, complain about that situation that they were doing it instead of somebody like you?**

A Like, complain to somebody specifically or just --

**Q Complain to anybody about amount of medical care being provided by jail staff instead of by you?**

A Not that I remember, no.

**Q Now, Mr. May, do you know where he was in the facility, meaning was he in the front?**

A Yeah. He was in the booking area.

**Q Okay. Where is your office?**

A Also in the booking area.

**Q Okay. So do you have to go to the back -- did you have to go -- once he's in the booking area for the last month or so, did you have to go back into the facility to go look at him?**

A No. I mean, he was in the booking area. But I didn't have access to, like, get into the cell without an officer.

**Q Okay. How far is it from the booking area**

**cells to your medical area approximately?**

A Maybe 50, 60 feet.

**Q Closer than the cells that are in the pod; is that fair?**

A I believe so. I only went back to the pods a couple times, so I'm not -- I don't recall exactly.

**Q Did you ever ask an officer to assist you, Julie Warnke or anybody else, to go check on Mr. May after February 14th?**

A Repeat the question? I'm sorry.

**Q After, say, February 14th when the wound care apparently was provided to you -- by you, did you ever ask Julie Warnke or anybody else to assist you at security to go check on Mr. May?**

A I mean, I was never alerted of any reason to need to go check on him, so no.

**Q I think I'm done. Let me just check my notes and I may pass.**

**Do you ever remember Mr. May not being communicative at any point that you were involved with his care where you were unable to communicate or unable to speak?**

A Not that I recall.

MR. MILLER: That's all I have. I'll pass the witness.