IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) LISA M. HICE, as )
Co-Administrator of the Estate of )
Marvin G. May, Deceased, and )
(2) LEANN D. HOFF, as )
Co-Administrator of the Estate of )
Marvin G. May, Deceased, )
)
Plaintiffs, )
)
VS. ) CASE NO.:
) CIV-24-1190-JD
(1) TURN KEY HEALTH CLINICS, LLC, )
(2) TAMARA CAREY, APRN, )
(3) STACIA UNRUH, LPN, )
(4) CUSTER COUNTY SHERIFF, in his )
Official Capacity, and )
(4) JULIE WARNKE, )
)
Defendants. )

VIDEOCONFERENCE DEPOSITION OF DR. JUSTIN BERK

TAKEN ON BEHALF OF DEFENDANTS

IN PROVIDENCE, RHODE ISLAND

ON SEPTEMBER 17, 2025

COMMENCING AT 9:00AM CST

INSTASCRIPT, LLC
125 PARK AVENUE, LOWER LEVEL
OKLAHOMA CITY, OKLAHOMA 73102
(405) 605-6880
www.instascript.net

DEFENDANT'S EXHIBIT 6
5:24-cv-00119-JD

REPORTED VIA ZOOM BY: ANN CRAFT, CSR

**Q.** Okay. And you understand and acknowledge that the Custer County Jail was not a prison but it was a jail; is that right?

A. Yes.

**Q.** Okay. Doc, I think last time you and I met we went through every one of your publications one by one and I'd be happy to do that, too, it that's what we need to do.

But I'm going to go ahead and pull up Exhibit No. 3 again. Do you believe you have authored or participated in any groups that have authored documents or publications that are particularly relevant to the issues that we're talking about today?

A. Yes.

**Q.** Okay. Can you tell me which ones those are or how would be the most efficient way for us to go through that?

A. It might be easier to go through one by one, or if we go by page, I can point out the citations that I think are most relevant to this case.

**Q.** That would be great. So for the record, I'm on Exhibit No. 3, page four; there's a heading here that says, Publication List; is this the spot I should look on your CV for the publications you've been involved with, Doctor?

**Q.** Fair enough. So to be clear, have you reviewed the contract between Custer County and Turn Key Health Clinics?
A. Yes, I believe I was given that and I did look at that; I admit I did not look at it extremely closely. But, yes, I saw that and reviewed it.
**Q.** Did you rely upon the contract between Custer County and Turn Key in formulating your opinions?
A. I can't say with confidence that that's a subconscious thing; but I didn't specifically talk about the contract in the document, if that's helpful.
**Q.** That is helpful. Do you have any opinions with regard to the contract between Turn Key and Custer County that aren't otherwise listed in your report?
A. No, I didn't think so. I don't know that I was explicitly asked to review the terms of the contract and so I think it helped me have an awareness of the setup but that was not the specific thing I wrote with the mind of evaluating in the report.
**Q.** Right. And you don't intend on offering opinions at the time of trial as it relates to the contract, itself; fair?
A. I think that's fair, unless, again, as we talked about last minute; if explicitly asked about them, with an exhibit in front of me. I don't want to say that I

wouldn't or can't; but, yes, I don't have an agenda, specifically, to talk about that outside of the report.

**Q.** Okay. Did you review any medical records for patients aside from Marvin May?

A. No.

**Q.** Okay. Is it fair for me to assume that you do not intend on offering any opinions regarding patients aside from Mr. May?

A. Yes. Correct.

**Q.** Did you review any of the medical provider's personnel files?

A. Yes. And, actually, I'm sorry, that, I think was an additional file that might not have been listed, Julie Warnke's -- information about Julie Warnke's personnel file.

**Q.** What about -- so what about Stacia Unruh and/or Tamara Carey?

A. I don't recall, specifically, if I reviewed those intently unless I listed them that I saw them; and if I did not cite them, then it was not a specific opinion that I had.

**Q.** Let me go about it this way, Doctor. Is it fair for me to assume that you will not be offering any opinions regarding the training or credentials of the medical providers involved on the Custer County Jail?

