**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased, and LEANN D. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. CIV-24-119-JD |
| TURN KEY HEALTH CLINICS, LLC, *et al.,* | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
**<u>CUSTER COUNTY SHERIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Bryon D. Helm, OBA #33003
bryonhelm@ssrok.com
SMOLEN & ROYTMAN
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
Telephone: (918) 585-2667
Facsimile: (918) 585-2669
***Attorneys for Plaintiff***

December 11, 2025

# TABLE OF CONTENTS


| | Page |
|---|---|
| Table of Contents | *i* |
| Table of Authorities | *ii* |
| Introductory Statement | *1* |
| LCvR 56.1(c) Statement | *2* |
| A. Response to the Sheriff's "Statement of Material Facts" | *2* |
| B. Additional Facts Precluding Summary Judgment | *20* |
| Discussion | *27* |
| Proposition: The Custer County Sheriff, In His Official Capacity, is *Not* Entitled to Summary Judgment on Plaintiff's Constitutional Claims | *27* |
| A. There is Significant Evidence That Mr. May's Constitutional Rights Were Violated by Multiple Employees or Agents of the Sheriff | *28* |
| B. There is Significant Evidence of Unconstitutional Policies or Customs that are Closely Related to the Violation of Mr. May's Constitutional Rights | *31* |
| Cetificate of Service | *41* |

# TABLE OF AUTHORITIES


| *Case* | *Page(s)* |
| --- | --- |
| *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397 (1997) | 28 |
| *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019) | 29, 31, 32, 34 |
| *Crowson v. Washington Cty. Utah,* 983 F.3d 1166 (10th Cir. 2020) | 32 |
| *DeSpain v. Uphoff,* 264 F.3d 965 (10th Cir. 2001) | 30 |
| *Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848 (10th Cir. 2021) | 7 |
| *Estelle v. Gamble,* 429 U.S. 97 (1976) | 28 |
| *Farmer v. Brennan,* 511 U.S. 825 (1994) | 28, 29, 30, 31 |
| *Garcia v. Salt Lake City,* 768 F.2d 303 (10th Cir. 1985) | 32 |
| *Goka v. Bobbitt,* 862 F.2d 646 (7th Cir.1988) | 35 |
| *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners,* 962 F.3d 1204 (10th Cir. 2020) | 31, 32 |
| *Kentucky v. Graham,* 473 U.S. 159 (1985) | 28 |
| *LaMarca v. Turner,* 995 F.2d 1526 (11th Cir.1993) | 35 |
| *Lance v. Morris,* 985 F.3d 787 (10th Cir. 2021) | 29, 32 |
| *Lopez v. LeMaster,* 172 F.3d 756 (10th Cir. 1999) | 12, 33 |
| *Martinez v. Beggs,* 563 F.3d 1082 (10th Cir. 2009) | 29 |
| *Mata v. Saiz,* 427 F.3d 745 (10th Cir. 2005) | 29, 35 |
| *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977) | 28, 31, 32 |

*Olsen v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir. 2002) 28

*Porro v. Barnes,* 624 F.3d 1322 (10th Cir. 2010) 28

*Prince v. Sheriff of Carter Cnty.,* 28 F.4th 1033 (10th Cir. 2022) 29, 32, 37

*Pyle v. Woods,* 874 F.3d 1257 (10th Cir. 2017) 32

*Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637 (10th Cir. 2017) 30

*Sawyers v. Norton,* 962 F.3d 1270 (10th Cir. 2020) 29

*Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000) 29

*Tafoya v. Salazar,* 516 F.3d 912 (10th Cir. 2008) 30, 31, 33, 34, 35

*Thao v. Grady Cnty. Crim. Just. Auth.,* No. 24-6226, 2025 WL 3290897, at *13 (10th Cir. Nov. 26, 2025) 38, 40

*Valdez v. Macdonald,* 66 F.4th 796 (10th Cir. 2023) 38

*Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998) 18, 35

*Whitson v. Bd. of Cnty. Commissioners of Cnty. of Sedgwick,* 106 F.4th 1063, 1067 (10th Cir. 2024) 34

*Winton v. Bd. of Comm'rs of Tulsa Cnty., Okl.,* 88 F. Supp. 2d 1247 (N.D. Okla. 2000) 33

COME NOW the Plaintiffs Lisa M. Hice and LeAnn D. Hoff, as Co-Administrators of the Estate of Marvin G. May ("Mr. May"), deceased, and respectfully submit their Response in Opposition to Defendant Custer County Sheriff, in his official capacity's ("Sheriff") Motion for Summary Judgment (Dkt. #135), as follows:

**Introductory Statement**

Despite the Sheriff's request for summary judgment, the evidence overwhelmingly supports Plaintiffs' claims in this matter. As the Sheriff acknowledges, on February 3, 2022, Defendant Tamara Carey, APRN, reported to Adult Protective Services that Mr. May had not eaten or showered in seven (7) days, that his Alzheimer's symptoms were worsening and that he had been incarcerated "too long from a medical standpoint." Day Depo. (Ex. 1) at 55:3 – 57:15. *See* APS Emails (Ex. 2) at DDR 38, 000012-13; Carey Depo. (Ex. 3) at 67:19 – 76:21. During his deposition, the Sheriff gave the following testimony:

> Q ...Would that be your ... expectation with an individual who seemed like they had diagnosed dementia, and they hadn't eaten for seven days, and they were unable to shower? ***Would you ... have an expectation that that person would be taken to the hospital emergently?***
> **** * ****
> ***THE WITNESS: Yes, sir.***
>
> ***Q ...[A] person who has refused or has an inability to eat for over a week, that's something that anyone, whether they've had medical training or not, should be aware of as an emergent medical situation. Agreed?***
> **** * ****
> ***THE WITNESS: Yes, sir.***

Day Depo. (Ex. 1) at 65:14 – 66:17 (emphasis added). Of course, Mr. May was *not* sent to a hospital on February 3, but rather languished and deteriorated in his cell until March 18, 2022, the day of his death. The Sheriff's own sworn admissions, alone, are sufficient to defeat

summary judgment in this matter. Nonetheless, as shown herein, there is much more to this tragic story. Mr. May needlessly suffered and died due to a "systemic breakdown in correctional health services." Berk (Verified) Report (Ex. 4) at 16. The Sheriff's Motion for Summary Judgment (Dkt. #135) should be denied.

## LCvR 56.1(c) Statement

### A. Response to the Sheriff's "Statement of Material Facts"

**1.** Denied. A Medical Intake Form indicates that Mr. May was at the Canadian County Jail as early as January 2, 2022. *See* Canadian County Medical Records (Ex. 5) at Canadian TK_004.

**2.** Plaintiffs deny that Mr. May was losing weight in the months leading up to his booking at the Canadian County Jail. For instance, on October 6, 2021, Mr. May's weight was charted as 276 pounds. *See* Mahmood Records (Ex. 6) at DDR 46, 000571-574. Mr. May's primary care physician "flagged" him as "obese." *Id.* at 574. Then, on January 9, 2022, approximately one week after Mr. May was booked into the Canadian County Jail, Integris Baptist Medical Center ("Baptist Hospital") recorded his weight as ***303 pounds***. *See* Baptist Hospital Records (Ex. 7) at DDR 46, 000754.

**3.** Objection. These "facts" are irrelevant. *See* FRE 401-402. To the extent these "facts" have any arguable probative value at all, such probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues. *See* FRE 403. These "facts" further constitute inadmissible character evidence. *See* FRE 404. Without waiving said objections, Plaintiffs vehemently dispute the implication that Mr. May's family did not care about his well-being. Ms. Hoff describes herself as a "daddy's girl" growing up who was very close to

her father. L. Hoff Depo. (Ex. 8) at 14:25 – 15:12. In August of 2021, Ms. Hoff and her husband, David Hoff, opened their home to Mr. May and he moved in with them. *See, e.g., Id.* at 29:17 – 30:18. Mr. May stayed with the Hoffs, in Hinton, Oklahoma, from August until a little after Christmas 2021. *Id.* at 29:17 – 30:18. During this four-month period, Mr. May seemed to be doing well. *Id.* at 30:15-22. May especially enjoyed spending time with his great-grandchildren while living with the Hoffs. *See* May Photos (Ex. 9); D. Hoff Depo. (Ex. 10) at 55:10 – 57:13, 58:21-24. While he was living with her, Ms. Hoff helped Mr. May organize his medications and ensured he took them regularly. *See* L. Hoff Depo. (Ex. 8) at 40:14 – 41:11. Mr. May left the Hoffs' home after Christmas 2021 to go on a road trip with a friend. *Id.* at 29:17 – 30:18, 44:11 – 48:20. Mr. May was gone on this trip for about one week, and when he returned to Oklahoma, around January 1, 2022, he did not move back in with the Hoffs. *Id.* Mr. May was arrested shortly after his return. *Id.*; *see also* Dkt. #135-1. Mr. Hoff was aware that May had a history of not appearing for court proceedings. *See* D. Hoff Depo. (Ex. 10) at 35:7 – 39:1, 50:15 – 52:19. The Hoffs were concerned that if they bailed Mr. May out, he would fail to appear, and they would be stuck with the financial responsibility. *Id.*; L. Hoff Depo. (Ex. 8) at 51:22 – 53:22, 65:16 – 66:13. Ms. Hoff had no reason to believe that Mr. May was in danger while in jail or that he would not receive the medical care he needed. *Id.* at 70:20 – 71:18, 74:13-25. The Hoffs believed that jail would be the safest place for Mr. May under the circumstances. *See* D. Hoff Depo. (Ex. 10) at 36:23 – 37:17, 50:15 – 52:19.

