IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN N. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

Plaintiffs,

-vs-

TURNKEY HEALTH CLINICS, LLC, et. al.,

Defendant.

Case No. 24-CV-119-JD

VIDEO DEPOSITION OF SHERIFF DANIEL GENE DAY

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 14, 2025, AT 10:27 A.M.

REPORTED BY: LANA L. LEDFORD, CSR

PLAINTIFF'S EXHIBIT 1

you mean yes just because it's hard for her to get down what "uh-huh" -- you know, we may understand you, but the record might not be clear.

THE WITNESS: Yes.

MR. MILLER: Thank you.

**Q (BY MR. SMOLEN) Okay. With respect to just the overall policies and procedures that existed at the sheriff's office at the time you took over, was there an existing policy and procedure manual?**

A Yes, sir.

**Q Okay. Was it ever revamped?**

A It was.

**Q Okay. And explain to me what that process was like.**

A That was -- I think, like, with our -- we used, like, our -- we had our jail administrator input and -- if I remember correctly, Crabtree pretty much was -- he was overseeing all of that. And so I would see that -- and I knew, you know, some of the things for sure. But I don't know exactly how that all went together.

**Q Okay. Is that something that you kind**

**of delegated to Crabtree to make sure?**
A It is.
**Q Okay.**
A That was one -- excuse me. But that was one of the -- one of the things that we -- when he came over to be our undersheriff, that I explained to him. Because my job is very political. You have to go to lots of functions. You have to go to -- you know.
**Q Sure.**
A And so there's no way that I myself would -- would have ever got a good job done at that. That's why I wanted someone that I knew and trusted that -- that would do what's right.
**Q You ultimately knew, as the sheriff, that you're responsible for the inmates' well-being.**
A I am.
**Q And you wanted to make sure you delegated to someone you felt like had experience in the custodial setting that was more familiar with it because you hadn't had any history in the custodial setting. Fair?**
A Yes, sir.
**Q Okay. And I'm assuming that was kind of**

**explained to Crabtree during that time frame.**

A Yes, sir.

**Q Okay. How much do you know about the case that we're here about today?**

MR. MILLER: Object to the form.

And as you know, don't discuss any conversations we've had, you know, any information that I have provided you.

**Q (BY MR. SMOLEN) Yeah. I'm not really interested in what your lawyer's told you. I'm just more interested in what you kind of know about the situation generally.**

A The -- I knew -- I knew who Mr. May was.

**Q I was going to go down there. Because you guys -- you both are a little bit older.**

A We are.

**Q Seasoned, if you will. And you'd both worked cattle sounds like.**

A And so I knew Mr. May. And it's no -- it's just open record, you know. He had several problems. And -- with neighbors, next-door ranchers, and this kind of thing. And he went through a period of time where he was -- if I can say that.

**Q Yeah.**

**that?**

A Yes, sir.

**Q Okay. That call was February 3rd of 2022. Could you recognize the voice of the female who was talking to the indigent defense lawyer?**

MR. MILLER: Object to the form.

THE WITNESS: I think her name was Angie.

**Q (BY MR. SMOLEN) Okay. And would you agree with me that Angie appears or sounds to be concerned about Mr. May's health?**

A Yes, sir.

**Q She indicates that he's not been able to walk and that since he's been booked into the jail, he's been not eating food.**

MR. MILLER: Object to the form.

**Q (BY MR. SMOLEN) Correct?**

MS. MARTINEZ: Same objection.

THE WITNESS: Yes, sir.

**Q (BY MR. SMOLEN) Okay. You and I can both agree that those can be indications of a serious medical complication or problem. Agreed?**

MR. MILLER: Object to the form.

THE WITNESS: It -- there's times that

it could. Yes, sir.

**Q (BY MR. SMOLEN) Okay. Did Crabtree ever tell you that when May was actually booked into Custer County, he was having these reported conditions of inability to ambulate or walk and that he was not eating?**

MR. MILLER: Object to the form

MS. MARTINEZ: Same objection.

THE WITNESS: The -- the only time that I remember was when -- and I don't know what the time was of that -- but was when he was notified and he -- he went back there to -- when I said earlier to try to get him to eat, and he did drink a shake, and he did take a shower. And that's the only one I -- time I remember.

**Q (BY MR. SMOLEN) Remember.**

**And you don't know, as far as the timeline with his incarceration, when that conversation happened?**

A No, sir.

**Q Okay. Let me hand you -- let's look at Exhibit 13 real quick.**

THE REPORTER: We have a 13 from yesterday. Is that --

MR. SMOLEN: Yeah. It should be the

same.

THE REPORTER: Okay.

**Q (BY MR. SMOLEN) And I'm looking at -- in the bottom right-hand corner, Sheriff, DDR38, Page 12. Should be the second-to-the-last page.**

A Second-to-the-last page?

**Q Yeah. Starting at the bottom, from the Missy Franz. Do you see that?**

A Yes, sir.

