IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, AS CO-ADMINISTRATOR OF THE ESTATE OF MARVIN G. MAY, DECEASED; AND LEANN N. HOFF, AS CO-ADMINISTRATOR OF THE ESTATE OF MARVIN G. MAY, DECEASED,

PLAINTIFF,

VERSUS CASE NO. 23-CV-119-JD

TURN KEY HEALTH CLINICS, LLC, ET AL.,

DEFENDANTS.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

The continued video deposition of TAMARA CAREY, taken in connection with the captioned cause, pursuant to the following stipulations before MARCIA B. MITCHELL, Certified Court Reporter, at Regus Shreveport Boardwalk, 333 Texas Street, Suite 1300, Shreveport, Louisiana, on the 3rd day of October 2025, beginning at 9:05 a.m.

PLAINTIFF'S EXHIBIT 3

A No.
Q Did you ever -- have you ever actually been to the Custer County jail?
A No, not in person. That was telehealth virtual visits.
Q So under your employment arrangement with respect to the Custer County jail, it was purely telehealth; s that correct?
A Correct. Yes.
Q Were you aware of how many hours a week of nursing was offered at the Custer County jail?
A No. I wasn t informed.
MR. MILLER:
Object to form.
COURT REPORTER:
Was that Mr. Miller?
MR. MILLER:
Yes, it was.
COURT REPORTER:
Okay. I m sorry.
BY MR. BLAKEMORE:
Q Do you want me to ask the question again or did you remember what I asked?
A You can ask the question again.
Q Were you aware of how many hours a week, of

nursing coverage, was offered at the Custer County jail?

MR. MILLER:

Object to the form.

A No. I wasn t aware of the nursing hours for the week.

Q How often were you doing telemedicine at the Custer County jail?

A Once a week.

Q And approximately how -- how many hours a week or how -- how long each week?

A It just depended on the patient -- the patient s need. A minimum of a hour. I don t recall ever going over three (3) hours or anything. It just depended on who needed to be seen.

Q So was it kind of just like as a -- on an as-needed basis?

A Correct. Yes.

Q Did you provide any clinical supervision of the nursing staff at the Custer County jail?

A When you say clinical, like virtually, not in person.

Q Okay. And tell me how you were able to provide clinical supervision, virtually?

anybody else.
Q Do you recall the -- who the LPN was at Custer County in early 2022?
A I believe it was Stacia.
Q Stacia Unruh?
A Uh-huh.
Q Yes?
A Yes.
Q Did you ever -- did you ever physically work with Staci Unruh?
A No. Not that I can recall. No.
Q Did you ever meet Staci Unruh?
A Not that I can recall. Not in person.
Q Did -- did Nurse Unruh ever call you, ask you for advice with respect to the clinical care being provided at the Custer County jail?
A I can t specifically recall but I m sure she did. So if I -- I was the provider for that jail I would be on call. So if there were any issues or concerns, someone is always on call, like as a provider.
Q Do you know whether anyone at the level of RN or above was providing care at the Custer County jail in early 2022?
A I m not sure. I -- I don t know the answer to

Q So do you know -- do you know whether any registered nurse or licensed physician was supervising Stacia Unruh on a day to day basis?

MS. MARTINEZ:

Object to form.

A I m not aware of that.

BY MR. BLAKEMORE:

Q Were you supervising Stacia Unruh s care at the Custer County jail?

A While we were doing the telemedicine visits, during that time, but not on a regular basis.

Q So beyond just the one time a week where you might be doing telemedicine --

A Uh-huh.

Q -- for maybe an hour, right?

A A minimum of a hour. At least an hour for sure.

Q Okay. You weren t providing any supervision to Stacia Unruh beyond that, were you?

A Not outside of that, no.

Q What about to any of the detention staff at the -- at the Custer County jail. Were you providing any kind of guidance or supervision to them with respect to medical issues at the jail?



Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

MR. MILLER:
Thanks.
BY MR. BLAKEMORE:
Q All right. So I m going ahead in this document, Exhibit 2, and for the record it is Custer TK17. Okay? And at the top of the page there it says; Chronic Care Note; do you see that?
A Yes.
Q Do you -- do you recognize this document?
A After reviewing it, yes. Uh-huh.
Q Okay. When s the last time you reviewed this document?
A With my lawyer. I don t remember the exact day like when we did the deposition prep and everything.
Q Okay. I m going to just go ahead a little bit to -- briefly to page 18 -- TK18 and there is a signature at the bottom of the page there. Do you recognize that signature?
A Yes.
Q Is that your signature?
A It is.
Q And did you -- did you draft this chronic care note?

