## INTRODUCTION

As a correctional medicine expert, I have been asked by attorneys for the plaintiff to review documents relating to the medical care in the final days of Mr. May's life, days that were spent in the custody and control of the Custer County Jail.

## DOCUMENTS AND MATERIALS REVIEWED

- Canadian County Turn Key Medical Records [Canadian TK_001-041]
- Custer County Turn Key Medical Records [Custer TK_001-095]
- DDR 2, 000001-DDR 2, 000003
- DDR 2, 000004-DDR 2, 000015
- DDR 3 - Videos of Marvin May dated 03-18-22
- DDR 6, 000001-DDR 6, 000044
- DDR 38 000011-DDR 38 000013
- DDR 40, 000001-DDR 40, 000028
- DDR 46, 000001-DDR 46, 000003
- DDR 46, 000004-DDR 46, 000009
- DDR 46, 000010-DDR 46, 000038
- DDR 46, 000039-DDR 46, 000504
- DDR 46, 000505-DDR 46, 000570
- DDR 46, 000571-DDR 46, 000735
- DDR 46, 000736-DDR 46, 000814
- 02-03-22 12.29.23 Diaz Teofilo (405) 496-4796 - Phone (323-1616).wav
- 02-03-22 13.00.57 Diaz Teofilo (405) 496-4796 - Phone (323-1616).wav
- 02-03-22 15.47.03 ST Of Oklahoma (405) 426-8146 - Phone (323-1616).wav
- 02-03-22 12.19.51 Avery Debbie (580) 445-5998 - Phone (323-1616).wav
- 02-07-22 09.10.00 Phone (323-8445) - (405) 426-8170 Latasha Goodman.wav
- DID 000001-DID 000699
- DID 000700-DID 000781
- Deposition Transcript of Brian Alvarado
- Deposition Transcript of Mike McCowen
- Deposition Transcript of Stacia Unruh

## QUALIFICATIONS AS AN EXPERT

I am a board-certified internist who has worked in the field of correctional medicine for over 5 years. Between 2020 and 2022, I served as the state Medical Director for the Rhode Island Department of Corrections. In this capacity, I was responsible for the oversight of the medical care at all correctional facilities in the state of Rhode Island and for the care provider to over 2,000 incarcerated individuals. Additionally, I am certified as a Correctional Health Professional-Clinical Provider (CCHP-CP) by the National Commission on Correctional Health Care (NCCHC).

My academic background includes an undergraduate degree at Yale University, followed by an MPH from the Yale School of Public Health. I earned my MBA from Texas Tech University Rawls College of

PLAINTIFF'S EXHIBIT 4

Business and my MD from Texas Tech University Health Sciences Center. My internship and residency were completed at the Johns Hopkins Hospital in Baltimore, MD, where I received training in an Urban Health track, which offered specialized training in topics of "urban medicine" including correctional medicine. Beyond my certification in Internal Medicine, I also hold board certifications in Pediatrics and Addiction Medicine.

Currently, I serve as an Associate Professor at Alpert Medical School at Brown University. My responsibilities encompass clinical education for trainees, overseeing NIH-funded research in correctional health, and providing clinical care. I have not only treated patients in correctional settings, but in outpatient primary care clinics and hospital settings. I have authored over 50 peer-reviewed publications on topics related to clinical medicine, addiction, and correctional healthcare. I am the author of the book chapter, "Health and Incarceration" in the *Oxford Research Encyclopedia of Criminology and Criminal Justice* and a co-author on the *New England Journal of Medicine* review "Carceral Health Care." I am a Fellow in the American College of Physicians (ACP) serve on the Board of Directors for the Academic Consortium for Criminal Justice Health (ACCJH) and a member of the Aging Research in Criminal Justice Network (ARCH).

## SCOPE OF THE REVIEW REQUESTED

I have been asked to review this case to assess and comment on the medical care provided to Mr. May while he was incarcerated at the Custer County Jail. I will consider, in my professional opinion, whether the Defendants' treatment of Mr. May was consistent with -- or in violation of -- applicable standards of care. I will also consider whether there are systemic deficiencies in the health services program at the facility, and whether there is a link between those systemic deficiencies and Mr. May's death. Lastly, I will consider and comment on whether, in my professional opinion, Mr. May's death resulted from substandard or inadequate care at the facility.

<u>Definition of Medical Standards</u>

In the body of this report, I will refer to medical standards. While there are many ways to practice medicine, medical standards represent the methods most experts agree upon. Broadly speaking, a community medical standard has been established which has already taken into consideration all points of view and evidence, and that is what I will use as a standard for care.

There is no separate or unequal standard of care for incarcerated individuals of correctional institutions; there are merely logistical challenges and reasonable accommodations and modifications of standard medical approaches that are a direct result of the restraints of confinement. But those exceptions and accommodations to security needs should be minimal and rarely interrupt and never prevent essential healthcare delivery. To the extent that providing medical care in a correctional setting raises some unique challenges, I draw on my knowledge of standards and practices as a physician experienced in correctional healthcare and familiar with standards of the field.

In general, when I refer to minimal community standards, I refer to services a patient with Medicaid coverage would likely be eligible to receive in a community health center or similar setting, recognizing that incarcerated individuals are not constitutionally entitled to the most sophisticated care money can buy, but to adequate medical care. Relevant correctional standards will also be reference including standards from the National Commission on Correctional Healthcare (NCCHC). It must be noted that those standards, as with those of the American Correctional Association, represent minimum standards and do not set the standard for good or excellent care but merely minimally acceptable care.

## SUMMARY OF THE CASE

Mr. Marvin May was a 74-year-old man with a medical history notable for Alzheimer's disease, diabetes, and heart disease. He was briefly incarcerated at the Canadian County Jail in early January 2022, where he was evaluated by APRN Tamara Carey on January 2nd and documented as having a stable gait, walking at a normal pace without an assistive device. While at Canadian County Jail, he was sent to Baptist Medical Center Emergency Department where he weighed 303 pounds on January 9.

Mr. May was subsequently incarcerated at the Custer County Jail from January 25, 2022, until his death on March 18, 2022. On February 2, 2022, a Jail Incident Report by correctional officer Julie Warnke noted that Mr. May had not showered or eaten in the past several days.

On February 3, 2022, Mr. May participated in a virtual telehealth visit with APRN Carey, who identified rapidly progressing Alzheimer's disease and contacted Adult Protective Services at the Oklahoma Department of Health. Over the following weeks, records reflect clinical deterioration, including functional decline requiring a wheelchair, pressure wounds attributed to immobility, incontinence requiring the use of a diaper, and significant weight loss. Between February 9 and February 22, 2022, jail documentation reflects that Mr. May intermittently consumed small amounts of food, received wound care and diaper changes, and continued to refuse nutritional supplements. No medical or nursing documentation appears in the record between February 22 and March 17, aside from ongoing meal refusal logs.

