IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased; and LEANN N. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,

Plaintiffs,

-vs-

TURNKEY HEALTH CLINICS, LLC, et. al.,

Defendant.

Case No. 24-CV-119-JD

VIDEO DEPOSITION OF DAVID ELDON CRABTREE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON AUGUST 13, 2025, AT 10:08 A.M.

REPORTED BY: LANA L. LEDFORD, CSR

PLAINTIFF'S EXHIBIT 14

officers to handle those functions.

**Q So was that jail -- was that jail in Clinton, was it -- is it more like a lock-up?**

A No, sir. It's a full-time jail.

**Q Okay.**

A It's one of the rare small cities that are a certified jail.

**Q I was going to say I've never -- never even heard of that.**

A Yes.

**Q Okay. So then when you take over as undersheriff, were you given a, like, a written job description?**

A I don't know if the county had a job description, but I understood what the duties were. And they were basically, like, when I was the assistant chief at Clinton PD. The assistant does the day-to-day operations. He oversees -- tries to find problems, to mitigate them, the hiring, the firing, the disciplinary actions. Try to make the -- the department run as smooth as you possibly can. And whatever divisions you have inside the department, you'll oversee the supervisors of each division.

**Q And how did you -- how did you come to**

**learn what your duties and responsibilities would be if there was no written job description?**

A Well, from my experience of doing it for, at the time, 28 plus years. I know the duties that you have to do because I've done them, and continually do them. Any administrator, in my opinion, that comes into a situation as I did with the sheriff's department -- I have to review. I have to see what's going on, to see what's broke before I can make changes. Sometimes, I had to make immediate changes. You have to evaluate, like I said, your staff, what your people -- what their training level is like. And it's not a quick process all the time.

**Q Okay. You say experience, and you did -- you obviously had a great deal of experience at Clinton PD --**

A Uh-huh.

**Q -- including as the chief. But you hadn't had experience yet in that kind of administrative role with the sheriff's office. True?**

A Well, at the PD we still had, like I said, we had a jail, and we would assign patrol

**Q As of January through March of 2022, was there anyone who held the actual job title of jail administrator?**

A Don't believe we actually had a jail administrator. It would be -- I guess it would be me, because I had to oversee everything there.

**Q So when you say you had to oversee everything there, how much time would you spend actually at the jail --**

A The jail.

**Q -- on a given -- a given day? Realizing it probably --**

A Right.

**Q -- is different from day-to-day. But.**

A Some days, maybe 30 minutes. Some days, four to five hours, depending on what was going on.

**Q So while you were -- I mean is it fair to say you were acting kind of as the -- the defacto jail administrator at that time?**

A I would -- I guess so. Like I said, I had -- I oversaw the entire department.

**Q Were you responsible for ultimately updating the -- the policies?**

A Between myself, I had a major that was

in the patrol division that would help me, along with Martha Standard -- Stanford.

**Q Who was that major?**

A Jeff Maynard.

**Q Did he have any role -- did Mr. -- Major Maynard have any role in -- with respect to the policies governing the jail?**

A If he did, it would be something I would have suggested to him, or Martha, then he would get a hold through Lexipol, because I'm not that sharp on technology.

**Q Okay.**

A Whether or not we made any changes with him being in that position, I do not know.

**Q So is it fair to say that for the most part, it would be you and -- is it Stanford, Martha Stanford?**

A Yes, sir.

**Q That would have been primarily responsible for the jail policies?**

A Yes.

**Q I'm going to hand you what I'm going to mark as Exhibit 47.**

(Plaintiffs' Exhibit 47 marked for identification)

**Q (BY MR. BLAKEMORE) And I'll just represent to you this is not the entire policy manual, which is, I think, 451 pages or something like that. But these are just some excerpts that I pulled. Does that -- does it look familiar to you?**

A Yes.

MR. MILLER: Do you -- do you have copies for us, counsel?

MR. BLAKEMORE: Oh, yes. Sorry.

MR. MILLER: Thank you.

MR. BLAKEMORE: (Hands documents to counsel.)

MR. MILLER: Thanks. You said this is 47?

MR. BLAKEMORE: Yes.

**Q (BY MR. BLAKEMORE) Mr. Crabtree, does this look like these are excerpts from the detention policy manual?**

A It appears to be.

**Q All right. So we're just going to talk about some of these.**

A Okay.

**Q So starting with -- and I'm going to use these little Bates numbers at the bottom there.**

**It's DID10. And that's the first page. Policy 100. It indicates -- I'm looking at 100-3 Divisional Responsibility. It states, the jail administrator is responsible for administering and managing the jail division and reports to the Custer County Sheriff's Office Undersheriff.**

**Do you see that?**

A Yes.

**Q And based on what you just told me, at least at the time of early 2022, there really was -- you were the jail administrator in essence.**

A I -- I guess in -- yes. Like I said, I oversaw the jail. I did not -- there was just too much to do as far as -- the jail administrator needs to be a full-time job.

**Q Okay.**

A And not the way I was trying to function.

**Q And was there a plan -- did you have a plan in early 2022 to hire a full-time jail administrator?**

A Once I got into the position and started reviewing what was going on there, I had spoken with the sheriff that we need to hire a full-time jail administrator.

