## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LISA M. HICE,<br>LEANN D. HOFF,<br>as Co-Administrators of the<br>Estate of Marvin G. May,<br>Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>TURN KEY HEALTH CLINICS,<br>LLC, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-24-119-JD |

## <u>REPORT AND RECOMMENDATION</u>

On January 25, 2022, Decedent Marvin G. May was booked into the Custer County Jail as a pretrial detainee. Doc. 1, at 4. Upon booking, Mr. May was 74 years old with a recorded past medical history of diabetes mellitus, chronic obstructive pulmonary disease (COPD), and cardiovascular disease. *Id.* Before and during his detention, Mr. May suffered from various ailments including dementia, high blood pressure, a worsening bed sore, fecal incontinence, and difficulty walking. *Id.* at 6; Doc. 156, at 12. On March 18, 2022, Mr. May fell out of his bunk and was transported to the emergency room where he was pronounced dead. Doc. 1, at 9. The Co-Administrators of his Estate brought this action under 42 U.S.C. § 1983 alleging Defendants deprived Mr. May of medical care in violation of his rights under the

Fourteenth Amendment of the U.S. Constitution and Oklahoma law. *Id.* at 3-4, 36-41. United States District Judge Jodi W. Dishman referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 3.

Before the Court is Defendant Advanced Practice Nurse (APRN) Tamara Carey's Motion for Summary Judgment, Doc. 139. Plaintiffs filed a response, Doc. 156, and Defendant APRN Carey replied, Doc. 179. So the matter is at issue.[1] The undersigned recommends the Court deny Defendant APRN Carey's motion for summary judgment.

## I.    Legal standards.

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[1]    Citations to a court document are to its electronic case filing designation and pagination. Except for capitalization, quotations are verbatim unless otherwise indicated.

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023).

## II.    Background.

Turn Key Health Clinics, LLC (Turn Key) contracted with the Custer County Sheriff's Office (Custer County) and the Board of County Commissioners of Custer County to provide certain medical care and treatment to inmates and detainees at the Custer County Jail. Doc. 139, at 5. The contract requires Turn Key to provide twelve hours of weekly on-site nursing services by a Registered Nurse (RN) or a Licensed Practical Nurse (LPN). *Id.* Ex. 1, at 4. The contract also requires a physician or mid-level

provider to hold a weekly patient clinic either in-person or via telemedicine. *Id.* Turn Key was responsible for ensuring 24/7 availability of an on-call physician or mid-level provider for "emergency consultation." *Id.*

During the relevant dates, Defendant APRN Carey worked as a Turn Key employee and provided telehealth medicine to inmates at the Jail once a week. Doc. 139, at 6; Doc. 156, at 6. She was responsible for taking calls from thirteen or fourteen separate facilities, one of which was Custer County. Doc. 155, Ex. 3, at 31-32, 35, 51.[2] She testified she was "overwhelmed" by the call situation, which was part of the reason she resigned from her position with Turn Key. *Id.* at 51.

On January 25, 2022, Mr. May was transferred to the Jail from the Canadian County Jail. Doc. 139, at 6. On January 27, 2022, Defendant LPN Stacia Unruh conducted a Medical Intake on Mr. May. *Id.* She recorded his vital signs, including his temperature, blood pressure, respiratory rate, pulse, and oxygen saturation. *Id.* She reviewed his medical history, evaluated his

---

[2]     Plaintiffs reference the exhibits attached to their response to Defendant Sheriff's motion for summary judgment, Doc. 155, interchangeably in their responses to Defendants' motions for summary judgment. For ease of reference, the undersigned will refer to the exhibits attached to Doc. 155 where the same arguments are made or where identical evidence is cited amongst the parties.

general appearance, behavior, level of consciousness, breathing, and his mobility. *Id.* LPN Unruh noted his gait was "stable" and made no notation that Mr. May needed a cane or wheelchair at that time. Doc. 155, Ex. 12, at 3.

