## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LISA M. HICE,<br>LEANN D. HOFF,<br>as Co-Administrators of the<br>Estate of Marvin G. May,<br>Deceased,<br><br>    Plaintiffs,<br><br>v.<br><br>TURN KEY HEALTH CLINICS,<br>LLC et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-24-119-JD |

## <u>REPORT AND RECOMMENDATION</u>

On January 25, 2022, Decedent Marvin G. May was booked into the Custer County Jail as a pretrial detainee. Doc. 1, at 4. Upon booking, Mr. May was 74 years old with a recorded past medical history of diabetes mellitus, high blood pressure, and cardiovascular disease. *Id.* Before and during his detention, Mr. May suffered from various ailments including dementia, a worsening bed sore, chronic obstructive pulmonary disease (COPD), incontinence, and difficulty walking. *Id.* at 6; Doc. 158, at 10. On March 18, 2022, Mr. May fell out of his bunk and was transported to the emergency room where he was pronounced dead. Doc. 1 at 9. The Co-Administrators of his Estate brought this action under 42 U.S.C. § 1983 alleging Defendants deprived Mr. May of medical care in violation of his rights under the

Fourteenth Amendment of the U.S. Constitution and Oklahoma law. *Id.* at 1; *see generally* Doc. 1. United States District Judge Jodi W. Dishman referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 3.

Before the Court is Defendant Stacia Unruh, Licensed Practical Nurse (LPN)'s Motion for Summary Judgment, Doc. 140. Plaintiffs filed a response in opposition, Doc. 158, and LPN Unruh replied, Doc. 178. So, the matter is at issue.[1] The undersigned recommends the Court deny LPN Unruh's motion for summary judgment.

## I.   Legal standards.

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[1]   Citations to a court document are to its electronic case filing designation and pagination. Except for capitalization, quotations are verbatim unless otherwise indicated.

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023).

## II.    Background.

Defendant Turn Key Health Clinics, LLC (Turn Key) contracted with the Custer County Sheriff's Office (Custer County) and the Board of County Commissioners of Custer County to provide certain medical care and treatment to inmates and detainees at the Custer Couty Jail. Doc. 140, at 5. The contract requires Turn Key to provide twelve hours of weekly "on-site nursing services by a Registered Nurse [(RN)] or a [LPN]." *Id.* at 5-6. The

contract also requires that a physician or mid-level provider provide a weekly patient clinic either in-person or via telemedicine. *Id.* at 6. Turn Key was responsibly for ensuring 24/7 availability of an on-call physician or mid-level provider. *Id.*

Defendant LPN Unruh works as a Turn Key employee at the Jail. *Id.*; Doc. 158, at 6. There is no RN at the Jail. Doc. 158, at 6.

On January 25, 2022, Mr. May was transferred to the Jail from the Canadian County Jail. Doc. 140, at 6. Detention officers performed a COVID-19 screen and Mr. May reported nausea. *Id.*

On January 27, 2022, Defendant LPN Unruh conducted a Medical Intake on Mr. May. *Id.* She recorded his vital signs, including his temperature, blood pressure, respirator rate, pulse, and oxygen saturation. *Id.* She reviewed his medical history, evaluated his general appearance, behavior, level of consciousness, breathing, and his mobility. *Id.* She also completed a Prison Rape Elimination Act (PREA) risk assessment. *Id.* Defendant LPN Unruh noted his gait was "stable" and made no note that Mr. May needed a cane or wheelchair at that time. Doc. 158, at 9; Doc. 155, Ex. 12, at 3.[2]

---

[2]    Plaintiffs reference the exhibits attached to their response to Defendant Sheriff's motion for summary judgment, Doc. 155, interchangeably in their

On February 2, 2022, Mr. May's cellmate notified Defendant Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). The inmate filed a sick call request form seeking help for Mr. May, noting that: "this old man marvin may hasnt eaten in 9 days or showered he needs real medical attention asap," Doc. 155, Ex. 33, at 1. Similarly, in a grievance form, the inmate wrote: "weve told staff and they aint done shit this old man marvin hasn't eaten or showerd in days he needs real medical help . . ." Doc. 155, Ex. 34. To each, Jail Officer Angie Schmidt responded: "We're going to move him to booking til the nurse comes in tomorrow so that we can watch him." Doc. 155, Ex. 33, at 2 & Ex. 34, at 1. That same day, Officer Warnke had Mr. May moved to his own cell in the "booking area," "to be monitored for his behavior and eating habits." Doc. 155, Ex. 17. She recorded that "[h]e [(Mr. May)] is to be offered a protein shake with every meal & charted on ODIS if he eats his meals or drinks his share per Lt. Stanford." *Id.*[3] Defendant LPN Unruh scheduled Mr. May for a telehealth visit

---

responses to Defendants' motions for summary judgment. For ease of reference, the undersigned will refer to the exhibits attached to Doc. 155 where the same arguments are made or where identical evidence is cited amongst the parties.

[3]    Lieutenant Martha Stanford, a non-defendant, supervised Officer Warnke. Doc. 155, Ex. 20, at 4.

with Defendant Advanced Practice Registered Nurse (APRN) Tamara Carey the next day. Doc. 140, at 6-7.

On February 3, 2022, APRN Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. Doc. 140, Ex. 2, at 35-36. APRN Carey assessed Mr. May's condition, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment for 90 days later. *Id.* Defendant LPN Unruh "assisted with some of it." Doc. 155, Ex. 15, at 3.

On February 11, 2022, Defendant LPN Unruh examined a wound on Mr. May's right hip, entered a Wound Care Note, and reported the wound to APRN Carey who ordered that antibiotic ointment be applied daily. Doc. 158, at 11; Doc. 140, Ex. 2, at 37, 40 & Ex. 3, at 12. On February 13, 2022, Officer Michael McCowen noted that Mr. May "defecated on himself" and that his feces "got . . . in his sore" and he "cleaned around [the] wound best [he] could." Doc. 155, Ex. 25, at 4 (Jail Entry Report). Defendant LPN Unruh looked at Mr. May's sore again on February 14, 2022. Doc. 140, at 7. After February 14, 2022, Defendant LPN Unruh made no further notes in Mr. May's file and never saw him again. *Id.* After February 14, 2022, officers applied the ointment, checked his blood pressure, and gave him his medications. Doc. 155, Ex. 25 (Jail Entry Report).

Officer Warnke testified that after February 14, 2022, she continued to keep Defendant LPN Unruh updated about Mr. May. Doc. 155, Ex. 11, at 39. She would tell Defendant LPN Unruh there's not really any "change in him," and ask is there "anything we can do?" *Id.* And Defendant LPN Unruh would answer, "No." *Id.* at 39-40. Jail staff reported to Officer Warnke that Mr. May was not showering or eating. *Id.* at 41. And she would encourage Mr. May to shower and eat, "[a]nd nine times out of ten, he'd take a shower." *Id.* She saw him and spoke with him each day she worked. *Id.* at 14. Officer Warnke was well-aware of Mr. May's incontinence, because she observed it "every day [she] worked." *Id.* at 19, 41-42. She updated Defendant LPN Unruh that Mr. May was still not eating, and unable to get around. *Id.* at 43-44. Officer Warnke also did not dispute the facility's meal log which showed Mr. May refused 118 of 132 meals offered to him. *Id.* at 22. And she agreed with the staff note that said Mr. May hadn't eaten in three weeks. *Id.* at 26-27. She believed Defendant LPN Unruh was "charting and keeping in contact with [APRN] Carey." *Id.* at 46.

On March 17, 2022, Officer Warnke filed a Jail Incident Report noting Mr. May refused to "set up" for a blood pressure check, and that he told her he

was "fine" and "okay." Doc. 140, Ex. 2, at 55. She noticed a pair of "soiled orange clothes," and she encouraged him to take a shower, but he refused. *Id.*

On March 18, 2022, Mr. May was discovered on the floor of his cell and became unresponsive when jail staff tried to "sit him up." *Id.* at 56. The Sheriff's Department notes from a responder state Mr. May was "naked from the waist down" and "cov[er]ed in dried feces." Doc. 155, Ex. 38. The responder further notes that "[t]he jail staff stated [Mr. May] ha[d] not ate or drank anything in 3 weeks." *Id.* Jail staff also stated that they "were unsure of the last time [he] was seen normal." *Id.* Ex. 39. Mr. May's "pupils [were] pinpoint" and he was "unable to speak" or "follow directions." *Id.* Ex. 39. The officers tried to revive him with an ammonia pack, but it had a "limited response." Doc. 140, Ex. 2, at 57. Officer Warnke notified the Turn Key provider on call, who told her "to have [Mr. May] sent to the hospital." *Id.* at 57. Officers then called for an ambulance. *Id.* at 56.

The Medical Examiner listed Mr. May's probable cause of death as "Coronavirus Disease 2019 (COVID-19) Pneumonia Sequalae." Doc. 155, Ex, 4, at 19. Plaintiff's expert, Dr. Justin Berk, will testify that "the evidence does not indicate that COVID-19 was a cause of Mr. May's death." *Id.* "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies,

8

hypotension—is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id.*

## III.   Deliberate indifference to Mr. May's medical needs.

Defendant LPN Unruh argues that Plaintiff has not cited evidence that her actions involving her care for Mr. May rise to the level of deliberate indifference. Doc. 140, at 13. Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the degree of protection against denial of medical attention which applies to convicted inmates under the Eighth Amendment. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023) (citing *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1153–54 (10th Cir. 2022)); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

The deliberate indifference standard contains both an objective and subjective component. *Lucas,* 58 F.4th at 1136. The objective component is satisfied if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Defendant LPN Unruh does not challenge the objective component of Plaintiffs' claim, and the Tenth Circuit has "held that 'death [is], without doubt, sufficiently serious to meet the objective component.'" *Burke v. Regalado*, 935

9

F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," but only that the official "merely refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." *Lucas*, 58 F.4th at 1137 (quoting *Farmer*, 511 U.S. at 842, 843 n.8.). "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence' such as whether 'the risk was obvious.'" *Id.* (quoting *Farmer*, 511 U.S. at 842). "An official disregards risk when [s]he fails to take reasonable measures to abate the risk." *Id.*

A "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Quintana v. Santa Fe Cnty. Bd. Of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020) (quoting *Farmer*, 511 U.S. at 842). But this requires "that such risks present themselves as 'obvious'

to the so-called 'reasonable man.'" *Id.* (quoting *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005)).

The Tenth Circuit recognizes two ways to establish the subjective component of a deliberate indifference claim against an individual defendant:

> [T]he subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ("failure to properly treat theory") or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ("gatekeeper theory"). The latter theory can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another. Even a brief delay in treatment can be unconstitutional.

*Lucas,* 58 F.4th at 1137 (internal citations omitted).

### A.    Objective component.

As noted, Defendant LPN Unruh concedes the objective component is met. Doc. 140, at 13-14; *see Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1045 (10th Cir. 2022) (concluding detainee's "ultimate harm of death was sufficiently serious for purposes of the objective component of deliberate indifference"); *Burke,* 935 F.3d at 994 (10th Cir 2019) (same).

### B.    Subjective component.

#### 1.    Failure to properly treat.

On February 2, 2022, days into Mr. May's detention, an inmate notified Officer Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). That resulted in Officer Warnke moving Mr. May to a cell next to Defendant LPN Unruh's office, close to the booking area "to be monitored for his behavior and eating habits." *Id.*; Doc. 155, Ex. 33, at 2 & Ex. 34, at 1.

The next day was Mr. May's medical visit with APRN Carey. Doc. 140, Ex. 2, at 35-36. Officer Warnke's Jail Incident Report notes state that Mr. May was brought via wheelchair for the visit. Doc. 155, Ex. 18. She and Defendant LPN Unruh "encouraged him to drink a protein shake and he refused to drink it but [he] drank some water." *Id.*

Officer Warnke's Jail Incident Report notes state that after the visit, APRN Carey stated Mr. May's,

> Mental condition appeared to be deteriorating rapidly and that when she had seen him at the previous county he was transported around via wheelchair at that facility also. [LPN Unruh and Officer Warnke] let [APRN Carey] know that he was moved to booking yesterday because he wasn't eating or showering while he was in the dorm housing. [APRN] Carey said that she wanted to notify Adult Protective Services about his well being due to his deteriorating mental state.

*Id.*

Officer Warnke testified she was aware of the February 3, 2022 telemedicine visit with APRN Carey and presumed that APRN Carey called Adult Protective Services, that Carey told Defendant LPN Unruh she wanted to contact Adult Protective Services, and that Officer Warnke had "seen forms come through" from Adult Protective Services. Doc. 155, Ex. 11, at 12, 23.

APRN Carey's February 3, 2022 chronic care note from Mr. May's visit documented Mr. May's COPD, and that she knew of Mr. May's "worsening Alzheimer's disease." Doc. 155, Ex. 35, at 1. "Per officer [Warnke]" she noted Mr. May had not eaten or showered in seven days. *Id.* She noted that Mr. May could not "ambulate safely alone" and scheduled another visit with her for 90 days later. *Id.* at 2.

Officer Warnke testified that Defendant LPN Unruh worked at the Jail for "12 hours a week." Doc. 155, Ex. 11, at 13. Officer Warnke testified she regularly reported to Defendant LPN Unruh about Mr. May's status. *Id.* ("I kept Stacia Unruh updated.").

Defendant LPN Unruh testified that after February 11, 2022, she did not enter any other wound care notes on Mr. May because the Jail's officers were "monitoring the wound care" after that date. Doc. 155, Ex. 15, at 8. She clarified that if the wound got worse, the officers were to report to her or the provider.

*Id.* at 9. She did not recall ever getting a report that the wound was worsening. *Id.* She testified she was never alerted of any reason she needed to go check on Mr. May after her last treatment of him on or around February 14, 2022. *Id.* at 15.

While it appears true that there are no Jail Entry Reports about Mr. May's wound from February 23, 2022 through March 16, 2022, Defendant LPN Unruh's care for Mr. May was not limited to wound care, given his many ailments.

Officer Warnke testified that on February 14, 2022, she and Defendant LPN Unruh encouraged Mr. May to shower (which he did), and then Defendant LPN Unruh looked at his wound and applied the ointment. Doc. 155, Ex. 11, at 38. After this, Officer Warnke testified she continued to keep Defendant LPN Unruh updated about Mr. May's condition. *Id.* at 39-40. When she would ask Defendant LPN Unruh if there was anything they could do for Mr. May, Defendant LPN Unruh would answer, "No." *Id.* She knew that Mr. May was sometimes refusing meals and was being offered protein shakes, which he also refused at times. *See* Doc. 155, Ex. 18.

Officer Warnke testified that because Mr. May was in the booking area, "anybody could walk by his cell" to check on him, but that if Defendant LPN

Unruh had a lot of sick calls, she might have been too busy to see him. Doc. 155, Ex. 11, at 40. Officer Warnke testified Turn Key ordered the adult diapers for Mr. May and that she recalled telling Defendant LPN Unruh that Turn Key was "ordering adult diapers for him." *Id.* at 42. Officer Warnke also believed that Defendant LPN Unruh "was charting and keeping in contact with [APRN] Carey" about Mr. May throughout his stay. *Id.* at 46. She believed "Unruh was contacting a provider regarding Mr. May . . . or documenting on him." Doc. 142, Ex. 9, at 8.

Officer Warnke testified that Defendant LPN Unruh expressed concern about Mr. May's sore becoming infected. Doc. 155, Ex. 11, at 17-18. Officer Warnke testified that her own knowledge in applying the antibacterial ointment stemmed only "from what [she had] observed at . . . nursing homes," and she did not know if her fellow officers had any training in applying the ointment. *Id.* at 18. In fact, fellow Officer Michael McCowen noted as early as February 13, 2022, that Mr. May's feces "got . . . in his sore." Doc. 155, Ex. 25, at 4.

Defendant LPN Unruh testified she was "not sure . . . whenever [Mr. May] started defecat[ing] on himself or urinating on himself," Doc. 142, Ex. 5, at 11, and did not recall if he was wearing a diaper on February 10, 11, or the

14th. *Id.* at 10-14, 16. She testified she did not recall knowing that Mr. May needed to have a diaper on February 14, 2022, the day after Officer McCowen reported feces had gotten into Mr. May's wound. *Id.* at 16.

Officer Brayan Alvarado also testified that for the "last two to three weeks" before Mr. May's death "the whole jail staff kind of knew" that Mr. May "need[ed] to go somewhere," Doc. 155, Ex. 21, at 14, i.e., "a facility that can take care of him." *Id.* He clarified that he meant a "medical facility." *Id.*

And Sheriff Daniel Day testified as follows:

> Q: Would that be your . . . . expectation with an individual who seemed like they had diagnosed dementia, and they hadn't eaten for seven days, and they were unable to shower? Would you . . . have an expectation that that person would be taken to the hospital emergently?
> . . . .
> A: Yes, sir.
> . . . .
> Q: [A] person who has refused or who has an inability to eat for over a week, that's something that anyone, whether they've had medical training or not, should be aware of as an emergent medical situation. Agreed?
> . . . .
> A: Yes, sir.

Doc. 155, Ex. 1, at 10-11.

Defendant LPN Unruh argues that because no officer contacted her, she thought that no further medical care was needed for Mr. May. Doc. 140, at 20.

16

Also, Defendant LPN Unruh observed no signs or symptoms of COVID-19, nor did Mr. May exhibit any. *Id.*

But that is not the medical care at issue. Given the record here, there is evidence from which a reasonable juror could conclude that Defendant LPN Unruh acted with deliberate indifference. She knew he was moved close to booking on February 2, in fact "next to her office," Doc. 148, at 2, because of concern for his medical status. She knew his Alzheimer's was worsening, given APRN Carey's Chronic care notes. She knew he could not walk without assistance. She knew Turn Key was ordering adult diapers for Mr. May, she knew he had a bed sore requiring prescription bacterial ointment with routine applications and expressed concern about it getting infected. Doc. 155, Ex. 11, at 17-18, 20, 38-39. And a quick look at the February 13, 2022 Jail Entry Report would have informed her that feces did in fact get into Mr. May's bed sore. Doc. 155, Ex. 25, at 4. This is not a case where she exercised her considered medical judgment. During her twelve hours of weekly time at the jail from February 14 through March 17, 2022, she did not stop in next to her office to check on Mr. May even though "anybody could walk by his cell and open the window and look at him and see how he was." Doc. 155, Ex. 11, at 40.

17

A reasonable jury may conclude that Defendant LPN Unruh acted with deliberate indifference to Mr. May's medical needs by not checking in on him in person even once over the four weeks he was there before he fell from his bunk. The record shows that Defendant LPN Unruh failed to treat Mr. May or provide him with proper medical care based upon her knowledge of his medical condition. *Lucas*, 58 F.4th at 1139 ("[M]erely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability.").

### 2.      Liability under the gatekeeper theory.

Similarly, there is evidence from which a reasonable juror could conclude that Defendant LPN Unruh acted with deliberate indifference under the "gatekeeper" theory. Defendant LPN Unruh was the only medical professional at the Jail, present two days a week. Doc. 155, Ex. 15, at 9-11. She was not allowed to perform patient assessments. *Id.* at 5. As noted above, given the information she had about Mr. May's worsening condition, a juror could find it deliberately indifferent not to contact APRN Carey to update her or anyone else who might assess him. *Paugh*, 47 F.4th at 1155; *see also id.* at 1160 ("[A] reasonable jury could find that [the defendant] was aware that [the inmate]

18

was in obvious need for medical attention, and . . . abdicated her gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)).

## IV.    Recommendation and notice of right to object.

For the reasons set forth above, the undersigned recommends the Court deny Defendant LPN Unruh's motion for summary judgment. Doc. 140.

The undersigned advises Defendant of her right to file an objection to this report and recommendation with the Clerk of this Court on or before April 21, 2026, in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2). The undersigned further advises Defendant that failure to make a timely objection to this report and recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation does not terminate the referral to the undersigned Magistrate Judge in this matter.

**ENTERED** this 31st day of March, 2026.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE