**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LISA M. HICE, ) | |
| LEANN D. HOFF, ) | |
| as Co-Administrators of the ) | |
| Estate of Marvin G. May, ) | |
| Deceased, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. CIV-24-119-JD |
| ) | |
| TURN KEY HEALTH CLINICS, ) | |
| LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

On January 25, 2022, Decedent Marvin G. May was booked into the Custer County Jail as a pretrial detainee. Doc. 1, at 4. Upon booking, Mr. May was 74 years old with a recorded past medical history of diabetes mellitus, chronic obstructive pulmonary disease (COPD), and cardiovascular disease. *Id.* Before and during his detention, Mr. May suffered from various ailments including dementia, arthritis, high blood pressure, a worsening bed sore, incontinence, and difficulty walking. *Id.* at 6; Doc. 157, at 11. On March 18, 2022, Mr. May fell out of his bunk and was transported to the emergency room where he was pronounced dead. Doc. 1, at 9. The Co-Administrators of his Estate brought this action under 42 U.S.C. § 1983 alleging Defendants deprived Mr. May of medical care in violation of his rights under the

Fourteenth Amendment of the U.S. Constitution and Oklahoma law. *Id.* at 1; *see generally* Doc. 1. United States District Judge Jodi W. Dishman referred this matter to the undersigned Magistrate Judge consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 3.

Before the Court is Defendant Turn Key Health Clinics, LLC's (Turn Key) Motion for Summary Judgment, Doc. 142. Plaintiffs filed a response in opposition, Doc. 157, and Turn Key has replied. Doc. 180. So the matter is at issue.[1] The undersigned recommends the Court deny Turn Key's motion for summary judgment.

## I.    Legal standards.

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[1]    Citations to a court document are to its electronic case filing designation and pagination. Except for capitalization, quotations are verbatim unless otherwise indicated.

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (internal quotation citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023).

## II.    Background.

Defendant Turn Key contracted with the Custer County Sheriff's Office (Custer County) and the Board of County Commissioners of Custer County to provide certain medical care and treatment to inmates and detainees at the Custer Couty Jail. Doc. 142, at 7. The contract requires Turn Key to provide twelve hours of weekly "on-site nursing services by a Registered Nurse (RN) or a Licensed Practical Nurse (LPN)." *Id.* at 7-8. The contract also requires that

a physician or mid-level provider provide a weekly patient clinic either in-person or via telemedicine. *Id.* Turn Key was responsible for ensuring 24/7 availability of an on-call physician or mid-level provider. *Id.* at 8.

During the relevant dates, Defendant LPN Stacia Unruh worked as a Turn Key employee at the Jail. *Id.* Defendant Advanced Practice Registered Nurse (APRN) Tamara Carey was also employed by Turn Key and provided telehealth visits at the Jail. *Id.*

On January 25, 2022, Mr. May was transferred to the Jail from the Canadian County Jail. *Id.* Two days later, LPN Unruh conducted a medical intake screening on Mr. May. *Id.* She recorded his vital signs, including his temperature, blood pressure, respiratory rate, pulse, and oxygen saturation. *Id.* She reviewed his medical history, evaluated his general appearance, behavior, level of consciousness, breathing, and his mobility. *Id.* at 8-9. She noted his gait was "stable" and made no note that Mr. May needed a cane or wheelchair. Doc. 155, Ex. 2, at 19-25.

On February 2, 2022, Mr. May's cellmate notified Defendant Officer Julie Warnke that Mr. May had not eaten in several days and refused to

shower. Doc. 155, Ex. 17 (Jail Incident Report).[2] The inmate filed a sick call request form seeking help for Mr. May, noting: "this old man marvin may hasnt eaten in 9 days or showered he needs real medical attention asap," Doc. 155, Ex. 33, at 1. Similarly, in a grievance form, the inmate wrote, "weve told staff and they aint done shit this old man marvin hasn't eaten or showerd in days he needs real medical help . . ." Doc. 155, Ex. 34, at 1. To each, Jail Officer Angie Schmidt responded: "We're going to move him to booking til the nurse comes in tomorrow so that we can watch him." Doc. 155, Ex. 33, at 2 & Ex. 34, at 1. That same day, Officer Warnke had Mr. May moved to his own cell in the "booking area," "to be monitored for his behavior and eating habits." Doc. 155, Ex. 17.  She testified that those cells were reserved "just for an emergency like this." Doc. 134, Ex. 15, at 44. She recorded that Mr. May was "to be offered a protein shake with every meal & charted on ODIS if he eats his meal or drinks his share per Lt. [Martha] Stanford." Doc. 155, Ex.

---

[2]    Plaintiffs reference the exhibits attached to their response to Defendant Sheriff's motion for summary judgment, Doc. 155, interchangeably in their responses to Defendants' motions for summary judgment. For ease of reference, the undersigned will refer to the exhibits attached to Doc. 155 where the same arguments are made or identical evidence is cited amongst the parties.

17. [3] LPN Unruh scheduled Mr. May for a telehealth visit with APRN Carey the next day. Doc. 142, at 9.

On February 3, 2022, APRN Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. *Id.* & Ex. 2, at 35-36. APRN Carey assessed Mr. May's condition, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment for 90 days later. Doc. 142, at 9 & Ex. 2, at 35-36. Defendant Unruh "assisted with some of it." Doc. 155, Ex. 15, at 3. A jail incident report noted that ARPN Carey observed Mr. May's "mental condition appeared to be deteriorating rapidly" and "she wanted to notify adult protective services about his well being due to his deteriorating mental state." *Id.* Ex. 18.

"On or around February 10 or 11th, 2022, [LPN] Unruh" examined a wound on Mr. May's right hip, entered a Wound Care Note, and reported the wound to APRN Carey who ordered that antibiotic ointment be applied daily. Doc. 142, at 10; Doc. 155, Ex. 11, at 17. LPN Unruh looked at Mr. May's sore again on February 14, 2022. Doc. 142, at 10. After February 14, 2022, LPN Unruh had no further notes in Mr. May's file and never saw him again. *Id.*

---

[3]    Lieutenant Martha Stanford, a non-defendant, supervised Officer Warnke. Doc. 155, Ex. 20, at 4.

After February 14, 2022, officers applied the ointment, checked his blood pressure, and gave him his medications. Doc. 155, Ex. 25 (Jail Entry Report).

Officer Warnke testified that after February 14, 2022, she continued to keep LPN Unruh updated about Mr. May. Doc. 155, Ex. 11, at 39. She would tell LPN Unruh there's not really any "change in him," and ask is there "anything we can do?" *Id.* And LPN Unruh would respond, "No." *Id.* at 39-40. Jail staff reported to Officer Warnke that Mr. May was not showering or eating. *Id.* at 41. She would encourage Mr. May to shower and eat, "[a]nd nine times out of ten, he'd take a shower." *Id.* She saw him and spoke with him each day she worked. *Id.* at 14. Officer Warnke was well-aware of Mr. May's incontinence. *Id.* at 19, 41-42. She updated LPN Unruh that Mr. May was still not eating, and unable to get around. *Id.* at 43-44. She also did not dispute the facility's meal log which showed Mr. May refused 118 of 132 meals offered to him. *Id.* at 22. And she agreed with the staff note that said Mr. May had not eaten in three weeks. *Id.* at 26-27.

On March 17, 2022, Officer Warnke filed a Jail Incident Report noting Mr. May refused to "[s]et up" for a blood pressure check, and that he told her he was "fine" and "okay." Doc. 142, Ex. 2, at 55. She noticed a pair of "soiled orange clothes," and she encouraged him to take a shower, but he refused. *Id.*

On March 18, 2022, Mr. May was discovered on the floor of his cell and became unresponsive when jail staff tried to "sit him up." *Id.* at 56. The Sheriff's Department notes from a responder state Mr. May was "naked from the waist down" and "cov[er]ed in dried feces." Doc. 155, Ex. 38. The responder further notes that "[t]he jail staff stated [Mr. May] ha[d] not ate or drank anything in 3 weeks." *Id.* Jail staff also stated that they "were unsure of the last time [he] was seen normal." *Id.* Ex. 39. Mr. May's "pupils [were] pinpoint" and he "was unable to speak" or "follow directions." *Id.* The officers tried to revive him with an ammonia pack but this had a "limited response." Doc. 142, Ex. 2, at 57. Officers then called for an ambulance. *Id.* at 56.

The Medical Examiner listed Mr. May's probable cause of death as "Coronavirus Disease 2019 (COVID-19) Pneumonia Sequalae." Doc. 155, Ex, 4, at 19. Plaintiff's expert, Dr. Justin Berk, concluded that "the evidence does not indicate that COVID-19 was a cause of Mr. May's death." *Id.* "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension—is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id.*

### III.    Standard of review for Turn Key's liability.

A plaintiff may sue local governing bodies directly for constitutional violations pursuant to the body's policies. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). And *Monell* extends to "private entities acting under color of state law," such as medical contractors like Turn Key. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

To establish municipal liability, a plaintiff must show: (1) the existence of a policy or custom, (2) a direct causal link between the policy or custom and a constitutional injury, and (3) that the municipality acted with deliberate indifference. *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048-51 (10th Cir. 2022). "A core principle of *Monell* liability is that municipal entities are liable for only their own actions and not vicariously liable for the actions of their employees." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). But "[b]ecause municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Id.* So "municipal liability arises when an individual defendant violates a pretrial detainee's rights while aligning with an official municipal policy or custom." *Barlean v. Oklahoma Cnty. Crim. Just. Auth.,* No. CIV-23-00488-JD, 2024 WL 4480184, at *2 (W.D. Okla. Oct. 11, 2024).

9

There is also a "limited exception to the requirement of individual unconstitutional action." *Buchanan v. Turn Key Health Clinics, LLC*, 2023 WL 6997404, at *7 (10th Cir. 2023) (quotations omitted). "[W]hen a municipal-liability claim is premised on the municipality's 'systemic failure[s],' no single individual defendant need be found liable. Rather, 'the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights.'" *Johnson v. Davis Cnty.*, 2022 WL 830202, at *3 (10th Cir. 2022) (internal citation omitted) (quoting *Crowson*, 983 F.3d at 1186); *see also Crowson*, 983 F.3d at 1192 (recognizing that even if health care providers "[do] not violate the Constitution individually, . . . their *combined* acts may be sufficient for *Monell* liability such that [a plaintiff] still has a claim for municipal liability irrespective of whether [an individual health care provider] violated his rights"; distinguishing between claims against a county premised on "*systemic* failures" and claims dependent upon a "predicate violation" by an individual defendant. (quotations and citation omitted)). That is, "the municipality may not escape liability by acting through twenty hands rather than two." *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1233 n.13 (10th Cir. 2025) (quoting *Crowson*, 983 F.3d at 1191). Whatever *Monell* theory a plaintiff advances, it is well settled "a

10

claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no constitutional violation." *Crowson*, 983 F.3d at 1186.

## IV.    Individual actions.

Plaintiffs allege that Turn Key employees violated Mr. May's constitutional right to adequate medical care and that Turn Key's policies or customs served as the moving force behind these violations. Doc. 157, at 18-24.

### A. The underlying constitutional violations.

The undersigned recommended that the Court deny Defendants LPN Unruh and Defendant APRN Carey's motions for summary judgment, given that a jury could reasonably find each deliberately indifferent under both the failure to treat and gatekeeper theories.  Docs. 183 & 184.

On February 2, 2022, an inmate notified Defendant Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). That resulted in Officer Warnke moving Mr. May to a cell next to LPN Unruh's office, close to the booking area "to be monitored for his behavior and eating habits." *Id*.; Doc. 155, Ex. 33, at 2 & Ex. 34, at 1. APRN Carey was aware Mr. May had been moved. Doc. 155, Ex. 18.

The next day was Mr. May's medical visit with APRN Carey. Officer Warnke's Jail Incident Report notes state Mr. May was brought in via wheelchair for the visit. *Id.* She and LPN Unruh "encouraged him to drink a protein shake and he refused to drink it[,] but [he] drank some water." *Id.*

Officer Warnke's Jail Incident Report notes state that after the visit, APRN Carey stated Mr. May's,

> Mental condition appeared to be deteriorating rapidly and that when she had seen him at the previous county he was transported around via wheelchair at that facility also. [LPN Unruh and Officer Warnke] let [APRN Carey] know that he was moved to booking yesterday because he wasn't eating or showering while he was in the dorm housing. [ARPN] Carey said that she wanted to notify Adult Protective Services about his well being due to his deteriorating mental state.

*Id.*

Officer Warnke testified she was aware of Mr. May's February 3, 2022 telemedicine visit with APRN Carey, that Carey told her and LPN Unruh she wanted to contact Adult Protective Services, and that she had "seen forms come through" from Adult Protective Services. Doc. 155, Ex. 11, at 12, 23.

APRN Carey's February 3, 2022 chronic care note from Mr. May's visit documented Mr. May's COPD, and that she knew of Mr. May's "worsening Alzheimer's disease." Doc. 155, Ex. 35, at 1. "Per officer [Warnke]" she noted Mr. May had "not eaten or showered" in seven days. *Id.* She noted that Mr.

May could not "ambulate safely alone" and scheduled another visit with her for 90 days later. *Id.* at 2.

A February 3, 2022 email from Oklahoma Human Services to the Oklahoma Department of Health relayed concerns from an Adult Protective Services screener that:

> [Mr. May] uses a cane or a wheelchair, since [he] is not allowed to use a cane in the jail. Reporter stated [Mr. May] has Alzheimer's. He can speak and talk, but his symptoms are getting worse. . . . Reporter stated they do not believe [Mr. May] needs to be in jail for missing court. Reporter does not know what the home conditions are. Reporter feels [Mr. May] needs to be in a nursing home or something, not in jail. [He] has been incarcerated for at least 2-3 months, maybe longer, but too long from a medical standpoint. . . . Reporter stated they saw [Mr. May] today via telemedicine. The staff at the jail are reporting [he] has not eaten or showered in 7 days. Reporter stated if [Mr. May] is not getting up to eat or shower, no one is telling him to.

Doc. 155, Ex. 2, at 2-3. APRN Carey confirmed the accuracy of the email as the summary of the report she gave Adult Protective Services. Doc. 155, Ex. 3, at 19-20.

Given the record here, there is evidence from which a reasonable juror could conclude that APRN Carey acted with deliberate indifference on or after February 3, 2022. Her chronic care notes outline Mr. May's worsening Alzheimer's, his inability to walk without assistance, and that he had not eaten or showered in a week. She agreed Mr. May had been in jail too long from a

13

medical standpoint and that he did not belong in jail, from a medical standpoint. *Id.* at 26. She testified Mr. May had a risk of falling. *Id.* at 28. She knew he had been moved close to the booking area "because he wasn't eating or showering." Doc. 155, Ex. 18. Her concerns were "worsening of those things." Doc. 155, Ex. 3, at 28. And that is exactly what happened without more intensive treatment outside the Jail's setting. She never attempted to follow up with Defendant Unruh, the only medical professional physically present at the Jail. *Id.* at 16-17, 51-52.

Nor did APRN Carey supervise Defendant Unruh "to ensure that [she] was medically monitoring Mr. May['s] condition." *Id.* at 51-52. She only scheduled a follow-up telehealth visit for Mr. May—90 days from when she observed his rapidly deteriorating condition. Doc. 155, Ex. 35, at 2.

APRN Carey also contacted Adult Protective Services on February 3, 2022, to try to arrange for care for when Mr. May was released. Doc. 155, Ex. 2, at 2-3 & Ex. 3, at 19-20.[4] Her urgent efforts underscore her concerns for Mr.

---

[4]     Plaintiff's expert Dr. Berk testified that APRN Carey should have sought a higher level of care for Mr. May on February 3, 2022. Doc. 155, Ex. 22, at 6 ("If you're that concerned about the care of this patient and feel like they need a nursing home. . . . that means inherently they need a higher level of care than what can be provided in the jail and, therefore, a higher level of care should have been sought."); *see also* Doc. 155, Ex. 4, at 8.

14

May's continued decline. And his decline continued. Within ten days, Mr. May was incontinent and had developed a bed sore requiring prescription ointment, which APRN Carey prescribed. Doc. 142, Ex. 4, at 21.

APRN Carey was the only medical professional licensed to perform a medical assessment as LPN Unruh could not perform a medical assessment. *See* Doc. 155, Ex. 15, at 5-6. There is no indication she gave monitoring instructions to LPN Unruh. She testified that it was her medical judgment that Mr. May did not belong in the Jail. Doc. 155, Ex. 3, at 25-26. APRN contacted Adult Protective Services, as noted, but she did not follow up with them. And she testified that contact was for arrangements for when he was released from the Jail. *Id.* at 15. Given the information she had about Mr. May's worsening condition, a juror could find she was deliberately indifferent by not contacting an off-site specialty care service to treat Mr. May. *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1160 (10th Cir. 2022) ("[A] reasonable jury could find that Anderson abdicated her gatekeeping duties by failing to obtain medical assistance for Paugh. Anderson understood that if Paugh exhibited red flags of alcohol withdrawal, meaning that if his condition worsened . . . in *any way*, she would have to return him to the hospital.") (internal quotation marks and record citations omitted); *see also Stella v. Davis Cnty.*, 2024 WL 4764694, at

15

*7 (10th Cir. Nov. 13, 2024) ("[A] delay in medical care that results in substantial harm, such as 'considerable pain' or death while awaiting treatment, can satisfy the objective component.") (quoting *Paugh*, 47 F.4th at 1155). Under both the failure to provide medical treatment and gatekeeper theories, there is evidence of APRN Carey's constitutional violations.

Similarly, for LPN Unruh, Officer Warnke testified that LPN Unruh worked at the Jail for "12 hours a week." Doc. 155, Ex. 11, at 13. Officer Warnke testified she regularly reported to LPN Unruh about Mr. May's status. *Id.* ("I kept Stacia Unruh updated.").

LPN Unruh testified that after February 11, 2022, she did not enter any more wound care notes for Mr. May because the Jail's officers were "monitoring the wound care" after that date. Doc. 155, Ex. 15, at 8. She clarified that if the wound got worse, the officers were to report to her or the provider. *Id.* at 9. She did not recall ever getting a report that the wound was worsening. *Id.* She testified she was never alerted of any reason she needed to go check on Mr. May after her last treatment of him on or around February 14, 2022. *Id.* at 15.

While it appears true that there are no Jail Entry Reports about Mr. May's wound from February 23, 2022 through March 16, 2022, LPN Unruh's care for Mr. May was not limited to wound care, given his many ailments.

16

Officer Warnke testified that on February 14, 2022, she and LPN Unruh encouraged Mr. May to shower (which he did), and then Nurse Unruh looked at his wound and applied the ointment. Doc. 155, Ex. 11, at 38-39. After this, Officer Warnke testified she continued to keep Nurse Unruh updated about Mr. May's condition. *Id.* at 39-40. When she would ask Nurse Unruh if there was anything they could do for Mr. May, Nurse Unruh would answer "No." *Id.* Unruh knew that Mr. May was sometimes refusing meals and was being offered protein shakes, which he also refused at times. *See* Doc. 155, Ex. 18.

Officer Warnke testified that because Mr. May was in the booking area, "anybody could walk by his cell" to check on him, but that if Nurse Unruh had a lot of sick calls, she might have been too busy to see him. Doc. 155, Ex. 11, at 40. Officer Warnke testified Turn Key ordered the adult diapers for Mr. May and that she recalled telling LPN Unruh that Turn Key was "ordering adult diapers for him." *Id.* at 42. Officer Warnke also believed that LPN Unruh "was charting and keeping in contact with [APRN] Carey" about Mr. May throughout his stay. *Id.* at 46. She believed "[LPN] Unruh was contacting a provider regarding Mr. May . . . or documenting on him." Doc. 142, Ex. 9, at 8.

Officer Warnke testified that LPN Unruh expressed concern about Mr. May's sore becoming infected. Doc. 155, Ex. 11, at 17-18. Officer Warnke

17

testified that her own knowledge in applying the antibacterial ointment stemmed only "from what [she had] observed at . . . nursing homes," and did not know if her fellow officers had any trainings in applying the ointment. *Id.* at 18. In fact, fellow Officer Michael McCowen noted as early as February 13, 2022, that Mr. May's feces "got . . . in his sore." Doc. 155, Ex. 25, at 4.

Officer McCowen testified that he was the first one to place adult diapers on Mr. May, because he was "just laying there defecating and urinating on himself in the bed." Doc. 155, Ex. 23, at 4. He told Officer Warnke and Lt. Stanford about this. *Id.* at 5-6. Officer McCowen testified that it concerned him that Mr. May was "not eating," not "lucid," "not ambulatory" and "laying in his own waste." *Id.* at 6. He testified that he and his fellow detention officers mentioned to Officer Warnke and Lt. Stanford that they believed Mr. May belonged in a hospital or a nursing home. *Id.* at 5-6.

LPN Unruh testified she was "not sure . . . whenever [Mr. May] even started defecat[ing] on himself or urinating on himself," Doc. 142, Ex. 5, at 11, and did not recall if he was wearing a diaper on February 10, 11, or the 14th. *Id.* at 10-14, 16. She testified she did not recall knowing Mr. May needed to wear a diaper on February 14, 2022, the day after Officer McCowen reported feces had gotten into Mr. May's wound. *Id.* at 16.

Officer Brayan Alvarado also testified that for the "last two to three weeks" before Mr. May's death "the whole jail staff kind of knew" that Mr. May "need[ed] to go somewhere," Doc. 155, Ex. 21, at 14, i.e., "a facility that can take care of him." *Id*. He clarified that he meant a "medical facility." *Id*.

Given the record present before the Court, there is evidence from which a reasonable juror could conclude that Nurse Unruh acted with deliberate indifference to Mr. May's medical needs. She knew he was moved close to booking on February 2, in fact "next to her office," because of concern for his medical status. Doc. 148, at 2; Doc. 142, Ex. 5, at 28, 29. She knew his Alzheimer's was worsening, given ARPN Carey's Chronic care notes. She knew he could not walk without assistance. She knew Turn Key was ordering adult diapers for Mr. May, she knew he had a bed sore requiring prescription bacterial ointment with routine applications, and expressed concern about it getting infected. Doc. 155, Ex. 11, at 17-18, 20, 38-39. And a quick look at the February 13, 2022 Jail Entry Report would have informed her that feces did in fact get into Mr. May's bed sore. Doc. 155, Ex. 25, at 4.

During her weekly shifts at the jail from February 14 through March 17, 2022, she did not stop in to check on Mr. May, who was housed next door to her office. Doc. 142, Ex. 5, at 29. A reasonable juror could conclude that Nurse

19

Unruh acted with deliberate indifference to Mr. May's medical needs by not checking in on him in person even once over the four weeks he was there before he fell from his bunk. The record shows that LPN Unruh failed to treat Mr. May or provide him with proper medical care based on her knowledge of his medical condition. *Lucas v. Turn Key Health Clinics, LLC,* 58 F.4th 1127, 1139 (10th Cir. 2023) ("[M]erely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability.").

Similarly, there is evidence from which a reasonable jury could conclude that LPN Unruh acted with deliberate indifference under the "gatekeeper" theory. LPN Unruh was the only medical professional at the Jail, present two days a week. Doc. 142, Ex. 5, at 4; *see e.g.,* Doc. 155, Ex. 15, at 9-11. She is not allowed to perform patient assessments. Doc. 155, Ex. 15, at 5. Turn Key argues LPN Unruh properly exercised her professional judgment whenever she was notified of Mr. May's need for treatment. *See* Doc. 180, at 10. But given the information she had about Mr. May's worsening condition, a juror could find it deliberately indifferent not to contact APRN Carey to update her or anyone else who might assess him. *Paugh,* 47 F.4th at 1155; *see also id.* at 1160 ("[A] reasonable jury could find that [the defendant] was aware that [the inmate] was in obvious need for medical attention, and . . . abdicated her

20

gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)).

## V.    Systemic failure of medical policies and procedures at the Jail.

Plaintiffs allege that Turn Key maintained an unconstitutional health care delivery system. Doc. 157, at 20-23. Plaintiffs maintain that Turn Key provided inadequate staffing and procedures. *Id.* at 21 (citing *Prince, 28* F.4th at 1049-51). They argue that having one LPN available up to twelve hours a week was insufficient for 150 inmates. *Id.* at 21-22 (citing Officer Warnke's testimony, Doc. 155, Ex. 11, at 24-25). APRN Carey provided telehealth visits once a week for 150 inmates at Custer County, was on call for two weeks at a time, and was responsible for thirteen or fourteen facilities. *Id.* at 23 (citing APRN Carey's testimony, Doc. 155, Ex. 3, at 33-35, 50-51).

As relevant here, Plaintiffs raise the *Monell* claim that Turn Key's failures "are the driving force behind [] constitutional violation[s] by [Carey and/or Unruh]." *Crowson*, 983 F.3d at 1186.

Turn Key relies on its arguments that no underlying constitutional violation occurred and that neither APRN Carey nor LPN Unruh acted with deliberate indifference. Doc. 142, at 16-19. And that it had a system in place to

contact a medical provider if needed that was known to the Jail's officers, and it was presumably not needed with respect to Mr. May. *Id.* at 20.

As to its underlying policies, Turn Key argues that Plaintiffs' expert Dr. Berk did not review any of Turn Key's policies, and that he was not sure if some of the "written policies and procedures" he reviewed were in fact Turn Key policies. *Id.* at 30. At bottom, Turn Key argues that the 12-hour nursing schedule combined with the off-site round-the-clock provider provided continuous access to medical care. *Id.* at 34-35; Doc. 180, at 14.

Turn Key argues that "Plaintiffs' criticisms" seems to be with the Jail's budgetary limitations, Doc. 180, at 13, and that it complied with its contractual obligations. Turn Key also argues that Dr. Berk acknowledged that with twelve hours of nursing care a week staffed, facilities such as the Jail would necessarily have to rely on sending patients to emergency rooms. *Id.* at 14-15; Doc. 142, Ex. 7, at 18-19.

With respect to Mr. May's missing meals, and how many missed meals might amount to a medical emergency, Officer Michael McCowen testified he did "not feel that [he] had the authority to make that call." Doc. 155, Ex. 23, at 13. He understood he was to take Mr. May's blood pressure, and monitor "him during the day." *Id.* at 13-14. He also cleaned Mr. May's wound, but

22

acknowledged he received no training with respect to wound care. *Id.* at 10-11, 13-14. And he did not know if a nurse was providing wound care and he had no training as to what fluctuating blood pressure might indicate. *Id.* at 14-15. Similarly, Officer Brayan Alvarado testified he had no training as to what signs or symptoms might indicate an emergent condition. Doc. 155, Ex. 21, at 15. He also did not know what blood pressure readings "might indicate an emergent medical condition." *Id.* at 16. He maintained it was Turn Key and Officer Warnke who would know what blood pressure readings indicated an emergent condition "because they[] [were] the ones supervising that." *Id.*

Officer McCowen testified that for inmates whose mental health conditions exceeded the jail's ability to treat, he would verbally advise up the chain of command. Doc. 155, Ex. 23, at 16-18. As to whether an inmate with mental health issues could ever just go directly to the hospital, Officer McCowen answer that he did not know, that "decision[] would have been made outside of [his] realm." *Id.* at 18.

Officer Alvarado verbally alerted his supervisors that he thought Mr. May should not be housed where he was, and the staff and inmates agreed the "jail was not fully equipped to take care of [Mr. May.]" Doc. 155, Ex. 21, at 5, 14. He testified Mr. May spoke mostly "gibberish," was in his diaper

"generally," was not eating or walking, and he believed Mr. May needed "a medical facility" that could take care of him. *Id.* at 11-15. But, he was not going to going over the heads of his supervisors, as that was "above [his] pay grade." *Id.* at 14.

Officer McCowen clarified that if Mr. May had a medical emergency, he would call EMS, not Turn Key. Doc. 142, Ex. 14, at 5. And Officer Alvarado testified that "[e]verything would be . . . funneled to [Officer] Warnke, then from Warnke to Turn Key," but he did know he could contact Turn Key, and EMS if necessary. Doc. 142, Ex. 15, at 3, 6.

Returning to Turn Key and its employees, APRN Carey was on call for twenty-four hours for thirteen or fourteen facilities for two weeks at a time. Doc. 155, Ex. 3, at 34, 51. She testified she was overwhelmed and reported this to Dr. William Cooper, Turn Key's Chief Medical Officer. *Id.* at 35, 51. And in the end, APRN Carey resigned in part due to how overwhelmed she was from covering "seven jails" and getting calls "all through the day [and] all through the night." *Id.* at 32. Nurse Unruh testified that her training was nothing more specific than a "general shadowing on the job." Doc. 142, Ex. 5, at 4.

Dr. Cooper testified that Turn Key does not keep a log of preventable deaths, but admitted that doing so might help determine whether systemic

24

problems contributed to these deaths. Doc. 155, Ex. 42, at 3, 5. He testified that Turn Key reviewed all in-custody deaths. *Id.* at 4. He admitted that there is no written record as to whether Turn Key has educated its staff on what it may have done wrong if there was a systemic problem. *Id.* at 8. Dr. Cooper testified that he didn't recognize a systemic problem. *Id.* He testified he recognized a total of three preventable deaths at Turn Key, but he could not remember who those persons were. *Id.* at 8-9. He testified that he would have to consider whether keeping a log of preventable deaths would "put [him] at a higher liability risk or not." *Id.* at 6. He testified that Turn Key does not log preventable deaths because doing so is not required. *Id.* at 5, 12.

Turn Key did not employ a licensed physician, nor a Registered Nurse, nor an on-site provider, and its contract with the Jail did not require it to do so. *See* Doc. 142, Ex. 1 (Turn Key contract). It did not track preventable deaths nor train its staff on systemic problems, because it was not required to do so. Outside of the twelve hours LPN Unruh was present per week, untrained jail guards were left to provide medical care to the inmates, including Mr. May. They were left to determine when emergent medical conditions arose. And even then, the untrained jail guards would only verbally alert superiors, and Officer Warnke was advising LPN Unruh.

Turn Key's unofficial policies or customs drove the actions of APRN Carey, who knew of Mr. May's many preexisting conditions, and his deteriorating mental and physical state. She called Adult Protective Services on his behalf, and told them Mr. May had been incarcerated for far too long already. Turn Key's unofficial policies or customs also drove the actions of LPN Unruh who knew of Mr. May's precipitous decline, but still failed to check on him or alert APRN Carey of his need for a greater level of care following her last recorded interaction with him on February 14, 2022. *See* Doc. 142, Ex. 5, at 29.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Turn Key had unofficial policies or customs of failing to provide sufficient medical staffing and resources which contributed to delays in medical attention resulting in deliberate indifference toward Mr. May's medical needs. Further, a reasonable jury could conclude that Turn Key acted with deliberate indifference to these failures and that these policies caused Mr. May's death.

## VI.    Recommendation and notice of right to object.

For the reasons set forth above, the undersigned recommends the Court deny Defendant Turn Key's motion for summary judgment. Doc. 142.

26

The undersigned advises the parties of their rights to file an objection to this report and recommendation with the Clerk of this Court on or before April 21, 2026, in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2). The undersigned further advises the parties that failure to make a timely objection to this report and recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation does not terminate the referral to the undersigned Magistrate Judge in this matter.

**ENTERED** this 31st day of March, 2026.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

27