# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LISA M. HICE,<br>LEANN D. HOFF,<br>as Co-Administrators of the<br>Estate of Marvin G. May,<br>Deceased,<br><br>       Plaintiffs,<br><br>v.<br><br>TURN KEY HEALTH CLINICS,<br>LLC et al.,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. CIV-24-119-JD |

## REPORT AND RECOMMENDATION

On January 25, 2022, Decedent Marvin G. May was booked into the Custer County Jail as a pretrial detainee. Doc. 1, at 4. Upon booking, Mr. May was 74 years old with a recorded past medical history of diabetes mellitus, chronic obstructive pulmonary disease (COPD), and cardiovascular disease. *Id.* Before and during his detention, Mr. May suffered from various ailments including arthritis, dementia, high blood pressure, a worsening bed sore, incontinence, and difficulty walking. *Id.* at 6; Doc. 159, at 18. On March 18, 2022, Mr. May fell out of his bunk and was transported to the emergency room where he was pronounced dead. Doc. 1, at 9. The Co-Administrators of his Estate brought this action under 42 U.S.C. § 1983 alleging Defendants deprived Mr. May of medical care in violation of the Fourteenth Amendment

of the U.S. Constitution and Oklahoma law. *Id.* at 1; *see generally* Doc. 1. United States District Judge Jodi W. Dishman referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 3.

Before the Court is Defendant and Jail Officer Julie Warnke's Motion for Summary Judgment, Doc. 134. Plaintiffs filed a response in opposition, Doc. 159, and Defendant Warnke has replied. Doc. 177. So the matter is at issue.[1] The undersigned recommends the Court deny Defendant Warnke's motion for summary judgment.

## I.    Legal standards.

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[1]    Citations to a court document are to its electronic case filing designation and pagination. Except for capitalization, quotations are verbatim unless otherwise indicated.

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023).

## II.    Background.

Defendant Turn Key Health Clinics, LLC (Turn Key) contracted with the Custer County Sheriff's Office (Custer County) and the Board of County Commissioners of Custer County to provide certain medical care and treatment to inmates and detainees at the Custer County Jail. Doc. 134, at 9; Doc 159, at 8. The contract requires Turn Key to provide twelve hours of weekly "on-site nursing services." Doc. 159, at 10 (quoting Doc. 155, Ex. 13, at 4 (Turn

Key Contract)).[2] The contract also requires that a physician or mid-level provider provide a weekly patient clinic either in-person or via telemedicine. Doc. 155, Ex. 13, at 4. Turn Key was responsible for ensuring 24/7 availability of an on-call physician or mid-level provider for "emergency consultation." *Id.*

During the relevant dates, Defendant Licensed Practical Nurse (LPN) Stacia Unruh worked as a Turn Key employee at the Jail two days a week. Doc. 134, at 10; Doc. 159, at 11. She served as the only medical professional physically present at the Jail. Doc. 159, at 11. The jail employed Defendant Warnke as its "medical officer," but she was not a medical provider. Doc. 134, at 11; Doc. 159, at 13. Defendant Warnke had eight years of experience taking care of patients with Alzheimer's and dementia, including patients in a memory care unit. Doc. 134, at 11. She was certified as a Certified Nursing Assistant (CNA) in 2001, and as a Certified Medication Aide (CMA) in 2009. *Id.* Her CMA certification expired in 2011. Doc, 159, at 12 (citing Doc. 155, Ex. 16). She could take vital signs, check blood sugar, pull medical charts, pass out

---

[2] Plaintiffs reference the exhibits attached to their response to Defendant Sheriff's motion for summary judgment, Doc. 155, interchangeably in their responses to Defendants' motions for summary judgment. For ease of reference, the undersigned will refer to the exhibits attached to Doc. 155 where the same arguments are made or where identical evidence is cited amongst the parties.

medications, set up for the Turn Key nurse during patient visits, and served as the liaison between the Jail and Turn Key. Doc. 134, at 11; Doc. 159, at 13.

On January 25, 2022, Mr. May was transferred to the Custer County Jail from the Canadian County Jail due to an outstanding warrant. Doc. 134, at 10. Two days later, LPN Unruh conducted a Medical Intake on Mr. May. *Id.* at 12. She recorded his vital signs, including his temperature, blood pressure, respiratory rate, pulse, and oxygen saturation. Doc. 134, Ex. 8, at 19; Ex. 14, at 19. She reviewed his medical history, evaluated his general appearance, behavior, level of consciousness, breathing, and his mobility. *Id.* at 19-20. LPN Unruh noted his gait was "stable" and made no note that Mr. May needed a cane or wheelchair at that time. *Id.*

On February 2, 2022, a cellmate of Mr. May's notified Defendant Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). The inmate filed a sick call request form seeking help for Mr. May, noting: "this old man marvin may hasnt eaten in 9 days or showered he needs real medical attention asap," Doc. 155, Ex. 33, at 1. Similarly, in a grievance form, the inmate wrote: "weve told staff and they aint done shit this old man marvin may hasnt eaten or showerd in days he needs real medical help . . ." Doc. 155, Ex. 34. To each, Jail Officer Angie Schmidt

responded: "We're going to move him to booking til the nurse comes in tomorrow so we can watch him." Doc. 155, Ex. 33, at 2 & Ex. 34. That same day, Defendant Warnke had Mr. May moved to his own cell with a shower in the "booking area," "to be monitored for his behavior and eating habits." Doc. 134, at 12 & Ex. 17, at 2; Doc. 155, at 13. She testified that those cells were reserved "just for an emergency like" Mr. May's situation. Doc. 134, Ex. 15, at 44. She recorded that "[h]e [(Mr. May)] is to be offered a protein shake with every meal & charted on ODIS if he eats his meal or drinks his share per Lt. Stanford." Doc. 155, Ex. 17, at 2, 3.[3] This placement also exposed Mr. May to fewer people who could possibly give him COVID-19. Doc. 134, at 12.

On February 3, 2022, Defendant Advanced Practice Registered Nurse (APRN) Tamara Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. *Id.* & Ex. 14, at 35-36. APRN Carey assessed Mr. May's condition, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment for 90 days later. Doc. 134, Ex. 14, at 35-36. LPN Unruh "assisted with some of it." Doc. 155, Ex. 15, at 3. Defendant Warnke noted that APRN Carey observed "'[Mr. May's] mental condition

---

[3]    Lieutenant Martha Stanford, a non-defendant, supervised Defendant Warnke. Doc. 155, Ex. 20, at 4.

appeared to be deteriorating rapidly[,]' and 'she wanted to **_notify adult protective services about his well-being due to his deteriorating mental state_**.'" Doc. 159, at 14 (emphasis added by Plaintiffs) (quoting Doc. 155, Ex. 18).

After the telemedicine visit on February 3, Defendant Warnke, and Officer Schmidt contacted Mr. May's defense counsel, Mr. Teo Diaz. Doc. 134, at 13 & Ex. 20 (recording). Defendant Warnke wanted to see whether Mr. Diaz could get Mr. May to "court faster." Doc. 134, at 13. Defendant Warnke and Officer Schmidt informed Mr. Diaz that Mr. May had dementia, and that he was not eating or drinking "Ensure, Boost, [or] protein supplements." Doc. 159, at 14-15. Mr. Diaz acknowledged Mr. May's court date could be moved with the agreement of the district attorney and the state court judge. Doc. 134, Ex. 20, at 2:28-2:45. Defendant Warnke stated that Turn Key is "worried" and "it" called Adult Protective Services because of concerns for what would happen to Mr. May when he "got out" as "he really need[ed] to be in a nursing home." *Id.* at 3:26-3:25. She added: "We were- we're concerned about Mr. May. He's not eating, he won't even drink the Ensure that we give him. And he's been here since [the] 25th of last month." *Id.* at 3:42-4:02.

When Mr. Diaz asked whether Mr. May needed to be in the emergency room, Defendant Warnke replied she "wasn't sure about that" as "the nurse saw him this morning" and that "she didn't say anything about sending him to the hospital so I'm not sure." *Id.* at 4:06-4:54. Mr. Diaz said, given that the courthouse was closed for the day and the weather conditions, it would be up to the Jail to keep a closer eye on Mr. May. *Id.* at 6:30-6:59. And Defendant Warnke said, "yeah, we've got him moved up front so we can keep an eye on him." *Id.* at 8:06-8:11. Mr. Diaz reiterated it would be up to "you guys," the doctor and nurse on duty, to handle Mr. May's medical condition. *Id.* at 8:49-8:55.

Shortly after she moved Mr. May to the cell in the booking area, Defendant Warnke arranged for him to meet with her and Undersheriff David Crabtree. Doc. 134, at 14. Undersheriff Crabtree testified he was the de facto Jail Administrator. Doc. 155, Ex. 14, at 4. Undersheriff Crabtree encouraged Mr. May to shower and have a protein shake, and Mr. May showered and had some of the shake. Doc. 134, at 14. Undersheriff Crabtree followed up with Defendant Warnke about Mr. May on February 7 or 8. *Id.* After finding out Mr. May was not improving, Undersheriff Crabtree sought out the first assistant district attorney (ADA). *Id.* Undersheriff Crabtree told the ADA Mr. May did

not belong in jail, and the ADA informed him that he would seek to obtain a mental competency evaluation for Mr. May. *Id.*

Undersheriff Crabtree advised the staff that if "this continue[d] on, [he] need[ed] to know, so [he] [could] go and make different arrangements . . . . Or if [Mr. May] need[ed] medical attention in a – in a hospital." Doc. 155, Ex. 14, at 14.

On February 8, 2022, Undersheriff Crabtree emailed Barry Edwards at the Oklahoma Department of Health. Doc. 134, at 14. Mr. Edwards contacted the Jail in response to APRN Carey's February 3 report to Adult Protective Services. *Id.* Undersheriff Crabtree told Mr. Edwards that he had met with the ADA about Mr. May and that the ADA was "going to look into the matter." *Id.* (citing Doc. 134, Ex. 29). Undersheriff Crabtree "believes" he had further contact with the ADA about Mr. May because he was getting updated by staff, but he does not have documentation of any further contact. *Id.* & Ex. 30, at 11-12.

On February 9, 2022, Mr. May's counsel Mr. Diaz filed an immediate application for determination of competency in Mr. May's criminal case. Doc. 134, at 15. The application requested for Mr. May to be placed in the custody of the Department of Mental Health or in a secure private facility for

observation and examination. *Id.* Mr. May's criminal proceedings were stayed by the district court until his competency could be evaluated at a hearing scheduled for March 3, 2022, which was later rescheduled to March 21, 2022. *Id.*

On February 10, 2022, LPN Unruh examined a wound on Mr. May's right hip, entered a Wound Care Note, and reported the wound to APRN Carey who ordered that antibiotic ointment be applied daily. *Id.* at 16 & Ex. 7, at 32-33; Doc. 134, Ex. 8, at 9-10. On February 13, Officer Michael McCowen noted that Mr. May "defecated on himself" and that his feces "got . . . in his sore" and he "cleaned around [the] wound best [he] could." Doc. 155, Ex. 25, at 4 (Jail Entry Report). On February 14, 2022, LPN Unruh looked at Mr. May's wound again. Doc. 134, at 16. After February 14, 2022, LPN Unruh made no further notes in Mr. May's file and never saw him again. *Id.*; see also Doc. 135, Ex. 15, at 21. After February 14, 2022, officers applied the ointment, checked his blood pressure, and gave him his medications. Doc. 134, at 16 & Ex. 16.

Defendant Warnke testified that after February 14, 2022, she continued to keep LPN Unruh updated about Mr. May. Doc. 134, Ex. 15, at 54-55. She would tell LPN Unruh there's not really any "change in him," and ask is there "anything we can do?" *Id.* at 54. And LPN Unruh would answer, "No." *Id.* at

55. Jail staff reported to Defendant Warnke that Mr. May was not showering or eating. Doc. 155, Ex. 11, at 41. And she would encourage Mr. May to shower and eat, "[a]nd nine times out of ten, he'd take a shower." *Id.* She saw him and spoke with him each day she worked. *Id.* at 14. Defendant Warnke was well-aware of Mr. May's incontinence, because she observed it "every day [she] worked." *Id.* She updated LPN Unruh that Mr. May was still not eating, and unable to get around. *Id.* at 43-44. She also did not dispute the facility's meal log which showed Mr. May refused 118 of 132 meals offered to him. *Id.* at 22. And she agreed with the staff note that said Mr. May had not eaten in three weeks. *Id.* at 26-27. She believed LPN Unruh was "charting and keeping in contact with [APRN] Carey." *Id.* at 46. She also testified that she could independently contact a Turn Key provider if needed. Doc 134, Ex. 15, at 35.

On March 17, 2022, Defendant Warnke filed a Jail Incident Report noting Mr. May refused to "set up" for a blood pressure check, and that he told her he was "fine and okay." Doc. 134, Ex. 14, at 55. She noticed a pair of "soiled orange clothes," and encouraged him to take a shower, but he refused. *Id.*

On March 18, 2022, Mr. May was discovered on the floor of his cell and became unresponsive when jail staff tried to "sit him up." *Id.* at 56. Defendant Warnke arrived for her 6:00 a.m. shift, and, after conferring with the on-call

11

Turn Key provider, instructed officers to call EMS at 6:04 a.m. Doc. 134, at 18 & Ex. 15, at 57.

The Sheriff's Department notes from a responder state Mr. May was "naked from the waist down" and "cov[er]ed in dried feces." Doc. 155, Ex. 38. The responder further notes that "[t]he jail staff stated [Mr. May] ha[d] not ate or drank anything in 3 weeks." *Id.* The jail also stated that they "were unsure of the last time [he] was seen normal." Doc. 155, Ex. 39. Mr. May's "pupils [were] pinpoint" and he was "unable to speak" or "follow directions." *Id.* The officers tried to revive him with an ammonia pack, but "it did not work." Doc. 134, Ex. 14, at 56-57. Defendant Warnke notified the Turn Key provider on call, who "said to have [Mr. May] sent to the hospital." *Id.* at 57. The Officers then called for an ambulance. *Id.* at 56.

"The Medical Examiner listed Mr. May's probable cause of death as 'Coronavirus Disease 2019 (COVID-19) Pneumonia Sequalae.'" Doc. 155, Ex, 4, at 19. Plaintiff's expert, Dr. Justin Berk, concluded that "the evidence does not indicate that COVID-19 was a cause of Mr. May's death." *Id.* "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension—is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id.*

12

## III.    Qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Est. of Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, (2015)). In short, it "protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12, (internal quotations omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To overcome the defense of qualified immunity, the plaintiff must raise a genuine issue of material fact that "(1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged misconduct." *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1261 (10th Cir. 2022). Failure at either step requires the Court to grant qualified immunity. *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018). The Court may address either step of the qualified-immunity analysis first. *Id.*

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is

13

entitled to judgment as a matter of law." *Est. of Beauford*, 35 F.4th at 1261-62 (internal quotation marks and citation omitted). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Id.* at 1262 (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002)).

## IV.    Deliberate indifference.

Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the degree of protection against denial of medical attention which applies to convicted inmates under the Eighth Amendment. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023) (citing *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1153-54 (10th Cir. 2022); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)).

The deliberate indifference standard contains both an objective and subjective component. *Lucas,* 58 F.4th at 1136. The objective component is satisfied if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Defendant Warnke does not challenge the objective component of Plaintiffs' claim, and the Tenth Circuit has "held that 'death [is], without doubt,

14

sufficiently serious to meet the objective component.'" *Burke v. Regalado*, 935 F.3d 960, 992 (10th Cir. 2019) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)); *see* Doc. 134, at 24.

The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate," but only that the official "merely refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." *Lucas*, 58 F.4th at 1137 (quoting *Farmer*, 511 U.S. at 842, 843 n.8). "An official disregards risk when [s]he fails to take reasonable measures to abate the risk." *Id.*

A "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Quintana v. Santa Fe Cnty. Bd. Of Comm'rs*, 973 F.3d 1022, 1029 (10th Cir. 2020) (quoting *Farmer*, 511 U.S. at 842). But this requires "that such risks present themselves as 'obvious' to the so-called 'reasonable man.'" *Id.* (quoting *Mata v. Saiz,* 427 F.3d 745, 752 (10th Cir. 2005)).

The Tenth Circuit recognizes two ways to establish the subjective component of a deliberate indifference claim against an individual defendant:

> [T]he subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ("failure to properly treat theory") or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ("gatekeeper theory"). The latter theory can apply to medical professionals when the professional knows that his or her role in a medical emergency is solely to refer the patient to another. Even a brief delay in treatment can be unconstitutional.

*Lucas,* 58 F.4th at 1137.

Because Defendant Warnke is not a medical professional, the Court focuses on the second type of conduct—that of "gatekeeper." *Sealock,* 218 F.3d at 1211.

"[W]hen prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," they may be liable for deliberate indifference. *Id.* So, a jail official's delay or refusal to obtain medical care for an inmate may constitute deliberate indifference. *See id.* So, the Court must determine whether a reasonable jury could find that Plaintiffs have raised a genuine issue of material fact that Defendant Warnke failed to fulfill her "gatekeeper" role. *Id.*

16

### A.    Deliberate indifference to Mr. May's medical needs.

#### 1.    Evidence needed.

The subjective component "requires the plaintiff to present evidence of the prison official's culpable state of mind." *Mata,* 427 F.3d at 751. That is, a plaintiff must present a triable issue of fact that a defendant "knows of and disregards an excessive risk to inmate health or safety." *Strain v. Regalado*, 977 F.3d 984, 990 (10th Cir. 2020) (quoting *Mata,* 427 F.3d at 751). For this, the plaintiff must establish that a defendant was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [s]he also must draw that inference." *Id.* (quoting *Mata,* 427 F.3d at 751).

A plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate." *Farmer*, 511 U.S. at 842. Rather, it is enough that an official "merely refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." *Id.* at 843 n.8. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

17

### 2.    Evidence of Defendant Warnke's state of mind.

On February 2, 2022, Defendant Warnke moved Mr. May to a cell in the booking area "to be monitored for his behavior and eating habits." Doc. 155, Ex. 17. She advised staff that "[Mr. May] is to be offered a protein shake with every meal & charted on ODIS if he eats his meal or drinks his share per Lt. Stanford." *Id.* Defendant Warnke testified she had no reason to dispute the meal log that showed Mr. May refused 118 of 132 meals offered from February 16 through March 16, 2022. Doc. 155, Ex. 11, at 22.

As of February 3, 2022, Defendant Warnke knew Mr. May could not ambulate, that "his mental condition appeared to be deteriorating rapidly," and that he had not eaten or showered "while he was in . . . dorm housing." *Id.* at 11 & Ex. 18. She and LPN Unruh "encouraged him to drink a protein shake and he refused to drink it but [he] drank some water." Doc. 155, Ex. 18.

Defendant Warnke testified she was aware of the February 3, 2022 telemedicine visit with APRN Carey. *Id.* Ex. 11, at 12-13. Warnke also testified that she presumed Carey called Adult Protective Services as Carey indicated "she was going to" and had "seen forms come through" from Adult Protective Services. *Id.* at 12, 23. Defendant Warnke was on the February 3, 2022 call to Mr. May's counsel and expressed dire concern about Mr. May's status. Doc.

18

134, Ex. 20. She informed Mr. May's counsel, Mr. Diaz, that Mr. May had dementia and was not eating. *Id.* at 1:59-3:35. She told Mr. Diaz that the jail hoped he could get Mr. May "to court faster" and that Turn Key had called Adult Protective Services because of concerns for "when [Mr. May] gets out, what would happen to him" and that "he really needs to be in a nursing home." Doc. 134, Ex. 20, at 1:26-3:35. Defendant Warnke told counsel: "We were- we're concerned about Mr. May. He's not eating, he won't even drink the Ensure that we give him. And he's been here since [the] 25th of last month." *Id.* at 3:42-4:02.

Defendant Warnke testified she continued to keep LPN Unruh apprised of Mr. May's condition each time LPN Unruh came on shift. Doc. 155, Ex. 11, at 39-40, 43. When she would ask LPN Unruh if there was anything they could do for Mr. May, LPN Unruh would answer, "No." *Id.* at 39-40. Defendant Warnke testified she knew Mr. May needed assistance to walk and had concerns about his risk of falling. *Id.* at 11, 16, 42, 45. She knew he was incontinent, that "several times . . . he would be wet, [his] clothing would be soiled," and that she had a "daily concern" about Mr. May's wound getting infected due to feces getting in it. *Id.* at 15-16, 20. She testified he "should have been in a nursing home." *Id.* at 35.

19

Officer Michael McCowen testified that he was the first one to place adult diapers on Mr. May, Doc. 155, Ex. 23, at 4, because he was "just laying there defecating and urinating on himself in the bed." He told Defendant Warnke and Lt. Stanford about this. *Id.* at 5-6. Officer McCowen testified that it concerned him that Mr. May was "not eating," not "lucid," "not ambulatory" and "laying in his own waste." *Id.* at 6. He testified that "we" mentioned to Defendant Warnke and Lt. Stanford that they believed Mr. May belonged in a hospital or a nursing home. *Id.* at 5-6.

Officer Brayan Alvarado also testified that for the "last two to three weeks" before Mr. May's death "the whole jail staff kind of knew" that Mr. May "need[ed] to go somewhere," Doc. 155, Ex. 21, at 14, i.e., "a facility that can take care of him." *Id.* He clarified that he meant a "medical facility." *Id.* Officer Alvarado verbally alerted his supervisors that he thought Mr. May should not be housed where he was, and that the "jail was not fully equipped to take care of [Mr. May]." *Id.* at 5, 14. He testified Mr. May spoke mostly "gibberish," was in his diaper "generally," was not eating or walking, and he believed Mr. May needed "a medical facility" that could take care of him. *Id.* at 11-15.

Defendant Warnke argues that Mr. May's family opted not to bail him out from either Canadian or Custer County Jails, because they did not want to

pay the full bail amount if he did not show up for court. Doc. 134, at 26-27. She maintains the family knew he needed to be in an assisted living facility, but they opted not to move him into one given the expense. *Id.* at 26.

The Court finds that Mr. May's family's actions are irrelevant to the care he received while housed as a detainee at the Custer County Jail. The jail has an "obligation to provide medical care for those whom it is punishing by incarceration" including pretrial detainees. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Paugh,* 47 F.4th at 1153-54.

Defendant Warnke also argues that Turn Key provided Mr. May care at Canadian County and his medical care was immediate upon his arrival at Custer County. Doc. 134, at 27. She maintains that the ER doctors in January 2022 did not seem to "believe[] [Mr. May's] dementia or weight loss was a medical emergency." *Id.* at 26. And that APRN Carey did not "believe [Mr. May] was having a medical or mental health emergency or that he needed to go to the hospital" after her telemedicine visit with Mr. May on February 3, 2022. *Id.* at 28.

Defendant Warnke suggests she took "multiple measures to abate" any risk of long-term harm to Mr. May as she continued to check him at least once a day when she was working, offered him protein shakes, and sat with him and

talked with him most days. *Id.* at 33-34. She contends Mr. May's weight loss abated at Custer County compared to Canadian County. *Id.* at 34. She also points to her efforts to continue to keep her supervisors, Lt. Stanford, Undersheriff Crabtree, and LPN Unruh, apprised of Mr. May's condition. *Id.* at 32-33. And that none of them "believed his condition was an acute emergency prior to March 18[, 2022]." *Id.* at 33.

She argues that she "took the step of contacting [Mr.] May's criminal attorney to see if he could get [him] released from jail sooner." *Id.* During that call, she expressed her serious concerns about Mr. May's dementia, and his refusal to eat. Doc. 134, Ex. 20, at 1:59-3:35. Defense counsel reiterated that he would need the district attorney and judge's acquiescence to move Mr. May's court date "up." *Id.* at 2:28-2:45. She argues, "there is no evidence [defense counsel]" "contacted any hospital on [Mr.] May's behalf, . . . reached out to [Mr.] May's family about him, and there is no evidence [he] attempted to obtain an OR bond for him." Doc. 134, at 30.

Again, the Court concludes Defendant Warnke's reference to Mr. May's counsel's actions is a red herring——what counsel was able to accomplish for his client is unrelated to whether Defendant Warnke's action or inaction with respect to Mr. May's medical condition was deliberately indifferent.

She also argues that Mr. May died from COVID-19, not Alzheimer's or dementia, challenging any hint of deliberate indifference. *Id.* at 35-36. But from the time Defendant Warnke was first notified that Mr. May had not eaten in several days (February 2, 2022), she moved Mr. May's cell to be in close proximity for monitoring, "just for an emergency like this," Doc. 134, Ex. 15, at 44. And she was aware of his telemedicine visit with Defendant Carey, started the meal log, reported to the Undersheriff, and called defense counsel to report her concerns. These actions by Defendant Warnke indicate that she was aware of Mr. May's deteriorating condition. And her testimony underscores her state of mind throughout Mr. May's detention at the Jail. She was consistently concerned that Mr. May did not belong at the Jail, and instead belonged somewhere where he could receive more attentive medical care, like a nursing home or a medical facility.

Based on the above, the undersigned concludes Defendant Warnke had sufficient subjective knowledge of an excessive risk of harm to Mr. May's health and safety based on the circumstantial facts surrounding Mr. May's medical condition before March 18, 2022. And that she failed to take reasonable measures to abate that excessive risk. The undersigned agrees with Plaintiffs

23

that a reasonable jury could find that her conduct amounted to deliberate indifference under the gatekeeper theory.

## B.    The right was clearly established.

Defendant Warnke argues that even if the objective and subjective components are met, Plaintiffs can point to no binding, clearly established precedent when neither:

> [T]he U.S. Supreme Court or the Tenth Circuit . . . has held Alzheimer's or dementia is an emergency condition or that jail staff violates a detainee's rights by not taking him to the hospital when there are no signs of a medical emergency or of the condition which was determined to have caused his death.

Doc. 134, at 35. She maintains that this entitles her to qualified immunity. *Id.* And, that she was "never aware of facts which indicated [Mr.] May had COVID-19 during his detention and never drew the inference that he was infected with COVID-19" which also warrants a finding of qualified immunity *Id.* at 35-36.

But the law can be clearly established even when "the very action in question" has not "previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). So long as the unlawfulness of the defendant's actions was "apparent" "in light of pre-existing law," then qualified immunity is inappropriate. *Id.* (quoting *Anderson*, 483 U.S. at 640); *see also Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir.

24

2008) (citing *Hope* with approval and denying qualified immunity on excessive force claim).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quotation marks omitted). And that "[a] prison official's deliberate indifference to an inmate's serious medical needs is a violation of" the detainee's rights. *Mata*, 427 F.3d at 751; *see also Sealock*, 218 F.3d at 1210-11 (holding that a prison officer plausibly violated a detainee's rights by not addressing the detainee's symptoms even when he knew they were "consistent with a heart attack"). Thus, before February 2022, the contours of the right were clearly established. Any reasonable officer in Defendant Warnke's position would have known that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights. *See Prince v. Sheriff of Carter Cnty.*, 28 F. 4th 1033, 1047-48 (10th Cir. 2022) ("[T]he facts of these four cases are sufficiently analogous to [Mr. May's] situation to have placed all reasonable jail officials on notice that disregarding his severe symptoms amounted to a constitutional violation. Each case involved the denial of medical attention to

25

an individual in custody, and three of the plaintiffs had pre-existing medical conditions.") (footnote omitted).

Dr. Berk's opinion states Mr. May's death was "preventable . . . due to neglect of basic medical needs." Doc. 155, Ex. 4, at 19. "He exhibited multiple, well-documented signs of clinical decline including weight loss, immobility, incontinence, and pressure ulcers that became contaminated with feces." *Id.* at 20.[4] The Court finds that Defendant Warnke's delay in seeking emergency care or more intensive medical care for Mr. May given his ongoing incontinence, meal refusals, inability to walk, and bed sore open to infections, and leaving him to languish and suffer until he fell off his bunk was unconstitutional.

---

[4]     The parties argue vehemently about the extent of Mr. May's weight loss while detained at the Custer County Jail. *See, e.g.*, Doc. 177, at 1. Defendant Warnke objects to the accuracy of the meal log, noting that although it shows 118 of 132 meals were refused, that does not account for protein shakes Mr. May was offered. *Id.* at 4-5. And that for Mr. May to defecate, he must have consumed something. *Id.* at 5. Although these facts are relevant to Mr. May's nutritional status before his death, the Court concludes the resolution of their accuracy and import is best left for the jury.

Defendant Warnke also emphasizes that the May family received burial funds from the Federal Emergency Management Agency (FEMA) "due to May having died from COVID-19." Doc. 134, at 19. Plaintiffs argue this is immaterial and inadmissible. Doc. 159, at 23. The undersigned finds that Dr. Berk's opinion was presumably not available at the time the May family received the funds, so it does not impact the determination of this matter.

In sum, the Court concludes Defendant Warnke is not entitled to qualified immunity on Plaintiffs' claim for failure to provide medical care. Where, as here, "disputed material facts implicate [both] of the two questions of whether a serious medical need existed [and] whether an officer was deliberately indifferent to it, a court may not grant summary judgment." *Olsen*, 312 F.3d at 1315-16. This case is rife with disputed fact issues—and this issue is appropriate for trial, not summary judgment.

Thus, Plaintiff has created a triable issue of fact as to whether Defendant Warnke failed to fulfill her obligation "to refer or otherwise afford [Mr. May] access to medical personnel *capable* of evaluating [his] treatment needs . . ." *Lucas*, 58 F.4th at 1139 (citation omitted) (emphasis added). Simply updating LPN Unruh of Mr. May's status does not relieve Defendant Warnke of liability. *Id.* ("[M]erely doing *something* (with no reference to the underlying condition) does not necessarily insulate one from liability."). That other jail staff employees could also contact EMS is not the point, as Defendant Warnke suggests. *See* Doc. 177, at 7. At bottom, a reasonable jury could conclude that Defendant Warnke failed to obtain medical care, which led to Mr. May's death. *Paugh*, 47 F.4th at 1155; *see also id.* at 1160 ("[A] reasonable jury could find that [the defendant] was aware that [the inmate] was in obvious need for

medical attention, and . . . abdicated her gatekeeping role by not relay[ing] the problem to medical staff." (quotations omitted)). Plaintiffs have thus put forth sufficient evidence to survive Defendant Warnke's summary judgment motion.

## V.    Recommendation and notice of right to object.

For the reasons set forth above, the undersigned recommends the Court deny Defendant Warnke's motion for summary judgment. Doc. 134.

The undersigned advises Defendant of her right to file an objection to this report and recommendation with the Clerk of this Court on or before April 21, 2026, in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2). The undersigned further advises Defendant that failure to make a timely objection to this report and recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation does not terminate the referral to the undersigned Magistrate Judge in this matter.

**ENTERED** this 31st day of March, 2026.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

28