**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| LISA M. HICE, | ) | |
| LEANN D. HOFF, | ) | |
| as Co-Administrators of the | ) | |
| Estate of Marvin G. May, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-24-119-JD |
| | ) | |
| TURN KEY HEALTH CLINICS, | ) | |
| LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

On January 25, 2022, Decedent Marvin G. May was booked into the Custer County Jail as a pretrial detainee. Doc. 1, at 4. Upon booking, Mr. May was 74 years old with a recorded past medical history of diabetes mellitus, chronic obstructive pulmonary disease (COPD), and cardiovascular disease. *Id.* Before and during his detention, Mr. May suffered from various ailments including arthritis, dementia, high blood pressure, a worsening bed sore, incontinence, and difficulty walking. *Id.* at 6; Doc. 155, at 17. On March 18, 2022, Mr. May fell out of his bunk and was transported to the emergency room where he was pronounced dead. Doc. 1, at 9. The Co-Administrators of his Estate brought this action alleging Defendants deprived Mr. May of medical care in violation of his rights under the Fourteenth Amendment of the U.S.

Constitution and Oklahoma law. *Id.* at 1; *see generally* Doc. 1. United States District Judge Jodi W. Dishman referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B), (C). Doc. 3.

Before the Court is Defendant Custer County Sheriff's Motion for Summary Judgment, Doc. 135. Plaintiffs filed a response in opposition, Doc. 155, and the Sheriff has replied. Doc. 176. So the matter is at issue.[1] The undersigned recommends the Court deny the Sheriff's motion for summary judgment.

## I.    Legal standards.

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[1]    Citations to a court document are to its electronic case filing designation and pagination. Except for capitalization, quotations are verbatim unless otherwise indicated.

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). In applying this standard, the Court "'review[s] the facts and all reasonable inferences those facts support[ ] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023).

## II.    Background.

Turn Key Health Clinics, LLC (Turn Key) contracted with the Custer County Sheriff's Office (Custer County) and the Board of County Commissioners of Custer County to provide certain medical care and treatment to inmates and detainees at the Custer County Jail. Doc. 135, at 9. The contract requires Turn Key to provide twelve hours of weekly "on-site nursing services." Doc. 155, Ex. 13, at 4 (Turn Key Contract). The contract also

requires that a physician or mid-level provider provide a weekly patient clinic either in-person or via telemedicine. *Id.* Turn Key was responsible for ensuring 24/7 availability of an on-call physician or mid-level provider for "emergency consultation." *Id.*

During the relevant dates, Defendant Licensed Practical Nurse (LPN) Stacia Unruh worked as a Turn Key employee at the Jail two days a week. Doc. 135, at 9. She served as the only medical professional physically present at the Jail. Doc. 155, at 10-11. The Jail employed Defendant Officer Warnke as its "medical officer," but she was not a medical provider. Doc. 135, at 9; Doc. 155, at 12. Defendant Warnke had eight years of experience taking care of patients with Alzheimer's and dementia, including patients in a memory care unit. Doc. 135, at 9. She was certified as a Certified Nursing Assistant (CNA) in 2001, and as a Certified Medication Aide (CMA) in 2009. *Id.* Her CMA certification expired in 2011. Doc. 155, at 12 & Ex. 16. She could take vital signs, check blood sugar, pull medical charts, set up for the Turn Key nurse during patient visits, and served as the liaison between the Jail and Turn Key. Doc. 135, at 9-10; Doc. 155, at 13.

On January 25, 2022, Mr. May was transferred to the Custer County Jail from the Canadian County Jail due to an outstanding warrant. Doc. 135, at 8.

4

He was asked questions from the medical questionnaire. *Id.* at 10. Two days later, LPN Unruh conducted an intake screening on Mr. May. *Id.* LPN Unruh noted his gait was "stable" and made no note that Mr. May needed a cane or wheelchair at that time. Doc. 155, Ex. 12, at 3.

On February 2, 2022, Mr. May's cellmate notified Officer Warnke that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). The inmate filed a sick call request form seeking help for Mr. May, noting: "this old man marvin may hasnt eaten in 9 days or showered he needs real medical attention asap," Doc. 155, Ex. 33, at 1. Similarly, in a grievance form, the inmate wrote, "weve told staff and they aint done shit this old man marvin hasn't eaten or showerd in days he needs real medical help . . ." Doc. 155, Ex. 34, at 1. To each, Jail Officer Angie Schmidt responded: "We're going to move him to booking til the nurse comes in tomorrow so that we can watch him." *Id.* Ex. 33, at 2 & Ex. 34, at 1. That same day, Officer Warnke had Mr. May moved to his own cell with a shower in the "booking area," "to be monitored for his behavior and eating habits." Doc. 135, at 10 & Ex. 17, at 2. She testified that those cells were reserved "just for an emergency like" Mr. may's situation. Doc. 134, Ex. 15, at 44. She recorded that Mr. May was "to be offered a protein shake with every meal & charted on ODIS

5

if he eats his meal or drinks his share per Lt. [Martha] Stanford." Doc. 135, Ex. 17, at 2.[2] This placement also exposed Mr. May to fewer people who could possibly give him COVID-19. Doc. 135, at 10.

On February 3, 2022, Defendant Advanced Practice Registered Nurse (APRN) Tamara Carey conducted a Chronic Care Provider visit with Mr. May via telemedicine. *Id.* at 11. APRN Carey assessed Mr. May's condition, obtained his medical history, changed his medication prescriptions, and scheduled a follow-up appointment for 90 days later. *Id.* & Ex. 14, at 35-36.

APRN Carey noted that Mr. May's "mental condition appeared to be deteriorating rapidly," and that "she wanted to ***notify adult protective services about [Mr. May's] well-being due to his deteriorating mental state."*** Doc. 155, at 13 (emphasis added by Plaintiffs) (quoting *id.* Ex. 18).

After the telemedicine visit on February 3, Officer Warnke, and Officer Schmidt contacted Mr. May's defense counsel, Mr. Teo Diaz. Doc. 135, at 11 & Ex. 20 (recording). Officer Warnke wanted to see whether Mr. Diaz could get Mr. May to "court faster." Doc. 135, at 11. Officers Warnke and Schmidt informed Mr. Diaz that Mr. May had dementia, and that he was not eating or

---

[2]    Lieutenant Martha Stanford, a non-defendant, supervised Officer Warnke. Doc. 155, Ex. 20, at 4.

drinking protein supplement shakes. *Id.* Mr. Diaz acknowledged the court date could be moved with the agreement of the district attorney and the state court judge. Doc. 135, Ex. 20, at 2:28-2:45. Officer Warnke told Mr. Diaz that Turn Key was "worried" and "it" called Adult Protective Services because of concerns for what would happen to Mr. May when he got out as "he really need[ed] to be in a nursing home." *Id.* at 3:26-3:25. She added: "We were- we're concerned about Mr. May. He's not eating, he won't even drink the Ensure that we give him. And he's been here since 25th of last month." *Id.* at 3:42-4:02.

When Mr. Diaz asked whether Mr. May needed to be in the emergency room, Officer Warnke replied she "wasn't sure about that" as "the nurse saw him this morning" and that "she didn't say anything about sending him to the hospital so I'm not sure." *Id.* at 4:06-4:54. Mr. Diaz said, given that the courthouse was closed for the day and the weather conditions, it would be up to the Jail to keep a closer eye on Mr. May. *Id.* at 6:30-6:59. And Officer Warnke said, "yeah, we've got him moved up front so we can keep an eye on him." *Id.* at 8:06-8:11. Mr. Diaz reiterated it would be up to "you guys," the doctor and nurse on duty, to handle Mr. May's medical condition. *Id.* at 8:49-8:55.

Shortly after she moved Mr. May to the cell in the booking area, Officer Warnke arranged for him to meet with her and Undersheriff David Crabtree.

Doc. 135, at 12. Undersheriff Crabtree testified he was the de facto Jail Administrator. Doc. 155, Ex. 14, at 4. Undersheriff Crabtree encouraged Mr. May to shower and have a protein shake, and Mr. May showered and had some of the shake. Doc. 135, at 12. Undersheriff Crabtree followed up with Officer Warnke about Mr. May on February 7 or 8. *Id.* After finding out Mr. May was not improving, Undersheriff Crabtree sought out the first assistant district attorney (ADA). *Id.* Undersheriff Crabtree told the ADA Mr. May did not belong in jail, and the ADA informed him that he would seek to obtain a mental competency evaluation for Mr. May. *Id.* at 12-13.

Undersheriff Crabtree advised the staff that if "this continues on, [he] need[ed] to know, so [he] [could] go and make different arrangements . . . . Or if [Mr. May] need[ed] medical attention . . . in a hospital." Doc. 155, Ex 14, at 14.

On February 8, 2022, Undersheriff Crabtree emailed Barry Edwards at the Oklahoma Department of Health. Doc. 135, at 13. Mr. Edwards contacted the Jail in response to APRN Carey's February 3 report to Adult Protective Services. *Id.* Undersheriff Crabtree explained that he had met with the ADA about Mr. May and that the ADA "was going to look into the matter." *Id.* & Ex. 29, at 1. Undersheriff Crabtree "believes" he had further contact with the ADA

8

about Mr. May because he was getting updated by staff, but he does not have documentation of any further contact. Doc. 135, at 13 & Ex. 30, at 13-14.

On February 10, 2022, LPN Unruh examined a wound on Mr. May's right hip, entered a Wound Care Note, and reported the wound to APRN Carey who ordered that antibiotic ointment be applied daily. Doc. 135, at 14 & Ex. 7, at 32-33; Ex. 8, at 9-10. On February 14, 2022, LPN Unruh looked at Mr. May's wound again. Doc. 135, at 14. After February 14, 2022, LPN Unruh had no further notes in Mr. May's file and never saw him again. *Id.* at 14-15. After February 14, 2022, officers applied the ointment, checked his blood pressure, and gave him his medications. *Id.* at 14; Doc. 155, Ex. 16.

On February 13, 2022, Officer Michael McCowen noted that Mr. May "defecated on himself" and that his feces "got . . . in his sore" and he "cleaned around [the] wound best [he] could." Doc. 155, Ex. 25, at 4.

Defendant Warnke testified that after February 14, 2022, she continued to keep LPN Unruh updated about Mr. May. Doc. 135, Ex. 15, at 14, 55. She would tell LPN Unruh there's not really any "change in him," and ask is there "anything we can do?" *Id.* at 55. And LPN Unruh would respond, "No." *Id.* at 56. Jail staff reported to Defendant Warnke that Mr. May was not eating. Doc. 155, Ex. 11, at 26-27. And she would encourage Mr. May to shower and eat,

"[a]nd nine times out of ten, he'd take a shower." Doc. 155, Ex. 11, at 41. She saw him and spoke with him each day she worked. Doc. 135, Ex. 15, at 21.

Defendant Warnke was well-aware of Mr. May's incontinence, because she observed it "every day [she] worked." *See* Doc. 155, Ex. 11, at 14, 15-16, 41-44. She also did not dispute the facility's meal log which showed Mr. May refused 118 of 132 meals offered to him. *Id.* at 22. And she agreed with the staff note that said Mr. May had not eaten in three weeks. *Id.* at 26-27. She updated LPN Unruh that Mr. May was still not eating and was unable to get around. *Id.* at 43-44. She believed LPN Unruh was contacting a provider regarding Mr. May "or documenting on him." Doc. 140, Ex. 8, at 8. She testified that she could independently contact a Turn Key provider if needed. *Id.*

On March 17, 2022, Officer Warnke filed a Jail Incident Report noting Mr. May refused to "set up" for a blood pressure check, and that he told her he was "fine" and "okay." Doc. 135, Ex. 14, at 55. She noticed a pair of "soiled orange clothes," and she encouraged him to take a shower, but he refused. *Id.*

On March 18, 2022, Officer Alvarado checked on Mr. May at 4:10 a.m. Doc. 155, Ex. 21, at 8, 13. Mr. May's head was hanging off his bunk. *Id.* at 10-11; Doc. 135, Ex. 26 (video). Mr. May was not wearing a diaper. Doc. 155, Ex. 21, at 10-11. Officer Alvarado placed Mr. May's head back on his bunk, and

10

Mr. May stared at the ceiling. *Id.* at 11. Officer Alvarado was not surprised when he saw Mr. May that morning, because "the whole jail staff kind of knew" that Mr. May needed to be in a "medical facility that could take care of him." *Id.* at 13-14.

At 5:51 a.m., Mr. May rolled off the mat on the bunk and fell to the floor. *Id.* at 16-17. Officer Alvarado checked on him at 5:53 a.m. and found him on the floor. *Id.* at 17. From the video, it appears Officer Alvarado smiles and chuckles. *Id.* at 18-19; Doc. 135, Ex. 26. Officer Alvarado testified he knew Mr. May's situation was not good. Doc. 155, Ex. 21, at 18-19. He was "uncomfortable" when he took the blanket off Mr. May and discovered he was naked from the waist down and had defecated on himself. *Id.* With the help of two officers, Officer Alvarado tried to lift Mr. May up but ended up leaning him on his side on the floor after several attempts to lift him failed. Doc. 135, Ex. 26 (1:53-4:50). Officer Warnke arrived for her 6:00 a.m. shift, and she instructed officers to call EMS at 6:04am. Doc. 135, at 16. Mr. May lay on the floor for eighteen minutes without treatment, but the officers were nearby and checked on Mr. May. Doc. 135, Ex. 26.

The Sheriff's Department notes from a responder state Mr. May was "naked from the waist down" and "cov[er]ed in dried feces." Doc. 155, Ex. 38.

The responder further notes that "[t]he jail staff stated [Mr. May] ha[d] not ate or drank anything in 3 weeks." *Id.* Jail staff also stated that they "were unsure of the last time [he] was seen normal." Doc. 155, Ex. 39. Mr. May's "pupils [were] pinpoint" and he was "unable to speak" or "follow directions." *Id.* The officers tried to revive him with an ammonia pack but this had a "limited response." Doc. 142, Ex. 2, at 56-57. Defendant Warnke notified the Turn Key provider on call, who told her "to have [Mr. May] sent to the hospital." *Id.* at 57. Officers then called for an ambulance. *Id.* at 56.

"The Medical Examiner listed Mr. May's probable cause of death as 'Coronavirus Disease 2019 (COVID-19) Pneumonia Sequalae.'" Doc. 155, Ex, 4, at 19. Plaintiff's expert, Dr. Justin Berk, concluded that "the evidence does not indicate that COVID-19 was a cause of Mr. May's death." *Id.* "Rather, Mr. May's profile—starvation, dehydration, lactic acidosis, nutritional deficiencies, hypotension—is tragically aligned with textbook examples of preventable death due to neglect of basic medical needs." *Id.*

## III.  Standard of review for the Sheriff's liability.

A plaintiff may sue local governing bodies directly for constitutional violations pursuant to the body's policies. *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). To establish municipal liability, a plaintiff must

show: (1) the existence of a policy or custom, (2) a direct causal link between the policy or custom and a constitutional injury, and (3) that the municipality acted with deliberate indifference. *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1048-51 (10th Cir. 2022). "A core principle of *Monell* liability is that municipal entities are liable for only their own actions and not vicariously liable for the actions of their employees." *Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). But "[b]ecause municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Id.* So "municipal liability arises when an individual defendant violates a pretrial detainee's rights while aligning with an official municipal policy or custom." *Barlean v. Oklahoma Cnty. Crim. Just. Auth.,* No. CIV-23-00488-JD, 2024 WL 4480184, at \*2 (W.D. Okla. Oct. 11, 2024).

There is also a "limited exception to the requirement of individual unconstitutional action." *Buchanan v. Turn Key Health Clinics, LLC*, 2023 WL 6997404, at \*7 (10th Cir. 2023) (quotations omitted). "[W]hen a municipal-liability claim is premised on the municipality's 'systemic failure[s],' no single individual defendant need be found liable. Rather, 'the combined acts or omissions of several employees acting under a governmental policy or custom

13

may violate an individual's constitutional rights.'" *Johnson v. Davis Cnty.*, 2022 WL 830202, at *3 (10th Cir. 2022) (internal citation omitted) (quoting *Crowson*, 983 F.3d at 1186); *see also Crowson*, 983 F.3d at 1192 (recognizing that even if health care providers "[do] not violate the Constitution individually, . . . their *combined* acts may be sufficient for *Monell* liability such that [a plaintiff] still has a claim for municipal liability irrespective of whether [an individual health care provider] violated his rights"; distinguishing between claims against a county premised on "*systemic* failures" and claims dependent upon a "predicate violation" by an individual defendant. (quotations and citation omitted)). That is, "'the municipality may not escape liability by acting through twenty hands rather than two.'" *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1233 n.13 (10th Cir. 2025) (quoting *Crowson*, 983 F.3d at 1191). Whatever *Monell* theory a plaintiff advances, it is well settled "a claim under § 1983 against either an individual actor or a municipality cannot survive a determination that there has been no constitutional violation." *Crowson*, 983 F.3d at 1186.

Plaintiff advances two theories of constitutional violations premised on municipal liability. First, that multiple employees violated Mr. May's constitutional rights, and second, that unconstitutional policies or customs

14

promulgated by the Sheriff are "closely related" to the violation of Mr. May's constitutional rights. Doc. 155, at 31, 34-35; Doc. 1, at 39-40.

## IV.    Underlying constitutional violations by Custer County jail staff.

Under the Fourteenth Amendment's Due Process Clause, pretrial detainees are entitled to the degree of protection against denial of medical attention afforded to convicted inmates under the Eighth Amendment. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023) (citing *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1153-54 (10th Cir. 2022); *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). "[W]hen prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment," they may be liable for deliberate indifference. *Sealock*, 218 F.3d at 1211. In other words, a jail official's delay or refusal to obtain medical care for an inmate may constitute deliberate indifference. *See id.*

"Deliberate indifference contains both an objective and subjective component." *Lucas,* 58 F.4th at 1136. The objective component is satisfied if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Defendant concedes that the objective component is met as "Mr. May's medical need was objectively

15

sufficiently serious at the time EMS took him out of the jail [and] at the time of his death." *See* Doc. 135, at 21.

> The subjective component of deliberate indifference is satisfied if

> the official knows of and disregards an excessive risk to inmate health or safety. The official must be aware of the facts from which the inference of a substantial risk of serious harm could be drawn and also draw that inference. A plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, but rather that the official merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious. An official disregards risk when he fails to take reasonable measures to abate the risk.

*Lucas*, 58 F.4th at 1137 (internal quotation marks and citations omitted).

Plaintiffs have presented sufficient evidence from which a reasonable jury could conclude that jail staff subjectively perceived a substantial risk of serious harm to Mr. May based on his circumstances and failed to take reasonable measures to abate that risk.

First, Officer Warnke was notified on February 2, 2022, that Mr. May had not eaten in several days and refused to shower. Doc. 155, Ex. 17 (Jail Incident Report). She knew on February 3, 2022, that Mr. May could not ambulate, that "his mental condition appeared to be deteriorating rapidly," and

that he had not eaten or showered "while he was in . . . dorm housing." Doc. 155, Ex. 18. She and LPN Unruh "encouraged him to drink a protein shake and he refused to drink it but [he] drank some water." *Id.* She moved Mr. May to a closer cell for monitoring, and started the meal log that recorded he had refused 118 of 132 meals offered to him. Doc. 155, Ex. 11, at 22.[3] She continually reported on Mr. May's condition to Undersheriff Crabtree, and called Mr. May's counsel to inform him of the Jail and Defendant Turn Key's concerns about Mr. May's condition. Doc. 135, Ex. 20, at 3:26-3:25, 3:42-4:02. She testified that Mr. May "should have been in a nursing home." Doc. 155, Ex. 11, at 35.

Second, Officer McCowen testified that he was the first one to place adult diapers on Mr. May, Doc. 155, Ex. 23, at 4, because he was "just defecating and urinating on himself in the bed." He told Officer Warnke and Lt. Stanford about this. *Id.* at 5-6. Officer McCowen testified that it "concerned him" that Mr. May was "not eating," was not "lucid," was "not ambulatory" and was

---

[3]    The Sheriff maintains that "[t]here is no evidence that logging a meal refusal meant that [Mr.] May refused the entire meal, or that [his] consumption of protein shakes was ever logged." Doc. 176, at 5. That may be well true, but while Plaintiffs' evidence may not "carry the day at trial, . . . it is sufficient to create a material factual dispute." *See Spray v. Bd. of Cnty. Comm'rs of Okla. Cnty.,* No. CIV-20-1252-R, 2023 WL 5439759, at *4 (W.D. Okla. Aug. 23, 2023).

"laying in his own waste." *Id.* at 6. He testified that "we" mentioned to Officer Warnke and Lt. Stanford that they believed Mr. May belonged in a hospital or a nursing home. *Id.* at 5-6.

Third, Officer Brayan Alvarado also testified that for about three weeks before March 18, 2022, "the whole jail staff kind of knew" that Mr. May "need[ed] to go somewhere." Doc. 155, Ex. 21, at 14. Officer Alvarado testified he verbally alerted his supervisors that he thought Mr. May should not be housed where he was, and the staff all agreed the "jail was not fully equipped to take care of [Mr. May.]" *Id.* at 5, 14. He testified Mr. May spoke mostly "gibberish," was in his diaper "generally," was not eating or walking, and he believed Mr. May needed "a medical facility" that could take care of him. *Id.* at 11-12, 14-15.

Based on the above, the Court concludes that jail staff was aware of the facts surrounding Mr. May's dire medical condition before he was sent to the hospital and died. And Plaintiffs have provided sufficient evidence showing that jail staff disregarded the substantial risk of serious harm to Mr. May. *See Prince*, 28 F. 4th at 1048 ("[T]he facts of these four cases are sufficiently analogous to [Mr. May's] situation to have placed all reasonable jail officials on notice that disregarding his severe symptoms amounted to a constitutional

violation. Each case involved the denial of medical attention to an individual in custody, and three of the plaintiffs had pre-existing medical conditions.") (footnote omitted); *see, e.g., See Spray,* 2023 WL 5439759, at \*4 ("There is evidence that jail staff were aware of Ms. Spray's changed condition, knew that it presented an excessive risk to her health, and disregarded that risk . . . . Although Plaintiff did receive some medical attention at the jail, whether jail personnel responded appropriately after observing or being informed that she could not walk is disputed.").

## V.    Unconstitutional policies or customs at the Jail.

Having found a constitutional violation in the form of the jail staff's deliberate indifference, "the question remains if there was a possible alternate basis for municipal liability in the form of an alleged systemic failure." *Lucas,* 58 F.4th at 1144. Any of the following constitute an official policy:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions— and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

19

*Id.* (quoting *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019)).

Plaintiff argues that there existed several systemic failures at the Jail: (1) the decisions of county employees with final policymaking authority harmed Mr. May; Doc. 155, at 36; (2) a systemic failure of medical policies and procedures; *id.* at 38; (3) failure to adequately staff the Jail's medical unit with qualified professionals, provide access to a physician, and supervise the Jail's medical delivery system; *id.* at 40; and (4) a failure to train*; id.* at 41.

## A.    Final policymaking authority.

Sheriff Daniel Day recalled that Undersheriff Crabtree told him about meeting Mr. May on February 3, 2022, and how he tried to get him to eat and take a shower. Doc. 155, Ex. 1, at 6. Undersheriff Crabtree testified he was the "de facto" Jail administrator. Doc. 155, Ex. 14, at 4. He acknowledged contacting the ADA about Mr. May and knowing about APRN Carey's report to Adult Protective Services. *Id.* at 34-35, 42-44. He asked for and received continued updates from Officer Warnke and Lt. Stanford about Mr. May's deteriorating condition. *Id.* at 14-15. And he asked for these so he could determine if he needed to "make different arrangements . . . . Or if [Mr. May] need[ed] medical attention in a . . . hospital." *Id.* at 14.

20

Defendant contends that "jail staff were doing all they could do to get May out of the jail and abate any risk of harm to him," and cites to Undersheriff Crabtree's efforts to obtain "a medical OR bond" for Mr. May. Doc. 135, at 28-29. The record reflects, however, that Undersheriff Crabtree could have sought a higher level of care for Mr. May but he did not. So the fact that the ADA did not seek an OR bond for Mr. May from the state district court is immaterial. And, as Sheriff Day testified, detention officers could "on their own authority" send inmates to the hospital if they determined that "the [jail] could not provide an appropriate level of care." Doc. 155, Ex. 1, at 9.

Sheriff Day recalled Undersheriff Crabtree summarizing the report to Adult Protective Services. *Id.* at 7-9. He also agreed that any concerns about the jail's capability to provide the appropriate level of care for Mr. May should have been recorded in the jail's log, but they were not. *Id.* at 9-10. He testified that he expected "an individual who seemed like they had diagnosed dementia, . . . hadn't eaten for seven days, and . . . were unable to shower" "would be taken to the hospital emergently." *Id.* at 10-11. And that someone without "medical training" would be able to recognize that a person refusing or unable to eat for over a week constituted an emergency medical situation. *Id.* at 11.

**B.    Systemic failures.**

21

The undersigned addresses the remaining challenges together to avoid redundancy. Sheriff Day argues that the Jail abided by its policies and the Oklahoma Jail Standards. Doc. 135, at 35. Custer County's jail policy required inmates to receive a health evaluation by a qualified health professional within fourteen days of entering the Jail. *Id.* & Ex. 33. "Any findings [from that evaluation] that may significantly impact the health, safety, or welfare of the inmate or others should be communicated to the Jail Administrator . . . . Health care needs that may affect housing, program participation, or other conditions of confinement shall be communicated and documented." *Id.* Ex. 33, at 2. The detention policy further states that the Sheriff's "Office is committed to providing humane conditions of confinement by ensuring that inmates received adequate care to meet their serious health care needs," including referrals for mental health care. Doc. 135, Ex. 32, at 1-2. Inmates may request care for an emergency condition, and it is available on a 24-hour basis. *Id.* at 2.

LPN Unruh made no entries in Mr. May's medical file after February 14, 2022, because she never checked on him again after that date. *See* Doc. 135, at 14-15. There were some Jail Entry Reports regarding Mr. May's treatment, including Officer McCowen's February 13, 2022, note that Mr. May defecated into his wound on February 13, 2022, Doc. 155, Ex. 25, at 4, but from February

22

23 through March 16, 2022, there were no Jail Entry Reports as to Mr. May. Doc. 155, Ex. 4, at 6; *see generally* Ex. 25.

Lt. Stanford testified she supervised Officer Warnke, and "put her" "in charge of medical" because of her "CNA experience." Doc. 135, Ex. 31, at 5. Lt. Stanford did not know what CNA stood for, but she knew Officer Warnke had worked in nursing homes. *Id.* Lt. Stanford was unaware whether in 2022 Officer Warnke was still licensed as a CNA. *Id.*

Lt. Stanford was "constantly" updating Undersheriff Crabtree about Mr. May not eating, drinking, or showering. Doc. *Id.* at 10. She estimated she "talked to [Undersheriff] Crabtree about Mr. May" about to six to eight times. *Id.* at 11. And Undersheriff Crabtree would respond that he was "'working on trying to get him out.'" *Id.* She also testified that Officer Warnke told her she contacted the Turn Key nurse about Mr. May's condition. *Id.* at 8.

Undersheriff David Crabtree testified that the Sheriff's office typically ran the Jail at capacity (128 inmates) or over-capacity. Doc. 155, Ex. 14, at 11. He testified the Jail suffered from understaffing. *Id.* at 9. He testified that he was unaware that the Custer County Jail had a hunger strike policy, which it

23

did. *Id.* at 12.[4] Under the policy, the Jail Administrator was to "evaluate the basis for the strike and seek an appropriate resolution." Doc. 155, Ex. 41, at 1. And where "an inmate [was] engaging in a hunger strike due to a mental condition, the appropriate medical protocols for mental illness [were to] be followed." *Id.*; *see also* Doc. 155, at 30.

Undersheriff Crabtree testified he met with Lt. Stanford and Officer Warnke, spoke to Mr. May to encourage him to drink a protein shake, and met with the ADA to encourage a "medical[] OR" bond. Doc. 155, Ex. 14, at 13-16. Lt. Stanford and Officer Warnke kept him updated as he instructed. *Id.* at 17. He testified he did not document any other conversations he had about Mr. May with anyone else at the Jail, the County, or Turn Key before Mr. May was "found unresponsive on March 18th." *Id.* He did not know if Mr. May was ever seen by a mental health professional and he never spoke to Turn Key about whether it had a mental health professional who could come and see Mr. May. *Id.* at 18. So no discussion about a referral for mental health care seems to have occurred.

---

[4]    The parties do not appear to dispute the applicability of the hunger strike policy to Mr. May. *See* Doc. 176, at 11 & Doc. 155, at 30.

24

As to training the Jail's officers, Undersheriff Crabtree was unable to give a definite date as to when training began regarding the Jail's policies, but knew it was sometime in 2022. *Id.* at 20. Lt. Stanford testified she was "pretty sure" she received training on the Jail's medical policies when she first started either in 2010 or 2014. Doc. 155, Ex. 20, at 5-6. She testified training was "very limited" in early 2022. *Id.* at 7. After Undersheriff Crabtree "took over, he started to implement more training" on CPR, handcuffing, and "defensive tactics." *Id.* She could did not recall the details of the Jail's Hunger Strike policy. *Id.* at 5.

Officer Warnke testified additional trainings on "the jail's medical policies" began *after* Mr. May's death. Doc. 155, Ex. 11, at 24. And that when she was hired she was provided "a small condensed policy of the Custer County Sheriff's Office." *Id.* at 6. She did not recall receiving any training with respect to the Jail's medical policies before Mr. May's death. *Id.* She had no training in wound care apart from what she had gleaned from working in nursing homes. *Id.* at 18. She was unaware that the Custer County Jail had a hunger strike policy. *Id.* at 22.

With respect to Mr. May's missing meals, and how many missed meals might amount to a medical emergency, Officer McCowen testified he did not

"feel that [he] had the authority to make that call." Doc. 155, Ex. 23, at 13. He understood that he was to take Mr. May's blood pressure and monitor him through the day. *Id.* He testified he received no training with respect to wound care. *Id.* at 14. He did not know if a nurse was providing wound care to Mr. May. *Id.* And he had no training as to "the medical significance of fluctuating blood pressure" or what to do "if a blood pressure reading was below a certain number." *Id.* at 15.

Similarly, Officer Alvarado testified he had no training as to what signs or symptoms might indicate an emergent condition. Doc. 155, Ex. 21, at 15. He also did not know what "blood pressure readings" would "indicate an emergent medical condition." *Id.* at 16. And he stated that it would be Turn Key and Officer Warnke's responsibility to know how to interpret the blood pressure readings as "they're the ones supervising that." *Id.*

Officer McCowen testified he "verbally expressed [his] concerns about the facility's inability to care for . . . mentally ill patients because it wasn't medically equipped to do that." Doc. 155, Ex. 23, at 17. He relayed these concerns up the "chain of command." *Id.* As to whether an inmate with mental health issues could ever just go directly to the hospital, Officer McCowen

26

answered that he did not know as "those were decisions that would have been made outside of [his] realm." *Id.* at 18.

Officer Alvarado testified he verbally alerted his supervisors that he thought Mr. May should not be housed where he was. Doc. 155, Ex. 21, at 5, 14. And the staff all agreed the "jail was not fully equipped to take care of [Mr. May.]" *Id.* He testified Mr. May spoke mostly "gibberish," was in his diaper "generally," was not eating or walking, and he believed Mr. May needed "a medical facility" that could take care of him. *Id.* at 11-15. But he was not going to going over the heads of his supervisors, as that was "above his pay grade." *Id.* at 14. Officer Alvarado testified he was not trained in providing medication, but he knew to alert the on-call nurse or provider should an inmate refuse medication. *Id.* at 3. He never received training as to what "signs and symptoms" a detainee might exhibit that would be deemed emergent. *Id.* at 15.

Officer McCowen clarified that if Mr. May had a medical emergency, he would have called EMS, not Turn Key. Doc. 142, Ex. 13, at 4-5. And Officer Alvarado testified that "everything would be . . . funneled to [Officer] Warnke, then from Warnke to Turn Key," but he was aware he could contact Turn Key, and EMS if needed. Doc. 142, Ex. 14, at 3, 6.

27

Officer Alvarado testified he knew to track what food was refused when an inmate was not eating, but he was not instructed to track weight. Doc. 155, Ex. 21, at 2. Officer McCowen recalled no training or policy being provided as to what an officer should do when "an inmate was observed to be not eating or drinking for a prolonged period of time." Doc. 155, Ex. 23, at 19. Like Undersheriff Crabtree, neither officer seemed aware of the Jail's Hunger Strike Policy. *Id.*; Doc. 155, Ex. 21, at 2.

As summarized, in relation to training, multiple Jail employees testified that they received no meaningful medical training. And APRN Carey testified she was overwhelmed by calls from the multiple facilities she oversaw. Doc. 155, Ex. 3, at 32, 51. And the Jail was consistently at or over capacity. Doc. 155, Ex. 14, at 11.

Turn Key provided up to twelve hours of weekly LPN staffing for about 150 inmates. *See* Doc. 155, Ex. 13, at 4 & Ex. 11, at 24. The County's contract with Turn Key neither required the employment of a licensed physician, nor an RN, nor an on-site provider. Doc. 155, Ex. 13. This left untrained jail guards to determine when emergent medical conditions arose. And when they did, they would only verbally alert superiors.

28

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that the Sheriff, who is in charge of the Jail, maintained policies or customs of inadequate training, inadequate staffing, and delays in medical attention, effectively amounting to a denial of access to adequate medical care. Doc. 1, at 39-40.

### C. The Sheriff's deliberate indifference.

The next inquiry is whether a reasonable jury could conclude that the Sheriff acted with deliberate indifference. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

The record reflects that the Sheriff, through the de facto Jail Administrator (Undersheriff Crabtree), had actual knowledge of numerous and systemic problems with the Jail's health care system. Undersheriff Crabtree's active efforts to get Mr. May out of custody via a "medical OR" bond speak to the Jail's inability to care for someone who was not eating or drinking, could not walk, and who likely suffered from dementia. He did not ask Turn Key

29

about a mental health referral. He did not seek a higher level of care. He did not know the Jail had a Hunger Strike policy. *See Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008) ("The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference.").

A Sheriff's "continuous neglect" of medical conditions similar to those in this case could lead a reasonable fact finder to infer causation of a plaintiff's injury sufficient to defeat summary judgment. *See Burke v. Regalado*, 935 F.3d 960, 1001 (10th Cir. 2019) ("A reasonable jury could find his continuous neglect of these problems 'was the moving force behind the injury alleged.'") (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997)). Plaintiffs have therefore established a genuine dispute of material fact as to the Sheriff's liability.

## VI.    Recommendation and notice of right to object.

For the reasons set forth above, the undersigned recommends the Court deny Defendant Sheriff's motion for summary judgment. Doc. 135.

The undersigned advises Defendant of his right to file an objection to this report and recommendation with the Clerk of this Court on or before April 21, 2026, in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b)(2). The undersigned further advises Defendant that failure to

make a timely objection to this report and recommendation waives the right to appellate review of both factual and legal questions contained herein. *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

This report and recommendation does not terminate the referral to the undersigned Magistrate Judge in this matter.

**ENTERED** this 31st day of March, 2026.

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE