IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) LISA M. HICE, as Co-Administrator of the Estate of Marvin G. May, Deceased, and<br>(2) LEANN D. HOFF, as Co-Administrator of the Estate of Marvin G. May, Deceased,<br><br>Plaintiffs,<br><br>v.<br><br>(1) TURN KEY HEALTH CLINICS, LLC,<br>(2) TAMARA CAREY, APRN,<br>(3) STACIA UNRUH, LPN,<br>(4) CUSTER COUNTY SHERIFF, in his official capacity, and<br>(5) JULIE WARNKE,<br><br>Defendants. | Case No. CIV-24-119-JD<br><br>JURY TRIAL DEMANDED |

---

**DEFENDANT CUSTER COUNTY SHERIFF, IN HIS OFFICIAL CAPACITY'S OBJECTION TO THE SECOND REPORT AND RECOMMENDATION REGARDING THE SHERIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Jordan L. Miller, OBA No. 30892
COLLINS, ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: jlm@czwlaw.com

***ATTORNEY FOR DEFENDANTS SHERIFF OF CUSTER COUNTY, IN HIS OFFICIAL CAPACITY, AND JULIE WARNKE***

October 14, 2026

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS ........ i-ii

TABLE OF AUTHORITIES ........ iii-iv

LIST OF EXHIBITS ........ v

DEFENDANT SHERIFF'S OBJECTION TO THE SECOND REPORT AND RECOMMENDATION REGARDING SHERIFF'S MOTION FOR SUMMARY JUDGMENT ........ 1

STANDARD OF REVIEW FOR SUMMARY JUDGMENT ........ 2

I. NO REASONABLE JURY COULD FIND THAT AN EMPLOYEE OF THE SHERIFF VIOLATED MAY'S CONSTITUTIONAL RIGHTS ........ 3

A. Warnke Never Drew the Inference that May Faced an Immediate, Substantial Risk of Serious Harm ........ 4

II. THERE IS NO EVIDENCE OF A FAILURE TO TRAIN ........ 8

A. The Sheriff Was Not on Notice of Training Inadequacies ........ 8

B. Specific Training Deficiencies Are Not Tied To Warnke ........ 9

III. THERE IS NO EVIDENCE OF A FAILURE TO SUPERVISE ........ 13

A. The Evidence Shows Adequate Supervision of Warnke ........ 14

B. The Second Report Substitutes a Different Theory of Liability ........ 16

C. A Constitutional Violation Was Not A Highly Predictable Consequence ........ 17

IV. THE EVIDENCE DOES NOT SUPPORT A SYSTEMIC FAILURE OCCURRED ........ 17

A. May Was Not Denied Access to Medical Care ........ 18

B. The Four "Failures" Do Not Establish Causation ........ 19

C. No Policy or Custom Has Been Identified ........ 21

D. No Evidence of Deliberate Indifference by the Sheriff ........ 23

CONCLUSION........................................................................................................ 23

CERTIFICATE OF SERVICE ........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Bryson v. City of Oklahoma City*, 627 F.3d 784 (10th Cir. 2010) .............................. 13, 17

*Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019) .............................................................. 23

*Canton v. Harris*, 489 U.S. 378 (1989) ................................................................................ 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 2

*City of Canton v. Harris*, 489 U.S. 378 (1989) ........................................................................ 9

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ........................................................ 23

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................................................. 8

*Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166 (10th Cir. 2020) ......................... 3, 8, 17, 22

*Estate of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*,
30 F.4th 1181 (10th Cir. 2022) ....................................................................................... 3, 13

*Farmer v. Brennan*, 511 U.S. 825 (1994) ................................................................................ 6

*George ex rel. Bradshaw v. Beaver Cnty. Bd. of Comm'rs*,
32 F.4th 1246 (10th Cir. 2022) .................................................................................... 2, 8, 23

*Hardy v. Rabie*, 147 F.4th 1156 (10th Cir. 2025) ................................................................... 7

*Hinton v. City of Elwood*, 997 F.2d 774 (10th Cir. 1993) ....................................................... 3

*Jolliff v. Rogers Cnty. Sheriff's Dep't*,
2025 WL 1570005 (N.D. Okla. June 3, 2025) .......................................................... 11-13

*Lance v. Marris*, 985 F.3d 787 (10th Cir. 2021) ............................................................. 11, 13

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ....................................................................... 4, 7

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) ............................................................. 22

*Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838 (5th Cir. 2009) ................................... 14

*Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247 (10th Cir. 2011) .................................................... 3

*S.M. v. Lincoln County*, 874 F.3d 581 (8th Cir. 2017) .......................................................... 14

*Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013) .... 18, 23

*Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008) .................................................................. 4

*Teetz v. Bd. of Cnty. Comm'rs*, 2023 WL 7698030 (D. Kan. Nov. 15, 2023) ................... 10

*Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214 (10th Cir. 2025) ..................... 3, 10

*United States v. One Parcel of Real Prop.*, 73 F.3d 1057 (10th Cir. 1996) ........................ 2

*Valdez v. Macdonald*, 66 F.4th 796 (10th Cir. 2023) ............................................................ 8

*Waller v. City & Cnty. of Denver*, 932 F.3d 1277 (10th Cir. 2019) .................................... 9
*Weatherford ex rel. Thompson v. Taylor*, 347 Fed.Appx. 400 (10th Cir. 2009) ............. 5-7

**Statutes**

28 U.S.C. § 636(b)(1)(C) ........................................................................................ 1-2
42 U.S.C. § 1983 ......................................................................................................1, 22, 24

**Rules**

Fed. R. Civ. P. 54(b) ................................................................................................ 3
Fed. R. Civ. P. 72(b)(3) ........................................................................................... 1-2

# LIST OF EXHIBITS

Exhibit 1: *Teetz v. Bd. of Cnty. Comm'rs*,
2023 WL 7698030 (D. Kan. Nov. 15, 2023)

Exhibit 2: *Jolliff v. Rogers Cnty. Sheriff's Dep't*,
2025 WL 1570005 (N.D. Okla. June 3, 2025)

**DEFENDANT CUSTER COUNTY SHERIFF, IN HIS OFFICIAL CAPACITY'S OBJECTION TO THE SECOND REPORT AND RECOMMENDATION REGARDING THE SHERIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Custer County Sheriff, in his official capacity ("Defendant" or "the Sheriff"), objects to the Magistrate Judge's September 30, 2026 Report and Recommendation [Dkt. 206] ("the Second Report") pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(3). Once again, the Second Report recommends denial of the Sheriff's Motion for Summary Judgment [Dkt. 135] on Plaintiffs' 42 U.S.C. § 1983 claim against him for deliberate indifference to Marvin May's serious medical needs. This Court re-referred Plaintiffs' failure-to-train, failure-to-supervise, and systemic-failure theories back to Magistrate Judge Mitchell for further consideration following Judge Mitchell's First Report and Recommendation ("the First Report). [Dkt. 200, pp. 20-29]. The Second Report also does not contain the thorough analysis those theories require. Instead, the Second Report adopts two of the three failure-to-train elements by reference, relies only on what jail officials learned during May's own detention to establish prior notice for municipal liability purposes, treats the Undersheriff's efforts to secure May's release as proof of deliberate indifference, and implies that the Sheriff may be liable under § 1983 for the conduct of medical providers who were not his employees.

The record does not support municipal liability under any theory. The Sheriff therefore objects to the findings and recommendations in the Second Report and requests that this Court enter summary judgment in his favor on Plaintiffs' 42 U.S.C. § 1983 deliberate indifference claim against him.

## STANDARD OF REVIEW

The Court reviews *de novo* any portion of the Second Report to which a proper objection is made and may accept, reject, or modify the recommended disposition. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). An objection must be specific enough to focus the Court's attention on the factual and legal issues in dispute. *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1059-1059 (10th Cir. 1996). This provides the district court with an opportunity "to correct any errors immediately." *Id.*

The Sheriff specifically objects to the following findings in the Second Report: (1) that a reasonable jury could find an individual Sheriff employee violated May's rights [Dkt. 206, pp. 8-10]; (2) that Plaintiffs' failure-to-train theory survives [Dkt. 206, pp. 3-10]; (3) that Plaintiffs' failure-to-supervise theory survives [Dkt. 206, pp. 10-12]; and (4) that Plaintiffs' systemic-failure theory survives [Dkt. 206, pp. 12-14].

Summary judgment for a defendant is warranted when the plaintiffs fail to make a showing sufficient to establish an element on which they bear the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Here, Plaintiffs bear the burden on every element of their *Monell* claim. *See generally George ex rel. Bradshaw v. Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1253 (10th Cir. 2022) (seeting out elements of a *Monell* claim). To the extent this Court's prior Order adopting the First Report in part [Dkt. 200] already addressed any issue raised below, the Sheriff is merely preserving all objections for a future appeal, as he was cautioned to do at the conclusion of the Second Report. [Dkt. 206, p. 15]. The Sheriff additionally notes that the previous ruling adopting portions of the First Report was interlocutory and that this Court remains free to revisit that ruling before final

judgment is entered. *See* Fed. R. Civ. P. 54(b); *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011).

## I. NO REASONABLE JURY COULD FIND THAT AN EMPLOYEE OF THE SHERIFF VIOLATED MAY'S CONSTITUTIONAL RIGHTS

The Court previously found that there is a question of fact regarding whether Defendant Julie Warnke's ("Warnke's) conduct violated May's constitutional rights. [Dkt. 200, pp. 15-20]. The Second Report is primarily based on that finding. [Dkt. 206]. The Sheriff maintains that finding was erroneous, preserves the issue for appeal, and respectfully requests this Court to revisit the finding when considering whether to adopt the findings in the Second Report. Each of Plaintiffs' theories of liability depend on an underlying constitutional violation having occurred. *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993); *Crowson v. Wash. Cnty. Utah*, 983 F.3d 1166, 1187 (10th Cir. 2020). Success via the failure-to-train and failure-to-supervise theories of liability require Plaintiffs to demonstrate that a constitutional violation was caused by a specific employee of the Sheriff. *Thao v. Grady Cnty. Crim. Just. Auth.*, 159 F.4th 1214, 1231, 1233 fn.13 (10th Cir. 2025); *Estate of Burgaz ex rel. Zommer v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1189-1190 (10th Cir. 2022). A systemic-failure claim requires that the combined acts of employees acting pursuant to a municipal policy or custom violated May's constitutional rights. *Crowson,* 983 F.3d at 1186, 1191. The Second Report identifies Defendant Warnke as the employee whom a jury could find violated May's constitutional rights. [Dkt. 206, pp. 9-10]. However, the record does not support that conclusion.

### A. Warnke Never Drew the Inference that May Faced an Immediate, Substantial Risk of Serious Harm

As the Second Report notes, the Sheriff conceded in his Motion for Summary Judgment that May's condition was ultimately sufficiently serious and thus satisfied the objective component of the deliberate indifference test. [Dkt. 206, p. 8]. It is therefore only the subjective portion of the test which is at issue in this case. The subjective component requires proof that Warnke was aware of facts from which the inference of a substantial risk of serious harm could be drawn, and that she actually drew that inference but failed to act. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "An official's failure to alleviate a significant risk of which [s]he was unaware, no matter how obvious the risk or how gross [her] negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). The Second Report bases its finding on Warnke's concern that May did not belong at the jail and belonged somewhere he could receive nursing-home-level care. [Dkt. 206, p. 9]. That concern is about long-term placement for an individual with a chronic, progressive disease; it is not an inference that May faced an acute risk requiring a visit to the emergency room or hospitalization. Warnke, who had eight (8) years of experience caring for Alzheimer's and dementia patients, including caring for them while working in a memory care unit, testified she did not believe May was experiencing a medical emergency at any time before March 18, and that he was communicating with her on March 17. [Dkt. 135, Ex. 15, 70:8-71:13, 80:2-81:13]. The medical providers who examined May reached the same conclusion. APRN Carey found no medical or mental health emergency when she

evaluated May and scheduled him for a 90-day follow-up. [Dkt. 135, Ex. 7, 34:11-35:13, 38:1-20: Ex. 14, pp. 35-36]. LPN Unruh, who could also send a patient to the hospital on her own authority if the situation was an emergency, also did not believe that May needed to go to the hospital. [Dkt. 135, Ex. 8, 136:23-137:8; Dkt. 177, Ex. 35, 34:15-22]. Lt. Stanford did not believe May's condition was an emergency and expert witness Dr. Hough also testified that May's condition did not become an emergency until May fell from his bunk on March 18. [Dkt. 135, Ex. 31, 65:18-66:3; Dkt. 176, Ex. 38, 28:4-29:18, 59:20-60:19].

A jail employee who reasonably relies on the opinion of medical professionals regarding the urgency of an inmate's medical needs and whether the inmate needs immediate, heightened medical attention does not violate the constitution. *See Weatherford ex rel. Thompson v. Taylor*, 347 Fed.Appx. 400, 404 (10th Cir. 2009) (citing *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009)). In *Weatherford*, the jail shift supervisor learned soon after starting her shift that the inmate was complaining of chest pain. *Id.* at 401. However, the medical employee informed the supervisor that the inmate would be fine until morning because the chest pain of which he was complaining was on the wrong side of his chest to indicate a heart attack. *Id.* In less than two hours, the inmate was clutching his chest and other inmates were getting jailers' attention on the inmate's behalf, saying he was having a heart attack. *Id.* Despite this, the supervisor made no attempt to speak with him, to contact the medical staff, or call an ambulance. *Id.* at 401-402. Nearly four hours after she was told about the inmate's chest pain, the inmate collapsed and the supervisor called paramedics, who took him to the hospital where he was pronounced dead.

*Id.* at 402. The Tenth Circuit explained that although it may have been reasonable for the supervisor to initially discount the severity of the inmate's pain given the medical provider's assertions that the pain was on the wrong side of his chest to be a heart attack, the supervisor was no longer entitled to rely on the opinion that the inmate would be fine until morning when it very quickly became obvious that the inmate needed immediate medical attention. *Id.* at 403. The evidence showed that the supervisor did not make any attempt to speak with the inmate or medical personnel even though she "knew that a person with chest pain could be suffering a medical emergency, including a heart attack." *Id.*

Applying the rationale of *Weatherford*, there can be no question that Warnke was entitled to rely on the opinions of the medical providers that May was not experiencing a medical emergency and that he did not need immediate medical attention until March 18. Unlike the supervisor in *Weatherford*, there is no evidence that Warnke was aware May could be suffering a medical emergency prior to March 18. This Court, however, has determined Warnke could have violated May's constitutional rights for not obtaining emergency medical care for May when neither she, nor Turn Key medical providers, had any awareness it was needed. The awareness Warnke had regarding May's medical condition was that he needed long-term care (such as a nursing home) that a hospital does not and cannot provide to an inmate or pre-trial detainee. The Sheriff reiterates that even officials who know of a substantial risk of harm "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994). After May was seen by LPN Unruh and APRN Carey, Warnke called May's defense attorney to move his case forward, arranged for the

Undersheriff to meet with May, and kept Stanford and the Undersheriff informed of May's condition. [Dkt. 135, Ex. 7, 27:20-29:25; Ex. 8, 68:4-25; Ex. 15, 25:10-26:23, 37:18-39:2, 98:4-101:6; Ex. 20]. Warnke checked on May every day she worked, offered protein shakes consistent with known nursing home practices, and repeatedly asked Unruh whether anything more could be done for May. [Dkt. 135, Ex. 15, 41:15-43:3, 91:7-93:6, 108:9-109:2].

A non-medical jail official serves as a gatekeeper to medical personnel capable of treating the condition and violates the constitution only if she unreasonably delays or refuses to fulfill that role. *Mata*, 427 F.3d at 751; *Hardy v. Rabie*, 147 F.4th 1156, 1166 (10th Cir. 2025). Warnke opened the gate the date after an inmate express concern about May, and kept it open through the duration of May's detention. Once she did, she was entitled to reasonably rely on the providers' medical judgment. *Weatherford, supra,* 347 F. App'x at 404. See also *Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (holding that a reasonable reliance on medical staff opinions negates rather than supports liability). The Second Report does not explain how a non-medical officer acts with deliberate indifference by accepting the assessment of an APRN and an LPN who examined May and who were kept informed of his condition.

The Second Report does not find that Officers McCowen or Alvarado individually violated May's constitutional rights. Like Warnke, their testimony shows they believed May needed a different long-term placement. McCowen testified that, like Warnke, he would have called EMS had he believed May was having a medical emergency, and Alvarado also knew he could contact Turn Key or EMS for an emergency. [Dkt. 206, p. 7].

A belief that a detainee ultimately needs long-term, nursing-home-level care elsewhere is *not* knowledge of a substantial risk of serious harm which requires emergency transport to a hospital. But that is precisely what the Second Report has determined: that a jury could find Warnke violated May's constitutional rights by failing to secure emergency transport to a hospital when she was not aware of any facts indicating he was having a medical emergency.

Because May's constitutional rights were not violated by the Sheriff's employees, every theory of municipal liability necessarily fails. *See Crowson, supra,* 983 F.3d at 1186.

## II. THERE IS NO EVIDENCE OF A FAILURE TO TRAIN

### A. The Sheriff Was Not on Notice of Training Inadequacies

A municipality's culpability is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate indifference ordinarily requires a pattern of similar violations by untrained employees, because without notice that a training program is deficient in a particular respect, policymakers cannot be said to have deliberately chosen a training program that will likely result in constitutional violations. *Id.* at 62; *George*, *supra*, 32 F.4th at 1253. Absent a pattern of previous violations, Plaintiffs must show the policymaker knew to a moral certainty that employees would confront the situation at hand, that the situation presents a difficult choice training would make less difficult, and that the wrong choice will frequently cause a constitutional deprivation. *Valdez v. Macdonald*, 66 F.4th 796, 816-17 (10th Cir. 2023).

The Second Report does not indicate that there was any pattern of previous constitutional violations similar to the one at issue in the present case, but still makes none

of the *Valdez* findings. It treats the first and third elements as settled by reference to the First Report. [Dkt. 206, pp. 3-4]. The First Report found a jury could conclude deliberate indifference occurred because Undersheriff Crabtree learned of problems while May was in custody. [Dkt. 187, pp. 29-30]. However, knowledge acquired during the detention at issue cannot show the Sheriff adopted or maintained a training program with prior notice of its shortcoming, deficiencies, or risk of constitutional injuries. Plaintiffs must show the Sheriff had actual or constructive notice *prior to May's detention* that his training program was substantially certain to result in a constitutional violation and consciously disregarded that risk. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019). Notice that arrives during the incident itself cannot show that the Sheriff earlier chose a deficient program. Nor does the Second Report point to any evidence in the record that jailers regularly confronted a detainee with advanced Alzheimer's disease or dementia whose condition was being monitored by medical providers, or that training would have made the relevant choice easier. The relevant choice (*i.e.*, whether May needed to be taken to the hospital prior to exhibiting signs of a medical emergency), were clinical decisions reserved to Turn Key's medical providers, who were not employees of the Sheriff.

**B. Specific Training Deficiencies Are Not Tied To Warnke**

To establish municipal liability based on a failure to train, Plaintiffs must identify a specific deficiency in training closely related to the injury and show the injury would have been avoided had the employee been trained under a program not deficient in that area. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Teetz v. Bd. of Cnty. Comm'rs*, 2023

WL 7698030, at *8 (D. Kan. Nov. 15, 2023)[1]. The deficiency must relate to the specific employee who committed the violation. *Thao*, 159 F.4th at 1231.

Most of the training testimony the Second Report recites concerns McCowen and Alvarado's testimony regarding their lack of training regarding wound care, the meaning of blood pressure readings, and signs of an emergent condition. [Dkt. 206, pp. 6-7]. It has not been determined that either officer violated May's rights, so any lack of training of these officers cannot support liability. *Thao*, 159 F.4th at 1231. As for Warnke, the Second Report found that she did not recall training on the jail's medical policies and that she was not aware the jail had a Hunger Strike Policy. [Dkt. 206, p. 5]. As the Second Report describes it, the Hunger Strike Policy required the jail administrator to evaluate the basis for the refusal and seek a resolution, and required appropriate medical protocols when the refusal stemmed from a mental condition. [Dkt. 206, p. 11]. Whether Warnke was aware of the policy or not, her actions followed these steps. Within one day of a grievance being filed which reported May was not eating, Turn Key medical providers evaluated May, noted worsening Alzheimer's disease, and APRN contacted Adult Protective Services regarding May's future *after he was released from jail.* [Dkt. 135, Ex. 7, 27:20-29:25, 32:13-33:11, 34:11-35:13, 37:18-39:23, 41:4-14, 48:6-51:2, 52:10-53:3, 56:13-57:20, 140:7-142:6; Ex. 8, 68:4-25, 130:11-133:11, 134:7-15; Ex. 14, pp. 35-36; Ex. 15, 31:15-32:7, 93:11-94:1; Ex. 17; Ex. 18, 20:2-23; Ex. 19]. The Undersheriff met with May and then sought a medical OR bond, after which a competency evaluation was scheduled. [Dkt.

[1] Unpublished decision attached as Exhibit 1.

135, Ex. 15, 25:10-26:23; Ex. 22, 45:22-46:6; Ex. 24; Ex. 30, 35:12-36:25, 63:21-64:15]. Knowing the Hunger Strike Policy existed and receiving training on the policy would therefore not have changed the outcome, because the policy was actually followed, whether that was intentional or not. Neither would training on when to contact medical personnel because Warnke *did* contact them and kept both the nurse and supervisor updated on May's condition. [Dkt. 135, Ex. 15, 108:9-109:2; Ex. 31, 31:15-23]. Importantly, May did not pass away from lack of wound care, hunger, or dehydration. [Dkt. 135, Ex. 28, p. 1]. He died from COVID-19, an infection of which he exhibited no symptoms prior to his death. [Dkt. 135, Ex. 28, p. 1; Ex. 7, 148:17-23; Ex. 8, 143:4-7]. Even accepting Plaintiff's expert's view that May's overall decline contributed to his death, the Second Report never connects how training jailers on blood pressure readings or training Warnke on a Hunger Strike Policy would have resulted in a different outcome, given that medical providers were aware of May's declining, but non-emergent condition and saw no need to escalate care.

The Second Report justifies its findings based on *Lance v. Marris*, 985 F.3d 787 (10th Cir. 2021) and *Jolliff v. Rogers Cnty. Sheriff's Dep't*, 2025 WL 1570005, at *5 (N.D. Okla. June 3, 2025)[2]. [Dkt. 206, pp. 5, 7]. However, neither decision supports liability in this case based on a failure to train. In *Lance,* employees with no training on when to call a nurse or doctor delayed care for an inmate's priapism, which was an acute condition. *Lance*, 985 F.3d at 801. Here, Warnke obtained a medical evaluation for May for his *non-*

[2] Unpublished decision attached as Exhibit 2.

*acute* condition the day after she was made aware of it, from medical providers who were accessible by jail staff around the clock. [Dkt. 135, Ex. 15, 78:8-80:5; Ex. 31, 62:12-22].

The *Jolliff* decision is also not applicable here. There, the plaintiff alleged that when she was a detainee in the jail after officers used physical force against her, she showed severe swelling and discoloration of her left arm, which could not move. *Jolliff*, 2025 WL 1570005 at *1. In other words, she exhibited signs of an acute injury which required immediate medical care. She alleged that although she repeatedly requested medical care from jailers, they accused her of faking her injury and told her to "suck it up" and "quit whining." *Id.* The plaintiff alleged she was not able to obtain an evaluation of her injury until after she had been released from the jail. *Id.* at *1. When ruling on the defendant's motion to dismiss, the *Jolliff* court determined that "[b]ecause judging the severity of a medical complaint can be challenging, training and proper supervision would benefit Jail staff in triaging detainee complaints and injuries." While this very general statement cited by the Second Report may be applicable in determining whether or not a plaintiff has alleged facts sufficient to survive a motion to dismiss, it has no applicability here, where actual evidence is at issue. The Second Report states that "[a] reasonable jury could find that adequate training on the Jail's written medical policies would have enabled officers to recognize when to contact medical or mental-health personnel, appreciate the potential significance of repeated blood-pressure readings, and seek emergency assistance when Mr. May's condition required it." [Dkt. 206, p. 7]. Again, the evidence shows that Warnke *did* contact medical personnel, that she repeatedly updated medical personnel and her supervisors on May, and sought emergency assistance when he did exhibit an acute illness

or injury on March 18 like the ones at issue in *Lance* and *Jolliff*. [Dkt. 135, Ex. 7, 27:20-29:25, 32:13-33:11, 37:18-39:23; Ex. 8, 68:4-25, 130:11-133:11; Ex. 14, p. 35-36, Ex. 15, 37:18-39:2, 44:25-45:16, 80:2-81:13, 108:9-109:2, 111:3-16; Ex. 26, Timestamp 5:52:13-5:55:53; Ex. 31, 30:8-23].

Essentially, the Second Report has concluded that a reasonable jury could find the Sheriff liable for failing to train Warnke to obtain emergency medical care for an inmate who was not experiencing a medical emergency, whose chronic Alzheimer's disease was being monitored by Turn Key medical personnel, for whom an OR bond had been sought based on his Alzhheimer's, and for whom a mental competency evaluation had already been scheduled. This conclusion is not supported by *Lance, Jolliff*, or any other decision cited in the Second Report or of which the Sheriff is aware, particularly when a hospital or emergency room could not provide the kind of long-term, nursing home care he needed before he fell from his bunk on March 18. This Court should therefore enter summary judgment in the Sheriff's favor on the failure to train theory of liability.

## III. THERE IS NO EVIDENCE OF A FAILURE TO SUPERVISE

In order to succeed on their claim premised on a failure to supervise, Plaintiffs must prove the Sheriff failed to supervise *the specific employee* who committed the constitutional violation, that the failure caused the violation, and that the failure resulted from deliberate indifference to the need for supervision. *Burgaz, supra,* 30 F.4th at 1189; *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788-89 (10th Cir. 2010). Absent a pattern of previous constitutional violations, the violation in question must be a highly predictable or plainly obvious consequence of the failure to supervise. *Bryson*, 627 F.3d at 789. The

Second Report does not demonstrate these elements were satisfied by Plaintiffs. When resolving a municipal liability issue, "the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it not, on whether such inadequate [supervision] can justifiably be said to represent 'city policy.'" *Canton v. Harris*, 489 U.S. 378, 390 (1989). As the Eighth Circuit has explained, liability may be imposed based on inadequate supervision when there is a complete lack of any supervision of the offending employee or when the plaintiff has identified a specific supervisory procedure that would have successfully deterred the employee from committing a constitutional violation. *S.M. v. Lincoln County*, 874 F.3d 581, 589 (8th Cir. 2017). The Fifth Circuit, too, has explained that in order for a governmental entity to be liable for failure to supervise, "it at least must have been obvious that the 'the highly predictable consequence' of not supervising its officers" was they would behave in such a way that the constitutional rights of citizens would be violated. *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009). Demonstrating some level of supervision regarding the type of constitutional violation at issue does not "raise a genuine issue of material fact on whether the obvious and 'highly predictable consequence' of the department's actions was the citizens' [constitutional rights] would be violated…" *Id.* Here, there is ample evidence of supervision and no evidence of inadequate supervision which would support submitting the issue to the jury.

### A. The Evidence Shows Adequate Supervision of Warnke

The Second Report states that "a reasonable jury could find that at least one employee of the Sheriff's department committed an underlying violation of Mr. May's

constitutional rights." [Dkt. 206, p. 10][3]. However, the Second Report made no potential finding of a constitutional violation by any employee other than Warnke. The only fact the Second Report cites about Warnke's supervision is that Lt. Stanford did not know what CNA stood for, but she knew Officer Warnke had worked in a nursing home. *Id.* Lt. Stanford was unaware whether in 2022 Officer Warnke was still licensed as a CNA. [Dkt. 206, p. 11]. There is no evidence in the record that the status of that certification affected anything Warnke did, or that if Lt. Stanford had understood the certification of her subordinate or known its status that it would have prevented Warnke from purportedly violating May's constitutional rights. Warnke was not acting as a CNA or as any other medical provider at the jail. [Dkt. 135, Ex. 31, 40:5-11].

The record actually reveals close supervision of Warnke. Warnke reported May's condition to Stanford and the Undersheriff, Stanford also kept the Undersheriff informed, and he met with May, followed up with Warnke and Stanford on February 7 or 8, and as a result of that supervision, he went to the District Attorney to seek May's release via an OR bond. [Dkt. 135, Ex. 15, 37:18-39:2; Ex. 29; Ex. 30, 35:12-36:25, 63:21-64:15, 71:7-73:24; Ex. 31, 30:8-31:8, 45:12-46:20]. The Second Report notes that:

> "Undersheriff Crabtree testified **he met with Lt. Stanford and Officer Warnke**, spoke to Mr. May to encourage him to drink a protein shake, and met with the ADA to encourage a 'medical[] OR' bond. Doc. 155, Ex. 14, at 13-16. **Lt. Stanford and Officer Warnke kept him updated as he instructed**. *Id.* at 17."

[3] The Second Report cites to Section III.A.2 for this finding. However, Section IIIA of the Second Report does not address this. [Dkt. 206, p. 10].

[Dkt. 206, p. 11] (emphasis added). That is the very definition of supervision of employees over the constitutional violation at issue. Because the record demonstrates active supervision over Warnke, there can be no liability based on a failure to supervise.

**B. The Second Report Substitutes a Different Theory of Liability**

Rather than identify a supervisory deficiency that caused a violation of May's constitutional rights, the Second Report inexplicably appears to state liability can be established under a failure to supervise theory on the basis that the Sheriff and Undersheriff did not personally speak to the LPN or APRN, did not personally seek additional medical or mental health care for May, ran the jail at capacity or over-capacity, and were unaware that the jail had a Hunger Strike Policy. [Dkt. 206, pp. 11, 12]. This simply does not fall within the scope of a claim premised on a failure to supervise a specific employee (*i.e*., Warnke) and the Second Report fails to explain how it possibly could. The Second Report also treats the Undersheriff's effort to obtain a medical OR bond as proof that he knew May's constitutional rights would be violated in the jail before the violation ostensibly occurred. [Dkt. 206, p. 12, fn. 4]. Not only does that action fail to support liability based on inadequate supervision, but in fact the effort was a reasonable response to a long-term placement problem jail employees could not solve on their own. The jail could release May only if his family posted bond, the District Attorney agreed to an OR bond, the charges were dropped, or a court found him incompetent. [Dkt. 135, Ex. 30, 127:5-129:16; Ex. 41, 72:22-74:19]. A reasonable response by jail officials defeats a deliberate indifference claim. *See Farmer, supra,* 511 U.S. at 844. Treating an official's efforts to help a detainee as evidence of deliberate indifference would discourage the very conduct the

Eighth/Fourteenth Amendment requires. The response by the Undersheriff certainly does not support that a failure to supervise occurred.

### C. A Constitutional Violation Was Not A Highly Predictable Consequence

The Second Report does not cite to evidence of any prior incident which put the Sheriff on notice that the supervision of Warnke, or even the Sheriff's personal supervision of the Undersheriff, was deficient at any time prior to May's detention. Again, in order to establish liability based on a failure to supervise, Plaintiffs are required to establish that the constitutional violation in question was a highly predictable consequence of the failure to supervise. *Bryson*, 627 F.3d at 789. A constitutional violation is not the highly predictable consequence of a supervisory structure in which Warnke brings detainees to medical providers, can contact medical providers 24 hours per day, keeps those providers updated, and reports on a detainee's condition up her chain of command. Because Plaintiffs have wholly failed to produce any evidence to support this element, there is no genuine dispute of material fact to submit to the jury on a failure to supervise. Summary judgment should therefore be entered for the Sheriff for this reason as well.

## IV. THE EVIDENCE DOES NOT SUPPORT A SYSTEMIC FAILURE OCCURRED

Under *Crowson, supra,* liability may be imposed when the combined acts of several employees acting pursuant to a municipal policy violates a detainee's rights even though no individual act does on its own. *See Crowson*, 983 F.3d at 1186, 1191. Deliberate indifference may be shown through gross deficiencies in staffing, facilities, equipment, or procedures such that the inmate is effectively denied access to medical care. *Id.* at 1186.

But all other *Monell* elements must still be met, including causation and the municipality's own deliberate indifference to a constitutional violation occurring. *Id.* at 1187. The policy must have been maintained with deliberate indifference to an almost inevitable constitutional injury. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). The Second Report does not demonstrate that these elements have been met.

**A. May Was Not Denied Access to Medical Care**

The record demonstrates that May had access to medical care throughout his detention at the jail. May arrived at the jail with his medications and received them from the first day. [Dkt. 135, Ex. 15, 82:10-84:5; Ex. 16, pp. 1-2]. Turn Key employees completed an intake screening two days after booking, well within the time jail policy requires. [Dkt. 135, Ex. 14, pp. 19-27; Ex. 33]. Turn Key providers were on call around the clock, and jail staff could call EMS at any time. [Dkt. 135, Ex. 15, 78:8-80:5; Ex. 30, 160:19-161:10]. A nurse and an APRN examined May the day after the grievance regarding his eating and showering was filed, the nurse examined his pressure sore twice, the APRN ordered treatment, jailers carried out the medical orders daily, and Warnke updated the nurse throughout his detention. [Dkt. 135, Ex. 7, 147:14-148:16; Ex. 8, 81:25-85:12; Ex. 15, 107:20-109:2; Ex. 16]. Disagreement with the providers' clinical judgment or failing to admit May to a nursing home facility - *which was simply not an option due to the criminal justice system and/or Oklahoma law requiring May's confinement* - does not constitute a denial of access to medical care.

### B. The Four "Failures" Do Not Establish Causation

Causation is one of the very questions this Court re-referred to Magistrate Judge Mitchell. [Dkt. 206, p. 13]. The Second Report purports to identify four "failures" which justify submitting the question of whether a system failure of the healthcare delivery system occurred to the jury. [Dkt. 206, p. 14]. None establish that May's rights were violated as a result of a denial of care caused by the Sheriff's own policies or customs.

First, the Second Report finds that May did not receive any medical care after February 14. [Dkt. 206, p. 14]. However, LPN Unruh could see May at any time; his cell was beside the medical office. She did not see him, however, because she did not think it was necessary. [Dkt. 135, Ex. 15, 109:6-25; Ex. 8, 136:23-137:8]. Warnke was keeping Unruh updated throughout May's detention. [Dkt. 135, Ex. 31, 31:15-23]. This was a clinical decision by a Turn Key nurse, not the product of the Sheriff's policies or customs. Additionally, between February 23 and March 16, medication records show daily medication, blood pressure checks, and wound care, plus Warnke saw May every day she worked. [Dkt. 135, Ex. 16, pp. 1-7; Ex. 15, 14:15-43:3].

Second, the Second Report indicates that May did not receive any mental health treatment. [Dkt. 206, p. 14]. However, APRN Carey evaluated May's cognitive condition, diagnosed worsening Alzheimer's disease and contacted Adult Protective Services about May's long-term prospects after release, and a competency evaluation was ordered in May's criminal case as a result of the actions of Jail employees. [Dkt. 135, Ex. 7, 27:20-29:25, 32:13-33:11, 34:11-35:13, 37:18-39:23, 41:4-14, 48:6-51:2, 52:10-53:3 56:13-57:20, 140:7-142:6; Ex. 8, 68:4-25, 130:11-133:11, 134:7-15; Ex. 14, pp. 35-36]. Neither

Plaintiffs nor the Second Report have offered evidence of what additional mental health treatment existed for a progressive neurodegenerative disease or how it would have changed May's outcome, particularly given the fact that May died from COVID-19, an infection of which he showed no signs in the jail. [Dkt. 135, Ex. 7, 148:17-23; Ex. 8, 143:4-7; Ex. 15, 90:4-15; Ex. 28, p. 1].

Third, the Second Report appears to find that the lack of an on-site physician, registered nurse, or provider caused the purported constitutional violation. [Dkt. 206, p. 14]. To the best of the Sheriff's knowledge, the Constitution does not mandate a particular staffing or healthcare model. Plaintiffs' own expert declined to opine on a required number of nursing hours required for a jail but did agree that access to providers via telemedicine is not improper. [Dkt. 176, Ex. 35, 75:11-24, 135:12-25]. The Second Report cites no evidence that an RN or physician would have reached a different conclusion than Turn Key's APRN and LPN who actually examined May. Crucially, neither Plaintiffs nor the Second Report explain how an RN or physician could have possibly secured nursing home care for an individual who is detained within the criminal justice system and who has not yet undergone his scheduled competency evaluation. The Sheriff is also not aware of any federal court in the country which has determined that a systemic failure of a jail's healthcare system occurred, rendering the system unconstitutional, because the jail did not employ a full-time medical professional to provide around-the-clock, nursing-home-level care for a detainee with worsening Alzheimer's disease. But that is precisely what the Second Report permits a jury to find.

Finally, the Second Reports indicates that a jury could find a systemic failure of the healthcare system occurred because an ambulance was not called for May prior to March 18. [Dkt. 206, p. 11]. Every witness with first-hand knowledge, and expert witness Dr. Hough testified May's condition was not an emergency before March 18. [Dkt. 135, Ex. 7, 34:11-35:13; Ex. 8, 136:23-137:8; Ex. 15, 80:2-81:13; Ex. 31, 65:18-66:3; Dkt. 176, Ex. 38, 59:20-60:19]. Dr. Reames testified May's refusals to eat were episodic and that his bowel movements reflected oral intake of food. [Dkt. 176, Ex. 40, 59:16-22]. Dr. Hough testified that May's symptoms over his two months at the jail were "not the thing that would have you put somebody in an ambulance and drive them to the hospital. But instead, you would notify your medical provider, which was done." [Dkt. 176, Ex. 38, 60:10-19]. May's weight loss slowed at the jail. He lost twenty pounds in nineteen days at Canadian County but only about sixteen pounds in roughly two months at Custer County. [Dkt. 135, Ex. 3, p. 1; Ex. 14, p. 19; Ex. 28, p. 1]. The Second Report identifies no date before March 18 on which an emergency was apparent. Again, the Sheriff is not aware of any federal court or jury determining that a systemic healthcare failure occurred, and that the constitution was violated, when an ambulance was not called for a condition which was not an emergency and for which no emergency was apparent.

**C. No Policy or Custom Has Been Identified**

The Second Report reaches its systemic-failure conclusion by combining the conduct of Warnke, Crabtree, Turn Key LPN Unruh, Turn Key APRN Carey, and Turn Key itself. [Dkt. 206, p. 13]. It acknowledges that the last three are not employees of the Sheriff. [Dkt. 20, p. 13, fn. 5]. The Second Report appears to attribute their conduct to the

Sheriff by stating that Turn Key employees "worked under a contract the Sheriff approved." [Dkt. 206, p. 13, fn. 5]. Approving a contract with a company to provide medical services to the jail is not implementing a policy to direct the medical providers' clinical decisions. Under *Crowson*, only the acts of employees acting pursuant to municipal policies and customs are aggregated for systemic liability purposes. *Crowson*, 983 F.3d at 1191. The Second Report identifies no policy or custom of the Sheriff that directed LPN Unruh not to re-examine May or directed APRN Carey to determine a follow-up visit was not needed for ninety (90) days. Those were the providers' own clinical decisions. Adding them to the conduct of the Sheriff's employees converts *Monell* liability into vicarious liability for a contractor's medical judgment, which § 1983 does not permit. *See generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

The collective conduct of Warnke and Undersheriff Crabtree does not establish a systemic failure either. If Plaintiff's allegations are true, Warnke and Undersheriff Crabtree violated the Sheriff's policies rather than acting pursuant to them. There was no written policy of the jail which permitted denying access to medical or mental health care. Nor is there any evidence in the Second Report or in the record of the Sheriff having an established custom of being deliberately indifferent to the medical needs of inmates or the needs of those with Alzheimer's. Plaintiffs have not pointed to a single other incidence of an inmate or pre-trial detainee being denied medical care in the jail. There can simply be no systemic failure under *Crowson* if the employees were not acting pursuant to a municipal policy or custom. The systemic failure claim therefore fails.

### D. No Evidence of Deliberate Indifference by the Sheriff

Finally, imposing municipal liability on the Sheriff requires that Plaintiffs prove a prior pattern of constitutional violations that put the policymaker on notice that his policies or customs would result in a constitutional violation. *Schneider, supra,* 717 F.3d at 770; *George, supra,* 32 F.4th at 1253. A single incident does not satisfy this unless it was caused by a pre-existing unconstitutional policy adopted or maintained by a policymaker with deliberate indifference to the inevitable result. *Id. See also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985). The Second Report cites no prior incident, complaint, or lawsuit involving the Custer County Jail and allegations of deliberate indifference to the serious medical needs of inmates or detainees. [Dkt. 206]. The only notice which it mentions is knowledge officials acquired *during* May's detention, not before it. That is the incident itself, not prior notice. *See Burke v. Regalado*, 935 F.3d 960, 1000 (10th Cir. 2019) (auditors warning the sheriff about understaffing, inadequate training, and poor follow-up on at least four occasions over four years constituted prior notice, yet the sheriff made no changes after that notice, which established liability based on notice). Nothing even remotely comparable exists here. The Sheriff could not possibly have been deliberately indifferent to the risk his policies or customs would result in a constitutional violation because he had no notice of any previous violations which occurred under those policies or customs.

## CONCLUSION

The Second Report does not identify a constitutional violation by any employee of the Sheriff, a training or supervisory deficiency that caused one, a policy-driven denial of

access to care, or that the Sheriff had prior notice that his policies, customs, training, or supervision were deficient and likely to result in a constitutional violation. The Sheriff therefore respectfully requests that this Court reject the findings, conclusion, and recommendations in the Second Report and Recommendation [Dkt. 206], and grant summary judgment to the Sheriff on the 42 U.S.C. § 1983 deliberate indifference claim against him in his official capacity.

Respectfully submitted,

s/ Jordan L. Miller
Jordan L. Miller, OBA No. 30892
COLLINS, ZORN & WAGNER, PLLC
429 N.E. 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
E-mail: jlm@czwlaw.com

***ATTORNEY FOR DEFENDANTS SHERIFF OF CUSTER COUNTY, IN HIS OFFICIAL CAPACITY, AND JULIE WARNKE***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2026, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Daniel E. Smolen
Robert M. Blakemore
Bryon D. Helm
SMOLEN & ROYTMAN
701 S. Cincinnati Avenue
Tulsa, OK 74119
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryonhelm@ssrok.com
***Attorneys for Plaintiffs***

Vanessa O. Martinez
Sean P. Snider
Anthony C. Winter
JOHNSON HANAN VOSLER
HAWTHORNE & SNIDER
9801 N. Broadway Ext.
Oklahoma City, OK 73114
(405) 232-6100
vmartinez@johnsonhanan.com
ssnider@johnsonhanan.com
awinter@johnsonhanan.com
***Attorneys for Turn Key Clinics, LLC, and Tamara Carey, APRN, and Stacia Unruh***

s/ Jordan L. Miller
Jordan L. Miller