MR. BLAKEMORE: Object to form.

THE WITNESS: I do think I would provide opinions on the credentials of people providing medical care at the Custer County Jail, yes.

**Q.** (By Mr. Winter) And maybe I should have been more precise. Are you anticipating offering opinions that any of the medical providers at the Custer County Jail were not properly licensed with the State of Oklahoma?

A. No, I don't think so. I mean, I think one of the things that I reviewed as, you know, Julie Warnke's expired CNA license, which I think is irrelevant.

I don't know that that's what you're asking and so I don't think I will have any specific concerns about the appropriate board certifications of individuals; that was not something that I reviewed.

**Q.** Okay. What about the training provided to Tamara Carey or Stacia Unruh; any opinions you anticipate offering at the time of trial with regard to that?

A. I do not anticipate offering opinions on the training of Tamara Carey or Stacia Unruh at this time.

**Q.** Thank you. Did you review any of the -- I always call them, like, staffing sheets or the timesheets for the medical providers at the jail?

A. There were a lot of documents that might have been included that I quickly reviewed but nothing that I

think strongly informed my opinion; those timesheets, I don't think strongly informed my opinion.

**Q.** Okay. Thank you. Do you anticipate offering any opinions as it relates to the medical staffing level at the Custer County Jail?

A. Yes. I think the limited number of nursing available hours is something that I think is a reasonable thing that would come up.

**Q.** Okay. Any evidence that you've reviewed that would -- that leads you to believe that Turn Key did not satisfy its contractual -- contractual requirements pursuant to the contract with Custer County?

MR. BLAKEMORE: Object to the form.

THE WITNESS: I'll be honest in that I don't know that I would have the legal expertise to talk about the fulfillment of a contract and I think my medical expertise was more on the health care service delivery which I feel more comfortable providing an expert opinion on.

**Q.** (By Mr. Winter) Okay. Did you review any of Turn Key's written official policies and procedures?

A. There were policies and procedures I certainly reviewed; I admit that I'm not clear if the authors were Turn Key or the Custer County Jail, but I did review relevant health care policies and procedures that would have been listed in the Documents Reviewed.

**Q.** And any opinions with regard to the policies And Procedures that you did review, are they outlined in your Expert Report?

A. Yes. That would be safe to say.

**Q.** Okay. Any of the policies and procedures that you reviewed as it relates to this case that you believe were unconstitutional or improper on its face -- on their face?

A. I mean, so I don't think I would have the legal expertise to say whether it's unconstitutional; I wouldn't want to say one way or the other. And I don't believe that I commented on any policy, itself, being improper -- I'm quickly checking if there was specific policies I called out.

There were certainly specific policies that I called out that I don't feel were implemented in Mr. May's care and, you know, if asked, could certainly provide general notes and critiques on some of the policies for things like hunger strike in care for people -- of elderly individuals.

But, otherwise, I don't think that I had specific policies that I thought were improper.

**Q.** Doctor, did you review -- I'm going call it the complete Medical Examiner's Report?

A. Yes. I'm believe so, yes.

pandemic; right?
A. Yes.
**Q.** And it's important to keep that in mind when you're talking about what the standard of care required; correct?
A. Yes.
**Q.** Right. I mean, medical providers across the United States were dealing with COVID-19 in some form or fashion; fair?
A. That's fair.
**Q.** Let me go about it this way. Doctor, is there anything, in and of itself, improper with telemedicine encounters between providers and patients?
MR. BLAKEMORE: Object to form.
THE WITNESS: I don't think there's anything inherently -- I'm sorry. What was the term that you used?
**Q.** (By Mr. Winter) Improper.
A. Yeah. I don't think there's anything inherently improper with telemedicine in very specific context of if it's an appropriate level of care matched to what the goal is of a telehealth visit.
**Q.** Have you ever provided health care via telehealth?
A. I have.
**Q.** All right. And in those settings, is there a

recommendations and stuff --

A. Yes.

**Q.** -- in response to that. But just the fact that she did it via telemedicine; you're not critical of that fact; right?

A. Yes.

**Q.** Okay. And you understand that at the time that Tamara was doing her encounter with Mr. May, there was a nurse physically present in the room with Mr. May as well; right?

A. That was my understanding, based on some of the communication.

**Q.** So at least as it relates to your personal experience with telemedicine, that would be different in this situation than you have practiced telemedicine; correct?

MR. BLAKEMORE: Object to form.

THE WITNESS: That would be different than how I have practiced telemedicine in my personal practice but not how we practiced telemedicine and how I oversaw a telemedicine practice at the Rhode Island Department of Corrections.

**Q.** (By Mr. Winter) At the Rhode Island Department of Corrections did you have a similar set up for telemedicine, i.e, either a nurse would be present at the

**Q.** So in response to Tamara Carey's encounter with Mr. May February 3rd of 2022, she initiated an APS referral; right?

A. Yes.

**Q.** Changed his medication prescriptions; right?

A. Yes.

**Q.** Anything with the medication that she prescribed that you believe was below the standard of care or otherwise improper?

A. No.

**Q.** Okay. She also scheduled a follow-up appointment with him for a later date; correct?

A. Right. For 90 days later.

**Q.** Right. And I believe your opinion is that 90 days wasn't sufficient; she should have been more -- should have done it sooner than 90 days; fair?

A. Yes.

**Q.** But at the end of the day, she did in fact schedule a follow-up appointment; correct?

A. Yes.

**Q.** Okay. Tamara Carey was subsequently contacted regarding an open wound with Mr. May; is that correct?

A. I believe that's correct, yes.

**Q.** And is it your understanding that she provided an additional order for the treatment of that open wound?

A. I believe that she was the one who -- for like the antibiotic ointment, yes.

**Q.** Right. Again, was that an appropriate order for her to have placed in response to the complaints that she was aware of regarding an open wound from Mr. May?

A. I don't know all of the details about what she received and so if it was described as a very terrible wound, it would warrant probably her going to look at it; but that would not be inherently inappropriate to prescript a triple-antibiotic ointment when being told an individual has a wound.

**Q.** Okay.

A. I would say that if it were me, I do think that it's reasonable to ask questions about why is there a wound, what's going on, it there a pressure ulcer, is this something we can prevent in other ways, including positioning, or is it, say, because he's not eaten and not moved. That was not documented but I also understand that -- yeah, I'll leave it there.

**Q.** Okay. Doctor, based on the deposition of, I believe the guy's name was Crabtree, would you agree with me that efforts were being made to get Mr. May released and/or transferred to a, maybe, more appropriate setting for his condition?

MR. BLAKEMORE: Object to form.

**Q.** (By Mr. Winter) Is there anything else that you believe the medical providers should have been doing for Mr. May to effectuate his transfer to an outside facility that wasn't otherwise being attempted?

A. Yes.

**Q.** What would that include?

A. Actually, it was a couple of things. I think, one, if there is, you know, the decision is made that this person is not safe in our facility, that automatically requires a higher level of care; that is a general standard of care. So another facility could have always been an emergency department and I'm very aware that there are rural emergency departments that would be available.

I'd also say that a single request without follow-up is not going to be as successful and I think sometimes does require more communication than one time to demonstrate the significance of the issue.

If this were an individual that I were seeing be it virtually being communicated with or in person, I would be very worried about the person and I wouldn't go home and say, like, Oh, well, I hope that turns out okay. I think I would continue to be a squeaky wheel to make sure people understood. Because I do think in bureaucratic systems, a lot of times that's how people get things done and I think people in those systems know that.

**Q.** Doctor, you would agree with me that there's a difference between, like, an acute situation versus a chronic situation; fair?

A. Yes. I would agree there's a difference between acute and chronic.

**Q.** Right. And at that time, at least when Tamara Carey encountered Mr. May, she didn't believe that he had any sort of acute issues; fair?

MR. BLAKEMORE: Object to form.

THE WITNESS: I don't know that I would agree with that.

**Q.** (By Mr. Winter) Go ahead.

A. In part, when she had seen him last, he was not requiring a walking device and he now did; I think that's an acute change that is now worrisome. I think she was worried enough, acutely, to call Adult Protection Services.

And so, while it wasn't a moment, you know, first-to-the-chest acuteness, there was a direct change in his care during his incarceration that was worrisome. And I think that would be the first time where I would be worried about, This is an acute change; this is worrisome.

**Q.** Doctor, I seem to recall that Tamara Carey remembered that Mr. May was not ambulatory at the Canadian County Jail; is that at odds with your recollection or

your review of the materials?
A. The Canadian County Jail, on January 2nd, the medical intake form from Tamara Carey documents that Mr. May's state is stable, normal speech and noted he was walking without an assistant device.
**Q.** So in your opinion, the change in his ambulatory status, in and of itself, was an acute situation that warranted Mr. May be transferred a hospital?
A. It certainly warranted higher level of care evaluation; that could be an in-person evaluation, that could be more frequent follow-up; but it's a level of acuity that definitely warrants escalation of care.
If you're in a facility that just doesn't have the resources, then that escalation of care, you know, unfortunately has to fall to transfer to an emergency department.
**Q.** Do you have any evidence that additional escalation of care within the Custer County Jail was available to the providers there?
A. I think if escalation of care was not available, that would be a gross violation of the standard of care for someone's health.
**Q.** Let me ask about it way --
A. Okay.
**Q.** -- I didn't phrase it very properly.

meals. From February 16th to March 17th, he ate only one meal over 30 days.

**Q.** (By Mr. Winter) Okay. And a patient that ate only one meal over 30 days, would they have enough food or fuel in their body to produce a bowel movement without some sort of caloric intake?

A. Probably not. But I admit that I don't know that I would have -- I would be hesitant to say a confident answer in how long someone can go without eating and still having a bowel movement. It's not common for me to see individuals that have this level of starvation, so possibly.

**Q.** Doctor, page 13 of your report at the very bottom paragraph; let me know when your there.

A. Do you say page 18?

**Q.** Page 13, I'm sorry.

A. I'm on page 13.

**Q.** Bottom paragraph. Doctor, was there not a policy in place, either Turn Key or Custer County policy that dealt with hunger strikes?

A. I don't know that I saw a hunger strike policy by Custer County or Turn Key.

**Q.** So to the extent that those exist, would you withdraw such a position?

A. If there was a policy in place at Custer County

or by Turn Key to address hunger strikes, I would withdraw that position.

**Q.** I believe, was it not Mr. Crabtree that testified that there was a policy regarding hunger strikes and that he believed they complied with?

A. I believe that's right; I believe he saw the hunger strike for the first time in that deposition. I think that's right.

**Q.** So there was, in fact, a hunger strike protocol or policy at the Custer County Jail, fair?

A. Yeah. I think that's right. I have not seen a policy in Custer or Turn Key to address hunger strikes. I would say if there was a policy in place, it was almost certainly not followed or it was an improper policy to go back to one of your original questions about my policy analysis.

**Q.** On page 14, I just -- I have a question and maybe it's just with the phrasing or words you used; just let me know when you're on page 14.

A. I am on page 14.

**Q.** So in there, you reference that Mr. May was not evaluated by in-person medical providers throughout his incarceration at Custer County; do you see that sentence?

A. Yes.

**Q.** Does your definition of medical provider not

facility or the infirmary level of care that you reference?

MR. BLAKEMORE: Object to form.

THE WITNESS: If they're unable to attend to ensure he's able to provide basic activities of daily living and their facility cannot maintain that level of care, they need to send him to the emergency department. It's something we've done, it's something other jails and prisons have to do; it's unfortunate, it's a broken system.

But, otherwise, if you can't care for -- if the person is unfit for incarceration and they cannot be there, because otherwise they're going to languish and ultimately die, which I think is the unfortunate outcome for Mr. May.

**Q.** I mean, isn't it just as likely that Mr. May would not have been admitted to the local hospital?

A. So I would say it then becomes the ED's responsibility to ensure a reasonable and safe discharge plan. And if they're -- it's just like any nursing home, for example, had a patient who was constantly falling or having an Issue, they're transferred to the emergency room and the nursing facility says, We are unable to safely take them back. Again, it's unfortunate; I'm not pretending this is, like, an ideal system.

A. Yes.

**Q.** Okay. Doctor, one of the statements we kind of talked about earlier was -- I don't want to put words in your mouth so I'm just trying to refresh your recollection -- that you may have opinions surrounding the limited number of nursing hours at the Custer County Jail. Do you generally recall such a statement?

A. Yes.

**Q.** Okay. I want to know about what your opinions are as is relates to the level or the hours of nursing on-site coverage at the Custer County Jail, if any?

A. Sure. Yeah. So I take it, it is difficult to give an exact number of what health care staffing is necessary for each facility. Obviously, as different facilities have different numbers of people, different level of comorbidities or acuity of care. I think if you are a rural jail that has very limited health care infrastructure and hours, that is going to mean that you're going to have to rely on external health care facilities, for example, an emergency department, while other facilities may have their own hospital within the jail or prison system.

So while I'm not going to opine that the exact number of hours were X, I think if you're going to have only 12 hours of LPN care a week, then those facilities are

necessarily going to have to rely on sending patients like this to the emergency department. Yeah. I'll stop there.

**Q.** Okay. And I appreciate that, Doctor.

I'm going to try and get a little bit of clarification and if it doesn't make sense, let me know. So it's my understanding that you're not saying the system, itself, was wrong; it was the way the system was used with Mr. May that you're critical of. Is that a true statement or correct statement of how you articulated it?

MR. BLAKEMORE: Object to form.

THE WITNESS: In relation to the number of hours, specifically.

**Q.** (By Mr. Winter) Yes.

A. I think, yeah. It's -- my opinion would be that 12 hours of LPN care seems very small to take care of a prison with a decent number of people. And if you're going to do that, it's going to mean a very low threshold to sending people out.

**Q.** Okay. You would agree with me that the evidence in this case has been that a nurse or a jailer can send someone out to the emergency room if they believe that's necessary; right?

A. Yes.

**Q.** You would agree with me that there was an on-call provider available by phone 24/7 if the jailers or nurses

**Q.** Okay. It's within DID 01 to 69.
A. Then, yes; that might have been -- yes.
**Q.** So is it possible you just kind of overlooked that?
A. It's included in there; I might have misstated that there as no policy, yes.
**Q.** Do you have any opinions -- I think you already said you have no opinions on the care provided to any other individual at the Custer County Jail ever; right?
A. Yes, that's correct.
**Q.** So you have no general opinion that the Custer County Jail or it's detention staff provide insufficient or inappropriate care; correct?
A. Not outside the case of Mr. May.
**Q.** Okay. Now, in writing your report; what is your understanding of Stacia Unruh, the LPN for Turn Key and what her role was in providing care to Mr. May?
A. It seemed like there was limited interactions between then; I'm reviewing my notes in that -- I don't know that I have specific documentation from her that I remember offhand. From my understanding, she was the LPN through Turn Key who was there 12 hours a week and for all the patients at the Custer County Jail.
**Q.** Right. Do you know, in writing your report, what your understanding was as to the last time there was

last month or so.

Do you think it would be reasonable for an LPN in Ms. Unruh's position to not check on someone that she's aware has all of these conditions for a month, at all?

A. Yes. That would be improper and inappropriate; this patient warranted very close observation; and so if she was not seeing him for a month, that would be very bad.

**Q.** Now, let's say, Julie Warnke is correct that she was updating Stacia Unruh every time she was there about Mr. May's condition; does it remain the case that she should be checking on him, really, either way?

A. Also seems bad.

**Q.** Even more clear that she should be checking on him if -- if it is true that Julie Warnke was telling her that; right?

A. Yes.

**Q.** Okay. We talked a little bit about the meal logs. I think you said you are not sure if the meal log refusals reflect whether or not he was eating Ensure, the protein shakes; is that fair?

A. That's correct.

**Q.** Do you know what the meal log means? Whether is just means that the tray wasn't eaten or he actually wasn't eating anything?

A. That's my understanding, yes.
**Q.** Okay. Now, Mr. May, do you agree that when he was at Canadian County, he was taken to the hospital and they sent him right back to jail?
A. Yes. Agreed. Which that was, I think explicitly for chest pain.
**Q.** Right. now, do you recall Julie Warnke's testimony that she ultimately did send Mr. May to the hospital on March 18th?
A. Yes. That sounds -- yes.
**Q.** When he fell out of the bunk?
A. Yes. When he was found down, yes.
**Q.** That, in her opinion, was what tipped this over the line to an emergency that needed emergency care, at least according to her; do you recall that?
A. Yes.
**Q.** Are you offering testimony of when that line should have been?
MR. BLAKEMORE: Object to form.
THE WITNESS: Yes.
**Q.** (By Mr. Miller) When do you believe Mr. May should have been sent to the hospital?
A. I believe there were several instances while Mr. May was in custody at Custer County Jail that he could have been sent -- that it would have been appropriate to

send him to the emergency department?

**Q.** Such as?

A. Such as, I think February 3rd, the day where Adult Protective Services is being called. If you're that concerned about the care of this patient and feel like they need a nursing home, which is what was stated, that means inherently that they need a higher level of care than what can be provided in the jail and, therefore, a higher level of care should have been sought.

**Q.** Are you --

A. I also --

**Q.** Sorry. Go ahead.

A. Well, I was just going to say the other acute -- the other times I would suggest would be in -- when there were acute changes. So it was somewhat difficult to tell based on documentation, but when Mr. May began to have urinary incontinence, that's worrisome and warrants workup; when Mr. May had fecal incontinence, that's worrisome and warrants medical workup.

We had multiple episodes of hypotension, of low blood pressures in the setting of not eating, being elderly; that is an acute reason -- multiple days when I would have sent that individual to the ED.

When he became wheelchair dependent, which new wheelchair dependence is an indication for, you know,

further medical workup. That certainly could have been done if you had a lot of medical infrastructure but, in this case, if all you have is 12 hours of an LPN, absolutely needs to be going to a higher level of care.

**Q.** When he had that meeting with Tamara Carey on third of February, do you see any evidence that Tamara Carey, the APRN, suggested he go to the hospital on an emergency basis?

A. No. I do not see her suggesting he go to the hospital.

**Q.** Okay. Do you recall in the audio with the criminal attorney Telafilo Diaz, where he tells Julie Warnke, It's up to the -- it's up to the nurse, the APRN, listen to her. Do you recall him telling that to her?

A. I remember him asking if she -- if Mr. May needed to go to the hospital. I might be remembering it incorrectly so I don't mean to -- but I thought she told him that would be up to medical but I might be misremembering and we can go back and look at it.

**Q.** You mention the hypotension, the low blood pressure; do you know whether Stacia Unruh was checking the medication administration record to see all of those -- to see the hypotension readings when there were hypotension readings?

A. If I remember correctly, in her deposition she

stated they were available but no one alerted her to them so she did not check them.

**Q.** Okay. Given what she did know about Mr. May and his condition, do you think she should have just been looking to see what his blood pressure was?

A. I think if there was ever any vital signs that is deemed recorded, be it by a medical or non- personnel, medical personnel should review it.

**Q.** Okay. Back to your report on page 18, your chart. Would you -- again, it starts at 303 pounds; I think you've already testified that may not be an accurate number. Would you agree that chart, if the 303 is wrong, would need to be modified to starting around 260?

A. I think that's right. I think the chart could be modified to include the other weights.

**Q.** All the various other weights?

A. Yes.

**Q.** Would you -- I mean, is a key point on when -- also on the chart when he entered our facility in Custer County in the first place? Meaning, he weighed 240 upon entering on January 25th.

A. I'm sorry. What was the question?

**Q.** Well, according to this chart --

A. Yes.

**Q.** -- there was an estimate that he would weigh