**4.** Denied. Ms. Hoff did *not* believe Mr. May was incompetent, but she was concerned he was starting to have memory problems prior to his arrest. *See* L. Hoff Depo. (Ex. 8) at

31:25 – 34:20. On August 23, 2021, Ms. Hoff took Mr. May to an appointment with his primary care physician and expressed her concerns about his memory. *Id.* There was no mention of assisted living. *Id.*; *see also* Mahmood Records (Ex. 6) at DDR 46, 000577-581.

5. Plaintiffs admit that "[i]n early 2022, Turn Key was the medical provider for both the Canadian County and Custer County Jails."

6. Plaintiffs deny that Mr. May was "was already using a wheelchair" while at the Canadian County Jail. There is no mention, in the medical records from Canadian County, that Mr. May was using a wheelchair while there. *See* Canadian County Medical Records (Ex. 5). On the contrary, the Medical Intake Form from the Canadian County Jail indicates that Mr. May's gait was "stable" at the time of booking. *Id.* at Canadian TK_001. Indeed, according to the Medical Intake Form, as of January 2, 2022, Mr. May was not injured and did ***not*** need a walker, ***wheelchair*** or cane to ambulate at the Canadian County Jail. *Id.* Even after Mr. May returned from the hospital, on *January 10, 2022*, Turn Key records show that he was in "[n]o distress" and did ***not need*** any "[s]upport devices" such as "crutches", ***a*** "cane", "walker" or ***"wheelchair."*** *Id.* at Canadian TK_031 (emphasis added). The Sheriff relies, in part, on the deposition testimony of Defendant Tamara Carey, APRN ("APRN Carey" or "Carey") in asserting that Mr. May used a wheelchair at the Canadian County Jail. But the only time APRN Carey saw Mr. May at the Canadian County Jail was during his initial assessment. *See, e.g.,* Carey Depo. (Ex. 3) at 124:24 – 132:15; Canadian County Medical Records (Ex. 5) at Canadian TK_004. According to Carey's note, Mr. May appeared to be "okay" when she saw him at the Canadian County Jail. Carey Depo. (Ex. 3) at 132:10-15. While Carey claimed, during her deposition, that she remembered seeing May in a

wheelchair at the Canadian County Jail (*id.* at 50:20-23), there is no mention of this in her note, nor anywhere else in the medical records. *See* Canadian County Medical Records (Ex. 5). Contradicting herself, Carey additionally testified that she ***does not recall seeing Mr. May at all*** while he was at the Canadian County Jail. *See, e.g.,* Carey Depo. (Ex. 3) at 124:24 – 132:15.[1]

**7.** Plaintiff disputes any suggestion that Mr. May was sent to the hospital, on January 9, 2022, due to concerns about "dementia" or "weight loss." As noted above, on January 9, 2022, Baptist Hospital recorded Mr. May's weight as ***303 pounds***. *See* Baptist Hospital Records (Ex. 7) at DDR 46, 000754, 778-79. There is no mention of dementia in the hospital records. *See, generally,* Baptist Hospital Records (Ex. 7). Upon discharge from Baptist Hospital back to the Canadian County Jail, it was noted that Mr. May had no acute pulmonary disease, his behavior was "normal" and he was alert and oriented to person, place and time. *Id.* at DDR 46, 000746-750.

**8.** Denied. The weights recorded at the jails are not reliable. Again, according to Baptist Hospital, Mr. May weighed ***303 pounds*** on January 9, 2022. *See* Baptist Hospital Records (Ex. 7) at DDR 46, 000754, 778-79. This is the most reliable recorded weight as the weights charted at the Canadian and Custer County Jails appear to be based on Mr. May's own self-reporting, rather than an actual scale or any other objective measurement. *See, e.g.,* Custer

[1] Plaintiffs further object to the Sheriff's reliance of Defendant Julie Warnke's ("Officer Warnke" or "Warnke") testimony concerning the Canadian County Jail. The testimony cited is merely Warnke's reading a hearsay statement from APRN Carey, of which she has no personal knowledge. *See* Dkt. #135-15 at 34:1-7. Warnke worked at the Custer County Jail, not the Canadian County Jail. *See, e.g.,* Warnke Depo. (Ex. 11) at 20:1 – 22:16.

County Medical Records (Ex. 12) at Custer TK_026; Canadian County Medical Records (Ex. 5) at Canadian TK_005. Specifically, the Custer County records indicate that when, on January 25, 2022, Mr. May was asked a "[g]eneral question" of "[w]hat is your confirmed weight?", he replied "240." Custer County Medical Records (Ex. 12) at Custer TK_026. Ms. Hoff has described her father as "morbidly overweight" and estimated that he weighed approximately 300 pounds. L. Hoff Depo. (Ex. 8) at 72:19 – 73:2.

**9.** Admit.

**10.** *See* LCvR 56.1(c) Stmt.(A)(3), *supra.*

**11.** Plaintiffs deny the suggestion that any Turn Key medical provider was reasonably available at the Custer County Jail ("Jail"). Custer County's contract with Turn Key provided for ***"up to 12 hours a week*** of on-site nursing services" and "on-call coverage" by a "[p]hysician or midlevel provider" for ***"emergency consultation."*** Turn Key Contract (2021-2022) (Ex. 13) at Turn Key_0004 (emphasis added). *See also* Crabtree Depo. (Ex. 14) at 103:3-8. This left "a lot of time" during the week when there was no nursing coverage at the Jail. Warnke Depo. (Ex. 11) at 35:13-19. Officer Warnke described the 12 hours of weekly nursing coverage as insufficient to meet the needs of 150 inmates. *Id.* at 23:9-25, 35:13-18, 65:6 – 66:1. During the limited time that a nurse *was* present, the Jail was staffed with a single Licensed Practical Nurse ("LPN"), Stacia Unruh. *See, e.g.,* Warnke Depo. (Ex. 11) at 23:3-20; Unruh Depo. (Ex. 15) at 120:2-8. Indeed, LPN Unruh was the only "medical professional" physically present at the Jail. *See, e.g.,* Unruh Depo. (Ex. 15) at 120:2-8. The scope of an LPN's practice is extremely limited. Unruh ***admits*** that as an LPN, she is *not even permitted to conduct patient assessments. See* Unruh Depo. (Ex. 15) at

48:20 – 49:15. Under Oklahoma law, "[l]icensed practical nursing" means "the practice of nursing *under the supervision or direction of a registered nurse, licensed physician* or dentist." 59 Okla. Stat. § 567.3a(4).[2] However, LPN Unruh was not being supervised by a registered nurse ("RN") or physician at the Jail. *See, e.g.,* Unruh Depo. (Ex. 15) at 120:2 – 121:3. LPN Unruh's purported "supervisor" was someone named "Gwen", but her contacts with Gwen were ***"very minimal."*** *Id.* at 125:4-21. Unruh spoke with her "supervisor" once during her job interview, and thereafter "may have asked her a couple of questions… here and there." *Id.* Turn Key assigned two "on-call" providers to the Jail, APRN Carey and Malachi Martin. *See, e.g.,* Carey Depo. (Ex. 3) at 17:9-21, 177:7 – 178:17. APRN Carey would be on call for two weeks, and then Martin would be on call for the next two weeks. *Id.* at 122:25 – 124:18. Under Turn Key's system, when on call, APRN Carey was ***responsible for*** taking calls from ***13 or 14 separate facilities***, *including* Custer County. *Id.* at 122:25 – 124:18, 177:7 – 178:17. APRN Carey was *overwhelmed* by the "call situation" and that is part of the reason why she ultimately resigned from her position with Turn Key. *Id.* at 91:15 – 92:16.

**12.** Admit.

**13.** Plaintiffs deny the implication that APRN Carey physically saw or examined detainees at the Jail. She did not. APRN Carey has never physically set foot in the Custer County Jail and did not provide regular supervision of the care provided by LPN Unruh.

---

[2] An LPN designation does not require an associate's or bachelor's degree … [and are] prohibited from prescribing medications, conducting health assessments, and diagnosing medical conditions." *Estate of Jensen by Jensen v. Clyde,* 989 F.3d 848, 852 (10th Cir. 2021).

Carey Depo. (Ex. 3) at 13:2-5, 19:1-20. APRN Carey virtually "saw" inmates at the Jail, once a week, through a laptop screen via "telemedicine" or "telehealth." *See, e.g.,* Unruh Depo. (Ex. 15) at 18:11-16, 21:12-18, 68:15-16; Warnke Depo. (Ex. 11) at 24:1-14; Carey Depo. (Ex. 3) at 13:2-9, 14:7-9. Plaintiffs otherwise deny the suggestion that the Sheriff or Turn Key provided adequate access to qualified health care professionals at the Jail. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(11,14) & (B)(4, 7, 12, 12, 16, 30, 22, 23).

**14.** Plaintiffs deny any suggestion that Officer Warnke was a medical professional or was otherwise qualified to provide medical care or supervision for the detainees. Although she was designated as the Jail's "medical officer", Officer Warnke is not a medical professional and was ***never even trained regarding the Jail's medical policies.*** *See* Warnke Depo. (Ex. 11) at 21:19 – 22:17, 23:21-25. While Officer Warnke had previously been certified as a "medication aide", or "CMA", that certification expired on August 31, ***2011***. *See* OSDH "Nurse Aide Search Results" (Ex. 16) at DDR 44, 000015.

**15.** Plaintiffs deny any suggestion that Officer Warnke was ever permitted, licensed or qualified to provide medical care to any patient, let alone patients with Alzheimer's or dementia. From 2001-2011, when she was working at a nursing home as a CMA or CNA, Warnke's scope of licensure or certification involved providing basic care, such as assisting patients with daily activities, bathing, eating, interacting with them and passing out medications. *See* Warnke Depo. (Ex. 11) at 7:14 – 9:16, 70:9 – 71:24, 74:15 – 76:24. She has never been licensed as a nurse. *Id.* at 9:2-11. And, again, at the time Mr. May was at the Custer County Jail, Warnke's CMA certificate had been expired for over a decade. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(14).

16. Admit. *But see* LCvR 56.1(c) Stmt.(A)(14-15).

17. Plaintiffs admit that "Warnke ... was not a medical provider."

18. Plaintiffs deny that Mr. May weighed 240 pounds when he was booked into the Jail on January 25, 2025. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(8).

19. Admit.

20-21. Admit. For additional pertinent information, *please see* LCvR 56.1(c) Stmt.(B)(1-3).

22. Plaintiffs dispute that Mr. May was moved to the cell in booking to "make sure he was eating." Rather, the plan was simply to observe and document *whether* Mr. May was eating. As documented in Officer Warnke's February 2, 2022 Incident Report, Mr. May was moved to "Cell 118 in the booking area to be monitored for his behavior and eating habits." Incident Report (2-2-22) (Ex. 17) at Custer TK_029. Warnke further initiated a plan, "per Lt. Stanford", to offer Mr. May a protein shake with every meal and to chart whether he eats his meal "or drinks his shake...." *Id.*

23. Admit.

24. Admit. *See also* LCvR 56.1(c) Stmt.(B)(4).

25. Plaintiffs deny that APRN Carey contacted Adult Protective Services merely concerning "what would happen when May was released from" the Jail. As documented by Officer Warnke, Carey said that: "[Mr. May's] mental condition appeared to be deteriorating rapidly"; and "she wanted to ***notify adult protective services about his well-being due to his deteriorating mental state."*** Incident Report (2-3-22) (Ex. 18) at Custer TK_30 (emphasis added). Plaintiffs also dispute the assertion that Mr. May was not experiencing an emergent medical condition on February 3. Again, the Sheriff ***admits*** that,

as of February 3, 2022, Mr. May was facing an emergent medical situation and should have been sent to the hospital. *See, e.g.,* Introductory Statement, *supra*; Day Depo. (Ex. 1) at 55:3 – 57:15, 65:14 – 66:17. *See also* LCvR 56.1(c) Stmt.(B)(5- 6).

**26.** Plaintiffs dispute the suggestion that Mr. May's criminal defense attorney, Teofilo Diaz, had the power to release him from the Jail. As Mr. Diaz told Officers Warnke and Schmidt during the February 3 phone call, the Jail's medical staff were responsible for determining whether Mr. May needed to be sent to the hospital. *See, e.g.,* Diaz Depo. (Ex. 19) at 24:15 – 26:17; Dkt. #135-20. And only a judge has the power to release an inmate on an "OR" bond. *See* Diaz Depo. (Ex. 19) at 80:14 – 81:4.

**27.** Plaintiffs admit that, during the February 3 call with Diaz, Warnke acknowledged that Mr. May "was not accepting the meals or the supplement shakes the jail was offering him." More specifically, Warnke admitted: "We're offering [Mr. May] meals. We're offering him, you know, Ensure, Boost, protein supplements, ***but he will not eat or drink them, either."*** Diaz Depo. (Ex. 19) at 21:11 – 22:1; Dkt. #135-20 (emphasis added). Warnke similarly stated, during the February 3 call: "***We're concerned about Mr. May. He's not eating, he won't even drink the Ensure that we give him.*** [A]nd he's been here since 25th of last month." Dkt. #135-20 at 3:42 – 4:02 (emphasis added).

**28.** Plaintiffs admit that Officers Warnke and Schmidt had knowledge, as of February 3, 2022, that Mr. May had dementia. More specifically, Warnke admitted: "Part of [Mr. May's] diagnosis is dementia." Diaz Depo. (Ex. 19) at 23:9-21; Dkt. #135-20 at 2:45 -3:44. Further, when Diaz asked Warnke whether Mr. May needed to be sent to the hospital, she replied: "I'm not sure." Dkt. #135-20 at 4:06-4:53.

**29-30.** Admit.

**31.** Admit. *See also* LCvR 56.1(c) Stmt.(B)(7).

**32.** Plaintiffs deny that there was a Jail Administrator in place as of early 2022. *See, e.g.,* Crabtree Depo. (Ex. 14) at 17:1-6, 21:1-17; Stanford Depo. (Ex. 20) at 15:1-20; Alvarado Depo. (Ex. 21) at 88:6-17. When asked whether there was a Jail Administrator from January through March of 2022, the Undersheriff testified: ***"Don't believe we actually had a jail administrator."*** Crabtree Depo. (Ex. 14) at 17:1-22. However, Undersheriff Crabtee "guess[es]" that he was the "*de facto* Jail Administrator" since he oversaw the entire department. *Id.* Further, it was Crabtree, not Stanford, who oversaw "everything" at the Jail. *Id. See also* LCvR 56.1(c) Stmt.(B)(8).

**33.** Admit.

**34.** Plaintiffs dispute the implication that the Assistant District Attorney had the authority to release Mr. May from the Jail via an "own recognizance" or "OR bond." It is the presiding judge who must issue an order releasing the defendant on his own recognizance. *See, e.g.,* Diaz Depo. (Ex. 19) at 80:14 – 81:9.

**35.** Admit. *See also* LCvR 56.1(c) Stmt.(B)(9-10).

**36.** Undersheriff Crabtree's purported "belief" is immaterial. *See* FRE 401, 402. Crabtree makes a "presumption" he followed up with the DA's Office, but has no documentation of this, and cannot "100 percent" say that he did. Crabtree Depo. (Ex. 14) at 71:7 – 72:21. Moreover, ***Crabtee never contacted*** anyone from Turn Key, nor ***<u>any</u>*** other ***medical provider, concerning Mr. May.*** *See, e.g.,* Crabtree Depo. (Ex. 14) at 34:15-19, 37:4-9, 38:19 – 39:2, 74:2-19. Indeed, ***Crabtree never*** communicated with anyone from Turn

Key concerning the Jail's medical policies, nor did ***anything to ensure that Turn Key was complying with the Jail's medical policies.*** *Id.* at 47:2-20.

**37.** Admit.

**38-40.** Mr. Diaz's purported failure to contact a medical provider or submit a proper application for competency hearing is immaterial as the Sheriff was ultimately responsible for May's well-being as a matter of law. *See, e.g.,* Day Depo. (Ex. 1) at 32:15-18; *Lopez v. LeMaster,* 172 F.3d 756, 763 (10th Cir. 1999).

**41-42.** Whether Mr. May could be "released" from the Jail and the scheduled date of his competency hearing are immaterial. The evidence is that Mr. May should have been sent the hospital, but was not. Again, the Sheriff admits this. *See* Day Depo. (Ex. 1) at 55:10 – 57:15, 65:14 – 66:17. Plaintiffs' medical expert, Dr. Berk, has testified that Mr. May should have been sent to the nearest hospital on "several instances", including on February 3, when Adult Protective Services was called. Berk Depo. (Ex. 22) at 201:21 – 203:4. As Dr. Berk explained, "[i]f you're that concerned about the care of this patient and feel like they need a nursing home, which is what was stated, that means inherently that they need a higher level of care than what can be provided in the jail and, therefore, a higher level of care should have been sought." *Id.* As the Sheriff concedes, the detention staff had the authority to send Mr. May to the hospital if they felt like he could not receive adequate care at the Jail. *See* Day Depo. (Ex. 1) at 57:16-24.

**43-44.** Admit. However, Defendant omits pertinent information. *Please see* LCvR 56.1(c) Stmt.(B)(11-15).

**45.** Plaintiffs admit that "Unruh saw May to look at his sore again on February 14." *See*

*also* LCvR 56.1(c) Stmt.(B)(16).

**46.** There is contradictory testimony on this point. It is true Warnke claims that "[o]ver the next month … May was in the jail [from February 15 to March 18, 2022], [she] continued to update Unruh about May's condition, telling her there was not any real change in him and asking her if there was anything they could do" and that "Unruh would always tell her no." *See, e.g.,* Dkt. #135-15 at 108:9-109:2; Dkt. #135-31 at 31:15-23. However, LPN Unruh asserts that she was "never alerted of any reason to … check on" Mr. May. Unruh Depo. (Ex. 15) at 186:11-16. *See also* LCvR 56.1(c) Stmt.(B)(17).

**47.** Admit.

**48.** LPN Unruh's purported belief is immaterial as it was obvious, even to a layperson, that Mr. May was experiencing a medical emergency at the Jail. *See, e.g.,* McCowan Depo. (Ex. 23) at 24:11-17; Day Depo. (Ex. 1) at 55:3 – 57:15, 65:14 – 66:17.

**49.** To the extent Defendant is suggesting that Warnke did not observe Mr. May in a state of medical distress, Plaintiffs dispute that suggestion. For instance, Ms. Warnke noted that Mr. May required assistance from two jailers to stand and was unable to ambulate safely on his own. *See, e.g.,* Warnke Depo. (Ex. 11) at 30:18-19, 136:4-23. Officer Warnke expressed concerns about Mr. May's risk of falling. *Id.* 47:13-15, 128:20 – 129:6. She observed that Mr. May was ***incontinent daily***, requiring adult diapers and frequent cleaning. *Id.* at 41:3-18, 46:20 – 47:7, 50:5-14. Officer Warnke also identified a stage 2 pressure ulcer on Mr. May's hip, likely caused by lying in the same position for prolonged periods. *Id.* at 48:10-24. She had continuing concerns about the risk of infection from feces getting into his pressure sores. *Id.* at 50:18 – 51:6. Officer Warnke further testified that Mr. May's mental condition

appeared to deteriorate, and she suspected he had dementia. *Id.* at 34:1-14, 71:4 – 73:7, 89: 2-11. Still, despite her serious concerns about Mr. May's health and safety, Officer Warnke ***never contacted a doctor*** prior to March 18, 2022. *See, e.g.,* Warnke Depo. (Ex. 11) at 105:21 – 107:8, 136:17 – 137:3. *See also* LCvR 56.1(c) Stmt.(A)(50).

**50.** Plaintiffs deny that Mr. May only "sometimes" refused meals or that he regularly drank protein shakes. Officer Warnke is not surprised by, and does not dispute, the Jail's meal logs which show that ***Mr. May refused 118 of 132 meals*** offered between February 2 and March 17, 2022. Warnke Depo. (Ex. 11) at 53:12 – 54:22; Meal Log (Ex. 24). Indeed, during her deposition, Officer Warnke ***agreed*** with a report that ***Mr. May had not eaten in 3 weeks***. Warnke Depo. (Ex. 11) at 67:22 – 68:8. By Dr. Berk's count, ***"Mr. May refused meals for nearly 30 consecutive days."*** Berk (Verified) Report (Ex. 4) at 13. Warnke also repeatedly stated and documented that Mr. May was refusing protein shakes. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(27); Jail Entry Report (Ex. 25) at DDR 21, 000090 & 100.

**51.** Plaintiffs admit that Warnke continued to update Crabtree on Mr. May's condition, and specifically told him that he was "not eating and still unable to walk." Sheriff's Fact No. 51 (citing Dkt. #135-15 at 37:18-39:2; Dkt. #135-31 at 30:8-31:8).

**52.** Plaintiffs admit that "Jail staff were constantly updating Crabtree about May…." Plaintiffs dispute that there was any reason to believe that Crabtree was "constantly" going to the DA's office trying to get May out of the Jail. *See* LCvR 56.1(c) Stmt.(A)(36).

**53-55.** Warnke and Stanford's purported belief is immaterial as it was obvious, even to a layperson, that Mr. May was experiencing a medical emergency. *See, e.g.,* McCowan Depo. (Ex. 23) at 24:11-17; Day Depo. (Ex. 1) at 55:3 – 57:15, 65:14 – 66:17. *See also* LCvR

56.1(c) Stmt.(A)(49-50) & (B)(1-6). Stanford's supposed "belief" is rendered even more irrelevant by her admission that she never once went to check on Mr. May, despite the fact that his cell was 20 to 30 feet from her office. *See* Stanford Depo. (Ex. 20) at 85:14-25.

**56-57.** Plaintiffs dispute the assertion that Mr. May was appropriately or adequately "tended to" on the morning of March 18, 2022. At approximately 4:11 AM, Officer Brayan Alvarado briefly entered Mr. May's cell. *See* 4:10 Video (Ex. 26) (Filed Conventionally); Alvarado Depo. (Ex. 21) at 40:2 – 41:23, 42:21 – 46:23. When Alvarado entered the cell at around 4:11 AM, Mr. May was naked, with his head hanging over the side of his bunk. *Id.* Mr. May was speaking incomprehensible "gibberish." Alvarado Depo. (Ex. 21) at 40:2 – 41:23, 42:21 – 46:23. Officer Alvarado was not surprised by Mr. May's appearance on the morning of March 18 because he had routinely observed him in the virtually ***same condition for "two to three weeks".*** *Id.*[3] Nonetheless, after kicking over Mr. May's cup of water, Officer Alvarado simply moved May's head back onto the bunk and left him in a state of distress. *See* 4:10 Video (Ex. 26) (Filed Conventionally). Nearly two hours later, at approximately 5:51 AM, Mr. May fell out of his bunk onto the filthy cell floor. *See* 5:51 Video (Ex. 27) (Filed Conventionally). After Officer Alvarado entered the cell at approximately 5:53 AM, he found Mr. May naked and motionless on the floor; Alvarado then ***began to smile and laugh.*** *Id.*; *see also* Alvarado Depo. (Ex. 21) at 48:23 – 51:20;

---

[3] According to Officer Alvarado, it was ***"common" knowledge*** within the Jail that ***Mr. May needed to go to a medical facility that could "take care of him."*** Alvarado Depo. (Ex. 21) at 40:2 – 41:23, 42:21 – 46:23. Officer Alvarado personally witnessed Mr. May's "clear[]" deterioration over time. *Id.* at 29:22 – 33:11, 46:24 – 48:13. May went from being ambulatory to unable to walk on his own, he stopped eating and could not communicate. *Id.*

Crabtree Depo. (Ex. 14) at 94:22 – 96:12. Alvarado knew that Mr. May was "not" in a "good situation", but Alvardo felt "uncomfortable." Alvarado Depo. (Ex. 21) at 48:23 – 51:20. Aside from making a half-hearted and unsuccessful attempt to lift Mr. May's limp, naked body off the floor, Alvarado and the other officers present, did not attempt CPR and generally did nothing to assist Mr. May for ***approximately 18 minutes***. *See* 5:51 Video (Ex. 27) at 5:53 to 6:11 (Filed Conventionally). After watching the March 18 video, the Sheriff agrees that Mr. May was facing an emergent medical situation and deserved better treatment than what he received. *See* Day Depo. (Ex. 1) at 77:11 – 78:25.

58. Plaintiffs admit that EMS was not called until 6:04 AM, which was ***11 minutes after*** Alvarado found Mr. May naked and motionless on the floor. *See* 5:51 Video (Ex. 27) at 5:53 (Filed Conventionally). Plaintiffs admit that EMS did not arrive until 6:11 AM, 18 minutes after Alvarado found Mr. May naked and motionless on the floor. *Id.* at 5:53 – 6:11. *See also* LCvR 56.1(c) Stmt.(B)(18).

59. Admit.

60. Plaintiffs deny that Mr. May died from COVID-19. Dr. Berk has opined that the "evidence does not indicate that Covid-19 was a cause of Mr. May's death." Berk (Verified) Report (Ex. 4) at 19. "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension— is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id. See also* Berk Depo. (Ex. 22) at 132:3 – 133:6.

61. Admit. *See also* LCvR 56.1(c) Stmt.(A)(60).

62. Objection. Warnke's testimony about what she would have done had she known

Mr. May had a family constitutes inadmissible opinion and is impermissibly speculative. *See* FRE 602 & 701. Further, it is clear that Warnke did little, if anything, to investigate whether Mr. May had a family. After May's death, CCSO had little problem finding -- and making contact with -- Ms. Hoff, Mr. May's daughter. *See, e.g.*. Incident Report (Ex. 28) at DDR 2, 00008.

**63.** Objection. Warnke's opinion testimony is irrelevant and otherwise inadmissible. *See* FRE 401-403, 701. Plaintiffs further dispute any suggestion that Warnke adequately cared for Mr. May. The evidence fully supports Plaintiffs' deliberate indifference claim against Warnke. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(14-15, 25, 27-18, 46, 48-51, 53-55) & (B)(2, 11, 17-18).

**64.** Disputed. While the Jail has pertinent written policies, they are not enforced or followed. For instance, while the Jail has policies regarding medical care,[4] the detention staff is not trained on the medical policies. *See, e.g.,* Warnke Depo. (Ex. 11) at 21:19-21. Indeed, ***Undersheriff Crabtree cannot give a "definitive answer" as to whether Jail staff was receiving <u>any</u> training regarding <u>any</u> policies in the pertinent timeframe of early 2022.*** Crabtree Depo. (Ex. 14) at 45:6-24. *See also* LCvR 56.1(c) Stmt.(A)(65-67) & (B)(21, 22).

**65.** Disputed. "[T]he existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware v. Jackson County, Mo.,* 150 F.3d 873, 882 (8th Cir. 1998). CCSO does not even begin to follow nor enforce its written medical policies. As noted above, CCSO provided no training to Jail staff

---

4 *See, e.g.,* Policy 701.6 (Ex. 29) at DID 318-19; Policy 702 (Ex. 30) at DID 320-324; Policy 703 (Ex. 31) at DID 325-327 .

concerning the medical policies. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(64). And while the policy cited by the Sheriff provides that CCSO is committed to "ensuring that inmates receive adequate care to meet their serious health care needs" (Dkt. #135-32 at 1), the evidence is that the administration utterly failed to comply with it. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(11, 14-15, 25, 27-18, 46, 48-51, 53-57) & (B)(1-19). The Jail was simply not equipped to care for a detainee like Mr. May, with serious or complex medical or mental health conditions. *See, e.g.,* Alvarado Depo. (Ex. 21) at 30:23 – 31:21; McCowan Depo. (Ex. 23) at 84:12 – 85:16.

66. Disputed. First, there is evidence that detention staff did not believe they could contact EMS directly, but were required to contact a supervisor, if they had concerns that an inmate was facing a medical emergency. *See, e.g.,* Alvarado Depo. (Ex. 21) at 46:3-23; McCowan Depo. (Ex. 23) at 67:6-15, 86:3-23. Second, the detention officers were inadequately trained to determine if certain relevant conditions were emergent. For instance, CCSO provided no training as to what actions to take if an inmate stopped eating. *See, e.g.,* McCowan Depo. (Ex. 23) at 48:10-13, 91:5-18; Alvarado Depo. (Ex. 21) at 24:10-19. Detention staff were not trained as to the medical significance of blood pressure readings. *See, e.g.,* McCowan Depo. (Ex. 23) at 73:4-23; Alvarado Depo. (Ex. 21) at 65:4-16. Detention staff were not trained concerning wound care. *See, e.g.,* Warnke Depo. (Ex. 11) at 49:6-12; McCowan Depo. (Ex. 23) at 63:20-23. Moreover, detention staff were not trained on "what signs and symptoms [they] might observe that should be deemed to be emergent...." Alvarado Depo. (Ex. 21) at 47:22-25.

67. Disputed. "[T]he existence of written policies of a defendant are of no moment in

the face of evidence that such policies are neither followed nor enforced." *Ware,* 150 F.3d at 882. In violation of its own policy (Policy 701.6 (Dkt. #135-33)), CCSO and Turn Key do not offer "in-person" health evaluations at the Jail. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(11,13-14, 17). And Undersheriff ***Crabtree did nothing to ensure that any of the medical policies were being complied with***, including the requirement for "in-person" health evaluations. *See* Crabtree Depo. (Ex. 14) at 46:10 – 48:17.

**68.** Plaintiffs dispute any suggestion that Warnke was adequately trained. *See, e.g.,* Warnke Depo. (Ex. 11) at 21:19-21, 49:6-12, 54:23 – 55:6.

**69-70.** Plaintiffs dispute any suggestion that Warnke was qualified, licensed or otherwise capable of providing medical care, monitoring or treatment to any inmate. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(14, 17).

**71.** Plaintiffs dispute the suggestion that Officer Stanford is, or ever was, a medical professional. Stanford never obtained certification as a "surgical tech." Stanford Depo. (Ex. 20) at 6:11 – 7:6. Admittedly, she "couldn't pass the test." *Id.*

**72.** Plaintiffs admit that Stanford is "pretty sure" she received training on the Jail policies in 2010 or 2014. *See* Stanford Depo. (Ex. 20) at 51:18 – 52:8. Stanford admits that the training provided to staff in the pertinent timeframe of early 2022 was ***"very limited."*** *Id.* at 54:12-20.

**73-74.** Plaintiffs deny that detention staff were receiving any relevant training in early 2022. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(14, 64-66, 68) & (B)(12-13, 22).

## B. Additional Facts Precluding Summary Judgment

1. When LPN Unruh conducted the intake medical screening, on January 27, 2022, Mr. May was documented as being ambulatory (*i.e., **able to walk <u>without</u> use of "crutches", a "cane", "walker" or "wheelchair"***). *See* Custer County Medical Records (Ex. 12) at Custer TK_001-002. Unruh specifically documented that, as of January 27, Mr. May's gait was "stable", he was "alert" and his behavior was "appropriate." *Id.* at Custer TK_001.

2. Mr. May's pod mate, Bryce Foster, observed that May was "senile" and "not all there"; Mr. May was walking around naked, covered in feces, and refusing to eat or shower for days. Foster Depo. (Ex. 32) at 11:13-24, 14:6-23, 16:8 – 17:2. Foster and another inmate, Damon Walker, tried to care for May by encouraging him to eat and shower, but May was not responsive. *Id. See also id.* at 28:5 – 29:2. When Mr. May first arrived in the pod, Foster began telling Jail staff about his condition. *Id.* at 47:7-23. Foster specifically spoke to Officers Alvarado and Warnke about Mr. May, but they were dismissive and did not take immediate action. *Id.* at 19:19 – 21:2, 42:7-24, 47:7 – 48:17.

3. On February 2, 2022, Foster submitted a sick call request and grievance form, reporting that Mr. May had not eaten or showered in nine (9) days and needed medical attention. *See, e.g.,* Foster Depo. (Ex. 32) at 15:1 – 20:15; Foster Sick Call Request (Ex. 33); Foster Grievance (Ex. 34). In his grievance, Foster stated: "We've told staff and they ain't done shit. This old man Marvin May hasn't eaten or showered in days. ***He needs real medical help*** ... he can barely stand let alone walk ***y'all need to do something."*** Foster Grievance (Ex. 34) (emphasis added).

4. APRN Carey "saw" Mr. May, via telehealth, on February 3, 2022. *See, e.g.,* Carey Depo. (Ex. 3) at 28:17 – 30:5. That same day, Carey entered a "Chronic Care Note" into

Mr. May's chart. *See id.*; and Chronic Care Note (Ex. 35). Carey documented his conditions, including hypertension, hyperlipidemia, chronic obstructive pulmonary disease (COPD), Alzheimer's, diabetes mellitus and rheumatoid arthritis. *See* Chronic Care Note (Ex. 35); and Carey Depo. (Ex. 3) at 32:13 – 35:13. APRN Carey further noted a report that Mr. May had not eaten or showered in seven (7) days and acknowledged his ***"worsening Alzheimer disease."*** Chronic Care Note (Ex. 35) at Custer TK_017 (emphasis added); Carey Depo. (Ex. 3) at 38:9-14, 40:5 – 41:18. She then scheduled Mr. May for a follow-up appointment in 90 days. *Id.* at Custer TK_018.

5. It is undisputed that APRN Carey reported the following to Adult Protective Services on February 3, 2022: (A) Mr. May is using a wheelchair; (B) Mr. May has Alzheimer's and his ***"symptoms are getting worse"***; (C) Mr. May "needs to be in a nursing home or something, not in jail"; (D) Mr. May has been incarcerated ***"too long from a medical standpoint"***; (E) "staff at the jail are reporting [***Mr. May] has not eaten or showered in 7 days"***; (F) Mr. May is "is not remembering to do these things on his own"; (G) the Jail is ***not an "appropriate placement"*** for Mr. May; and (H) Mr. May is "vulnerable" at the Jail. *See* APS Emails (Ex. 2) at DDR 38, 000012-13; Carey Depo. (Ex. 3) at 67:19 – 76:21.

6. The *Sheriff was aware*, on or about February 3, 2022, that Mr. May's dementia was worsening and that he had not showered or eaten in a week. *See, e.g.,* Day Depo. (Ex. 1) at 55:10 – 57:15. The Sheriff acknowledges that, as of February 3, 2022, Mr. May was facing an emergent medical situation and should have been sent to the hospital. *Id.* at 55:10 – 57:15, 65:14 – 66:17.

7. Undersheriff Crabtree met with Mr. May at the Jail sometime prior to February 7,

2022. *See* Crabtree Depo. (Ex. 14) at 144:9-17. This was the one and only time Crabtree had any interaction with Mr. May. *Id.* at 36:8-11. After his meeting with Mr. May, the Undersheriff advised the Jail staff that if May continued to refuse meals and showering, he needed to know, so that different arrangements could be made, ***including sending him to a hospital.*** *Id.* at 32:5 – 33:9. Still, despite receiving reports that May's condition was not improving, Crabtree never contacted *any* medical provider. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(36, 51).

8. Per CCSO Policy, the Jail Administrator is responsible for overseeing and managing the Jail Division and reports to the Undersheriff. *See, e.g.,* Policy 100.3 (Ex. 36) at DID 010. As Undersheriff Crabtree testified, the Jail Administrator role is a "minimum 40-hour-a-week job." Crabtree Depo. (Ex. 14) at 20:19-21:17. Crabtree emphasized that the Jail Administrator role requires full-time attention to address staffing shortages, training, and operational issues. *Id.* at 20:19 – 24:4. Crabtree acknowledges that he was unable to dedicate the necessary time to the Jail Administrator role due to his other responsibilities as Undersheriff. *Id.* at 12:11 – 13:15, 19:24 – 24:4.

9. On February 7, 2022, Undersheriff Crabtree was contacted by Barry Edwards of the Oklahoma State Department of Health ("OSDH"). Their conversation was recorded. *See* OSDH Phone Call (2-7-22) (Ex. 37) (filed conventionally); Crabtree Depo. (Ex. 14) at 60:20 – 66:25. During the call, Edwards notified Crabtree that OSDH had been forwarded a complaint from Adult Protective Services, indicating that Mr. May had "dementia" and cannot "care for himself." *Id.* Edwards inquired whether Mr. May had been eating and whether he'd been taking his medications. *Id.*

**10.** The following day, Edwards forwarded, via email, APRN Carey's February 3 complaint, to Undersheriff Edwards. *See* APS Emails (Ex. 2) at DDR 38, 000012-13. Thus, Crabtree had notice as to the substance of Carey's complaint, which is summarized above. *See* LCvR 56.1(c) Stmt.(B)(5). *See also* Crabtree Depo. (Ex. 14) at 74:22 – 85:1. Crabtree agreed that the Jail was not an appropriate placement for Mr. May. *Id.*

**11.** In a Jail Entry Report, dated February 12, 2022, Officer Mike McCowen noted that he ***changed Mr. May's diaper*** and applied triple antibiotic ointment to his wound. *See* Jail Entry Report (Ex. 25) at DDR 21, 000111. McCowan believes he was the first officer to put a diaper on Mr. May. *See* McCowan Depo. (Ex. 23) at 35:4 – 37:17. Mr. May was placed in diapers because he was observed "***just laying there defecating and urinating on himself in the bed.***" *Id.* (emphasis added). May could not ambulate on his own to get up and go to the restroom. *Id.* Officer McCowan, and other jailers, were concerned that Mr. May needed to be checked out in an emergency room. *Id.* This was brought to the attention of both Officer Warnke and Officer Stanford. *Id.*

**12.** On that same date, February 12, 2022, Officer McCowan documented that Mr. May did not eat his breakfast or lunch. *See* Jail Entry Report (Ex. 25) at DDR 21, 000111. On February 13, 2022, McCowan again noted that Mr. May did not eat breakfast or lunch. *Id.* at 109. McCowan could tell that Mr. May was ***"going downhill."*** McCowan Depo. (Ex. 23) at 20:9-19. McCowan observed that Mr. May was not eating or drinking anything, and would not even touch the "Ensure" shakes he brought to him. *Id.* at 47:17 – 49:4. But McCowan ***was not trained*** at all on what he was supposed to do when an inmate stopped eating or drinking. *Id.* at 47:17 – 49:4.

**13.** On the afternoon of February 13, 2022, Officers McCowan and Carter entered Mr. May's cell to clean him up and change his diaper. *See* Jail Entry Report (Ex. 25) at DDR 21, 000108. McCowan noted that Mr. May had ***"defecated on himself" and that feces had gotten into his open bed sore.*** *Id.* Even as a layperson, McCowan knew that Mr. May was at risk of infection. *See* McCowan Depo. (Ex. 23) at 71:5-20. But McCowan had no training in wound care. *Id.* at 62:6 – 64:2, 71:5-20.

**14.** It was obvious to Officer McCowan that Mr. May was experiencing a ***"serious medical crisis"*** while he was at the Jail. McCowan Depo. (Ex. 23) at 24:11-17.

**15.** McCowan stopped logging his observations of May after February 13 because Mr. May's condition was a "known situation." McCowan Depo. (Ex. 23) at 113:3-8.

**16.** The last time LPN Unruh documented anything in Mr. May's medical chart was her February 11, 2022 wound care note. *See* Custer County Medical Records (Ex. 12) at Custer TK_019; Unruh Depo. (Ex. 25) at 85:4 – 86:17. According to Unruh, this is because the *detention staff*, who were there every day, *were responsible for monitoring Mr. May's wound care.* Unruh Depo. (Ex. 25) at 85:4 – 86:17. Warnke noted that Unruh applied antibiotic cream to May's sore on February 14, 2022. *See* Custer County Medical Records (Ex. 12 at Custer TK_019. This was the last documented interaction between Mr. May and LPN Unruh. *See, e.g.,* Warnke Depo. (Ex. 11) at 107:15 – 108:15.

**17.** On March 17, 2022, at 1:30 PM, Officer Warnke reported that Mr. May refused to "set up" and was encouraged to shower after she noticed *"soiled orange clothes."* Custer County Medical Records (Ex. 12) at Custer TK_033. *See also* Warnke Depo. (Ex. 11) at 41:3-18.

**18.** As reported by EMT Joseph Halcomb, when Sinor EMS arrived on the scene, Mr. May was "naked from waist down" and ***"covered in dried feces."*** Halcomb Statement (Ex. 38) at DDR 2, 000014. Mr. May was "barely responsive", "unable to speak" and "[u]nable to follow directions." Voss Statement (Ex. 39) at DDR 2, 000015. Jail staff told EMS Mr. May ***had not eaten or drunk "anything in 3 weeks."*** Halcomb Statement (Ex. 38) at DDR 2, 000014. Halcomb observed that Mr. May's "mouth was dry." *Id.*

**19.** On March 18, 2018, Mr. May weighed 225 pounds. *See* Clinton ER Records (Ex. 40) at Custer TK_049; Berk (Verified) Report (Ex. 4) at 7. Thus, Mr. May lost approximately ***78 pounds*** between January 9 and March 18, 2022. *See* Berk (Verified) Report (Ex. 4) at 1, 7-8, 13; & Baptist Hospital Records (Ex. 7) at DDR 46, 000754. According to Dr. Berk, this level of involuntarily weight loss caused "severe medical complications", including "dehydration" and "progressive debility." Berk (Verified) Report (Ex. 4) at 14. Mr. May should have been "transferred for hospital care [and] monitored with regular weight checks [and] labs…." *Id.*

**20.** As Dr. Berk found, "Mr. May exhibited multiple clear signs of clinical deterioration during his incarceration, including progressive immobility, use of a wheelchair, incontinence requiring diapers, rapid and sustained weight loss, the development of bed sores, and hypotension." Berk (Verified) Report (Ex. 4) at 16. And while this clinical deterioration required "immediate reassessment and escalation of care", this never happened at the Jail. *Id.* Dr. Berk opines that this was a ***"systemic breakdown in correctional health services."*** *Id.* (emphasis added).

**21.** The Sheriff delegated policymaking authority, with respect to the Jail, to

Undersheriff Crabtree. *See, e.g.,* Day Depo. (Ex. 1) at 31:7 – 33:2.

**22.** CCSO has a written "Hunger Strike" Policy. *See, e.g.,* Hunger Strike Policy (Ex. 41) at DID 166-167. However, Undersheriff Crabtree, the official responsible for Jail operations, had no idea that the hunger strike policy existed until it was shown to him at his deposition. *See* Crabtree Depo. (Ex. 14) at 17:1 – 18:21; 30:11-25. None of the Jail staff were trained with respect to the hunger strike policy. *Id.* at 102:24 – 103:2; *see also* Warnke Depo. (Ex. 11) at 54:23 – 55:6. The policy provides in pertinent part, that the Jail Administrator shall seek to resolve any hunger strike and *"notify the Health Care Services Physician* to review, coordinate and document *any medical actions taken, based upon protocols and/or at the direction of qualified health care professionals*, in response to a hunger strike." Hunger Strike Policy (Ex. 41) at DID 166-167. The policy further provides that "[i]f an inmate is engaging in a hunger strike ***due to a mental condition, the appropriate medical protocols for mental illness will be followed."*** *Id.* (emphasis added). Of course, there was no physician at the Jail and the ***Undersheriff***, who was acting as "Jail Administrator", ***did not contact <u>any</u> medical professional concerning Mr. May.*** *See* Crabtree Depo. (Ex. 14) at 34:5-19, 58:9-22.

**23.** The failure to provide medical care at the Jail is not limited to Mr. May. Mr. Diaz testified that his clients tell him "every day" they are not receiving medical care at that Jail. *See* Diaz Depo. (Ex. 19) at 90:21 – 92:22, 104:7 – 105:4. Moreover, Mr. May's former podmate, Bryce Foster, testified that he complained to Jail staff about his worsening syphilis infection for a period of weeks before he received any care. *See* Foster Depo. (Ex. 32) at 51:5-16.

## Discussion

**PROPOSITION: THE CUSTER COUNTY SHERIFF, IN HIS OFFICIAL CAPACITY, IS *NOT* ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CONSTITUTIONAL CLAIMS**

Plaintiffs' constitutional claims -- of deliberate indifference to a serious medical need -- are brought against the Custer County Sheriff in his official capacity. A claim against a state actor in his official capacity, such as the Sheriff, "is essentially another way of pleading an action against the county or municipality" he represents and is considered under the standard applicable to § 1983 claims against municipalities or counties. *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010). *See also Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). In *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1977) and subsequent cases, the Supreme Court has consistently "required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 403 (1997). The evidence in this case establishes that Mr. May needlessly suffered and died due to a "systemic breakdown in correctional health services" at the Jail. Berk (Verified) Report (Ex. 4) at 16. The evidence in this case easily meets the requirements of *Monell.* The Sheriff is not entitled to summary judgment.

### A. There is Significant Evidence That Mr. May's Constitutional Rights Were Violated by Multiple Employees or Agents of the Sheriff

Usually, courts will not hold a municipality liable without proof of an "underlying constitutional violation by [one] of its officers." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317–18 (10th Cir. 2002). In this case, there is abundant evidence that multiple employees

or agents of the Sheriff violated Mr. May's constitutional right to adequate medical care. There is abundant evidence of "underlying" constitutional violations.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). *See also Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The Fourteenth Amendment's Due Process Clause entitles pretrial detainees" like Mr. May "to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance v. Morris,* 985 F.3d 787, 793 (10th Cir. 2021) (citation omitted).

Deliberate indifference involves both an objective and subjective component. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205, 1209 (10th Cir. 2000); *Prince v. Sheriff of Carter Cnty.,* 28 F.4th 1033, 1043-44 (10th Cir. 2022). The objective component examines whether the medical condition or harm claimed by the inmate was "sufficiently serious" to be cognizable under the Cruel and Unusual Punishment Clause. *Prince,* 28 F.4th at 1044 (citing *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009)). "A medical condition is 'sufficiently serious' when 'the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* As part of his Motion, the Sheriff "does not dispute that May's medical need was objectively sufficiently serious at the time EMS took him out of the jail [on March 18, 2022] or at the time of his death." Dkt. #135 at 15. But, by the Sheriff's own admission, even a lay person would have recognized, by ***February 3, 2022***, that Mr. May's condition necessitated a doctor's attention. *See* Day Depo. (Ex. 1) at 55:3 – 57:15, 65:14 – 66:17. Plaintiffs have established the objective component.

Additionally, Plaintiffs' evidence establishing the subjective component is overwhelming. "To satisfy the subjective component, the plaintiff must show the official 'knows of and disregards an excessive risk to inmate health or safety.'" *Burke,* 935 F.3d at 992 (quoting *Farmer,* 511 U.S. at 837); *See also Sawyers v. Norton,* 962 F.3d 1270, 1283 (10th Cir. 2020); *Mata v. Saiz,* 427 F.3d 745, 753 (10th Cir. 2005). Put another way, a civil rights defendant is deliberately indifferent where she "has knowledge of a substantial risk of serious harm to inmates . . . [and] fails to take reasonable steps to alleviate that risk." *Tafoya v. Salazar,* 516 F.3d 912, 916 (10th Cir. 2008).

"Because it is difficult, if not impossible, to prove another person's actual state of mind, whether an official had knowledge may be inferred from circumstantial evidence." *DeSpain v. Uphoff,* 264 F.3d 965, 975 (10th Cir. 2001). Importantly, ***"the existence of an obvious risk to health or safety may indicate awareness of the risk."*** *Rife v. Oklahoma Dep't of Pub. Safety,* 854 F.3d 637, 647 (10th Cir. 2017) (emphasis added) (citing *Farmer,* 511 U.S. at 842). The Sheriff's overarching position with respect to the subjective component is that his Jail staff "were not aware his condition was an emergency prior to March 18" and that "[w]hen jail staff became aware that May was experiencing a medical emergency on March 18, EMS was called and he was taken to the hospital immediately." Dkt. #135 at 17. This argument is easily vanquished.

Most glaringly, as repeated throughout, the Sheriff himself concedes that "anyone, whether they've had medical training or not" should have recognized that Mr. May was facing an "emergent medical situation" on February 3, 2022, when it was reported that he had not eaten or showered in 7 days and that his Alzheimer's was worsening. Day Depo. (Ex. 1) at

55:3 – 57:15, 65:14 – 66:17. The Sheriff further testified that it would be his expectation that Mr. May be taken to the hospital emergently on February 3. *Id.* However, as we know, Mr. May was not sent to the hospital until March 18, 2022. The Sheriff's admissions alone are evidence that Mr. May's health and safety were at obvious and substantial risk on February 3, and that the obvious and substantial risk was disregarded. The Sheriff's admissions alone are sufficient evidence of "underlying" deliberate indifference. *See, e.g. Burke,* 935 F.3d at 992; *Tafoya,* 516 F.3d at 916. In addition, Officer McCowan admits that it was *obvious* Mr. May was experiencing a ***"serious medical crisis"*** well in advance of March 18. *See* LCvR 56.1(c) Stmt.(B)(11-13) (emphasis added). Aside from the Sheriff and McCowan's admissions, there is copious circumstantial evidence that the risks to Mr. May's health and safety were excessive and obvious. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(B)(25, 27, 49-50, 56-57) & (B)(2-6, 9-14, 17). Nothing more is required. *See, e.g., Farmer,* 511 U.S. at 842. The evidence of subjective deliberate indifference by individual medical and detention staff is further discussed, extensively, in Plaintiffs' Responses to Warnke, Carey and Unruh's respective Motions for Summary Judgment. Plaintiffs fully adopt and incorporate herein the arguments and authorities set out in those Responses. In sum, there is considerable evidence of "underlying" constitutional violations in this matter.[5]

### B. There is Significant Evidence of Unconstitutional Policies or Customs that are Closely Related to the Violation of Mr. May's Constitutional Rights

[5] The Sheriff spends seven (7) pages of his "underlying violation" argument summarizing and reciting his Statement of Uncontroverted Facts. *See* Dkt. #135 at 17-23. Rather than waste valuable space responding in kind, Plaintiffs refer the Court to their LCvR 56.1(c) Statement, *supra.*

As the Tenth Circuit has succinctly stated, in order to establish *Monell* liability, the plaintiff "must prove (1) official policy or custom[,] (2) causation, and (3) state of mind." *Hinkle v. Beckham Cty. Bd. of Cty. Commissioners,* 962 F.3d 1204, 1239 (10th Cir. 2020).

Policies or customs meeting this standard may arise from "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle,* 962 F.3d at 1239–40 (10th Cir. 2020) (quoting *Pyle v. Woods,* 874 F.3d 1257, 1266 (10th Cir. 2017)). *See also Lance v. Morris,* 985 F.3d 787, 800-02 (10th Cir. 2021).

County sheriffs may be held liable for the maintenance of an unconstitutional health care delivery system. In *Burke*, the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff based on evidence that he maintained a policy or custom of insufficient medical staffing, resources, and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail. *See Burke,* 935 F.3d at 999-1001. As the Tenth Circuit reiterated in *Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020), a county may face liability premised on a "theory [of the] ***systemic failure of medical policies and procedures"***. (emphasis added). "Deliberate indifference to serious medical needs may be shown by proving that there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake City,* 768 F.2d 303, 308 (10th Cir. 1985). More recently, the Circuit held that a county sheriff may face *Monell* liability for his failure to adequately staff a

jail's medical unit with qualified professionals, failure to provide access to a physician and failure to supervise a jail's medical delivery system. *See Prince,* 28 F.4th at 1049-51 (citing *Burke,* 935 F.3d at 1001). Here, Plaintiffs can establish the Sheriff's liability in a variety of ways.

**First**, and most simply, Mr. May was harmed by the "decisions of [county] employees with final policymaking authority." In Oklahoma, county sheriffs are the officials with final policymaking authority with respect to the county jails and are ultimately responsible for the health and safety of the inmates. *See, e.g., Lopez v. LeMaster,* 172 F.3d 756, 763 (10th Cir. 1999); *Winton v. Bd. of Comm'rs of Tulsa Cnty., Okl.,* 88 F. Supp. 2d 1247, 1262 (N.D. Okla. 2000); 19 Okla. Stat. § 513; 57 Okla. Stat. §§ 47, 52. To the extent the Custer County Sheriff has relinquished any of that final policymaking authority, it was delegated to Undersheriff Crabtree. *See* LCvR 56.1(c) Stmt.(B)(21). In either case, the Sheriff is liable in his official capacity. This is the rare case where officials with final policymaking authority had real time notice of a substantial risk to an inmate's health or safety and failed to take "reasonable steps to alleviate that risk." *Tafoya,* 516 F.3d at 916.

By February 8, 2022, at the latest, Undersheriff Crabtree had knowledge of APRN Carey's February 3 complaint submitted to Adult Protective Services. *See* LCvR 56.1(c) Stmt.(B)(9-10). Thus, by February 8, at the latest, Undersheriff Crabtree knew that APRN Carey reported the following to Adult Protective Services: (A) Mr. May is using a wheelchair; (B) Mr. May has Alzheimer's and his ***"symptoms are getting worse"***; (C) Mr. May "needs to be in a nursing home or something, not in jail"; (D) Mr. May has been incarcerated ***"too long from a medical standpoint"***; (E) "staff at the jail are reporting [***Mr.***

***May] has not eaten or showered in 7 days"***; (F) Mr. May is "is not remembering to do these things on his own"; (G) the Jail is ***not an "appropriate placement"*** for Mr. May; and (H) Mr. May is "vulnerable" at the Jail. LCvR 56.1(c) Stmt.(B)(5, 9-10). The evidence further establishes that Jail staff continued to update Undersheriff Crabtree on Mr. May's condition and Warnke specifically told him that May was "not eating and still unable to walk." LCvR 56.1(c) Stmt.(A)(51-52).

Similarly, the *Sheriff was* <u>*aware*</u>, on or about February 3, 2022, that Mr. May's dementia was worsening and that he had not showered or eaten in a week. *See,* LCvR 56.1(c) Stmt.(B)(6). The Sheriff acknowledges that, as of February 3, 2022, Mr. May was facing an emergent medical situation and should have been sent to the hospital. *Id. See also* LCvR 56.1(c) Stmt.(A)(41-42).

Still, neither the Sheriff nor the Undersheriff took any measures to ensure that Mr. May was sent to the hospital. On the contrary, ***Crabtee never contacted*** anyone from Turn Key, nor <u>***any***</u> other ***medical provider, concerning Mr. May.*** *See* LCvR 56.1(c) Stmt.(A)(36).[6] This evidence, taken together, establishes that the Sheriff and Undersheriff were deliberately indifferent to Mr. May's serious medical needs. *Burke,* 935 F.3d at 992; *Tafoya,* 516 F.3d at 916. This deliberate indifference, by the final policymakers, is "fairly

---

[6] The Sheriff suggests that Crabtree was not deliberately indifferent because he "went to the district attorney's office to obtain a medical OR bond for May." Dkt. #135 at 27. A reasonable jury could find that the Undersheriff only *once* met with the assistant DA concerning Mr. May. *See* LCvR 56.1(c) Stmt.(A)(36). In any event, the Sheriff concedes that the DA "never approved an OR bond for May." Dkt. #135 at 27. While CCSO had no authority to release Mr. May from the Jail via bond, it did have authority to send him to the hospital. *See,* LCvR 56.1(c) Stmt.(A)(41-42). Again, the failure to do so under the circumstances constitutes deliberate indifference.

attributable to" to the County. *Whitson v. Bd. of Cnty. Commissioners of Cnty. of Sedgwick,* 106 F.4th 1063, 1067 (10th Cir. 2024) (internal quotation and citation omitted).

**Second,** there was a "systemic failure of medical policies and procedures". *Crowson,* 983 F.3d at 1192. As a matter of practice and custom, CCSO ignored, and violated, its own policies that were necessary to inmate health and safety. In his Motion, the Sheriff attempts to avoid liability primarily based on the mere existence of written policies purportedly governing medical care at the Jail. *See, e.g.,* Dkt. #135 at 29. However, "the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced." *Ware,* 150 F.3d at 882. It is also well established that "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya,* 516 F.3d at 919 (citing *LaMarca v. Turner,* 995 F.2d 1526, 1536 (11th Cir.1993) (finding deliberate indifference where prison official "failed to ensure that his direct subordinates followed the policies he established"), and *Goka v. Bobbitt,* 862 F.2d 646, 652 (7th Cir.1988) (holding that failure to enforce a policy where the policy is critical to inmate safety may rise to the level of deliberate indifference)). *See also Mata v. Saiz,* 427 F.3d 745, 758 (10th Cir. 2005) (finding that a "DOC protocol mandating that [defendant] treat severe chest pain as a cardiac symptom constitutes circumstantial evidence of her knowledge of the seriousness of such pain").

Most prominently, while CCSO has a written "Hunger Strike" Policy, Undersheriff Crabtree, the official responsible for Jail operations, ***had no idea that the Policy even existed*** until it was shown to him at his deposition. *See* 56.1(c) Stmt.(B)(22). The policy provides in pertinent part, that the Jail Administrator shall seek to resolve any hunger strike and *"notify*

*the Health Care Services Physician* to review, coordinate and document *any medical actions taken, based upon protocols and/or at the direction of qualified health care professionals*, in response to a hunger strike." Hunger Strike Policy (Ex. 41) at DID 166-167. The policy further provides that "[i]f an inmate is engaging in a hunger strike ***due to a mental condition, the appropriate medical protocols for mental illness will be followed."*** *Id.* (emphasis added). In direct violation of the policy, the Undersheriff, who was acting as "Jail Administrator", ***did not contact any medical professional concerning Mr. May.*** *See* 56.1(c) Stmt.(B)(22). All the while, ***Mr. May, a man suffering from progressive Alzheimer's, refused 118 of 132 meals*** offered between February 2 and March 17, 2022 and lost upwards of 78 pounds. *Id.* at (A)(50) & (B)(19). According to Dr. Berk, this level of involuntarily weight loss caused "severe medical complications", including "dehydration" and "progressive debility." *Id.* at (B)(19). There was never any medical or mental health intervention. If Undersheriff Crabtree had bothered to read and enforce the existing Hunger Strike Policy, Mr. May might still be with us today. Instead, Crabtree never notified a physician of Mr. May's status and did nothing to ensure that "appropriate medical protocols" were followed. This was a "systemic failure of medical policies and procedures". This was deliberate indifference.

Furthermore, while written policy provides that CCSO is committed to "ensuring that inmates receive adequate care to meet their serious health care needs" (Dkt. #135-32 at 1), the evidence is that the administration utterly failed to comply with it. *See, e.g.,* LCvR 56.1(c) Stmt.(A)(11, 14-15, 25, 27-18, 46, 48-51, 53-57, 65) & (B)(1-19). The Jail was simply not

equipped to care for a detainee like Mr. May, with serious or complex medical or mental health conditions. *Id.*[7]

**Third,** there was a failure to adequately staff a jail's medical unit with qualified professionals, failure to provide access to a physician and failure to supervise a jail's medical delivery system. *See Prince,* 28 F.4th at 1049-51. In his Motion, the Sheriff attempts to prop up his utterly deficient medical delivery system by touting "medical officer" Warnke. *See* Dkt. #135 at 25. To be clear, Officer Warnke is not a medical provider and her CMA certificate expired in 2011. *See* LCvR 56.1(c) Stmt.(A)(14). Indeed, though the Sheriff relied on Warnke as the Jail's "medical officer", she was ***never even trained regarding the Jail's medical policies.*** *Id.* LPN Unruh was at the Jail just 12 hours a week, which was wholly insufficient to meet the needs of 150 inmates. LCvR 56.1(c) Stmt.(A)(11). This left untrained detention staff to medically monitor and attempt to care for inmates, like Mr. May, with serious and complex medical and mental health conditions. *See, e.g., id.* at (B)(11-14). Such a system was destined to fail. There was no physician at the Jail, and LPN Unruh, who is not trained or licensed to even conduct patient assessments, was herself unsupervised, in violation of Oklahoma law. *Id.* at (A)(11). Again, "[d]eliberate indifference to serious medical needs may be shown by proving that there are such gross deficiencies in staffing ... or procedures that the inmate is effectively denied access to adequate medical care." *Garcia,* 768 F.2d at 308. The Sheriff's medical delivery system was "grossly deficient" such that Mr.

[7] For his part the Sheriff argues that "it was the state's judicial system and his own family that failed him, not the healthcare system at the Custer County Jail." Dkt. #135 at 24. But as the Sheriff himself concedes, he was ultimately responsible for May's well-being. Day Depo. (Ex. 1) at 32:15-18.

May was denied access to adequate medical care. Mr. May fell victim to a "systemic breakdown in correctional health services." LCvR 56.1(c) Stmt(B)(20).

**Fourth,** there was a failure to train. "[A] plaintiff presents a viable 'single-incident failure-to-train claim' ... by showing: "(1) the existence of a [municipal] policy or custom involving deficient training; (2) an injury caused by the policy that is obvious and closely related; and (3) that the municipality adopted the policy or custom with deliberate indifference to the injury." *Thao v. Grady Cnty. Crim. Just. Auth.,* No. 24-6226, 2025 WL 3290897, at *13 (10th Cir. Nov. 26, 2025) (quoting *Valdez v. Macdonald,* 66 F.4th 796, 816–17 (10th Cir. 2023)). **(1)** CCSO's training was utterly and completely deficient. ***Undersheriff Crabtree cannot give a "definitive answer" as to whether Jail staff was receiving any training regarding any policies in the pertinent timeframe of early 2022.*** LCvR 56.1(c) Stmt(A)(64). The detention staff, including the "medical officer", is not trained on the medical policies. *Id.* at (A)(64-65). There was no training with respect to the Hunger Strike Policy. *Id.* at (B)(22). In this regard, CCSO provided no training as to what actions to take if an inmate stopped eating. *Id.* at (A)(66). Detention staff were not trained as to the medical significance of blood pressure readings. *Id.* Detention staff were not trained concerning wound care. *Id.* Moreover, detention staff were not trained on "what signs and symptoms [they] might observe that should be deemed to be emergent…." *Id.*

**(2)** The deficient training caused injuries that were obvious and closely related. By way of example, had there been any training on the Hunger Strike Policy, as Mr. May continued to refuse meals, a physician would have been contacted, and he would have been treated under appropriate medical and mental health protocols. Further, if staff had been

trained on what signs and symptoms they might observe that should be deemed to be emergent, Mr. May would have been sent to the hospital well before March 18, 2022. For instance, according to Officer Alvarado, it was "common" knowledge within the Jail that Mr. May needed to go to a medical facility that could "take care of him." f.n. 3. Officer Alvarado personally witnessed Mr. May's "clear[]" deterioration over time. *Id.* May went from being ambulatory to unable to walk on his own, he stopped eating and could not communicate. *Id.*

Officer McCowan was the first officer to put a diaper on Mr. May. LCvR 56.1(c) Stmt(B)(11). Mr. May was placed in diapers because he was observed "***just laying there defecating and urinating on himself in the bed.***" *Id.* (emphasis added). On February 13, McCowan noted that Mr. May had "defecated on himself" and that feces had gotten into his open bed sore. *Id.* at (B)(13). May could not ambulate on his own to get up and go to the restroom. *Id.* McCowan could tell that Mr. May was ***"going downhill."*** *Id.* at (B)(12). McCowan observed that Mr. May was not eating or drinking anything, and would not even touch the "Ensure" shakes he brought to him. *Id.* Officer McCowan, and other jailers, were concerned that Mr. May needed to be checked out in an emergency room. *Id.*

However, without relevant medical training, Officers Alvarado and McCowan were unsure how to handle the situation and believed they were required to contact a supervisor, rather than contacting EMS directly under the circumstances. *Id.* at (B)(66). Had these officers been appropriately trained, Mr. May would have been sent emergently to a hospital and received the higher level of care he so desperately needed.

(3) The Sheriff adopted the policy or custom of deficient training with deliberate indifference. The Tenth Circuit has adopted a three part test for deliberate indifference,

which is satisfied when (1) the entity's "policymakers 'know to a moral certainty that their employees will confront a given situation' "; (2) "the situation 'presents the employee with a difficult choice of the sort that training or supervision will make less difficult' "; and (3) "[t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Thao,* 2025 WL 3290897, at *13 (citation omitted). The Sheriff and Undersheriff knew, to a moral certainty, that detention officers would face situations where they would encounter inmates like Mr. May, with complex and serious medical conditions. Indeed, due to the lack of medical staffing at the Jail, it was certain that detention staff would be forced to medically monitor and supervise inmates like Mr. May. Further, this situation presented employees with a difficult choice of the sort that training or supervision would have made less difficult. That choice being whether to attempt to care for the inmate or call for a physician or ambulance. Additional training on food refusal, Alzheimer's, incontinence, low blood pressure and/or emergency conditions, would have made the choice easier. Lastly, the wrong choice will frequently cause the deprivation of a citizen's constitutional rights. That is, where layperson detention staff are left to guess whether a serious and complex condition is sufficiently emergent or whether they are permitted to call a physician, the likelihood of constitutional depravations is almost certain.

In sum, a reasonable jury could find the Sheriff was responsible for unconstitutional policies or customs that are causally linked to the violation of Mr. May's constitutional rights.

WHEREFORE, premises considered, the Sheriff's Motion for Summary Judgment (Dkt. #135) should be denied.

Respectfully,

/s/ Robert M. Blakemore
Daniel Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
Smolen & Roytman
701 South Cincinnati Avenue
Tulsa, OK 74119
Phone: (918) 585-2667
Fax: (918) 585-266

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 11th day of December 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/ Robert M. Blakemore