**Q She says, "Hello. I'm a screener for Adult Protective Services. I'm sending the following to you for an investigation. It is reported for the Custer County Jail at 300 North 7th Avenue, Arapaho, Oklahoma 73620. Thank you." And it says, "Specific situation reported" onto the next page.**

**It says, "Reporter stated the AV uses a cane or a wheelchair since the AV is not allowed to use a cane in the jail. Reporter stated the AV has Alzheimer's. He can speak and talk, but his symptoms are getting worse. Reporter stated the AV was living alone on a farm and something happened his animals. Reporter stated they believe the AV may have forgotten to feed the animals due to his dementia. Reporter believes**

the charges were from 2019. Reporter stated the AV did not go to court since he may have forgotten the date so the AV was picked up on a warrant from his home.

Reporter stated they do not believe the AV needs to be in jail for missing court. Reporter does not know what the home conditions are. Reporter feels the AV needs to be in a nursing home or something; not in jail. The AV has been incarcerated for at least two to three months, maybe longer, but too long from a medical standpoint. The AV has not had any family come to visit him so reporter is assuming he is just alone. Reporter stated they saw the AV today via telemedicine.

The staff at the jail are reporting the AV has not eaten or showered in seven days. Reporter stated if the AV is not getting up to eat or shower, no one is telling him to. The AV is not remembering to do these things on his own. Reporter stated that this has become a safety issue for him since the other inmates get upset with him for not doing these things. Reporter stated they do not know the criminal side of things, but they do not think this is an

appropriate placement. Reporter stated the AV was most likely in better shape in 2019 when he was charged, with better memory than now. AV is not believed to be aggressive to other people. Reporter stated the other inmates can become aggressive to him and he is vulnerable there."

Did you -- were you able to follow along with me there?

A Yes, sir.

Q Okay. Was that information conveyed to you by Crabtree as well?

A He didn't read me the whole -- whole thing. But yes, sir.

Q Okay. Generally, he summarized that?

A Yes.

Q Okay. At this time, February of 2022, do you know if the sheriff's office detention officers, okay, if they felt like an inmate had a safety concern or that they were medically unsafe in the facility because the facility could not provide an appropriate level of care, could your jailers, on their own authority, send the inmate to the hospital?

A Yes.

Q Okay. And to your knowledge, were the

**to February 3rd, why there were no entries made in the jail log regarding that situation?**
MR. MILLER: Object to the form.
THE WITNESS: No. I do not know.
**Q (BY MR. SMOLEN) Okay. Would you agree with me that it should have been included in that?**
MR. MILLER: Object to the form.
THE WITNESS: I do.
**Q (BY MR. SMOLEN) Okay. Because we see them start to track it after the 3rd; right? At least in part on the report.**
A (Nods head.)
**Q When we -- you kind of had raised this issue of a heart attack and if a guy wakes up and he's clenching his chest and saying, my chest hurts, your expectation, at least as the sheriff, was get him in an ambulance and get him to the hospital; right?**
A Yes, sir.
**Q Okay. Would that be your same expectation with an individual who seemed like they had diagnosed dementia, and they hadn't eaten for seven days, and they were unable to shower? Would you also have an expectation that**

**that person would be taken to the hospital emergently?**

MR. MILLER: Object to the form

MS. MARTINEZ: Same objection.

THE WITNESS: Yes, sir.

**Q (BY MR. SMOLEN) Okay. When we get to -- I mean we talk about there might be complicated medical issues that someone doesn't pick up on. But a person who has refused or has an inability to eat for over a week, that's something that anyone, whether they've had medical training or not, should be aware of as an emergent medical situation.**

**Agreed?**

MR. MILLER: Object to the form.

MS. MARTINEZ: Same objection.

THE WITNESS: Yes, sir.

**Q (BY MR. SMOLEN) Okay. There is an entry -- let me find it, Sheriff. Let's take a break. We've been going a little bit. Are you good with a break?**

A Yes, sir.

THE VIDEOGRAPHER: Off the record. 11:59 a.m.

(Short break)

**this country is to have a constitutionally kind of a minimum level of care that a detainee or an arrestee or someone who's been convicted and awaiting transport, but still in a county jail, that there's a level of basic norms that we follow in the United States with respect to caring for even those individuals that are in custody.**

**Agreed?**

A Yes, sir.

**Q Okay. Would you agree with me that Mr. May deserved better than what -- what he received?**

A Watching this on this video, yes.

**Q Okay. We had talked earlier, even going back into the month of February, there were clear signs of emergent medical condition. But certainly, by March 18th, when Mr. May's in what we can now visually observe on video this type of condition, no question he needs to be sent out for medical care -- emergent medical care.**

**Agreed?**

MR. MILLER: Object to the form.

MS. MARTINEZ: Same objection.

THE WITNESS: I'm not a jailer, but I

would have sent him out.
**Q (BY MR. SMOLEN) Right. And I understand you're not a jailer. But as a human being walking into that cell --**
A I would have.
**Q -- seeing what you're seeing, it doesn't leave a whole lot up to the imagination that this person is in a crisis. Agreed?**
A Agreed.
**Q Okay. After Mr. May's death, did Crabtree ever tell you about the condition that May was in in his cell at the time that he was ultimately taken from the holding cell to the hospital?**
A After that, I believe I was advised and -- the way he -- he put it, it was exactly what I would think. It was not good.
**Q Okay. After he had reviewed the video?**
A Uh-huh.
MR. MILLER: You mean yes.
THE WITNESS: Yes.
**Q (BY MR. SMOLEN) Okay. And so after he had reviewed the videos, he also had concerns with what he had observed; correct?**
A Yes, sir.