A Yes.
Q And what s the date on this?
A February 3rd of 2022.
Q All right. So this was a note drafted by you on February 3, 2022, in connection with your telemedicine visit with Marvin May; true?
A Yes.
Q And what do you recall, if anything, about how it is that you -- you came to have this telemedicine visit with Mr. May?
A I -- I don t exactly recall but I m -- from my understanding that s when he was transferred over to Custer from Canadian and that was like his first visit with me at Custer.
Q Do you recall anyone from the jail contacting you prior to this telemedicine visit with Mr. May about any concerns that they had?
A Prior to -- I don t know if it was like before we started doing the visits and they brought patients in or the day before, but there were a lot of concerns from like the officer about him not eating.
Q Okay. Do you recall who you talked to at the -- at the jail about Mr. May?
A I -- I remember Julie. I mean, Julie was the

main officer that I recall.
Q Is that Julie Warnke?
A Yes, sir. Yes.
Q Okay. But you knew her as Julie?
A Yes, I ju -- just first name basis.
Q Okay. So let s look at some of this note. Well, before we get there, when -- when would you have written this -- this note?
A I would have done it that day. Like --
Q Okay.
A -- either after the visit or during the visit. Usually during the visit I would kind of have another screen open kind of typing things as we were discussing or write notes down and go back but it would have been that day.
Q Okay. So you're--
A That's --
Q -- you re working on this note during the telemedicine visit, right?
A Uh-huh.
Q Is that a, yes?
A Yes.
Q And then after the telemedicine visit is over then you would complete the note; is that -- is that fair?

A Correct.
Q All right. So you have this telemedicine vide -- visit with Mr. May. Do you recall anyone else being present, with Mr. May, during this visit?
A No. Usually it would just be the patient, an officer and the nurse in the room.
Q Okay. But as you sit here today you don t recall whether all those folks were there or not. Is that -- is that true?
A No, I m sure they were all there because they would have --
Q Okay. All right. Going to the substance of the -- the note here, I m looking down under Clinic, so what s the pur -- is this like a form that Turn Key --
A Yes. It s a form.
Q The --
A It s a SOAP note. So providers do SOAP notes, subject, objective, assessment, plan like on everybody. That s like the format of your charting as a provider.
Q Okay. And so the first thing that I want to look at -- well, let me ask you this first. One of the things here, it says allergies and

then there s an abbreviation there. What does that mean? NKDA.
A No known drug allergies.
Q Okay. Then the next thing down there is -- it says; Clinic.
A Uh-huh.
Q Now what does that -- what's -- what does that mean?
A Those are the patients like diagnosises.
Q Okay.
A Things that they ve been diagnosed with.
Q And so you've checked here; Cardiovascular, HTN HLD. Now, what do those abbreviations mean?
A Hypertension and hyperlipidemia.
Q And you were -- do you recall where you got that information?
A From the original intake at Canadian.
Q At Canadian?
A Uh-huh.
Q Yes?
A Yes.
Q All right. Then do you know whether like during the visit would you have been asking Mr. May for any of this information or was this just purely from a -- a chart review?

A Well, not the clinic information. That was from chart review. Prior information.
Q Okay. So then you've got pulmonary; COPD and for the record what is COPD?
A Chronic Obstructive Pulmonary Disease.
Q Neuro; Alzheimer s, right?
A Right.
Q And for the jury, what is Alzheimer s?
A It s a slowly progress -- well, it doesn t have to be slowly but it s a progressive disorder where the person pretty much just forgets functions -- forgets things pretty much. It s like a --
Q And --
A -- neurological disorder..
Q And would -- the same with the other conditions that are listed here, did you get that information with respect to Alzheimer s from -- from the Canadian County chart?
A Yes. From like their original intake information. Uh-huh.
Q Okay. And this last one --
A Endocrine.
Q What -- I gue -- was it -- yeah, endocrine and what s that -- what s that abbreviation?

A Diabetes Mellitus.
Q And what -- do -- do you recall what -- what type diabetic Mr. May was?
A After reviewing the charts I do. He was on oral medication.
Q Was he -- was he insulin dependent?
A I don t recall.
Q Do you know what medication he was taking for diabetes?
A Not off the top of my head, no.
Q All right. And then you have; Other -- RA. What is RA?
A Rheumatoid Arthritis.
Q All right. So -- and -- and Mr. May, we ve got his date of birth up here April 19, 1947, right?
A Correct.
Q So he was elderly, true?
A Yes. Uh-huh.
Q Yes?
A Yes.
Q So with him being elderly and having these other chronic conditions that you ve identified, what, if any, concerns does that give you as a -- as a nurse practitioner?

your meds? Is there anything that we need to change? So obviously he denied that there was any need for change.
Q Okay. One of the things that you -- you state down here provider -- and that s -- you re referring to yourself when you say provider, right?
A Yes.
Q "Provider is aware of patient s worsening Alzheimer disease." Did I read that correctly?
A Correct.
Q So would it be fair to say that if you re aware of his Alzheimer s disease worsening --
A Uh-huh.
Q -- that Mr. May, at that point, might not have had the -- the mental capacity to accurately comment one way or another on his treatment plan; would that be fair?
MS. MARTINEZ:
Object to form.
A Well, no.
MR. MILLER:
Same objection.
A No. Just because it s worsening it doesn t mean -- he s still like oriented. He was still

Q So it says up here; "Per officer patient has -- has not eaten or showered in 7 days." Did I read that correctly?
A Correct.
Q And so was that -- in addition to the not eating for seven days was the not showering -- did that also give you concerns that his Alzheimer s was worsening?
A Yes.
Q Anything else, not documented in this history, that you recall Ms. Warnke or anyone else from the jail telling you about Mr. May that gave you concerns that his Alzheimer s disease was worsening?
A So like I said, we ve had conversations. I don t remember if it was prior to the visit or the day before I don t know, but I do remember like her concerns about just the things that he weren t doing but like during our visit he would say I m fine, you know, things like that and I never -- we never know what they re there for. That s, you know, not -- I m just here to take care of the patient but I do remember like a conversation saying he was liked picked up for a warrant because he forgot to go to court

or something and that was like a concern for me because I -- I -- like I said, I don t know his charges. I don t know why he was there or anything but when I found that out, I m like, oh, so he s really like demented or his Alzheimer s is, you know, getting worse because he was I guess forgetting appointments and they picked him up for a warrant or something. But there was a conversation like that we would -- we had outside of the -- it was outside of the visit. He wasn t there when we had that conversation. I just don t remember if it was before or over the -- I don t remember but I remember the conversation.
Q Which -- after you had that conversation, did you do anything else independently to investigate what Mr. May s charges were or --
A No.
Q Okay.
A Not his charges. I don t -- I mean I don t care about charges. I care about, you know, managing his care, but that s why I ultimately called APS because I was concerned about what was going on, on the outside, so whenever he was released from this situation what would

further contact with Mr. May?
A No. Not that I recall. No.
BY MR. BLAKEMORE:
Q So after this telemedicine visit and your contacting Adult Protective Services, did you ever follow up with Stacia Unruh or Julie Warnke or anyone at the -- the jail to see how Mr. May was doing?
A I wouldn t have reached out to Julie but I don t recall. Maybe I -- I don t recall honestly. I m sure I may have asked Stacia, hey, you know, anything going on with any -- with him or anything but I -- I don t recall.
Q Do you recall Stacia Unruh or anyone from the Custer County jail or Custer County Sheriff s Office, Turn Key, anybody between this time of February 3, 2022 -- and you actually left Turn Key on I think March 17th, right?
A It was shortly after, uh-huh. That --
Q Okay. Do you recall anyone ever contacting you about Mr. May and telling you anything about his condition or what was going on with him during that time frame after this -- this visit on February 3rd?
A I don t -- I don t recall but I mean you get a

lot of calls from jail, shall I say, from officers and nurses, so if they -- I just -- I don t recall but I would have --
Q I mean if some -- if somebody did contact you --
A Uh-huh.
Q -- about Mr. May s condition --
A Uh-huh.
Q -- with some kind of concern, would you have charted that or put it in some kind of a note?
A You -- if they called with a concern depending on what it is, if orders were like made, yes. I would have charted it and sent the orders over or the nurse would have charted it or the officer -- whoever called would have charted that they spoke with me.
Q Okay. And -- but as you sit here today, you don t recall that ever happening; is that fair?
A I don t recall.
Q Okay. All right. Skipping down here under, General.
A Uh-huh.
Q I just want to ask you about these things that you have checked just to be sure what -- what they are. NAD; what is that?

soft. Like if it was -- I mean hard or something, you know, we would have to see if there was, I don t know, any severe constipation or hernias or, you know, inflamed appendix or spleen, things like that.
Q Okay. Then the next thing you have checked is NBS times four (NBSx4). What s that?
A Normal bowel sounds in all quadrants.
Q All right. Extremities. Patient is unable to ambulate safely alone. Assistance needed via wheelchair. Did I read that correctly?
A Correct.
Q And did you have any understanding, based on the information that you had, review of the records as to whether that was a -- that was a new development or something that had been a chronic issue with Mr. -- Mr. May?
A From what I recall he was in a wheelchair in Canadian as well, so it was --
Q You recall seeing him in a wheelchair at Canadian?
A I -- them bringing him in, in a wheelchair at Canadian, as well.
Q Okay. Neuro down here, Assessment Diagnosis you have degree of control, good. And what do

A I don t --
Q Do you remember?
A -- recall.
Q Okay. All right. So going back to 12, the top of this email, Ms. Franz is saying; "Hello, I am a screener for Adult Protective Services. I am sending the following to you for investigation. It is reported for the Custer County Jail" and then Specific Situation Reported and it goes on to the next page, and I want you just to briefly -- it s a -- it s a long paragraph and --
A Can you make that bigger, as well? That -- those --
Q Yeah.
A -- words are smaller.
Q That better?
A Uh-huh.
Q So is this -- what we re looking at now on page 13 of Exhibit DDR 3813 --
A Uh-huh.
Q -- is this your report that you gave to Adult Protective Services? And take as much time as you need to read it to answer that question.
A Okay.

Q All right. So does this look like -- is this a summary of the report that you gave to Adult Protective Services regarding Mr. May?
A Yes.
Q Is there anything in this summary that you believe is incorrect?
A No. Not that I m aware of. That s basically the summary and --
Q Okay.
A -- uh-huh.
Q Now did you -- did you write this or is this Ms. Franz or somebody from APS -- is this their written summary of what you verbally reported?
MR. MILLER:
Object to form.
BY MR. BLAKEMORE:
Q If you know.
A I didn t write it. I called, so...
Q Okay. All right. So I m going to kind of just -- we ll take this in pieces. "Reporter stated that the AV," and that means -- I believe that means adult victim?
A Adult victim. Uh-huh.
Q "Uses a cane or a wheelchair since the AV is not allowed to use a cane in the jail." Did I

read that correctly?
A Yes.
Q And we ve kind of -- we ve already talked about that is he had issues ambulating.
A Uh-huh.
Q Was -- from your view as a APRN, if Mr. May didn t have a wheelchair or was trying to walk on his own, would he have been a fall risk?
A Yes. He would be considered a fall risk.
Q Do you know what, if anything, that was being done at the -- the jail to -- to alleviate the -- the risk that Mr. May might fall?
A I m not sure.
MS. MARTINEZ:
Object to the form.
BY MR. BLAKEMORE:
Q All right. Next sentence here; "Reporter stated the AV has Alzheimer s. He can speak and talk but his symptoms are getting worse." So we ve already talked about that with respect to your chronic care note.
A Uh-huh.
Q And what your concerns were. And in reading this summary of your report to Adult Protective Services, is there anything, additional, that

you would add to that earlier testimony about Mr. -- Mr. May s Alzheimer s symptoms getting worse?
A I mean nothing additional. He just was, you know, starting to refuse eating and getting up, things like that but --
Q Okay.
A -- like I say he -- nothing additional. His symptoms were worsening but he still wasn t in any like acute distress.
Q All right. So this next part, there s a little bit more detail about Mr. May s background, states; "Reporter stated that the AV was living alone on farm and something happened with his animals. Reporter stated they believe the AV may have forgotten to feed the animals due to his dementia and reporter believes charges were from 2019." Did I read that correctly?
A Correct.
Q And does that -- does that refresh your recollection, at all, about some of the background issues that were going on with Mr. May?
A It does. And this information is information that I got from like Julie because like I said,

I -- we don t -- I don t know why they re there but when the concerns and things were brought up and, you know, she was telling me things like that what was going on with him, I was just reporting to APS.

Q Yeah.

A I didn t hear that information from Mr. May.

Q Okay. You got that from Julie Warnke?

A Correct.

Q And I know that you said a few times now that you don t typically know what -- what your patient s criminal charges are, what their criminal background is, but in some cases that can be relevant information, true?

A True.

Q And in this case would you agree that this was relevant information with respect to Mr. May s dementia?

A Yes.

MR. MILLER:

Object to the form.

MS. MARTINEZ:

Same objection.

BY MR. BLAKEMORE:

Q Okay. "Reporter stated that AV did not go to

court since he may have forgotten the date so AV was picked up on a warrant from his home." We ve kind of already talked about that. "Reporter stated they do not believe the AV needs to be in jail for missing court." First of all, with respect to that part of this summary, it says they do not believe. When you gave your report to Adult Protective Services, was -- was anyone else on the -- on the phone with you?

A No, I don t remember anyone being on the phone. No. Just --

Q So do you know --

A Uh-huh.

Q -- as you sit here today reading this what is -- why it says they do not believe?

A I m assuming they was said because I m sure I was like, you know, I m calling, you know, in reference to a patient that I have in jail and the officer has given me information. So I guess they would be myself and the officer, but --

Q And that's Warnke, right?

A -- Julie wasn t on the phone.

Q And that officer would be Julie Warnke, right?

A Right.
Q And so you re -- as you re giving this report, you re not only talking about your own concerns but you re talking about the concerns that were conveyed to you that Ms. Warnke had; is that true?
A Yes.
Q All right. Next sentence; "Reporter does not know what the home conditions are. Reporter feels that the AV needs to be in a nursing home or something, not in jail." And did you -- is that an accurate statement as to what you conveyed to Adult Protective Services?
A Like I don t know what exact words I used and that -- I m sure it was just my opinion on the medical side of things. I don t know the law and their side, but I just felt after he was released that he shouldn t go home alone. He needed to go to like a long-term care somewhere where someone could watch him.
Q And I m not asking you as -- for anything on the legal side. I m only asking you with respect to your medical assessment.
A Uh-huh.
Q But it was your -- your assessment of Mr. May

that he -- he did not belong in jail, true?
A Medically. I --
Q That s all I m asking.
A Yes. I -- I guess. I mean, medically he -- I feel like he shouldn t have been but if a crime was done I mean I can t, you know --
Q Yeah. I m not asking you -- I'm just asking you from --
A So medically, no. I would not want my father with those -- that situation in jail if -- like from a medical standpoint.
Q Right. And then the next sentence it says; "The AV has been incarcerated for at least two (2) to three (3) months, maybe longer, but too long from a medical standpoint." Did I read that correctly?
A Yes.
Q And was that your opinion with respect to Mr. May, again medically?
A Correct. Yes.
Q "The AV has not had any family come and visit him so reporter is assuming he is just alone." Where did that -- did that information also come from Ms. Warnke?
A That was something that, you know, Julie would

have told me if he had -- if he s had visitors because I m sure I asked, you know, has he had visitors? If he has, can you talk to them about maybe like getting him out or something? So...

Q "Reporter stated that they saw the AV today via telemedicine." We ve already talked about that. This -- "The staff at the jail are reporting the AV has not eaten or showered in seven days." Talked about that, right?

A Right.

Q "Reporter stated that AV is not getting up to eat or shower. No one is telling him to." Now what -- what does that mean?

A I m assuming that s something I was told. Like if he s -- someone wasn t telling him to get up. I -- I don t know. I m not sure.

Q You re not sure what that means?

A I can only assume it means that Mr. May was saying, you know, no one told me to get up to ear or shower or drink, so he wasn t doing so. Like they were having to kind of watch over him and make him do things or advise him to do things.

Q And I think that -- that goes along with this

next sentence. "The AV is not remembering to do things on his own."
A No.
Q Okay. Did I read that correctly?
A Yes.
Q And that s again based on the information that you were given from Ms. Warnke?
A Yes.
Q What -- what concerns, if any, does it give you as a nurse practitioner if you see someone with Alzheimer s that s beginning to not do these basic life care things on a daily basis? Not eating, not showering and not remembering to do these things on his own. What -- what were your concerns about that?
A My concerns were basically like just the worsening of those things. He can fall. He can -- I mean in the setting he was in, like I said, inmates are getting mad at him. I mean, it s a concern all the way around because of the setting that he s in.
Q Okay.
A If nobody s there to coerce him to do those things, he forgets and it will affect his -- his like overall health.

Q And I think as you said earlier Alzheimer's -- Alzheimer s is a progressive disease, correct?
A Right. There s no treatment.
Q And it just gets worse with time?
A Correct.
Q True?
A Yes.
Q So when you see him starting to deteriorate, you know, that it s -- it s not going to get better, right?
A Right.
Q Okay. Skipping down a couple of sentences here. Reporter stated that the AV was most likely in better shape -- no, I m sorry. "Reporter stated that they do not know the criminal side of things but they do not think this is an appropriate placement." We talked a little bit about that. Is that an accurate statement of what your view was of, again medically, of Mr. May at the time?
A Yes.
Q "AV is not believed to be aggressive to other people." Is that true based on your -- the information you were provided?
A Yes.

Q Okay. So that was your report. Did anyone -- after you gave this report to Adult Protective Services, did anyone from APS or State of Oklahoma or even the jail, the sheriff s office, did anybody follow up with you regarding this complaint?
A I don t --
MR. MILLER:
Object to the form.
BY MR. BLAKEMORE:
Q Report?
A I don t recall.
Q And as you sit here today, you don t recall anyone following up with you; is that fair?
A Correct. I don t recall anyone following up.
Q Did -- did anyone from the sheriff s office ever contact you? Aside from Ms. Warnke this -- this -- around this time in early February, did anyone from the sheriff s office ever contact you regarding Mr. May?
A No. Not that I can recall.
Q All right. I m now up on -- it s page 11 of Exhibit DDR 3811 and this is February 7th, an email from the -- actually it s Barry Edwards, the Program Manager the Department of Health to

to problems or issues that you were seeing or having in doing your job?
A I mean, I can t recall just specifics or anything but it was just overwhelming. Sometimes I just felt like I wanted to do more and couldn t because of the legal side of things or, you know -- I don t know.
Q And what do you mean by that?
A I mean just, you know, someone is incarcerated we can only do what we can do with what we have. If there was, I don t know, a test or something that needed to be ran or, you know, just more in depth things just wasn t able to do it.
Q So there were -- were there difficulties in providing the care that you thought was -- was needed for some of the inmates?
MS. MARTINEZ:
Object to form.
A Do I still answer?
MS. MARTINEZ:
Yeah.
A Oh, okay. Not all the times but at times it could have been patient s specific situations.
BY MR. BLAKEMORE:



Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com

Q You've said a couple of times it was -- it got to -- it got to the point that it was overwhelming and that s part of the reason why you -- you resigned. What -- what specifically are you referring to when you say it was overwhelming?
A Oh, there was nothing specifically. It was just over time like a build up of different things. Nothing in particular.
Q Okay. When you say different things, like what kind of -- what kind of things?
A Like the call situation, you know, covering a lot of jails, things like that. You cover seven jails, you re going to get calls, you know, all through the day all through the night or whatever.
Q It -- cover -- trying to cover seven different jails, did you feel -- did you feel you were overextended?
A At times.
Q All right. Anything -- any other kind of concerns that you voiced to Dr. Cooper?
A I can t remem -- recall anything in particular, you know. Just conversations we would have. Nothing in particular.

describe with Julie on the phone or on that telehealth visit?

A It was just telehealth or over the phone.

Q Okay. Since this all happened, have you had any encounters as far as you recall with Julie Warnke?

A No.

Q Were any of the jails in person visits? I think you said Canadian County was. Were any of the others, other than Canadian County?

A Canadian and Rogers were.

Q Okay. Would you agree with me that Canadian County is a relatively large facility by Oklahoma County jail standards?

A It's --

MR. BLAKEMORE:

Object to form.

BY MR. MILLER:

Q One of the bigger ones?

A It's --

MR. BLAKEMORE:

Object to form.

A It was one of the larger, yes.

BY MR. MILLER:

Q How often were you on call during this time

period that you served these seven facilities?
A We would do two (2) weeks on, two (2) weeks off or was it every week? I think it was every two weeks. Like two weeks on, two weeks off. I had like a partner provider and he would swap out.
Q Okay. So when you're on call, are you on call for all seven facilities or just some of them?
A All facilities, plus --
Q And --
A -- my partner's facilities.
Q Plus what?
A Plus my partner's facilities.
Q Okay. And when you re on call is it like a shift or like how -- what is the time period that you re on call when you are on call?
A So Monday through Friday eight to five would be -- you would cover your own county -- I m saying this in reference to my partner. He would be on call for his own but other than that, you re on call twenty-four/seven (24/7) all day every day.
Q For a two-week period or for a one-week period?
A It was two week -- two-week period.
Q Okay. So meaning you could get calls from any

of those facilities at any time during that two-week period.
A Correct.
Q That arrangement of -- of who your counties were and when you were on call, did Custer County make that arrangement or is that Turn Key that does it?
A Well, Dr. Cooper assigned me and --
Q Correct.
A -- things like that.
Q And Dr. Cooper -- he s with Turn Key, correct?
A Correct.
Q The decision of how many facilities you were to be on call for, how many facilities you would work at, is that Turn Key that makes that decision or is that Custer County?
A I guess Turn Key because it was Dr. Cooper who --
Q And the decision of -- well, strike that. Did you play any role yourself in the contract between Turn Key and Custer County as to the amount of coverage they were to provide?
A No.
Q We talked a little bit about your time -- and again I m jumping around -- with Mr. May in

Canadian County. I -- I wanted to make sure
I m clear on your testimony. Do you actually
recall meeting Marvin May in Canadian County or
do you only recognize that you knew him at
Canadian County based on review of the records?
A Based on the review of the records. I don t
recall like seeing him or -- you know --
Q Okay.
A -- from Canadian.
Q So you do recall the telehealth visit with him
at Custer County but you do not recall
physically meeting him in Canadian County; is
that correct?
A I don t recall.
Q Okay. You were shown some records earlier from
Canadian County. I think it was Exhibit 1 and
I will submit to you the medical intake form in
Canadian County it has your signature on it.
You actually did the intake with him in
Canadian County. Did -- do you --
A Can I see the --
Q Do you recall doing that?
A I don t recall doing that but I m sure I did
like the initial -- I -- I would have to look
at it. I don t --

Q Okay.
A -- recall.
MR. MILLER:
Bob, can you put -- it was your exhibit. Can you put back up Exhibit 1 page Canadian TK 4?
MR. BLAKEMORE:
Yeah. Just give me a second.
MR. MILLER:
Sure.
MR. BLAKEMORE:
Okay. Exhibit --
MR. MILLER:
The Canadian County Turn Key records.
MR. BLAKEMORE:
Yeah. Just give me a second.
MR. MILLER:
Sure.
MR. BLAKEMORE:
Yeah, page four?
MR. MILLER:
Yes.
BY MR. MILLER:
Q Okay. So this is -- the first four pages of that exhibit are his medical intake and there

at the bottom I think that s your signature; is that fair?

A So that s not the medical intake form. That s my -- if you go to the first page --

Q Okay.

A -- of this -- I don t think it is. So that page there, that s not mine. That s not the first page. Like these are out of order.

Q Okay. So the first page, the medical intake form --

A That s not mine.

Q -- you do not believe you did; is that fair?

A No, I didn t do that. That s not my handwriting. Those --

Q Okay.

A -- that second, third and the signature page, there s another sheet to it.

Q Okay.

A See how that says two in the top left? There is a one to this and that s mine.

Q Okay. So the -- the fourth page, however, what is that?

A That s the end of my note. I don t -- the first page to this is in here because I went through this. It s just not in order. That s

like my initial assessment on him in Canadian. It s not that medical intake form. I didn t do that.

Q Okay. Fair enough. Regardless, it does appear -- well, this fourth page, does this describe a physical encounter that you had with Mr. -- with Mr. May that you physically saw him in person?

A Well, yes, I physically saw him, yes, and --

Q Okay. And that date is January 2nd of '22; is that -- is that fair?

A That s fair.

Q Okay. But you do not remember this visit; is that right?

A I -- not exactly.

Q Okay. There are a bunch of medications listed on this form.

A Right.

Q Is that your handwriting kind of on what his medications are?

A Yes, it is.

Q Okay. Do you know how you determined what his medications were?

A Usually when they come in, the nurse will get a list of their medications and they are suppose

to verify with like a pharmacy or pill bottles, depending on how they obtained the information.
Q Okay. So would you agree with me that -- in early January Turn Key is aware of what his medications are and it s, you know, various things. Celebrex, Atorvastatin, Montelukast, some others. Is that a medication list that was able to be transferred when he then also transferred to Custer County; meaning if Turn Key s aware of his medications in Canadian County, does that mean they re also aware of it when he s in Custer County?
A I m assuming they should be. They should transfer all of his documents with him.
Q Okay. So it wouldn t be surprising that in Custer County, he s already getting -- he gets the medications that it wa -- Turn Key already knew he was getting when he was in Canadian County; is that fair?
A Yes.
Q Okay. So up under assessments, what are the assessment diagnoses; what are the conditions you write there?
A Those are -- oh, the diabetes, hypertension, costochondritis and Alzheimer s.

Q Okay. And then under degree of control, good, fair, poor, diabetes is listed as good; is that right?
A Right.
Q Hypertension is listed as good, correct?
A Correct.
Q Costochondritis is listed as fair, right?
A Right.
Q Okay. What is costochondritis, just for the record?
A He must have just had some pain in his chest area around his ribs or something -- was complaining.
Q Okay. And then fourth is Alzheimer s and that s listed as good. Do you see that?
A Right.
Q Okay. I am curious how do you as an APRN have the understanding, in the first place, back in January that he had Alzheimer s?
A It must have been somewhere in his medical intake form where they put it and then also that medication, Donezipil (sic) that is for dementia and Alzheimer s.
Q Okay. Did you diagnose him with Alzheimer s or --

A No.
Q That must have come from somewhere else?
A Yes.
Q Okay. So who does the medical intake forms if you don t at Canadian County? I --
A I m not --
Q -- maybe I misunderstood. I thought it was you but --
A Not that --
Q -- you didn't --
A -- first page. I just do the initial like assessment but --
Q Okay.
A -- when they come in, I assume -- I believe it s the nurse or -- I don t know if officers --
Q At Canadian County?
A -- do it or not. I don t know.
Q Okay. Because I -- I don t see Alzheimer s listed on any of those first three pages. So the -- but the one that I see it listed is on your assessment. Did -- do you know if you did any kind of like mental examination of him to determine whether he might have some kind of dementia or -- or not sure?

MR. BLAKEMORE:
Object to form.
A Okay. I m not sure. I do -- I m not sure if I did a screening or anything for his dementia or Alzheimer s.
BY MR. MILLER:
Q Do you know if he ever told you he had Alzheimer s things?
A I don t recall him telling me that.
Q And you have no memory of his appearance or how he appeared, at any point, when he was in Canadian County; is that right?
A I don t recall but according to that -- according to my note like he appeared to be okay.
Q Okay. I notice on monitoring kind of on this form, it says; "JP checks times seven days b.i.d." Is that twice -- twice a day?
A Twice a day for seven days.
Q Okay. So that s similar to something that was also occurred later at Custer County; is that fair?
A Yes.
Q Is that because he s on that blood pressure medicine?

know.

BY MR. MILLER:

Q Did you ever call any members of his family -- Mr. May s family?

A No. I wouldn t have been the one to do so.

Q Did you know whether he had any family or had any family that would want to help?

A No.

Q I think I know the answer to this, but did you call anyone at the District Attorney s office or anyone in the judge s office about the possibility of him getting what s called a OR bond?

A No.

Q Trying to get him released on his own recognizance?

A No.

Q Did you do that?

A No, I didn t.

Q Did you ever speak with Mr. May s criminal attorney, Teofilo Diaz, is his name?

A No.

Q There was a phone call between Julie Warnke and Angie Schmidt to -- to detention officers and Mr. Diaz, his criminal attorney, in which they

describe some of their concerns about Mr. May. Were you on that call?
A No.
Q Were you involved in the decision to call Mr. Diaz, his criminal attorney?
A No.
Q Okay. Did you know that they were doing that, calling Mr. Diaz, or is that something that they did on their own?
A I had no -- I have no clue about that situation.
Q Okay. The call that you did to APS, was that -- do you know what phone you call -- phone number that was from? Was that from your cell phone or like a office phone of some kind?
A I m sure it was from my cell phone.
Q All right.
A Uh-huh.
Q Any reason to think that was recorded?
A Not on my side but if it was, that s fine.
Q Did you ever make notes on that recording? We know that the person you were talking to apparently did but -- but did you make notes of that recording?
A No, not in a chart or anything.

A No.
Q There s also some conversa -- some comments in here about, you know, why he had missed court and why he wasn t feeding his animals and kind of suggesting maybe that had something to do with his Alzheimer s disease.
A Uh-huh.
Q Do you even know that or is that kind of a guess --
A I don t --
Q -- as to why he missed court or that's why he wasn't feeding --
A I don t know that. That s information that I received from Julie.
Q I think you may have already said. Do you yourself as an APRN have the ability to release someone from jail -- or from custody?
A Absolutely not.
Q Can you do that?
A Absolutely not.
Q Okay. Do you know if APS can do that?
A I don t know if they can.
Q Do you understand how the kind of OR bond or own recognizance bond process works?
A Not really. I ve heard several like inmates

say it, like I need a OR bond, but I don t know exactly how it works because that s not like in my scope.

Q Right. Do you know if Julie Warnke played any role in the decision to contact APS or was that kind of you and Josephine who made that decision?

A I don t recall me and her -- I just recall her like giving me her concerns and things like that, trying to see if there was something, you know.

Q Do you know what Julie was doing in terms of updating people higher in her chain of command like the jail lieutenant or the undersheriff? Do you know what she was doing on that side?

A No.

Q Now you -- there s a reference here in this note that he didn t belong in jail. Reporter stated they do not believe the AV needs to be in jail for missing court. Reporter does not know what the home conditions are. Reporter feels the AV needs to be in a nursing home or something, not in jail. Would you agree with me it s not really up to you whether someone is in jail for missing court or not? That s --

case scenario, would be in some kind of nursing home or memory care?
A Ideally, yes.
Q All right. Are you aware, as somebody who worked in the system in Oklahoma, of a memory care unit for county jails? Does -- does that exist --
A I m sure it doesn t.
Q -- in Oklahoma? I m sorry?
A I m sure it doesn t.
Q Are you aware of anywhere you could send someone, like Mr. May, who has dementia but is incarcerated and -- and can t get bailed out within the Oklahoma jail system; is there anywhere to send him while he s an inmate?
MR. BLAKEMORE:
Object to form.
A I -- I don t know.
BY MR. MILLER:
Q Okay. Did you have the power to suggest he go to the hospital?
A Yes.
Q Okay. That is one thing that could be done; is that fair?
A Right.

Q Correctly?
A Yes.
Q He could be sent to the hospital?
A Yes.
Q And would you agree with me you never suggested that, at any time?
A Right. You -- I would only suggest that in an -- in an emergency situation or if he was in acute distress.
Q Right. And you never saw that; acute distress or emergency?
A Correct.
Q So when you re talking about he needs to be in a nursing home, is that more of a long term solution?
A Yes, that s after the fact.
Q After his release?
A Release. Right.
Q As a medically trained person, a APRN, do you have any knowledge about how a lack of family interaction, whether that has any effect on the course of dementia? Meaning not being around people that you know. Do you have any knowledge of that?
MR. BLAKEMORE:

MR. BLAKEMORE:
I ve got just a couple of real short ones and we ll get you out of here.
MS. MARTINEZ:
Okay.
RE-EXAMINATION BY MR. BLAKEMORE:
Q But I just want to follow up on one of the things that you testified to -- I just wanted to clarify this is, you said that when you were on call you were on call with respect to all of your seven facilities and then you said and your partner s facilities. Is that --
A Cor -- correct.
Q Is that --
A Yes.
Q Okay. So let me ask you this, first. Who is -- who is your partner?
A Malachi. Malachi Martin.
Q Malachi Martin. And was Malachi Martin an APRN?
A Correct. Yes.
Q And how many facilities was -- was Malachi Martin responsible for?
A I m not sure. We all ranged from at -- six, seven or so.

Q Okay. So when you were on call --
A Uh-huh.
Q -- you were on call for your seven facilities plus six or seven facilities that Malachi Martin was responsible for?
A Correct. Yes.
Q So thirteen (13) to fourteen (14) facilities?
A Depending on how many he had, yes.
Q And you could get call -- you had a call from anyone of those 13 or 14 facilities at any time?
A Correct.
Q And so is that part of what the concern that you raised with Dr. Cooper as far as being overwhelmed that you had 13 to 14 facilities that could potentially call you at any time?
A Correct.
Q All right. Did you do anything to ensure -- after the -- the telemedicine visit on February 3rd, did you do anything to ensure that Stacia Unruh was medically monitoring Mr. May s condition?
A No. She would call if the opportunity -- you know, if anything significant was going on she would call. She would usually call.

Q So you re just relying on her to call rather than like actively supervising what she was doing?

MR. MILLER:

Object to form.

A We'll say I didn t call to make any follow ups on what she was doing.

BY MR. BLAKEMORE:

Q Okay. All right. Thank you. That s all I have, ma am.

MS. MARTINEZ:

I just -- sorry. I just have a few more questions.

RE-EXAMINATION BY MS. MARTINEZ:

Q In regards to the officers, I believe you testified that they were the main ones with the inmates; is that correct?

MR. BLAKEMORE:

Object to form.

A I mean, yes, they were there every day all day. Uh-huh.

Q Okay. And again if they had any concerns or questions regarding an inmate, medically, they could contact you; is that correct?

A Correct.



Veritext Louisiana – CRLA/goDEPO cs-Louisiana@veritext.com
A Veritext Company www.veritext.com