On March 18, 2022, Mr. May was found unresponsive in his cell, covered in feces. He was transported to the emergency department in critical condition, where he was diagnosed with hypothermia, severe dehydration, lactic acidosis, and acute kidney failure. His weight was recorded at 225lbs suggesting a 78lbs weight loss over 68 days. He died shortly after arrival. The Medical Examiner documentation suggested Covid-19 as probable cause of death; an autopsy was not performed.

## KEY CHRONOLOGY AND TIMELINE

### <u>Prior to Incarceration [*DDR 46, 000571-DDR 46, 000735*]</u>

<u>8/23/21</u> – Mr. May's primary care physician administered a Mini-Mental Status Examination (MMSE), which yielded a score of 14 (pg. 7), indicating moderate cognitive impairment at this time. Physician documentation further confirmed this as they wrote: "*will write letter for family for lack of mental capacity to control his affairs including financial*."

Mr. May's baseline creatinine was 1.09 (pg. 147), indicating no evidence of chronic kidney disease. He had "received COVID19 shots" (pg. 19) suggesting he was fully immunized against Covid-19.

Based on PCP records, he had known heart disease (hypertension, hyperlipidemia, coronary artery disease, and valvular heart disease), type 2 non-insulin dependent diabetes that was well controlled (A1c 6.3%) without complication, and sleep apnea. He had a history of squamous cell carcinoma (skin cancer).

**<u>Canadian County Jail [*Canadian TK_001-041*]</u>**

<u>1/2/22</u> – A Medical Intake form from Tamara Carey, APRN documented Mr. May's gait as "stable" and at "normal speed," and noted he was walking without an assistive device. Recorded past medical history included diabetes mellitus, hypertension, cardiac disease, and "unknown" cancer "treated with chemo/radiation." (pg. 1)

<u>1/9/22</u> – Mr. May exhibited symptoms concerning for cardiac distress: "making concerning noises," stating he was "going to die," and had a pulse of 46. He was administered nitroglycerin and transported via EMS to the ED, where he was diagnosed with costochondritis (i.e. musculoskeletal pain of the chest).

ED records showed no signs of a myocardial infarction (heart attack). His labs were normal, showing a hemoglobin of 14.5 g/dl, MCV 85.7 fl, platelets 253, normal electrolytes, and a creatinine of 0.98 (confirming no chronic kidney disease). Notably, Mr. May's ED records reflect that he was 303 pounds when weighed at the Baptist Medical Center on January 9. **[DDR 46, 000736-DDR 46, 000814]**

**<u>Custer County Jail [*Custer TK_001-095*]</u>**

<u>1/25/22</u> – Mr. May was booked in Custer County Jail. Mr. May screened positive for nausea/vomiting on a COVID screening form, which advised consideration of isolation, masking, notifying the medical department, and included the instruction: "If symptoms appear at a later time, repeat the screening process."

<u>1/27/22</u> –He is documented as being ambulatory (i.e., able to walk unassisted). His past medical history is documented as chronic obstructive pulmonary disease (COPD), diabetes mellitus, cardiovascular disease, and Alzheimer's.

There seems to be no further medical documentation for the first 8 days of his incarceration.

<u>2/2/22</u> – There is a Jail Incident by Julie Warnke that Mr. May has not eaten or showered for 7 days. [pg.28]. The note states:

"INMATE MAY, M HASN'T EATEN FOR SEVERAL DAYS AND REFUSING TO SHOWER. I HAD INMATE MAY, M MOVED TO CELL 118 IN THE BOOKING AREA TO BE MONITORED FOR HIS BEHAVIOR AND EATING HABITS. HE IS TO BE OFFERED A PROTEIN SHAKE WITH EVERY MEAL & CHARTED ON IF HE EATS"

<u>2/3/22</u> –

Chronic *Care Note (pgs. 17-18)*

Mr. May was seen in a virtual visit (i.e., via telemedicine) by APRN Tamara Carey. The Chronic Care Note states Mr. May has HTN (elevated blood pressure), HLD (high cholesterol), COPD (chronic obstructive lung disease), Alzheimer, DM (diabetes mellitus), RA (rheumatoid arthritis). [Of note, this is inconsistent with prior documentation as there is no known history of COPD (although patient is a former smoker) and no known history of rheumatoid arthritis]. A weight was not taken on this date.

Ms. Carey's note includes:

"*Pt present for initial CC visit. Provider is familiar with pt due to being transferred from Canadian Co. Pt denies concerns in treatment p Ian. Per officer, pt has not eaten or showered in 7 days. Pt report being "fine". Denies fatigue, chills, fever, or any abnormalities at this time. Provider is aware of pts worsening Alzheimer disease."*

The provider also documents, "*Pt is unable to ambulate safely alone; assistance needed via wheelchair*"

He was reported to be alert and oriented to person, place and time. Documentation shows APRN Carey scheduled a follow-up appointment to be in 90 days.

*Jail Incident Report (2/3/22) (pg.30)*
On the same day, a Jail Incident Report by Julie Warnke states Mr. May was using a wheelchair, documented the rapid deterioration of Mr. May's mental condition, suggests that he may have been using a wheelchair at Canadian County (contrary to medical records), and that APRN Carey suggested she would notify adult protective services:

*"INMATE MAY, MARVIN WAS BROUGHT TO MEDICAL IN WHEELCHAIR FOR MEDICAL VISIT. BEFORE THE PROVIDER VISIT THE NURSE STACIA AND I ENCOURAGED HIM TO DRINK A PROTEIN SHAKE AND HE REFUSED TO DRINK IT BUT DRANK SOME WATER. INMATE MAY WAS SEEN BY THE PROVIDER (CAREY,T}. AFTER THE VISIT, SHE STATED THAT HIS MENTAL CONDITION APPEARED TO BE DETERIORATING RAPIDLY AND THAT WHEN SHE HAD SEEN HIM AT THE PREVIOUS COUNTY HE WAS TRANSPORTED AROUND VIA WHEELCHAIR AT THAT FACILITY ALSO. STACIA AND I LET THE PROVIDER KNOW THAT HE WAS MOVED TO BOOKING YESTERDAY BECAUSE HE WASN'T EATING OR SHOWERING WHILE HE WAS IN THE DORM HOUSING. PROVIDER CAREY SAID THAT SHE WANTED TO NOTIFY ADULT PROTECTIVE SERVICES ABOUT HIS WELL BEING DUE HIS DETERIORATING MENTAL STATE."*

On this day (2/3/22), he was moved to a new cell with the justification of closer monitoring. **[DDR 46, 000001-DDR 46, 000003]**

*Email* [**DDR 38 000011-DDR 38 000013]**
On this day (2/3/22), an email from Oklahoma Human Services relayed concerns from an Adult Protective Services screener that Mr. May "is *not allowed to use a cane in jail… has Alzheimer's, his symptoms are getting worse,*" and that the reporter, who saw him via telemedicine (APRN Carey), "*feels [that Mr. May] needs to be in a nursing home*." The screener added, "*The staff at the jail are reporting that [he] has not eaten or showered in 7 days… no one is telling him to*," and noted, "*Reporter stated this has become a safety issue*." Custer County Jail Undersheriff David Crabtree responded, "*The D.A. said that he will look into this matter.*"

A phone call with the facility confirmed the concern as Speaker 4 in a call transcript states: "*Hey. Yes. Yeah. We were concerned about Mr. May. He's not eating, he won't even drink the Ensure that we give him. I, and he's been here since 25th of last month*" **[02-03-22 12.29.23 Diaz Teofilo (405) 496-4796 - Phone (323-1616)]**

2/9/22 – A Jail Incident Report by Julie Warnke states that Mr. May took a small bite of eggs and a cookie and several cups of water. [pg. 31]
2/10/22 – A wound care notes right hip wound care was provided. [pg. 19]
In a Jail Entry Report, Mike McCowen notes that he changed Mr. May's diaper and applied triple antibiotic ointment to wound. [pg. 36]
2/13/22 **–** In a Jail Entry Report, Mike McCowen notes that Mr. May had defecated into his wound. [pg.36]
2/14/22 –In a Jail Entry Report, Montese Herrera notes the continued use of diaper. [pg. 36]

2/17/22 – In a Jail Entry Report [pg. 36], Julie Warnke documented Mr. May as having taken a shower, received wound care, and refused a nutritional supplement.

2/22/22 – In a Jail Entry Report, Julie Warnke noted Mr. May refused to drink protein shake. A triple antibiotic was noted to be applied to his wound. [pg. 36]

2/23/22 – 3/16/22 - *In a Jail Entry Report From 01/25/2022 - 03/18/2022,* I see no documentation regarding Mr. May from 2/22/22 to 3/17/22 in the Jail Entry Report, the day before the death of Mr. May. There are no other Progress Reports.

*Vital Sign Reporting*
Mr. May did have his blood pressure checked 1 – 2 times per day during this time period with some concerning readings including:

3/9/22: BP 79/62 HR 80 | 3/10/22: BP78/62 HR 71 | 3/13/22: BP 82/64 HR 65 |
3/15/22: BP 87/63 HR 66 | 3/15/22 PM: BP 70/51 HR 48 | 3/16/22 80/59 HR 51 |
3/16/22 PM: BP 82/62 HR 53

3/17/22 – In a Jail Incident at 1:30pm Report Julie Warnke states that Mr. May refused to "set up" and was encouraged to shower after she noticed "soiled orange clothes." [pg. 33]

3/18/22 – A Jail Incident Note from Brandon Lopez states staff found Mr. May at 5:45am on the floor of his cell and reported that he became unresponsive while being assisted into a sitting position. EMS arrived at 6:02am. He arrived at the hospital at 6:57am. EMS staff Voss reported "*Pt is barely responsive. Pt is unable to speak. Unable to follow directions.*" Another (EMS?) voluntary statement from Halcomb states, "*Pt was naked from waist down. Patient was covered in dried feces… jail staff stated patient has not ate or drank anything in 3 weeks. Patient mouth was dry."* [**DDR 2, 000004-DDR 2, 000015** pgs. 11-12].

**CUSTER COUNTY MEAL LOG [DDR 40, 000001-DDR 40, 000028]**
From January 25, 2022 to March 17, 2022, a total of 52 days were tracked for Mr. Marvin May's meal intake while incarcerated. During this period, Mr. May refused a total of 118 meals of 156 offered. This does not include his first seven days of incarceration (1/25/23 – 2/1/22) where no meal refusals are recorded despite Julie Warnke's note that he did not eat during this period. Starting from 2/2/22 when meal refusals for Mr. May were recorded, he refused 118 of 132 meals offered.

From 2/16/22 – 3/17/22, he ate only one meal over 30 days.

**AllianceHealth Clinton Emergency Department [*DDR 46, 000505-DDR 46, 000570*]**

3/18/22 - Hospital documentation states "*EMS was dispatched emergent to Custer County Jail for an unresponsive male that is barely breathing. u/a pt was laying in feces and would open his eyes to verbal stimuli but nothing else… The staff from the county jail reports the patient has refused to eat anything but water for the past 3 weeks*."

Mr. May's physical exam showed dry oral mucosa (a sign of dehydration). His initial vital signs were *BP 140 / 87; Pulse 61; Resp 14; Temp 85.5; Pulse ox 94% on R/A; Weight 102.06 kg {225 lbs}); Height 6 ft. 0 in.* He is described as "*smells of feces*."

Initial labs showed acute kidney failure (creatinine 6.7), poor organ perfusion (lactate of 9.8) and a weight of 102.06kg (225 lbs) [demonstrating a 78 lbs weight loss over 68 days between January 9, 2022 and March 18, 2022.] A chest X-ray [pg. 67] showed "*Hazy upper and lower lung opacities may represent edema or pneumonia."* His hemoglobin was 12.8 and mean corpuscular volume (MCV) was 79 fl showing newly acquired microcytic anemic. His procalcitonin level was 0.46 (normal).

He had 3 "code blue" episodes while in the ED. He was intubated and put on a ventilator. His time of death was at 10:36am, 4 and a half hours after arriving.

The Medical Examiner reported Covid-19 as probable cause of death. [**DDR 46, 000505-DDR 46, 000570**]

## GENERAL OBSERVATIONS FROM MEDICAL RECORD

(1) At the time of incarceration, Mr. May was a 74-year-old man with multiple chronic medical conditions, including Alzheimer's disease and documented moderate cognitive impairment.

(2) On January 9, 2022, 18 days prior to being booked into the Custer County Jail, Mr. May was weighed 303 pounds Baptist Medical Center Emergency Department. At the time of his death, he weighed 225 pounds at the AllianceHealth Clinton Emergency Department, reflecting an approximate 78-pound (26%) weight loss over the course of his incarceration.

(3) Mr. May received no screening or targeted viral testing for Covid-19. He completed a Covid-19 screening form that was positive, but he was not subsequently tested. He did not appear to have any signs of Covid-19. In the records I reviewed, there is no evidence of a positive Covid-19 test. He did not receive any evidence-based treatment for Covid-19.

(4) From 2/16/22 – 3/17/22, Mr. May ate only one meal over 30 days. Aside from intermittent offers of nutritional supplements, there were no structured efforts to assess, address, or treat his refusal to eat. Weight checks were not regularly assessed.

(5) There is no documentation of any psychiatric evaluation, physician involvement, or multidisciplinary response to his prolonged refusal of meals. There was no assessment if this was voluntary food refusal or inability for him to understand basic needs of sustenance.

(6) Over the course of incarceration, Mr. May experienced significant clinical deterioration, including malnutrition, development of pressure ulcers, urinary and fecal incontinence requiring diaper use, and a transition from ambulatory status to wheelchair dependence.

(7) This clinical deterioration was documented by APRN Carey, correctional officer Warnke, and undersheriff Crabtree and brought to the attention of jail staff though email and phone calls.

(8) Despite clinical deterioration, Mr. May never saw an in-person clinician at Custer County Jail. His only clinical encounter occurred via telemedicine with APRN Tamara Carey on February 3, 2022—eight days after booking. During that encounter, the APRN documented concerns about his mental decline and limitations of functional abilities.

(9) In the single (tele-health) visit in a medical provider, the APRN was so concerned that she then reported concerns to the state Adult Protective Services department on the same day. He was not seen by a clinician after.

(10) On 2/3/22, the Oklahoma Human Services Adult Protective Services contacted the jail with serious concerns regarding Mr. May's worsening Alzheimer's disease and refusal to eat. APS characterized the situation as a safety issue.

(11) The Custer County Jail acknowledged this concern via email and telephone calls and medical documentation.

(12) Mr. May progressively lost the ability to perform basic ADLs, including eating, bathing, and toileting.

**(13) Despite ongoing refusal of food, functional decline, and the presence of multiple red flags—including weight loss, loss of the ability to walk, urinary incontinence, fecal incontinence, hypotension and worsening cognitive status—there was no escalation of care, transfer to a higher level of care, or re-evaluation by a medical provider.**

(14) Upon review of Jail Incident Records and EMR data, there was no documentation from 2/23/22 to 3/16/22 (the 3 weeks leading up to his death) except documentation of Mr. May's meal refusal and alarming blood pressure readings.

(15) In the Emergency Department, Mr. May had hypothermia, acute kidney failure, lactic acidosis suggesting poor organ perfusion, and signs of severe malnutrition and dehydration.

## RELEVANT CLNICAL INFORMATION AND RELEVANT STANDARDS

**Issue #1: Care for Alzheimer's Disease / Dementia in Correctional Settings**

### Dementia Relevant Standard 1: Alzheimer's Association Dementia Care Practice Recommendations[1] (Community Standard)

The Alzheimer's Association is the largest non-profit organization focused on Alzheimer's Disease and puts out practice recommendations written by experts in the field. The primary goal and treatment for Alzheimer's Disease is providing interdisciplinary supports to ensure safety and meet ADL needs. This works to avoid unnecessary deconditioning, falls, worsening mental health status, unnecessary hospitalizations, and decreased mortality. These evidence-informed guidelines emphasize the importance of structured support for activities of daily living (ADLs), recognizing that needs change over time as dementia advances. The recommendations state:

> *Support for ADL function must recognize the activity, the individual's functional ability to perform the activity, and the extent of cognitive impairment. Dementia is a progressive disease, accompanied by progressive loss in the ability to independently conduct ADLs. Needs for supportive care increase over time—such as beginning with support needed for dressing, and later toileting, and later eating—and must address both cognitive and functional decline as well as remaining abilities.*

### Dementia Relevant Standard 2: National Commission on Correctional Position Statement: Care for Aging Patients in Correctional Settings (Correctional Standard)

In its *Position Statement on Care for Aging Patients in Correctional Settings*, the NCCHC emphasizes that correctional health professionals have a duty to respond to the unique needs of older adults in custody. The statement outlines a baseline expectation for care, including medical vigilance, risk mitigation, and ethical responsibility. It reads:

> *Correctional health professionals should be attuned to the signs and symptoms of potential elder abuse during clinical encounters with older adults, provide medical and mental health care as clinically indicated, and advocate for correctional interventions to ensure patient safety.*

**Relevance of Dementia Standards to the case of Mr. May:**

Mr. May had known diagnosis of Alzheimer's and documented functional impairment. However, Mr. May received limited accommodations or assistance with ADLs except for sporadic encouragement to eat and occasional help with showers. Concerns were escalated externally to Adult Protective Services within days of his arrival, and yet no meaningful change in his care occurred. Failure to accommodate these risks constitutes a deviation from the minimum standards of reasonable care in a correctional environment or community environment. The decrease in the most basic activities of eating, bathing, toileting was clearly documented. Even without medical guidelines, a lay person or family member would identify that the subacute loss of the ability to walk, bathe, toilet, and eat constitutes a serious medical issue that warrants a higher level of care then what was offered during Mr. May's incarceration.

[1] Fazio S, Pace D, Maslow K, Zimmerman S, Kallmyer B. Alzheimer's Association Dementia Care Practice Recommendations. Gerontologist. 2018 Jan 18;58(suppl_1):S1-S9. doi: 10.1093/geront/gnx182. PMID: 29361074.

The failure to address Mr. May's basic care needs led to a cascade of avoidable complications and, ultimately, his death after being found unresponsive, dehydrated, and covered in feces. These events are consistent with the well-known medical consequences of unmet ADL needs in individuals with dementia: such as skin breakdown, dehydration, weight loss, falls, hospitalization, and even death.[2]

**Issue #2: Food Refusal and Malnutrition in a Correctional Settings**

Food refusal can be a common symptom of Alzheimer's Disease and warrants close nutritional monitoring and ADL supports to ensure appropriate nutrition and intake. Inadequate nutrition is associated with increased morbidity and mortality. The International Academy on Nutrition and Aging (IANA) states: "*Weight loss may be associated with protein and energy malnutrition leading to severe complications (alteration of the immune system, muscular atrophy, loss of independence)… Prevention of weight loss in [Alzheimer's Disease] is a major issue. It requires regular follow-up and must be an integral part of the care plan*."[3]

Persistent fasting is a life-threatening condition that can lead to death through several physiologic pathways, including cardiac arrhythmias, multi-organ dysfunction, and impaired immune response. In fasting individuals, serious medical complications are typically observed after a loss of approximately 18% of initial body weight[4], and death becomes likely when weight loss exceeds 30%.[5]

**Relevant Food Refusal Standard 1: National Commission on Correctional Healthcare (NCCHC) Article in *CorrectCare* (Correctional Setting)**

CorrectCare is the official publication of the National Commission on Correctional Healthcare (NCCHC). In its Fall 2023 issue, the magazine provided clinical guidance on the management of food refusal and hunger strikes, outlining both common-sense practices and minimum standards for correctional health professionals. While this guidance was not published at the time of Mr. May's incarceration, they do not provide any new data or information but merely discuss the existing standards of care in caring for individuals refusing food.

The article emphasizes the importance of a collaborative and interdisciplinary approach:

> *A collaborative approach is called for in caring for someone who is not eating. Coordinated care among nursing, medical, and mental health professionals is essential to ensuring a safe progression through the food refusal. Initial medical, nursing, and mental health assessments should occur along with scheduled routine nursing assessments.*

The article highlights the importance of close medical monitoring including weight checks, labs, and vital signs.

---

[2] He S, Craig BA, Xu H, Covinsky KE, Stallard E, Thomas J 3rd, Hass Z, Sands LP. Unmet Need for ADL Assistance Is Associated With Mortality Among Older Adults With Mild Disability. J Gerontol A Biol Sci Med Sci. 2015 Sep;70(9):1128-32. doi: 10.1093/gerona/glv028. Epub 2015 Apr 1. PMID: 25834196; PMCID: PMC4841172.

[3] Gillette Guyonnet S, Abellan Van Kan G, Alix E, Andrieu S, Belmin J, Berrut G, Bonnefoy M, Brocker P, Constans T, Ferry M, Ghisolfi-Marque A, Girard L, Gonthier R, Guerin O, Hervy MP, Jouanny P, Laurain MC, Lechowski L, Nourhashemi F, Raynaud-Simon A, Ritz P, Roche J, Rolland Y, Salva T, Vellas B; International Academy on Nutrition and Aging Expert Group. IANA (International Academy on Nutrition and Aging) Expert Group: weight loss and Alzheimer's disease. J Nutr Health Aging. 2007 Jan-Feb;11(1):38-48. PMID: 17315079.

[4] Cahill GF Jr. Starvation in man. N Engl J Med. 1970;282(12):668-675

[5] Hunger strikes, force-feeding, and physicians' responsibilities. JAMA. 2007 Aug 1;298(5):563-6. doi: 10.1001/jama.298.5.563. PMID: 17666678.

> *As soon as someone states an intention to stop eating or their refusal to eat is noted, begin monitoring and assessments: weight checks, vital signs, labs, full system assessment, and intake monitoring.*
>
> *Continue ongoing nursing, psychiatric/mental health and medical evaluations to identify increasing risks of complications throughout the food refusal or strike. Assessment may include:*
> *• Laboratory assessment*
> *• Weight check*
> *• Vital signs*
> *• Dipstick urinalysis*
> *• Blood glucose test*
> *• Oral mucous membrane assessment*
> *• Skin turgor assessment for dehydration*

The article emphasizes the important that "*health care professionals must appropriately monitor the patient's condition to ensure that those consequences do not become more serious and that the refusal to eat is not putting the patient at risk of serious injury or death.*"

**Relevant Food Refusal Standard #2: Textbook: *Correctional Healthcare: Guidelines for the Management of an Adequate Delivery System*[6] (Correctional Standard)**

One of the most authoritative textbooks on correctional healthcare is *Correctional Healthcare: Guidelines for the Management of an Adequate Delivery System* which was written in collaboration with the NCCHC. This standard reinforces the responsibility of correctional facilities to ensure that food refusal is not the result of diminished capacity, and that high-risk individuals are monitored in a medical setting:

> *It is recommended that serious hunger strikes (i.e., those lasting more than 2 or 3 days) be supervised by an interdisciplinary committee of correctional and non-correctional personnel. A committee formed to scrutinize life-threatening refusals of care also might be appropriate for this task. If the committee agrees that the inmate has made a careful, considered, voluntary decision based on a principled position—and not as a response to mental illness—the inmate should be permitted to continue. At this point, the inmate should be moved to a medical setting.*

**Relevant Food Refusal Standard #3: American Correctional Association (ACA) - Performance-based Standards and Expected Practices for Adult Correctional Institutions:[7] ACA-3B-14 (Correctional Standard)**

In ACA-3B-14, the American Correctional Association Standards highlight the importance of having protocols for hunger strikes and the involvement of medical in addressing these issues.

---

[6] Anno, B. Jaye, and National Commission on Correctional Health Care. *Correctional Health Care : Guidelines for the Management of an Adequate Delivery System / B. Jaye Anno.* 2001 edition.., U.S. Department of Justice, National Institute of Corrections, 2001.
[7] American Correctional Association. (2022). *Performance-based standards and expected practices for adult correctional institutions* (5th ed.). American Correctional Association.

> ***(MANDATORY)*** *Written plans must be in place that outline procedures to be followed during events that threaten institutional security. These events may include, but are not limited to, riots, hunger strikes, disturbances, hostage situations, and natural or man-made disasters. The plans must be accessible to all relevant personnel, reviewed annually, and updated as necessary.*
>
> *Comment: The plans should identify the personnel responsible for implementing the procedures, specify when and which authorities or media should be contacted, detail how the situation should be contained, and describe the steps to follow once the incident has ended. Plans should also account for regular inspection and maintenance of specialized equipment required for implementation. All personnel must be familiar with these procedures. Hospital and medical staff should be directly involved in creating the plans, as they are responsible for patient safety.*

**Relevant Food Refusal Standard #4: Performance-Based National Detention Standards ICE (Correctional Standard)**

The U.S. Immigration and Customs Enforcement (ICE) Performance-Based National Detention Standards (PBNDS) are federal guidelines for health care in immigration detention settings. While developed for immigration detention facilities, they represent a widely recognized correctional standard for the provision of constitutionally adequate care. According to the PBNDS:

> *Any detainee who does not eat for 72 hours shall be referred to the medical department for evaluation and possible treatment by medical and mental health personnel. Prior to 72 hours, staff may refer a detainee for medical evaluation, and when clinically indicated, medical staff may refer the detainee to a hospital;*
>
> *The detainee's health shall be carefully monitored and documented, as shall the detainee's intake of foods and liquids. The clinical director, designated physician or treating medical staff shall conduct a full clinical and mental health assessment and evaluation, and recommend a course of treatment, intervention or follow-up.*

**Relevant Food Refusal Policy Example #1: Oklahoma Department of Corrections[8]**

The Oklahoma Department of Corrections has a relevant Hunger Strike policy (OP-140122) that emphasizes:

> *B. Verification of Intent Hunger strikes can be viewed as existing on a continuum of severity, from refusal of all liquids and solid food, to refusal of solid foods while ingesting liquids such as milk and/or juices in excess of 72 hours or nine consecutive meals. A health care provider or correctional health services administrator (CHSA) will verify the inmate's intent to begin/continue a hunger strike, the date/time it began, and the exact nature of the food products refused and ingested…*

---

[8]From 1/3/22:
https://web.archive.org/web/20210103053838/https://oklahoma.gov/content/dam/ok/en/doc/documents/policy/section-14/op140122.pdf

*3. The inmate will be assessed by a health care provider, RN or LPN within 24 hours following notification. The assessment will be documented immediately after it is performed on the "Hunger Strike Nursing Protocol" form (MSRM 140117.01.13.1) and cosigned to the health care provider, CHSA and the appropriate Qualified Mental Health Professional (QMHP).*

*D. Evaluation of Competency. The facility qualified mental health professional (QMHP) will evaluate the inmate after 72 hours on the hunger strike to determine if the inmate suffers from a mental disorder that renders him/her incapable of making a rational, reasonable decision concerning the hunger strike. The mental health evaluation will assess whether the inmate suffers from a mental illness or developmental disability, which prevents him/her from understanding the health consequences of his/her hunger strike.*

*1. The facility QMHP will provide a confidential, written evaluation report to the chief mental health officer, and the facility head or designee within 24 hours of completion of the evaluation.*
*2. If it is determined by the psychiatrist or psychologist that the inmate is not competent to make a rational decision about his/her hunger strike, the facility mental health authority, in collaboration with other mental health and health care providers, will develop an individualized treatment plan. The plan will detail ongoing monitoring, psychotropic medication and psychotherapy.*

> *a. If the inmate refuses the treatment prescribed by the psychiatrist and treatment plan and continues the hunger strike, the inmate will be transferred to the appropriate mental health unit (MHU) for further evaluation and possible treatment via OP-140652 entitled "Involuntary Psychotropic Medication in Non-Emergency Situations."*

*F. Hunger Strike Individualized Monitoring Plan*
*1. Within 72 hours of establishing legitimacy of the hunger strike, the facility health care provider will develop an individualized care plan for medical management, based on the nature of the hunger strike.*
*a. This plan will be submitted to the chief medical officer and facility head through the CHSA and a copy will be documented in the inmate's electronic medical record.*
*b. The CMO will forward the plan to the director of Health and Offender Services. c. The care plan will be updated as clinically indicated.*

*2. The plan will include, but not be limited to:*
> *a. Periodic weights and vital signs;*
> *b. Criteria for laboratory monitoring such as urinalysis and serum chemistry testing;*
> *c. Other parameters to be monitored;….*

**<u>Relevance of Food Refusal Standards to the case of Mr. May:</u>**

Mr. May refused meals for nearly 30 consecutive days. Based on Emergency Department weight measurements, he lost approximately 78 pounds or 26% of his body weight over 68 days which has severe medical complications.

There was no policy in place at Custer County or by Turn Key to address hunger strikes, determine intent, or evaluate competency. No psychiatric or capacity evaluation was conducted (though a phone transcript with Undersheriff David Crabtree seems to acknowledge that this may be necessary: "*So what*

*my plan is, I get a little busy. I'm going to go back there and see what the status on him is and if it's something I need to bring up to the DA to see if we can do something with him and get him out of here if that's the case. But they're going to want to know if it's been diagnosed. We may have to go send him somewhere and get that done too."* [**02-07-22 09.10.00 Phone (323-8445) - (405) 426-8170 Latasha Goodman]**

Mr. May was not transferred for hospital care nor monitored with regular weight checks or labs as aligned with the standard of care. No interdisciplinary team was convened (indeed, there seemed to be little communication between jail staff, nursing, and the provider regarding the patient despite each identifying the severity of the case). In her deposition, Nurse Unruh stated she "*was never alerted to check on him*." [**173752 UNRUH STACIA 042525 pg. 186, line 11**].

Mr. May was not evaluated by an in-person medical provider throughout his incarceration at Custer County. His decline—marked by significant weight loss, dehydration, and progressive debility—was not only predictable but consistent with textbook consequences of untreated food refusal. These multiple omissions constitute a serious deviation from established correctional standards (including those outlined in the state of Oklahoma prison system) and geriatric care standards. Outside of correctional and community standards, Mr. May's food refusal should be alarming to any lay person.

**Issue #3: COVID-19 in Correctional Settings**

At the time of Mr. May's incarceration (January 2022), the Omicron variant of COVID-19 was at its global peak. Correctional facilities were widely recognized as high-risk environments. During this time, the Center for Disease Control and Prevention (CDC) provided guidance on screening, routine testing, quarantine, and isolation procedures specific to detention facilities given the high risk.[9]

**Relevant Covid Standard 1: CDC Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Correctional Standard)**

The Centers for Disease Control and Prevention (CDC) issued detailed recommendations for the management of COVID-19 in jails and prisons. Key elements of the CDC's guidance include:

- *Symptomatic individuals should be placed under medical isolation and evaluated.*
- *Facilities without onsite healthcare providers must coordinate with public health authorities to ensure safe transfer to another facility or hospital for evaluation and care.*
- *All symptomatic individuals should be tested for COVID-19, regardless of vaccination status.*

This guidance also identified individuals at increased risk for severe illness[10] including older adults, people in congregate settings including correctional facilities, and medical conditions including dementia, chronic lung disease, heart conditions, diabetes).[11]

[9] Internet archive available: https://web.archive.org/web/20220101083428/https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html [As of 1/1/2022]
[10] https://web.archive.org/web/20220101074223/https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html
[11] https://web.archive.org/web/20220101073514/https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

The guidance clearly applies to facilities with limited onsite medical services—such as Custer County Jail—and outlines minimum expectations for care even in resource-limited environments.

**Relevance of Covid Standards to the case of Mr. May:**

Despite having a positive result on an initial Covid-19 screening, Mr. May was not evaluated, tested, isolated, or transferred to a hospital. There was no documentation of basic public health precautions in this high-risk congregate setting.

**Issue #4: Provision of General Health Services During Incarceration**

In addition to public health programs including Covid-19 preventive measures, correctional health care systems are responsible for ensuring that all incarcerated individuals have timely access to basic and acute medical services. Clinical deterioration may present in many forms—including weight loss, incontinence, decreased mobility, low blood pressure, and the development of pressure ulcers—and requires timely assessment and intervention. When signs of clinical decline are present, appropriate care includes reassessment by qualified clinicians, documentation of clinical reasoning, and escalation to a higher level of care if necessary.

**Relevant Standard #1: 2018 NCCHC Standards National Commission on Correctional Healthcare (NCCHC) Jail Guidelines (Correctional Settings)**

The NCCHC Standards for Health Services in Jails establishes nationally recognized standards for the delivery of health services in jail settings. These standards serve as the benchmark for adequate correctional care and are used by facilities nationwide to guide policies, clinical procedures, and accreditation processes. The following NCCHC standards are particularly relevant to the evaluation and treatment of individuals with significant cognitive, functional, and medical needs:

**NCCHC Standard J-A-01: Access to Care**

This standard defines access to care as requiring that, "*in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered.*" The standard further notes that it is unacceptable for a facility to create "*unreasonable barriers to care,*" *including "having an understaffed, underfunded, or poorly organized system with the result that it is not able to provide appropriate and timely access to care."*

**NCCHC Standard J-F-03: Mental Health Services**

This standard requires that correctional systems ensure integration between medical, mental health, and substance use services. It states that *"patient management is appropriately integrated, medical and mental health needs are met, and the impact of these conditions on each other is adequately addressed."*

**NCCHC Standard J-F-02: Infirmary-Level Care**

Infirmary-level care is defined as care for patients who require *"daily monitoring, medication, and/or therapy, or assistance with activities of daily living at a level needing skilled nursing intervention."* The standard specifies:

- *"At least daily, a supervising RN ensures that care is being provided as ordered."*
- *"Initiation and discontinuation of infirmary-level care is by provider order."*

**Relevance of General Healthcare Services to the Case of Mr. May:**

Mr. May exhibited multiple clear signs of clinical deterioration during his incarceration, including progressive immobility, use of a wheelchair, incontinence requiring diapers, rapid and sustained weight loss, the development of bed sores, and hypotension. These findings—well-documented in the jail's own records—reflect serious medical decline warranting immediate reassessment and escalation of care.

Despite this, there is no documentation that Mr. May was re-evaluated by a physician or seen in person by any licensed medical provider. No diagnostic tests were ordered to determine the causes or consequences of his deterioration. He was not transferred to a medical unit or hospital, and there is no evidence that an interdisciplinary care plan, wound care strategy, or nutritional intervention was developed or implemented. Moreover, there was no attempts at ensuring continuity of care between Canadian County Jail and Custer County Jail where weight loss could have been identified in a more timely manner. These omissions violate multiple NCCHC standards:

Under **Standard J-A-01**, Mr. May was not provided timely access to a qualified health care professional, nor was he rendered a clinical judgment or treatment plan in response to his ongoing deterioration.

Under **Standard J-F-03**, there is no indication that Mr. May's medical and mental health needs were addressed in an integrated fashion, despite his documented cognitive impairment and functional decline by multiple individuals.

Under **Standard J-F-02**, Mr. May met the criteria for infirmary-level care—he required assistance with activities of daily living, daily monitoring, and skilled nursing—but was never placed in an infirmary setting or formally evaluated for that level of care.

These cumulative omissions—across access to care, mental health integration, and infirmary eligibility—demonstrate a systemic breakdown in correctional health services. Mr. May's condition warranted daily oversight and medical escalation, yet his care remained static and unresponsive until the moment of his collapse.

## DISCUSSION OF CASE

Baseline Health

Prior to incarceration, Mr. May was a 74yo male with heart disease, controlled type 2 diabetes without complications, and newly diagnosed Alzheimer's dementia. He appeared to be fully vaccinated against Covid-19.

*Assessing Dementia Severity* - Alzheimer's disease is a progressive neurodegenerative condition associated with cognitive decline, impaired judgment, and loss of ability to perform daily functions. Alzheimer's is often defined in severity as mild, moderate, or severe. Mild disease typically presents with difficulties with "instrumental activities of daily living" (e.g., managing money, housework). Moderate disease presents with difficulties with "basic activities of daily living" (e.g., dressing, feeding, toileting). Severe disease is fully dependent for all activities of daily living (ADLs).[12]

The Mini-Mental Status Exam (MMSE) is a validated, standardized tool used by clinicians to screen for and assess the severity of cognitive impairment and correlates with severity of cognitive disease.[13] Feeding problems are some of the most common complications in advanced dementia and can include the inability to feed oneself, or the refusal to eat.[14]

Mr. May had a pre-incarceration MMSE score of 14, consistent with moderate dementia (stage 2) which can be described as "Severely impaired in handling problems, similarities and differences; social judgment usually impaired" and "requires assistance in dressing, hygiene..."[15]



*Figure 1. Prediction of Survival in Dementia (Haaksma et al. 2020)*

*Assessing Health* Status - The Charlson Comorbidity Index (CCI) is a validated clinical tool to serve as a proxy for health status based on a patient's diagnoses.[16] Mr. May appeared to have a CCI of 6 of 33 points. Based on his MMSE and CCI, his prognosis can be estimated based on the world's largest dementia dataset available (SveDem) to predict survival time.[17] Based on an MMSE of 14 and CCI of 6, this dataset predicts a 3-year survival probability of 60-69% (*See Figure 1*).

---

[12] DSM-V TR

[13] Tombaugh TN, McIntyre NJ. The mini-mental state examination: a comprehensive review. J Am Geriatr Soc. 1992 Sep;40(9):922-35. doi: 10.1111/j.1532-5415.1992.tb01992.x. PMID: 1512391.

[14] Mitchell SL. CLINICAL PRACTICE. Advanced Dementia. N Engl J Med. 2015 Jun 25;372(26):2533-40. doi: 10.1056/NEJMcp1412652. PMID: 26107053; PMCID: PMC4539157. | Kai K, Hashimoto M, Amano K, Tanaka H, Fukuhara R, Ikeda M. Relationship between eating disturbance and dementia severity in patients with Alzheimer's disease. PLoS One. 2015 Aug 12;10(8):e0133666. doi: 10.1371/journal.pone.0133666. PMID: 26266531; PMCID: PMC4534398.

[15] Morris JC. The Clinical Dementia Rating (CDR): current version and scoring rules. Neurology. 1993 Nov;43(11):2412-4. doi: 10.1212/wnl.43.11.2412-a. PMID: 8232972.

[16] The CCI includes comorbid conditions, each assigned a weighted score based on its association with 10-year mortality risk and includes: myocardial infarction*, congestive heart failure, peripheral vascular disease, cerebrovascular disease, dementia*, chronic pulmonary disease, connective tissue disease, peptic ulcer disease, mild liver disease, diabetes* (with or without complications), hemiplegia or paraplegia, moderate/severe renal disease, any malignancy, leukemia, lymphoma, moderate/severe liver disease, metastatic solid tumor, and AIDS/HIV. *indicates 3 diagnoses of Mr. May plus 3 points for his age.

[17] Haaksma ML, Eriksdotter M, Rizzuto D, Leoutsakos JS, Olde Rikkert MGM, Melis RJF, Garcia-Ptacek S. Survival time tool to guide care planning in people with dementia. Neurology. 2020 Feb 4;94(5):e538-e548. doi: 10.1212/WNL.0000000000008745. Epub 2019 Dec 16. PMID: 31843808; PMCID: PMC7080282.

Unmet Medical Needs Led to Clinical Deterioration

Addressing the basic hygiene needs of an individual is an essential component of dementia care. **Despite clear medical need for assistance with basic activities of daily living (ADLs), Mr. May received inadequate assistance to meet his ADL needs including feeding and toileting.**

In correctional environments, difficulty performing ADLs can lead to increased vulnerability to victimization by peers.[18] Notably, concern for peer victimization was explicitly documented by APRN Carey on Day 8 of Mr. May's incarceration.

Jail staff attempted to offer protein shakes but failed to escalate care when Mr. May continued refusing food. No plan of care was developed and no change in housing or level of support occurred as would be expected based on a reasonable standard of care. Mr. May refused meals, eating only one time in his last 30 days. He appeared to lose 78lbs in 68 days. (*See Figure 2)*. During this time, there is no documentation of psychiatric or capacity evaluations, no interdisciplinary case review, and no formal monitoring of weight or oral intake. Vital signs were taken and demonstrated alarming values showing hypotension that did not lead to additional intervention.




*Figure 2. Weight Loss, Meal Refusal, Alarming Events*

**Mr. May's progressive functional decline was predictable and preventable in the context of dementia and warranted a higher level of care including closer medical monitoring and intervention.**

**His unmet needs worsened his health condition and led to a poor heath outcome.** It does not take a medical degree to recognize that going without food for this length of time poses a serious and obvious risk of life-threatening complications.

Violation of Standards

**The lack of clinical monitoring, psychological assessment, interdisciplinary review, and consideration for transfer in a patient that had not eaten for 50 days was a gross violation of any bare minimum standard of care, particularly for a cognitively impaired individual.** Any food refusal warrants regular weight checks and consideration of further work-up or evaluation for higher level of care, none of which Mr. May was afforded, a clear violation of basic standards of care.

**Mr. May's medical care fell far below the bare minimum of community standards.** His condition deteriorated visibly and progressively throughout his incarceration. He developed incontinence, immobility, pressure injuries, weight loss, and hypotension. Yet no licensed clinician ever evaluated him in person. His only documented clinical encounter during over 50 days of incarceration was a remote tele-visit, during which the provider documented "*Provider is aware of pts worsening Alzheimer disease"* expressed sufficient concern to report the case to Adult Protective Services and yet there was

[18] *AMA J Ethics.* 2023;25(10):E783-790. doi: 10.1001/amajethics.2023.783.

no appropriate clinical follow-up. **The facility and healthcare team's failure to respond to that report—and to schedule any follow-up evaluation—represents a critical breakdown in clinical oversight and patient safety systems.**

The care he received did not meet (1) community or correctional standards of dementia care, (2) the correctional standard for addressing food refusal, (3) the community or correctional standard for Covid-19 screening and testing, and (4) the correctional standard of general healthcare delivery including timely access to care, mental health care services, and daily monitoring needed for infirmary-level of care.

Cause of Death

On March 18, 2022, Mr. May was found minimally responsive, lying in his own feces. He was transported to the emergency department where he was found to have severe dehydration, acute kidney failure, lactic acidosis, hypothermia, and malnutrition (including lab abnormalities of newly acquired microcytic anemia (small red blood cells), thrombocytopenia (few platelets) likely nutritional deficiencies e.g. thiamine deficiency, iron deficiency). Chest x-ray revealed possible pneumonia or pulmonary edema (fluid). He required intubation and critical care, coded multiple times, and died shortly after arrival.

Pneumonia and pulmonary edema are well-documented autopsy findings in hunger strikers[19], consistent with Mr. May's condition and his prolonged, unaddressed starvation. Prolonged starvation leads to extracellular fluid loss (dehydration), decreased perfusion of organs, and impaired tissue oxygen delivery, all of which drive anaerobic metabolism and lactate accumulation. Indeed, his elevated lactate (9.8) and acute kidney failure demonstrates significant tissue hypoperfusion and metabolic crisis.[20]

The Medical Examiner listed Mr. May's probable cause of death as "Coronavirus Disease 2019 (COVID-19) Pneumonia Sequelae." However, the Medical Examiner did not perform an autopsy. Additionally, I see no evidence of symptoms, no results of a Covid test, and his lab abnormalities are not consistent with severe Covid-19. Elevated procalcitonin is a predictive biomarker of Covid-19 severity.[21] Mr. May's procalcitonin was normal (0.46). Mr. May's critically elevated lactate demonstrates metabolic crisis and can be elevated in sepsis, hypovolemic shock, and other medical emergencies. [22] Interestingly, patients with severe COVID-19 exhibit near-normal blood lactate.[23] Thus, the evidence does not indicate that Covid-19 was a cause of Mr. May's death. **Rather**, **Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension— is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs.**

---

[19] Chalela JA, Lopez JI. Medical management of hunger strikers. Nutr Clin Pract. 2013 Feb;28(1):128-35. doi: 10.1177/0884533612462896. Epub 2012 Oct 22. PMID: 23090653.

[20] Kraut JA, Madias NE. Lactic acidosis. N Engl J Med. 2014 Dec 11;371(24):2309-19. doi: 10.1056/NEJMra1309483. PMID: 25494270.

[21] Kumar A, Karn E, Trivedi K, Kumar P, Chauhan G, Kumari A, Pant P, Munisamy M, Prakash J, Sarkar PG, Prasad K, Prasad A. Procalcitonin as a predictive marker in COVID-19: A systematic review and meta-analysis. PLoS One. 2022 Sep 9;17(9):e0272840. doi: 10.1371/journal.pone.0272840. PMID: 36084093; PMCID: PMC9462680.

[22] Kraut JA, Madias NE. Lactic acidosis. N Engl J Med. 2014 Dec 11;371(24):2309-19. doi: 10.1056/NEJMra1309483. PMID: 25494270.

[23] Iepsen UW, Plovsing RR, Tjelle K, Foss NB, Meyhoff CS, Ryrsø CK, Berg RMG, Secher NH. The role of lactate in sepsis and COVID-19: Perspective from contracting skeletal muscle metabolism. Exp Physiol. 2022 Jul;107(7):665-673. doi: 10.1113/EP089474. Epub 2021 Jun 18. PMID: 34058787; PMCID: PMC8239768.

## CONCLUSION

Based on my review of the available records, it is my expert opinion that Mr. May's medical care during his incarceration at Custer County Jail fell far below accepted standards of practice in both community and correctional settings. His cognitive impairment was inadequately addressed leading to prolonged food refusal and life-threatening malnutrition. He exhibited multiple, well-documented signs of clinical decline including weight loss, immobility, incontinence, and pressure ulcers that became contaminated with feces. A lay person would recognize the substantial risk of this deterioration. Yet his condition was allowed to worsen over several weeks without appropriate medical oversight, clinical intervention, or transfer to a suitable care environment. His only medical encounter with a prescribing practitioner was a tele-health visit that was concerning enough to report his condition to Adult Protective Services, yet no response was taken and a follow-up was inappropriately scheduled for 90 days later. It is my opinion the failure to meet his needs for adequate nutrition caused his worsening clinical status, violated clear standards in care, and ultimately led to his death.

Had Mr. May received appropriate dementia accommodations, psychological assessment, appropriate clinical monitoring, nutritional support, and/or timely transfer to a medical facility, his death would have been completely preventable. The prolonged inaction and systemic failures in his care represent a profound deviation from the standards of medical and correctional healthcare, and in my professional opinion, contributed directly to his suffering and death.

Justin Berk

**Justin Berk, MD MPH MBA, CCHP-CP**
Former Medical Director, Rhode Island Department of Corrections

**VERIFICATION**

I, Justin Berk, M.D., declare under penalty of perjury under the laws of the United States, that the attached Expert Report (provided in *Hice, et al. v. Custer County Sheriff, et al.*) is my expert report, and that the statements and opinions therein are true and correct, to the best of my knowledge and belief.

Executed on: December 11, 2025

Justin Berk

Justin Berk, M.D.