**Q When did you first -- when did you first tell the sheriff we need to hire a full-time jail administrator?**

A I don't have a clue. Like I said earlier, when you come in, you have to review what's going on to make decisions -- make hopefully a good decision. When I came to the sheriff's department, this was going to be my assignment. Once I got into the position and saw what -- how big of a jail that we do have and the problems, I'm going to say maybe February, January. I don't know. I said we need to start -- we need to hire a full-time jail administrator because this is a minimum 40-hour-a-week job.

**Q And when you say "February," are you talking about 2022?**

A Yes, sir.

**Q Did the -- the incident involving Mr. May have any influence on your decision that you needed a full-time jail administrator?**

A I believe this occurred, maybe, again, I'm not for sure, before Mr. May's incident.

**Q Okay. You mentioned that when you came in and you started kind of evaluating the situation at the jail, one of the things you said**

**it was bigger than -- bigger than you thought or big --**

MR. MILLER: Object to the form.

**Q (BY MR. BLAKEMORE) You said it was -- or a big jail. I might have --**

A Well, what the problem was was the personnel. Was that we couldn't get people to stay working in corrections or detention. People did not want to come to work in detention. And once we -- we spent a lot of time hiring people. We'd have a person show up for a week. They might make it a month, and we're starting all over again. So that was one of the main issues was trying to get people hired, trained, and staying.

**Q So would you say it was a -- there was an issue with under staffing?**

MR. MILLER: Object to the form.

THE WITNESS: Yes.

**Q (BY MR. BLAKEMORE) Any other -- you mentioned that -- you said that as you started to kind of do this analysis of the -- the jail, that there were problems. Other than this -- this issue with retaining staff and -- and under staffing, were there any other problems that**

**-- that led you to think we need somebody doing this full-time?**

A Well, pretty much, you know, the -- the personnel is a big issue. If you've ever been in charge of something. Trying to find the best qualified applicant. Trying to train them. A lot of people would come to -- like I said, would come to work there for a week. One day we had one -- a guy come in one day and then nothing. So then you're -- you're going through the application process. And then there would be times where we'd go a month before even got an applicant. And we tried all the new -- I'm the old way, you put an ad in the paper. Now there's Indeed and there's Facebook and there's no telling what else out there to try and get people interested. So you've got to go out and make these phone calls trying to get them in here once you get an applicant. Then the process -- it's just -- we don't -- you don't come in today and we hire you today. So we've got people tied up our side as far as we have an -- excuse me -- investigator that will do a background check because we want to make sure we're not hiring an unqualified applicant. So it's -- it's a big

task. And in my opinion, there, that jail needs more people than what we're allotted by the excise board or the county commissioners. We need more staffing.

**Q What's the -- what's the average -- well, let me ask you this first. What's the capacity of the jail?**

A 128. Everyone has a rack. But the jail standards allows you to go above that -- what they call -- what's a boat.

**Q All right.**

A It's a plastic looking canoe thing. And you can put them on the ground, you know with a mattress and a blanket. But.

**Q And going back to this time frame of early 2022, was the jail typically at capacity? Over capacity? How -- how was it as far as the -- the amount of inmates?**

A I cannot give you an exact number, but it seems that we always run at capacity or over. Very rarely do we go below the 128.

**Q All right. So just -- just with respect to this -- this Policy 100, and specifically 100.3. Were you aware of this -- this policy when you took over as undersheriff?**

**Q So as far as you're aware, there is no -- there is no report setting out the results of the annual review?**
A Not that I'm aware of. No.
**Q Okay.**
A I mean, we do keep track of you know, obviously, inmate counts. We don't hold juveniles in custody anymore. Like I said, the inmate grievances -- a lot of these things we -- are documented. But as a yearly report, no.
**Q Does -- does the sheriff's office have a policy on hunger strikes?**
A I don't know.
**Q Turn to page, DID166.**
A 166?
**Q Yes, sir.**
A Okay. (Witness complies.)
Okay.
**Q And that's Policy 400-5, Hunger Strike. I take it from your prior answer, that you were not aware that this policy was in the manual; correct?**
A Again, I may have read this -- I believe I've read this policy, but remembering everything, no, I do not.

want to read the policy?

THE WITNESS: Sure.

(Reviews document.)

I believe it was.

**Q (BY MR. BLAKEMORE) Okay. One of the -- one of the requirements here, it states in this kind of preamble paragraph, right under the -- the header there, the jail administrator should evaluate the basis for the strike and seek an appropriate resolution.**

**Now, again, at the time that Mr. May was -- was at the -- the jail, there -- there was no individual with the title, jail administrator. You were essentially acting as the jail administrator.**

**What, if anything, did you do to seek an appropriate resolution for Mr. May's situation?**

A Well, when I was advised that Mr. May -- on one of these issues, that he hadn't eaten and he wasn't bathing. So I was advised by the medical staff if I could come speak with him. I did. And they -- it was a protein drink. I was conversing with him. I said these taste good. I drink them every day. I opened it for him. He took a drink. A couple drinks. I said why don't

you go bathe? You'll feel a lot better. I did not watch him go bathe, but I was advised he did. I advised the staff if this continues on, I need to know, so I can go and make different arrangements with across the street. Or if he needs medical attention in a -- in a hospital. But I need to be aware of this, so I can make the -- the proper decisions or actions to get him help.

**Q Okay. When -- do you recall about when that happened?**

A I do not.

**Q And I think later, we'll be looking at some documents that'll maybe refresh your recollection on that. But you said that you talked to the staff. Do you recall which staff you talked to and gave these directions to?**

A This particular one was Julie Warnke.

**Q Okay.**

A And Martha Stanford was also the jail lieutenant at the time. And like I said, if things are not improving, I need to know, so I can get something done. You know, if he needs to go to the doctor, then get us -- get us an appointment. We'll get him there.

**Q Did you talk to any of the medical staff about Mr. May?**

A If I did, it was a TurnKey, and I don't know the -- the nurse's name.

**Q As you sit here today, do you recall specifically speaking with any of the medical staff regarding Mr. May?**

A The TurnKey medical staff?

**Q Was there other medical staff?**

A Oh, I don't know. I meant -- well, our medical personnel.

**Q Right.**

A Just the TurnKey the nurse. I don't remember the person's name or nothing.

**Q Right. But do you -- do you specifically whoever -- whatever her name was, do you specifically recall talking to the nurse about Mr. May?**

A That I do not recall.

**Q Okay. But you do recall having this conversation with Julie Warnke and Martha Stanford?**

A Correct.

**Q And essentially, you told them if things are not improving, I need to know.**

**Q And what was the conversation you had with Mr. McPherson?**

A Well, I told him based off of what I was informed, that he had not been eating. His bathing -- he's not bathing. I'd also -- through a phone call with the -- the jail division advised me that he potentially had Alzheimer's or dementia. And I said now, that has not been confirmed. Given that, his age, I said we need to get him out of our jail, either medically OR him, let's -- let's -- he doesn't belong here.

**Q Okay. And what did Mr. McPherson say?**

A Well, we didn't get him out of jail. As far as what he said, that they have their protocols. They were going to try and get him mentally looked at. I can't think of the word right now.

MR. DAY: (Inaudible.)

THE WITNESS: Who?

MR. MILLER: You can't speak.

THE WITNESS: I can't think of -- they had their protocols.

**Q (BY MR. BLAKEMORE) Okay.**

A They're going to see if he's mentally stable or what his mental capacity is. And so --

**Q And do you recall about when that was, that you had this meeting with McPherson?**

A I'm sorry. I do not know.

**Q You said that his Alzheimer's and dementia had not been confirmed. Did you ever check with any of the TurnKey medical staff as to whether he had been diagnosed with Alzheimer's or dementia?**

A No, I did not.

**Q Did you ever -- after this meeting with McPherson, did you have any other conversations with anyone at the jail or within the County or TurnKey about Mr. May prior to him -- him being found unresponsive on March 18th?**

A If I did, I don't have it documented. Like I said, I spoke with Martha -- or Ms. Stanford and Ms. Warnke keeping me apprised of it. If a TurnKey employee was there, if I spoke to them, I just don't remember.

**Q When -- during this time that you were aware that Mr. May was not eating and potentially had Alzheimer's or -- or dementia, did you do anything to assure that appropriate medical protocols were being followed?**

A Well, we did based off of what I stated.

We did put him up front by himself to ensure he was safe because we didn't want to have any inmates hurt the man. And just the -- whatever TurnKey -- their protocols were.

**Q Do you know if Mr. May was ever seen by a mental health professional while he was at the jail?**

A I don't recall if he was. I know -- I believe they had started the process for this, but he passed away before they did.

**Q When you say process for this, what do you mean?**

A Well, like I said, the DA's going to line up trying to get him assessed by, I don't know if it was Vinita or -- or Griffin Memorial Hospital, to check on -- on his status. I don't know what the DA does on that.

**Q Did you -- did you ever ask TurnKey if they had any mental health professional that could come and see Mr. May?**

A No. When -- let me explain on that part. When I found out about this phone call that I got from the jail division, that's when they informed me that he may have Alzheimer's or dementia. And so what time frame that was, the

time that I went across and spoke with the DA, I don't know.

**Q I think that's going to --**

A Yeah. I think I've got it. I mean it's written down in --

**Q Yeah. We'll get there.**

A Yeah.

**Q Do you know how often Mr. May -- you mentioned that he had been put in this cell in booking. Do you know how often he was supposed to be visually checked on?**

A By jail standards, hourly. All inmates are supposed to be checked hourly. And then if there's -- depending on what type of -- you know, if they're suicide watch, they're supposed to be 15 minutes. As far as Mr. May, we had a jailer sitting up front. So they were -- just to make sure and keep an eye on the man.

**Q When you say a jailer up front, though, he was in a -- he was in a cell behind a locked door; correct?**

A Correct. Yes.

**Q So you couldn't actually -- you couldn't actually see him unless you went up and looked in the bean hole; correct?**

**case in 2022; correct?**
A No.
**Q That is correct?**
A Yes. I'm sorry.
**Q All right. That's fine.**
**All right. 318. Well, before we get there, in 2022, I mean, I understand what you're saying that you've done -- since you became the undersheriff. But I want to -- I want to be clear on time frames. In early 2022, were the -- was the detention staff being trained on the requirements of the -- the policies?**
A I wish I could give you a definitive answer when we started that. I know we started in 2022. And we may have started the program, but I don't know the exact date.
**Q Okay.**
A Because it was -- well.
**Q So with respect to early 2022, you can't give a definitive answer --**
A As to when we started it. No.
**Q -- as to whether the detention staff was being trained in the policies; correct?**
A I cannot say that. Yes.
**Q 318 which is part of the medical policy.**

MR. MILLER: Whenever you're ready for a break. I could use the restroom.

MR. BLAKEMORE: Okay. Sure. We'll take a five-minute break.

THE VIDEOGRAPHER: Off the record. It is 11:08 a.m.

(Short break.)

THE VIDEOGRAPHER: We are back on the record. It is 11:16 a.m.

**Q (BY MR. BLAKEMORE) We're back on the record after a short break. So we left off, we were still looking at the -- some of these policies that I copied. And I'm looking at, in particular, it's DID 318. And I'm looking specifically at 701.6 Health Evaluations.**

**Are you familiar with that policy?**

A Yes.

**Q So this policy provides that health care professionals shall complete an in-person health evaluation of each inmate within 14 days after arrival at the jail and annually thereafter if the inmate is still in custody. And then it gives a list of -- of everything that this health evaluation should include. Do you see that? It actually goes on to the next page.**

A Yes, sir.
**Q Do you know whether Mr. May received a health -- health evaluation by a qualified health professional?**
A Well, I would have to say I would presume so since TurnKey was employed by us.
**Q Do you know, though?**
A Do I know for a fact? No, I do not know for a fact.
**Q Do you know whether TurnKey was aware of this -- this policy?**
A I have no idea.
**Q Did you ever have any communication with anyone from TurnKey about the -- concerning the jail's medical policies?**
A No. Not that I'm aware of.
**Q Did you ever do anything to assure that TurnKey was complying with the jail's medical policies?**
A No, sir. I did not.
**Q Do you know whether -- just in general, did you ever do anything to assure that inmates at the -- the jail were receiving in-person health evaluation within 14 days of arrival?**
A No. What I -- if I may say this. That

when an individual is arrested and placed into our facility, there is a medical questionnaire that they -- questions they are asked. If the inmate has any physical, mental problems, they're supposed to let them know and they're supposed to document these things. So every person that's brought in, there is a medical questionnaire that the -- the detention officer, the booking officer, will do.

**Q Right. I understand that. But as far as like actually having a -- assuring that this policy is being complied with. That the qualified health professional is completing an in-person health evaluation within 14 days, you didn't do anything to assure that that was happening, did you?**

A No.

**Q Do you know whether there was a regularly scheduled sick call that was being conducted --**

A Yes.

**Q -- at the jail?**

A Yes.

**Q And when was that? Do you know?**

A I believe sick call was every morning.

individuals need.

**Q (BY MR. BLAKEMORE) Did you do anything to make sure that TurnKey was complying with this policy?**

A No. Just what I was base -- what I was told. And like I said, when I got to the point where I got involved, that's when I stepped in and tried to get the man out of jail.

**Q Under 703.3, Chronic Disease Care. It states the jail administrator should work with the healthcare services physician.**

A Uh-huh.

**Q Who is the healthcare services physician under this policy?**

A Well, I would have to say that would be TurnKey.

**Q Was there actually a physician that worked at the jail?**

A A physician, no. From what I understand, they would do and still do a video. The doctor is on a video, the inmate's in front of him and they discuss their care.

MR. MILLER: Bob, Ms. Warnke just walked in quite early. Do you mind if I just go tell her to -- maybe if she wanted to go eat lunch or

**working with TurnKey to develop programs and procedures to assist inmates with chronic diseases?**

A No.

**Q This last sentence in this paragraph. The jail administrator should maintain a list of these inmates to facilitate the implementation of any treatment plan a follow-up care.**

**Did you maintain a list of the inmates that were special care inmates?**

A No.

**Q Do you know if there was a list of --**

A I do not know.

**Q Let me just finish the question.**

A Okay.

**Q Do you know if there was a list of special care inmates maintained by anyone at the jail?**

A Not that I'm aware of.

**Q All right. We can put that to the side.**

**All right. I'm going to play this -- this kind of goes to some of your previous testimony about Mr. May. And you mentioned that you had a phone call with someone from the health department. I'm going to play this. It's, like,**

**six minutes. I might kind of stop it at times to ask you questions, but I just want to ask you questions about it.**
A Okay.
**Q And for the record, this is dated February 7th of 2022. (Plays audio)**
UNIDENTIFIED SPEAKER: (Inaudible) Detention (inaudible).
UNDERSHERIFF CRABTREE: Yes. I was looking to contact Barry Edwards.
**Q (BY MR. BLAKEMORE) Is that you?**
A Yes. Doesn't sound like me, but that's me.
UNIDENTIFIED SPEAKER: He's not in the office. Let me see if I can get him on the phone. I'm sorry. What is your name again?
UNDERSHERIFF CRABTREE: My name is David Crabtree. Undersheriff Custer County, Oklahoma. He called and left a message with one of the admin assistants, and I'm --
UNIDENTIFIED SPEAKER: I'm sorry. I have my phone down too low. Hold on a second.
UNDERSHERIFF CRABTREE: Okay.
UNIDENTIFIED SPEAKER: All right. What was that?

UNDERSHERIFF CRABTREE: Crabtree. Undersheriff, Custer County. Returning a call to Barry Edwards.

UNIDENTIFIED SPEAKER: Okay.

**Q (BY MR. BLAKEMORE) Does that refresh your recollection? Is Barry Edwards the person you were contacting with the -- the health department?**

A Yes.

**Q (Plays audio.)**

UNIDENTIFIED SPEAKER: Okay. Let me try and get a hold of him.

MR. CRABTREE: Okay.

**Q (BY MR. BLAKEMORE) Sorry. Takes him a while to get on the phone. A real long time for him to get on the phone.**

A Apparently, that's most of the conversation.

**Q Yeah.**

MR. EDWARDS: This is Barry Edwards. Can I help you?

MR. CRABTREE: Yeah, this is David Crabtree.

MR. EDWARDS: How are you Mr. --

MR. CRABTREE: Oh, pretty good.

MR. EDWARDS: Hey, the reason why I called is you actually have a Marvin May detained there; is that right?

MR. CRABTREE: Yes, sir.

MR. EDWARDS: And adult protective services got a complaint and they forwarded it to us.

MR. CRABTREE: Uh-huh.

MR. EDWARDS: And basically that this individual has dementia.

MR. CRABTREE: Okay. Has he been diagnosed with it, or is it just their presumption?

MR. EDWARDS: Well, their -- their -- the complaint is that, I mean you have him in jail. You're going to know if he's got any -- any -- any -- any cognitive issues or anything else and stuff that need to be brought to the DA's office --

A Uh-huh.

**Q -- attention to stuff. Said that he can't care for himself. So my question is, is he eating? Is he getting his medication? Does he need assessed.**

**Well, we obviously have medical here.**

**I'm trying to think of what day it was I went in there. They said he hadn't been eating. When I went in there, he got up, took his meds and drank a protein shake, and I haven't had a discussion with him since then.**

MR. BLAKEMORE: Okay.

MR. CRABTREE: So what my plan is I get a little busy, and I'm going to go back there and see what the status on him is. And if it's something I need to bring up to the DA to see if we can do something with him and get him out of here if that's the case. But they're going to want to know if it's been diagnosed when they have to go and send him somewhere and get that done, too. But.

MR. EDWARDS: Okay. Let me go ahead and forward this to you. Let me --

MR. CRABTREE: Okay.

MR. EDWARDS: Let me double check the email we have on file here. Just a sec.

MR. CRABTREE: I can give you my email address.

MR. EDWARDS: I want to double check to see what we have on file, in case I need to change it. Okay. I have -- are you -- you're

Rick Thompson? I have rthompson@cityofcushing.org.

MR. CRABTREE: No. This is Custer County Sheriff's Department.

MR. EDWARD: Okay, I'm sorry. I'm sorry. I'm on the wrong one. Hold on. That was Cushing, sorry about that. It's kind of early in the morning. Okay. So Custer. M -- is it Stanford?

MR. CRABTREE: Well, yeah that's -- Martha -- Martha's the jail lieutenant. So you can --

MR. EDWARDS: Okay.

MR. CRABTREE: -- if you want to send that to her, go ahead. You can -- you understand, because she's the jail lieutenant.

MR. EDWARDS: Okay.

MR. CRABTREE: And if you want to put me on your list as well, you can.

MR. EDWARDS: Okay. And what is your name?

MR. CRABTREE: David Crabtree. Common spelling.

MR. EDWARDS: Okay. Mr. Crabtree, I will have this out to you guys and everything

else. We may have an investigator just follow up later on. If you have any updates, or anything if you could just reply back, I'd appreciate it.

MR. CRABTREE: Okay. Do you want my email address as well? Or do you just want Martha's.

MR. EDWARDS: Yeah. Go ahead.

MR. CRABTREE: Okay. It's dcrabtree@custercountysheriff.com.

MR. EDWARDS: Okay. Sure appreciate it, sir.

MR. CRABTREE: All right. Thank you, sir.

**Q (BY MR. BLAKEMORE) Sorry.**

**So is that the -- you mentioned that you listened to some recorded phone calls in preparing for your deposition back, I think you said maybe, like, last summer.**

MR. MILLER: Object to the form.

THE WITNESS: I --

**Q (BY MR. BLAKEMORE) Earlier this summer?**

A Yes.

**Q And was that -- is that one of the calls that you listened to?**

A Yes.

**Q Do you specifically recall saying that and making that request of ADA McPherson?**

A Yes.

**Q And that would have been also either February 7th or February 8th?**

A I believe so.

**Q And did -- after this -- I believe you testified earlier that after this interaction with -- first, with Warnke and Stanford and then with McPherson, and it would have been we know now around February 7th or February 8th, that you didn't -- you didn't have any other conversations with anyone about May until after he was found unresponsive.**

**Is that true?**

MR. MILLER: Object to the form.

THE WITNESS: I want to think I was still in contact with Martha or Julie. And again, I did not document. I make the presumption that I did go over there and ask McPherson, where are we at on this. And I would get their -- whatever their procedural thing that they're going to get him evaluated. And I was saying, again I'm sure -- I was -- the first time I went over I thought was enough to get him out

of jail, or at least to get him medically OR'd.

**Q (BY MR. BLAKEMORE) You said you make the presumption. Do you specifically recall any other meetings, phone calls, discussions that you had with anyone regarding Mr. May between this time of around February 7th or February 8th, and the time that he was found unresponsive on March 18th?**

A Again, it would have probably have been if I -- again, conversations with the DA.

**Q Okay. But do you specifically recall that?**

A The dates, no.

**Q You --**

A I do not know -- I cannot sit there 100 percent and say -- I would presume that I did.

**Q Okay. But you can't say 100 percent?**

A I don't have it documented so that's why I'm just hesitant to say, yes, on this date I did.

**Q Okay. But Do you -- and whether you have it documented or not, do you specifically recall having a conversation after this date of around February 7th or February 8th regarding Mr.**

A I do not know.

**Q And you said they were updating you on his condition. What -- what did they tell you?**

A I'm trying to remember. He's not eating. He's still not bathing. Something along the lines of maybe his mental outlook isn't correct. And again, I would -- you know, I just didn't forget about the man.

**Q After those subsequent conversations and updates that you had from Warnke and Stanford, did you contact anyone from TurnKey at that point?**

A I do not recall.

**Q Did you contact any healthcare or mental health provider at that point?**

A Not that I'm aware of. If I may add, I would like to have think -- thought that our medical professionals would be doing that. Again, I failed to check on that.

(Plaintiffs' Exhibit 13 marked for identification)

**Q (BY MR. BLAKEMORE) Mr. Crabtree, I'm handing you what's been identified as Exhibit 13.**

MR. BLAKEMORE: (Hands exhibits to counsel.)

MR. MILLER: Thank you.
**Q (BY MR. BLAKEMORE) Do you recognize this document?**
A Yes.
**Q And what is it?**
A It's an email from Barry Edwards to myself. It's also a photo of the email it looks like from DHS or Oklahoma Human Services in regards to Mr. May.
**Q Okay. And then, for the record, I'm looking at DDR3811. And that's the first page of this email string. And so it starts at February 8, 2022, and kind of goes backwards. But this email at the top is from Edwards. He's saying thanks for your feedback. And that's February 8th. Looks like February 8th, 7:39 a.m, you send an email to Edwards, per our phone conversation yesterday, I met with the DA in regards to inmate May and my concerns the DA said that he will look into them -- this matter.**
**Did I read that correctly?**
A Yes.
**Q And what specifically did -- was your understanding that the DA would do, and that's ADA McPherson, would do to look into this matter?**

A Well, again, they have their protocols. They were going to look at getting him evaluated. As I said earlier, either through Vinita or Griffin Memorial, to -- for the courts to have their -- see if he's competent, or if he's having some other type of mental health issue. And I believe they were starting that process.

**Q Do you know whether that -- that process was actually started?**

A I believe they did start the process to get him evaluated. I --

**Q And what are you basing that testimony on?**

A Based off of what he told me.

**Q All right. Next email down here is February 7th at 9:19 a.m., and it's from Edwards to you and Ms. Stanford; correct?**

A Yes.

**Q And he states, per our telephone conversation with David Crabtree, see the below complaint pertaining to Marvin May. If you have any questions, please contact our office.**

**Right?**

A Yes.

**Q And then if you go to the next page,**

that's DDR3812, and we see first, an email from a Missy Franz with adult protective services.

Do you know -- do you know her?

A No.

Q Did you ever have a conversation with Ms. Franz?

A Not that I can remember.

Q Okay. Then if you go down to the bottom of the page here -- and this is February 3rd of 2022. Missy Franz -- this is an email she's sending to the Department of Health, Mr. Edwards, stating, I'm a screener for adult protective services. I'm sending the following to you for investigation. It's reported for the Custer County Jail. And then specific situation reporting goes on the next page.

Did you read all of this at the time that these emails were forwarded to you on or about February 7th?

A I don't know if it was the 7th. Could have been the 8th.

Q Okay. February 7th or February 8th, either. Did you --

A I believe -- oh, I'm sorry.

Q Did you read all of this material in the

**emails?**
A I do believe I read it.
**Q All right. So she is -- and I say she. Ms. -- Ms. Franz is forwarding this report.**
**Did you ever do anything to determine who it was who was making this report?**
A Well, I did -- when I -- Mr. Barry or Edwards, when he was telling me these things, I don't know -- no, I don't think I asked him that because I don't think they'll -- they'll give us that information when they get these types of complaints.
**Q Did you ever independently do anything to determine who made this report?**
A No.
**Q Why not?**
A I did not.
**Q No, I know -- I know you didn't. But why not?**
A I didn't. Again, based with the information I had on him, I was taking this stuff, again, over to Mr. McPherson for his consideration.
**Q Who was the -- you mentioned there was a doctor from TurnKey who does, like, telemedicine.**

**Do you know who that was at this time?**

MR. MILLER: Object to the form.

THE WITNESS: No, I do not know the doctor's name.

**Q (BY MR. BLAKEMORE) Do you remember a advanced practice registered nurse named Carey? With the last name Carey?**

A No, I do not.

**Q All right. So this states, reporter stated that the AV -- which means adult victim -- uses a cane or a wheel chair, since adult victim is not take loud to use a cane in the jail.**

**Do you dispute that?**

A No.

**Q If that was the case?**

A We don't allow canes in the jail.

**Q Do you dispute that Mr. May was having to use a wheelchair?**

A I do not know. He was -- when I was up there, he was strictly up front. When I went in the day of the -- I told you about the -- him drinking a shake, he was standing. He would take some steps that I remember. And I remember -- don't know if they wheelchaired him over to the

shower stall or not.

**Q And again, you don't know -- can you give me a date of when you actually saw him?**

A I -- I don't have that date.

**Q Would you agree that it would have been before February 3rd?**

A Yes.

MR. MILLER: Object to the form.

THE WITNESS: Sorry.

MR. MILLER: Sorry. I should have gotten that out earlier.

THE WITNESS: I just don't know the exact date. I'm sorry.

**Q (BY MR. BLAKEMORE) All right. So this also indicates he has Alzheimer's.**

**Do you see that?**

A Yes.

**Q And you read that at the time?**

A Yes.

**Q He can speak and talk, but his symptoms are getting worse; right?**

A Okay.

**Q Reporter stated they do not believe the AV, meaning Mr. May, needs to be in jail for missing court.**

**Did I read that correctly?**

A Where would I go to? I'm trying to find it.

**Q I skipped down a few sentences?**

A Yeah.

**Q I mean just in general, you were aware that staff at the jail were saying he shouldn't be here.**

A Correct.

**Q Did you -- at this point, when you read this email, did you have any basis to dispute that Mr. May had Alzheimer's?**

A I try to base all my -- the way I am as a cop, to have facts. This was reported to adult protective services. The way I read this, this person appears to have some fairly detailed information on Mr. May, with him living on a farm, forgetting court dates. Again, with this information, I'm passing along to the district attorney as far as he -- you know, I told him I don't have a document that he has Alzheimer's, but I'm no medical professional.

**Q Did you ever ask to look at his medical records?**

A I can't say with 100 percent fact if I

did.

**Q All right. Skip down a little bit. It states, reporter stated they saw that AV, meaning Mr. May, today via telemedicine.**

A Okay. Okay. AV.

**Q Did you have -- did you have any suspicions as to who this person might be, based on the statement that the reporter saw him via telemedicine?**

A I did not have a --

MR. MILLER: Go ahead.

THE WITNESS: Oh. I don't know who the person was.

**Q (BY MR. BLAKEMORE) Okay. I mean who would have been seeing him -- who, if anyone, would have been seeing Mr. May via telemedicine?**

A Who would have seen him?

**Q Yes.**

A Well, I'm going to have to say it's going to be someone from inside the jail.

**Q Okay. Via telemedicine?**

A Well, via telemedicine. That's going to tell me -- that would probably be a TurnKey nurse.

**Q Okay.**

A Because the telemedicine's going to have the doctor on the -- the computer with the -- the inmate there. And that's going to require the nurse.

**Q Right.**

A So that's where I would probably guess -- if you want me to guess. I don't have any facts to base it, but what I'm reading, to me it looks like to me it would be a nurse staff at the jail.

**Q Okay.**

A That's the way I'm reading this statement here.

**Q I mean, you say you don't have any facts, but you also didn't do anything to follow up with TurnKey about this; correct?**

MR. MILLER: Object to the form.

THE WITNESS: Not that I'm aware of. Not that I can remember.

**Q (BY MR. BLAKEMORE) All right. Says he had -- at this point this again this is February 3rd -- has not eaten or showered in seven days.**

A Uh-huh.

**Q He's not getting up to eat or shower. And he's not remembering to do these things on**

his own.

Do you see all that?

A Yes.

Q And you read that at the time; correct?

A Yes.

Q Did this cause you any concern about Mr. May's health and safety at the jail?

A Yes.

Q Reporter stated this has become a safety issue for him since the other inmates get upset with him for not doing these things.

Do you see that?

A Yes.

Q Do you recall reading that at the time?

A Yes.

Q And then again, reporter stated they do not know the criminal side of things, but they do not think this is an appropriate place for him.

Did you agree with that? Based on just the description in this complaint, realizing that you didn't review his medical records or talk to TurnKey -- but just based on your reading of this, did you agree that as of early February 2022, that the jail was not an appropriate placement for Mr. May?

A Yes.
(Plaintiffs' Exhibit 22 marked for identification)
**Q (BY MR. BLAKEMORE) All right. Mr. Crabtree, I'm now handing you what we've marked Exhibit 22.**
**Have you seen this document before?**
A Yes.
**Q And what is it?**
A It's an incident offense report from the OTIS system that we utilize at the sheriff's office.
**Q And this is -- what's the date of this?**
A Date is 3/18/2022.
**Q And it's involve -- it's regarding Marvin May; correct?**
A Yes.
**Q All right. Turn to page -- it's DDR27.**
A (Witness complies.)
Okay.
**Q Well, first of all, who -- who actually prepared this report?**
A I believe that would have been investigator Jeff Stanford did the initial report and then a supplemental would be done -- looked

**that OSBI should be brought in?**

A I advised him of what we had, and asked him if he wanted the bureau to be brought in. He stated no, there was no foul play.

**Q All right. Last paragraph of your statement here. I reviewed the video on 3/18/22 and saw no sign of foul play. May appeared to fall off his bunk around 6:52, less than a minute staff entered his cell and render aide.**

**Did I read that correctly?**

A Yes.

**Q How much of the video from 3/18/2022 did you review prior to making this narrative?**

A I don't -- the way I understand the cameras that if there's movement, it'll activate. So it would probably have been that day or from midnight on. I don't know the exact time, but every time there's movement, the camera would start recording. And during -- I don't know -- I didn't watch months of it, no. I would probably say that day or that night.

**Q Okay. So the -- the video from that day of Mr. May. Was there anything in that video recognizing you say there was no sign of foul play? Was there anything in that video that you**

**saw that gave you concerns about the way that Mr. May was treated by the either the detention staff or medical?**

MR. MILLER: Object to the form.

THE WITNESS: What I saw was once reviewing the video, that one of the jailers came in and he had a smile on his face. And once I reviewed that, I met with that jailer and we had a very philosophical discussion about smiling. I told him it was it completely inappropriate.

**Q (BY MR. BLAKEMORE) And do you remember who that jailer was?**

A I believe his name was Alvarado.

**Q What -- at that point that Officer Alvarado was smiling in the video, what kind of condition was -- did Mr. May appear to be in?**

A I -- you know, I don't remember all of it. I was not pleased with the -- the cell. It should have been cleaned better. I couldn't tell if he had used the bathroom on himself or not.

**Q Had you heard reports that Mr. May was in continent?**

A Say what?

**Q That he lost control of his bowels and had to basically wear a diaper at times?**

A I understood that they put him in a diaper. Yes.

**Q And when you say you had issued with the cleanliness of the cell, did you observe that there was fecal matter in his cell?**

A I believe -- I believe on him there was some.

**Q All right. This last couple of sentences here. The video is attached.**

**Now, do you know whether Stanford reviewed the video?**

A That I do not know.

**Q Do you know if the DA reviewed the video?**

A I don't know what they did.

**Q Okay.**

A No, I do not.

**Q Then the next thing it says along with jail checks. What does that mean?**

A Site checks.

**Q Is that like a log?**

A Yes.

**Q Okay. And Mr. May's medical records.**

A Yes.

**Q Do you know if Stanford or the D. A's**

**correct?**

A That's what was written in a -- what the adult protective service complaint.

**Q Uh-huh.**

A That's what they stated.

**Q Well, someone from inside your jail --**

A Yeah. I agree.

MR. MILLER: Object to the form.

THE WITNESS: Sorry.

**Q (BY MR. BLAKEMORE) Someone from inside your jail made that report; correct?**

MR. MILLER: Object to the form.

THE WITNESS: If that's the case then they should have notified me.

**Q (BY MR. BLAKEMORE) Well, you were notified by the department of health; correct?**

A That's correct.

**Q If -- if the meal log shows that from February 16, 2022 -- or yeah, 2022, to March 17, 2022, that Mr. May only had one meal during that time frame of 30 days, I mean, do you have any -- do you have any basis to dispute that?**

A If it's documented, no, I do not.

**Q Do you know whether anyone -- anyone who worked at the jail had been trained on the -- the**

**hunger strike policy?**

A Not that I'm aware of. No.

**Q And just to confirm, under the -- the contract that you had in place at the time with TurnKey, there was only 12 hours -- or there are 12 hours a week of nurse coverage at the jail; correct?**

A Yes. To my knowledge.

MR. MILLER: Bob, I will need a quick break again if you get a chance. I don't know if you're like almost done.

MR. BLAKEMORE: I've got one more thing to show him.

MR. MILLER: Let's finish with you and then we'll take break before cross.

(Plaintiffs' Exhibit 2 marked for identification)

**Q (BY MR. BLAKEMORE) Hand you what's been marked Exhibit 2. And these are the -- as they were produced to us, these are the -- Mr. May's medical records. As you kind of thumb through these, do you recall whether you were -- if you reviewed these?**

A At the time of his arrest, no.

MR. MILLER: You said the time of his arrest. I'm not sure if that's what you meant.

thought Mr. May's situation was an emergency?
A No.
Q Did anyone ever suggest to you that Mr. May -- until the 18th?
A Right.
Q Should be transported to the hospital immediately?
A No.
Q You may have already said this, but in terms of when you saw Mr. May, you agree on February 7th when you spoke with Barry Edwards, you told him you had already gone back there with the protein shake; right?
A Yes.
Q So it must have been sometime prior to February 7th. Is that fair?
A I believe so.
Q Okay. On Exhibit 13 which is the email exchange with David Crabtree [sic] -- you emailed him on February 8th and told him that you had met with the DA with regards to Inmate May and my concerns yesterday.
So what day, based on that email, do you think you met with Mr. -- Mr. McPherson?
A It would have been probably on the 7th.