On February 2, 2022, an inmate notified Defendant Officer Julie Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). The inmate filed a sick call request and a grievance form seeking help for Mr. May, noting: "this old man marvin may hasnt eaten in 9 days or showered he needs real medical attention asap," Doc. 155, Ex. 33, at 1. Similarly, the inmate wrote "weve told staff and they aint done shit this old man marvin hasn't eaten or showered in days he needs real medical help . . ." Doc. 155, Ex. 34, at 1. To each, Jail Officer Angie Schmidt responded that "We're going to move him to booking til the nurse comes in tomorrow so that we can watch him." Doc. 155, Ex. 33, at 2 & Ex. 34, at 1. Officer Warnke had Mr. May moved to his own cell in the "booking area," "to be monitored for his behavior and eating habits" and advised that "[h]e is to be offered a protein shake with every meal &

5

charted on ODIS if he eats his meal or drinks his share per Lt. [Martha] Stanford." Doc. 155, Ex. 17.[3]

On February 3, 2022, Defendant APRN Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. Doc. 139, at 6-7. While Defendant APRN Carey assessed Mr. May's orientation, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment 90 days later, LPN Unruh gathered objective information from Mr. May onsite. *Id.* at 7.

Officer Warnke's Jail Incident Report notes state Mr. May was brought via wheelchair for the visit. Doc. 155, Ex. 18. She and LPN Unruh "encouraged him to drink a protein shake and he refused to drink it but [he] drank some water." *Id.*

After the visit, Officer Warnke noted that Defendant APRN Carey stated that Mr. May's

> Mental condition appeared to be deteriorating rapidly and that when she had seen him at the previous county he was transported around via wheelchair at that facility also. [LPN Unruh and Officer Warnke] let [APRN Carey] know that he was moved to booking yesterday because he wasn't eating or showering while he was in the dorm housing. [APRN] Carey said that she wanted to

---

[3]    Lieutenant Martha Stanford, a non-defendant, supervised Officer Warnke. Doc. 155, Ex. 20, at 4.

6

notify Adult Protective Services about his well being due to his deteriorating mental state.

*Id.* Defendant APRN Carey's chronic care note stated:

Pt present for initial CC visit. Provider is familiar with pt due to being transferred from Canadian Co. Pt denies concerns in treatment plan. Per officer, pt has not eaten or showered in 7 days. Pt report being "fine". Denies fatigue, chills, fever, or any abnormalities at this time. Provider is aware of pts worsening Alzheimer disease.

. . . .

Pt unable to ambulate safely alone; assistance needed via wheelchair[.]

Doc. 139, Ex. 2, at 35-36. Defendant APRN Carey's February 3, 2022 chronic care note also documented that Mr. May suffered from hypertension, hyperlipidemia, COPD, diabetes mellitus, and rheumatoid arthritis. *Id.* at 35; Doc. 155, Ex. 3, at 10-12. She set another visit for 90 days later, which she testified was typical, because this was Mr. May's follow-up visit after her initial telehealth visit with him while he was in Canadian County's jail. Doc. 139, Ex. 4, at 17. She also recalled Mr. May being in a wheelchair in Canadian County. Doc. 155, Ex. 3, at 18.

Officer Warnke testified she presumed that Defendant APRN Carey called Adult Protective Services after the February 3, 2022 telehealth visit because APRN Carey told LPN Unruh she wanted to contact Adult Protective

7

Services. Doc. 155, Ex. 11, at 12, 23. Officer Warnke also testified she had "seen forms come through" from Adult Protective Services. *Id*. at 23.

A February 3, 2022 email from Oklahoma Human Services to the Oklahoma Department of Health relayed concerns from an Adult Protective Services screener that Mr. May was not allowed to use a cane in jail, had "worsening" Alzheimer's, and that the "Reporter" (Defendant APRN Carey) from the Custer County Jail "feels [Mr. May] needs to be in a nursing home," but "not in jail." Doc. 155, Ex. 2, at 2-3; Doc. 156, at 11. The screener wrote that "[t]he staff at the jail [reported] that [he] has not eaten or showered in 7 days" and "no one is telling him to, " and he "has been incarcerated for at least 2-3 months, maybe longer, but too long from a medical standpoint," and that "they do not think this is an appropriate placement." Doc. 155, Ex. 2, at 3. In her deposition, Defendant APRN Carey confirmed the accuracy of the contents of the email as the summary of the report she gave to Adult Protective Services. Doc. 155, Ex. 3, at 19-20.

In reviewing that report, Defendant APRN Carey testified that it was her medical assessment that Mr. May "did not belong in jail." *Id*. at 25-26. And that he had been incarcerated for two to three months or longer, and that this was "too long from a medical standpoint." *Id*. at 26. She testified that while his

Alzheimer's symptoms were worsening, she did not believe he was in "acute distress" yet. *Id.* at 22. She also testified that Alzheimer's is a progressive disease and Mr. May's condition would only deteriorate and get worse. *Id.* at 29-30. She testified that she did not follow up with LPN Unruh after the telemedicine visit to ensure that she was continuously monitoring Mr. May's condition. *Id.* at 51.

On February 11, 2022, LPN Unruh saw Mr. May's wound on his right hip and entered a Wound Care Note, and got an order from Defendant APRN Carey to apply antibiotic ointment to the wound. Doc. 156, at 12; Doc. 139, Ex. 2, at 32, 40 & Ex. 4, at 12. Defendant APRN Carey recalled giving this verbal order. Doc. 139, Ex. 4, at 19.

On March 17, 2022, Officer Warnke filed a Jail Incident Report noting Mr. May refused to "set up" for a blood pressure check, and that he told her he was "fine" and "okay." Doc. 139, Ex. 2, at 55. She noticed a pair of "soiled orange clothes," and she encouraged him to take a shower. *Id.* Mr. May refused. On March 18, 2022, Mr. May had fallen out of his bed and was discovered unresponsive. *Id.* at 56. The officers tried to revive him with an ammonia pack but this had a "limited response." *Id.* at 57. Officers called for an ambulance. *Id.* at 56.

The Medical Examiner listed Mr. May's probable cause of death as "Coronavirus Disease 2019 (COVID-19) Pneumonia Sequalae." Doc. 155, Ex, 4, at 19. Plaintiff's expert, Dr. Justin Berk, will testify that "the evidence does not indicate that COVID-19 was a cause of Mr. May's death." *Id.* "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension—is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id.*

## III.    Deliberate indifference to Mr. May's medical needs.

Defendant APRN Carey argues that Plaintiff cannot show that any failure to transfer Mr. May to an outside facility rises to the level of a constitutional violation. Doc. 139, at 13. Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the degree of protection against denial of medical attention which applies to convicted inmates under the Eighth Amendment. *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1136 (10th Cir. 2023) (citing *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1153–54 (10th Cir. 2022); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

The deliberate indifference standard contains both an objective and subjective component. *Lucas,* 58 F.4th at 1136. The objective component is satisfied if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511

10

U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Defendant APRN Carey does not challenge the objective component of Plaintiffs' claim, and the Tenth Circuit has "held that 'death [is], without doubt, sufficiently serious to meet the objective component.'" *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," but only that the official "merely refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." *Lucas*, 58 F.4th at 1137 (quoting *Farmer*, 511 U.S. at 842, 843 n.8.). "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence' such as whether 'the risk was obvious.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). "An official disregards risk when [s]he fails to take reasonable measures to abate the risk." *Id.*

A "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Quintana v. Santa Fe Cnty. Bd. Of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020) (quoting *Farmer*, 511 U.S. at 842). But this requires "that such risks present themselves as 'obvious' to the so-called 'reasonable man.'" *Id.* (quoting *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005)).

The Tenth Circuit recognizes two ways to establish the subjective component of a deliberate indifference claim against an individual defendant:

> [T]he subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ("failure to properly treat theory") or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ("gatekeeper theory"). The latter theory can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another. Even a brief delay in treatment can be unconstitutional.

*Lucas,* 58 F.4th at 1137. (internal citations omitted).

### A.    Objective component.

As noted, Defendant APRN Carey concedes the objective component is met, but she qualifies the harm solely as Mr. May's death. Doc. 139, at 13-14; *see Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022) (concluding detainee's "ultimate harm of death was sufficiently serious for

purposes of the objective component of deliberate indifference"); *Burke v. Regalado*, 935 F.3d 960, 994 (10th Cir. 2019) (same). Plaintiffs also claim Mr. May suffered from obvious, severe, and emergent medical and mental health needs before his death which were reported to Defendant APRN Carey on February 3, 2022. Doc. 1, at 37.

First, "[t]he objective component of deliberate indifference is met if the 'harm suffered rises to a level of 'sufficiently serious' to be cognizable under the Cruel and Unusual Punishment Clause.'" *Burke*, 935 F.3d at 992 (quoting *Mata,* 427 F.3d at 753). "A medical need is considered sufficiently serious to satisfy the objective prong if the condition 'has been diagnosed by a physician as mandating treatment *or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.*'" *Hardy v. Rabie*, 147 F.4th 1156, 1164 (10th Cir. 2025) (emphasis added) (quoting *Al-Turki v. Robinson,* 762 F.3d 1188, 1192-93 (10th Cir. 2014)). Where a plaintiff alleges that he was harmed by a delay in medical treatment, the objective component of harm "can be satisfied merely by 'an intermediate injury, such as the pain experienced while waiting for treatment and analgesics.'" *Id.* (quoting *Al-Turki,* 762 F.3d at 1193).

> Objective harm has been characterized as either "(1) the alleged harm to the prisoner or (2) the prisoner's symptoms at the time of

the prison employee's actions." [*Mata*, 427 F.3d at 753.] The latter is not about the ultimate harm or risk of harm, but how that harm would appear to an objective observer. *See* [*Prince*, 28 F.4th at 1045] ("Yet because we conclude that [the plaintiff's] earlier symptoms should prompt a layperson to seek immediate medical attention, the risk of death was an incorrect inquiry.").

*Id.* at 1165.

While Defendant APRN Carey does not dispute the objective component to the extent that the harm suffered was Mr. May's death, the Court notes that the delay in receiving greater medical attention is pertinent here because of the suffering Mr. May experienced from his already extant refusal to eat, his deteriorating mental condition, and his inability to ambulate on his own. That persistent delay in receiving any medical treatment apart from medication management and some applications of his prescription ointment, amounts to a sufficiently serious medical need that also satisfies the objective component. *See Stella v. Davis Cnty.*, 2024 WL 4764694, at *7 (10th Cir. Nov. 13, 2024) ("[A] delay in medical care that results in substantial harm, such as 'considerable pain' or death while awaiting treatment, can satisfy the objective component.") (quoting *Paugh*, 47 F.4th at 1155).

B.   **Subjective component.**

1.   **Failure to properly treat.**

On February 2, 2022, an inmate notified Officer Warnke that Mr. May had not eaten in several days and refused to shower, Doc. 155, Ex. 17 (Jail Incident Report), which resulted in Officer Warnke moving Mr. May to a cell next to LPN Unruh's office, close to the booking area. *Id.;* Doc. 155, Ex. 33, at 2 & Ex. 34, at 1. This way, Mr. May could be monitored for his behavior and eating habits. Doc. 155, Ex. 17. Defendant APRN Carey was aware Mr. May had been moved. Doc. 155, Ex. 18.

The next day was Mr. May's medical visit with Defendant APRN Carey. Officer Warnke's Jail Incident Report notes state Mr. May was brought via wheelchair for the visit. *Id.* She and LPN Unruh "encouraged him to drink a protein shake and he refused to drink it but [he] drank some water." *Id.*

Officer Warnke noted that Defendant APRN Carey observed Mr. May's

> Mental condition appeared to be deteriorating rapidly and that when she had seen him at the previous county he was transported around via wheelchair at the facility also. [LPN Unruh and Officer Warnke] let [Defendant APRN Carey] know that [Mr. May] was moved to booking yesterday because he wasn't eating or showering while he was in the dorm housing. [APRN] Carey said that she wanted to notify Adult Protective Services about his well being due to his deteriorating mental state.

*Id.*

Officer Warnke testified she was aware of the February 3, 2022 telemedicine visit with Defendant APRN Carey and presumed that APRN

15

Carey called Adult Protective Services, that Carey told LPN Unruh she wanted to contact Adult Protective Services, and that Officer Warnke had "seen forms come through" from Adult Protective Services. Doc. 155, Ex. 11, at 12, 23.

Defendant APRN Carey's February 3, 2022 chronic care note documented that Mr. May suffered from hypertension, hyperlipidemia, COPD, diabetes mellitus, rheumatoid arthritis, and that APRN Carey knew of Mr. May's "worsening Alzheimer's disease." Doc. 139, Ex. 2, at 35; Doc. 155, Ex. 3, at 10-12. "Per officer [Warnke]" she noted that Mr. May had not eaten or showered in seven days. Doc. 139, Ex. 2, at 35. She noted he cannot ambulate safely and she set another visit for 90 days. *Id.* at 36.

A February 3, 2022 email from Oklahoma Human Services to the Oklahoma Department of Health relayed concerns from an Adult Protective Services screener that Mr. May is not allowed to use a cane in jail, has "worsening" Alzheimer's, and reported that the "Reporter [(APRN Carey)]" from the Custer County Jail "feels [Mr. May] needs to be in a nursing home," but "not in jail." Doc. 155, Ex. 2, at 2-3. The screener wrote that "[t]he staff at the jail [reported] that he has not eaten or showered in 7 days and no one is telling him to," and "has been incarcerated for at least 2-3 months, maybe longer, but too long from a medical standpoint," and that "they do not think

16

this is an appropriate placement." *Id.* at 3. Defendant APRN Carey confirmed the accuracy of the email as the summary of the report she gave to Adult Protective Services. Doc. 155, Ex. 3, at 19-20.

Given the record here, there is evidence from which a reasonable juror could conclude that Defendant APRN Carey acted with deliberate indifference on or after February 3, 2022. Her chronic care notes outline Mr. May's worsening Alzheimer's, his inability to walk without assistance, and that he had not eaten or showered in a week. She agreed Mr. May had been in jail too long and, from a medical standpoint, did not belong in jail. *Id.* at 26. She testified he had a risk of falling. *Id.* at 28. She knew he had been moved close to the booking area "because he wasn't eating or showering." Doc. 155, Ex. 18. Her concerns were "worsening of those things." Doc. 155, Ex. 3, at 28. And that is exactly what happened without more intensive treatment outside of the Jail's setting. She neither attempted to follow up with Defendant Unruh, the only medical professional physically present at the Jail, nor did she supervise Defendant Unruh. *Id.* at 16-17, 51-52. She only set a follow-up telehealth visit for Mr. May—90 days from when she observed his rapidly deteriorating

17

condition.[4] *See Lucas*, 58 F.4th 1127, 1142 (10th Cir. 2023) ("Dr. Myers entirely failed to monitor her afterwards to determine if his treatment plan, if it can even be described as such, was working. Thus, Dr. Myers is not insulated from liability by providing some initial modicum of care and then proceeding to otherwise ignore all of Ms. Caddell's serious medical symptoms.").

Defendant APRN Carey also contacted Adult Protective Services to try to arrange for care for when Mr. May was released. Her urgent efforts underscore her concerns for his continued decline. Doc. 155, Ex. 2, at 2-3 & Ex. 3, at 19-20. And, within ten days, Mr. May was incontinent and had developed a bed sore requiring prescription ointment, which Defendant APRN Carey prescribed. A day later, feces got into the wound, a risk Defendant APRN Carey would know of, given her training. Having viewed the evidence in the light most favorable to the Plaintiffs, the undersigned concludes a genuine dispute remains as to whether Defendant APRN Carey properly treated Mr. May. So

---

[4]    Plaintiff's expert Dr. Berk testified that Defendant APRN Carey should have sought a higher level of care for Mr. May on February 3, 2022. Doc. 155, Ex. 22, at 6 ("If you're that concerned about the care of this patient and feel like they need a nursing home. . . . that means inherently they need a higher level of care than what can be provided in the jail and, therefore, a higher level of care should have been sought."); *see also* Doc. 155, Ex. 4, at 8.

she has not established that she is entitled to judgment as a matter of law as to deliberate indifference under the failure to properly treat theory.

### 2.    Liability under the gatekeeper theory.

Similarly, Plaintiffs have presented sufficient evidence to allow a reasonable fact finder to consider the objective and subjective components of deliberate indifference under the gatekeeper theory. Defendant APRN Carey was the only medical professional licensed to perform a medical assessment. Doc. 155, Ex. 15, at 5-6. She testified that it was her medical judgment that Mr. May did not belong in the Jail. Doc. 155, Ex. 3, at 25-26. Defendant APRN Carey contacted Adult Protective Services but she did not follow up with them. And she testified that contact was for arrangements for when he was released from the Jail. *Id.* at 15. Given the information she had about Mr. May's worsening condition, a juror could find she was deliberately indifferent in failing to  either coordinate or seek off-site specialty care for Mr. May. *Paugh*, 47 F.4th at 1155; *see also id.* at 1160 ("[A] reasonable jury could find that [the defendant] . . . was aware that [the inmate] was in obvious need for medical attention, and . . . abdicated her gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)).

19

## IV.    Recommendation and notice of right to object.

For the reasons set forth above, the undersigned recommends the Court deny Defendant APRN Carey's motion for summary judgment. Doc. 139.

The undersigned advises Defendant of her right to file an objection to this report and recommendation with the Clerk of this Court on or before April 21, 2026, in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2). The undersigned further advises Defendant that failure to make a timely objection to this report and recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation does not terminate the referral to the undersigned Magistrate Judge in this matter.

**ENTERED** this 31st day of March, 2026.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE